# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ST. MICHAEL'S MEDIA, INC., | Case No. _____ |
| Plaintiff, | |
| v. | **PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION** |
| THE CITY OF BALTIMORE, *et al.*, | |
| Defendants. | |

Plaintiff St. Michael's Media, Inc. requires a temporary restraining order against Defendants The City of Baltimore, James Shea, and Mayor Brandon M. Scott (collectively, "Defendants"). St. Michael's Media seeks a temporary restraining order and preliminary injunction requiring Defendants to instruct Royal Farms Arena, the company with which St. Michael's entered into contracts to conduct its rally at its chosen location, to honor its contractual relationships with St. Michael's, and preventing Defendants from interfering with St. Michael's preparations for and conducting its rally. This Motion is made pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1.0 INTRODUCTION

Plaintiff St. Michael's Media is an organization dedicated to the promotion of conservative Catholic values and ideology. For many years, it has been in conflict with the mainstream Catholic Church, including the United States Conference of Catholic Bishops (the "USCCB"), and has criticized what they perceive as shortcomings of the mainstream Church, including covering up reports of sexual abuse by priests, and their perceived betrayal of traditional Catholic values. To voice its views, St. Michael's held a rally in 2018 during the USCCB General Assembly, in Baltimore, Maryland. The event went off without a hitch, and the entire event was peaceful. The only thing disturbed was the desire of the USCCB to operate without dissent.

When the USCCB announced that it would return to Baltimore in 2021, St. Michael's Media began organizing a repeat of this peaceful vigil. Everything was on track for this plan to go forward

until Defendants suddenly canceled St. Michael's contracts with the venue. Defendant James Shea lied about the reasons for this decision – claiming that St. Michael's was involved in the January 6 events at the Capitol in Washington – which they took no part in, and no credible report exists that says they did. In reality Defendants canceled the rally because they favored the views of the USCCB.

Defendants violated St. Michael's First Amendment rights. St. Michael's Media is entitled to an immediate temporary restraining order and preliminary injunctive relief, requiring Defendants to restore the *status quo ante* – requiring the venue to honor its contractual agreement with St. Michael's Media and for the City Government defendants to cease all further interference with St. Michael's making preparations for and conducting its rally.

## 2.0   STATEMENT OF RELEVANT FACTS

St. Michael's Media is a registered 501(c)(3) nonprofit organization formed under the laws of Michigan that publishes news stories about societal issues and a particular focus on the Catholic Church. (Compl. ¶ 3.) St. Michael's often criticizes the current leadership of the Church, *inter alia* in regard to the perception of corruption in the Church and claims that the Church protects priests and other church officials responsible for the sexual abuse of minors. (*Id.* at ¶ 7.)

The United States Conference of Catholic Bishops (the "USCCB") is scheduled to conduct its Fall General Assembly from November 15-18, 2021, at the Baltimore Waterfront Marriott. (*Id.* at ¶ 8.) Numerous bishops and other high-ranking Catholic Church leaders will be in attendance. (*Id.*)

On June 16, 2021, St. Michael's Media prepared to hold a rally at the MECU Pavilion in Baltimore on November 16, 2021, titled the "Bishops: Enough is Enough Prayer Rally." (*Id.* at ¶ 9.) The MECU Pavilion is directly adjacent to the Waterfront Marriott Hotel. (*Id.*) St. Michael's Media entered into valid contractual relationships with Royal Farms Arena ("Royal Farms"), the contract agency hired by the City of Baltimore to manage events at the MECU Pavilion. (*Id.*) St. Michael's chose this time and location for its rally specifically because it would take place at the same time and immediately adjacent to the USCCB Fall General Assembly. (*Id.* at ¶ 10.) The purpose of the rally is to engage in protected speech criticizing elements of the power structure of the Catholic Church in a

situation where the speech would reach the Church's leadership. (*Id.*) St. Michael's rally is also planned to include praying the Rosary, and thus will be an explicitly religious demonstration. (*Id.* at ¶ 11.)

St. Michael's Media held this same kind of rally, at the same location and also coinciding with the USCCB's Fall General Assembly, in November 2018. (*Id.* at ¶ 12.) The City of Baltimore permitted St. Michael's to hold this rally, and no individuals or property was harmed during this rally. (*Id.*) The only thing that was disturbed was the USCCB's desire to operate without being questioned.

Prior to August 5, 2021, Royal Farms did not indicate there would be any problems with the rally. (*Id.* at ¶ 13.) Relying on Royal Farms's acceptance of the rally, St. Michael's paid a $3,000 deposit. (*Id.*) St. Michael's then spent weeks communicating with Royal Farms regarding the logistics of the rally. (*Id.*) St. Michael's also began publicly promoting the rally, resulting in thousands of reservations and booking over a dozen speakers to discuss topics of interest to rally-goers. (*Id.*)

On August 5, 2021, however, Royal Farms notified St. Michael's that the rally had been canceled. (*Id.* at ¶ 14.) It provided no explanation for this development and told St. Michael's to contact Defendant Shea for additional information. (*Id.*)

On August 6, 2021, St. Michael's CEO, Michael Voris, spoke with Defendant James Shea regarding the cancellation of the November 16 rally. (*Id.* at ¶ 15.) Shea told Mr. Voris that his office received reports that St. Michael's had "ties to the January 6 [2021] riot" at the Capitol building in Washington, D.C. (*Id.*) Mr. Voris immediately told Shea that this was categorically false and asked for the source of any such reports. (*Id.*) Shea responded that he had not found any such reports himself, but that unspecified "people" had told him such reports were "widely available on the internet." (*Id.*) Such reports are not "widely available." (*Id.*) In fact, no one has <u>ever</u> accused St. Michael's of being involved in any capacity with the January 6 riot. (*Id.* at ¶ 16.) No one could reasonably come to the conclusion that such reports existed, and no one ever told Shea that such reports existed. (*Id.*)

After Mr. Voris explained to Shea how this allegation was completely false, Shea changed his tune. He then claimed that his office conducted a risk assessment and determined that St. Michael's Media posed a "risk of violence," including potential property damage, and a threat to safety at the

- 3 -
Motion for Temporary Restraining Order and Preliminary Injunction

MECU Pavilion while the USCCB's Fall General Assembly was going on.  (*Id.* at ¶ 17.)  He then explained that he had exercised his authority to instruct Royal Farms to cancel its contract with St. Michael's.  (*Id.*)  He also mentioned that the proximity of the MECU Pavilion to high-scale properties in Maryland was a factor in deciding to cancel the rally.  (*Id.*)  Mr. Voris asked Shea for any evidence of reports about St. Michael's involvement in the January 6 riot, but Shea refused to provide any such evidence.  (*Id.* at ¶ 18.)  Mr. Voris told Shea that St. Michael's had safely held a rally for the same purpose and in the same circumstances in 2018.  Shea only responded "well, a lot has changed in three years."  (*Id.* at ¶ 19.)  The Constitution has not changed in those intervening years.

Shea has close ties to the USCCB.  (*Id.* at ¶ 20.)  Mr. Voris asked Shea during this call whether anyone from or related to the USCCB had asked him to cancel the November 16 rally.  (*Id.*)  Shea responded: "I can neither confirm nor deny that."  (*Id.*)  Shea did not offer any accommodations to St. Michael's.  (*Id.* at ¶ 21.)  Shea repeatedly stated during this call that he had the authority to decide to cancel St. Michael's contract with Royal Farms, and that he did in fact exercise this authority to cancel the contract.  (*Id.* at ¶ 22.)  After this conversation, St. Michael's continued to attempt to resolve its dispute with Defendants informally, concluding with a demand letter it sent on August 27, 2021, giving Defendants until September 3, 2021, to allow the rally to go forward.  (*Id.* at ¶ 23.)  Defendants ignored this demand.  (*Id.* at ¶ 24.)

Shea did not provide any prior notice of his decision to cancel St. Michael's contract.  (*Id.* at ¶ 25.)  There are no official means of challenging Shea's decision to cancel St. Michael's contract, nor did Shea provide any informal means for doing so.  (*Id.* at ¶ 26.)  Mr. Voris asked Shea what criteria he used in deciding to cancel St. Michael's contract, but Shea refused to provide this information.  (*Id.* at ¶ 27.)  Shea could not have engaged in any kind of investigative or fact-finding process before deciding to cancel St. Michael's contract.  (*Id.* at ¶ 28.)  No one could have told Shea, with a scintilla of credibility that there was a true risk of violence.  (*Id.* at ¶ 29.)  The sole reason Royal Farms refuses to fulfill its contractual obligations with St. Michael's is because Defendants canceled the contract.  (*Id.* at ¶ 32.)  Defendants did so because of the Plaintiff's content and viewpoint they planned to express at the rally.

The entire purpose of the November 16 rally is to communicate the ideas of St. Michael's members and attending speakers to the USCCB in a format and in a venue that they cannot ignore. (*Id.* at ¶ 33.)  Conducting the rally at a different time or in a different place would completely neuter the expressive elements of the rally.  (*Id.*)  Similarly, praying the Rosary, a traditional Catholic series of prayers, will be significant at the rally because of the proximity to the USCCB, as it will express the rally-goers' refutation of the USCCB claim to un-challenged legitimacy.  (*Id.* at ¶ 34.)  Conducting the rally at a different time or place would neuter the religious significance of the rally.  (*Id.*)

St. Michael's Media has been harmed, and will continue to be harmed, by Shea's unconstitutional actions.  (*Id.* at ¶ 35.)  St. Michael's has expended significant sums of money in purchasing and moving equipment for the rally and entering into other contractual relationships in anticipation of it.  (*Id.*)  It will not be possible for St. Michael's to recoup all of these costs if the rally does not go forward.  (*Id.*)  St. Michael's also will not be able to conduct its rally unless emergency injunctive relief to restore the status quo ante is granted.  (*Id.* at ¶ 36.)  The November 16 rally is intended to be large, with thousands of attendees.  (*Id.*)  Preparing for it requires St. Michael's not only to expend significant sums of money, but also to enter into contracts with third parties, including but not limited to guest speakers and audio-visual equipment providers.  (*Id.*)  St. Michael's is not able to make these preparations while Defendants' position is that St. Michael's chosen venue is unavailable for the event.  (*Id.*)  If it remains unclear by September 20, 2021, whether Defendants will allow St. Michael's rally to go forward, it is extremely unlikely St. Michael's will have sufficient time to make arrangements for the rally, meaning delay in granting injunctive relief will have the effect of cancelling it.  (*Id.*)  Relief on or before Sept. 20 is imperative.

Beyond this, thousands of rally-goers also purchased plane tickets and made hotel reservations in anticipation of the rally, many of which expenses cannot be recouped or refunded.  (*Id.* at ¶ 37.) St. Michael's reputation will be harmed if these rally-goers end up having wasted their money due to Shea's unconstitutional actions.  (*Id.*)  St. Michael's good-will among the general public will also be further harmed if the rally remains canceled, as the purported justification for this cancellation is Shea's patently false claim that St. Michael's was involved in the January 6 riot and poses a risk of violence.

(*Id.* at ¶ 38.) These allegations are fundamentally incompatible with St. Michael's views, message, and public image. (*Id.*)

## 3.0 LEGAL STANDARD

Rule 65 of the Federal Rules of Civil Procedure provides for temporary restraining orders and preliminary injunctions in federal courts upon notice to the adverse party. *See* Fed. R. Civ. P. 65(a) and (b). A temporary restraining order or preliminary injunction must (1) state the reasons why it issued; (2) state its specific terms; and (3) describe in reasonable detail the act or acts restrained or required. Fed. R. Civ. P. 65(d). The principal function of a temporary restraining order or preliminary injunction is to maintain the status quo. *See Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). However, injunctive relief can also be used to restore, rather than merely preserve the status quo, even when the nonmoving party has disturbed it. *See Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012).

The Supreme Court of the United States articulated a four-part standard for issuance of injunctive relief: (1) that plaintiff is likely to succeed on the merits; (2) that plaintiff is likely to suffer irreparable harm if the injunction did not issue; (3) that the balance of equities tips in plaintiff's favor; and (4) the injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

## 4.0 LEGAL ARGUMENT

### 4.1 St. Michael's Media is Likely to Succeed on the Merits of its Claims

St. Michael's Media asserts three claims for relief under 42 U.S.C. § 1983 for violation of the First Amendment to the U.S. Constitution: Namely (1) freedom of speech; (2) free exercise of religion; and (3) freedom of assembly. St. Michael's is likely to succeed on all three claims.

#### 4.1.1 Free Speech Claim

St. Michael's anticipates Defendants will attempt to characterize their conduct as a content-neutral time, place, and manner restriction, as they did not make reference to the content of St. Michael's speech in canceling St. Michael's rally. Content-neutral time, place, and manner restrictions are subject to intermediate scrutiny, meaning they must be "narrowly tailored to serve a

significant government interest, and … leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

This argument is not well-taken, as Defendants' restriction is clearly content-based. The only reason they canceled the rally is due to the content of St. Michael's speech, namely, speech that is critical of the USCCB made in such a way that USCCB members could not ignore it. A restriction on speech is content-based when it either seeks to restrict, or on its face restricts, a particular subject matter. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Any restriction on speech based on the message conveyed is presumptively unconstitutional. *See Turner Broadcasting System, Inc., v. FCC*, 512 U.S. 622, 641-43 (1994). This presumption becomes stronger when a government restriction is based not just on subject matter, but on a particular viewpoint expressed about that subject. *See R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992). The government cannot be allowed to impose restrictions on speech where the rationale for the restriction is the opinion or viewpoint of the speaker. *See Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983). A content-based restriction on speech, whether or not described as a time, place, and manner restriction, must satisfy strict scrutiny, meaning it furthers a compelling government interest and it is narrowly tailored to achieve that interest. *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011).

Defendants' restriction is both content-based and viewpoint-based. The only reason it is not allowed to hold its rally at the MECU Pavilion on November 16 is because of the content of the speech at the rally. Indeed, Defendants' problem with St. Michael's speech is with its specific viewpoint that criticizes the USCCB. If the rally was being held by an organization allied with the USCCB and that would be praising that organization, Defendants would have no issue with it. Defendants' restriction must satisfy strict scrutiny, which it has no chance of doing.

In a generic sense, the government has a legitimate interest in ensuring public safety. However, this interest is not furthered in any way by not allowing St. Michael's to hold its rally. Defendants never received any information that could possibly lead them to believe St. Michael's is in any way violent or that allowing the rally to go forward would even potentially lead to any violence.

Defendants' restriction is not narrowly tailored either, as allowing St. Michael's to hold its rally at a different time or in a different place would make St. Michael's speech ineffective for its intended purpose. For these same reasons, Defendants' restriction fails to pass intermediate scrutiny as well.

### 4.1.2   Free Exercise Claim

St. Michael's Second Claim for Relief is brought pursuant to the First Amendment's Free Exercise Clause. Under this clause, the government may not prohibit "the free exercise of religion." U.S. Const. *amend. I*. It is a fundamental principle of the nation's free exercise jurisprudence that laws imposing special disabilities on the basis of religious status trigger the strictest scrutiny. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, – U.S. –, 137 S. Ct. 2012, 2015 (2017). This standard "demands a state interest 'of the highest order' to justify the policy at issue." *Id.* at 2016 (*quoting McDaniel v. Paty*, 435 U.S. 618, 628 (1978)).

Ordinarily, a plaintiff asserts a successful free exercise claim if it alleges that: (1) its proffered beliefs are sincerely held; and (2) its claims are rooted in religious belief and not on purely secular philosophical concerns. *See Walker v. Beard*, 789 F.3d 1125, 1128 (9th Cir. 2015) (*quoting Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994)). The Free Exercise Clause is applicable to the states by incorporation into the Fourteenth Amendment. *See Employment Div. v. Smith*, 494 U.S. 872, 876-77 (1990) (*citing Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)).

The First Amendment excludes all "governmental regulation of religious beliefs." *Sherbert v. Verner*, 374 U.S. 398, 402 (1963). The First Amendment prohibits the government from: (1) compelling affirmation of religious belief (*Torcaso v. Watkins*, 367 U.S. 488 (1961)); (2) punishing the expression of religious doctrines it believes to be false (*U.S. v. Ballard*, 322 U.S. 78, 86-88 (1944)); (3) imposing restrictions on the basis of religious views or religious status (*McDaniel*, 435 U.S. 618; *Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953)); and (4) lending its power to one side in a controversy over religious authority or dogma (*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U.S. 440, 445-452 (1969)).

If federal and state governments are to "respect the Constitution's guarantee of free exercise, [they] cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot

act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, – U.S. –, 138 S. Ct. 1719, 1731 (2018). In fact, the Free Exercise Clause "bars even 'subtle departures from neutrality' on matters of religion." *Id.* (*quoting Church of Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 534 (1993)). The Constitution "commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and the rights in secures." *Church of Lukumi Babalu Aye*, 508 U.S. at 547.

The First Amendment guarantees "that our laws [will] be applied in a manner that is neutral toward religion." *Masterpiece Cakeshop*, 138 S. Ct. at 1732. Factors relevant to the assessment of government neutrality include "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision making body." *Church of Lukumi Babalu Aye*, 508 U.S. at 540. The government "has no role in deciding or even suggesting whether [a religious belief] is legitimate or illegitimate." *Masterpiece Cakeshop*, 138 S. Ct. at 1731.

The analysis here is similar to the free speech analysis. There is no legitimate justification for Defendants not allowing St. Michael's rally to go forward, as the rally does not present any reasonable threat of violence, and any claims to the contrary are entirely pretextual. Instead, Defendants are affirmatively taking a side in a dispute between the USCCB, a religious organization, and a religious demonstration that is critical of the USCCB. St. Michael's has differing religious views from USCCB and regularly provides criticism of its practices and beliefs. By allowing the USCCB Fall General Assembly to go forward as scheduled while not allowing the rally to go forward, which will include religious observance, Defendants are favoring one religious group over another. In doing so, Defendants are substantially burdening the religious practices of St. Michael's and its rally-goers. This is directly violative of the Free Exercise Clause and Defendants have no justification for this conduct. St. Michael's is likely to prevail on the merits of this claim.

### 4.1.3 Establishment Clause Claim

Just as Defendants have violated St. Michael's rights under the Free Exercise Clause, they have also violated the Establishment Clause. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). "[W]hen we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." *Id.* at 246. The Supreme Court has repeatedly established that "no State can 'pass laws which aid one religion' or that 'prefer one religion over another.'" *Valente*, 456 U.S. at 246 (quoting *Everson v. Board of Education*, 330 U.S. 1, 15 (1947)). The "government must be neutral when it comes to competition between sects." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952). "The First Amendment mandates governmental neutrality between religion and religion … The State may not adopt programs or practices … which 'aid or oppose' any religion … This prohibition is absolute." *Epperson v. Arkansas*, 393 U.S. 97, 104, 106 (1968). "[O]ne of the greatest dangers to the freedom of the individual to worship in his own way lay[s] in the Government's placing its official stamp of approval upon one particular kind of prayer …." *Engel v. Vitale*, 370 U.S. 421, 429 (1962).

St. Michael's is a vocal critic of the mainstream Catholic Church, including the USCCB. It disagrees with, and criticizes, a number of the USCCB's positions on religious doctrine and morality, as well as the Catholic Church's likely criminal conduct in covering up the sexual abuse committed by its priests. By canceling St. Michael's rally for no reason other than having distaste for St. Michael's religious beliefs and speech, while allowing the USCCB's Fall General Assembly to go on unhindered, Defendants have clearly expressed a governmental preference for one religious doctrine over another. There is no justification for this disparity in treatment other than the government's preference for the USCCB's religious beliefs and practices. This is unquestionably prohibited under the Establishment Clause, and St. Michael's has a strong likelihood of prevailing on this claim.

### 4.1.4 Right of Assembly Claim

"The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental … The First Amendment of the Federal Constitution expressly guarantees that

right against abridgment by Congress." *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937). "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Ala. Ex rel. Patterson*, 357 U.S. 449, 460-61 (1958). "From the [nation's] outset, the right of assembly was regarded not only as an independent right but also as a catalyst to augment the free exercise of the other First Amendment rights with which it was deliberately linked by the draftsmen." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577 (1980). Accordingly, the Supreme Court has applied the test for time, place, and manner restrictions in freedom of assembly cases. *See id.* at 578; *see also Cox v. New Hampshire*, 312 U.S. 569, 576 (1941).

The analysis as to the merits of this claim is thus largely identical to the analysis of St. Michael's freedom of speech claim. It is a content and viewpoint-based restriction on protected speech, which is amplified by having thousands of individuals peaceably assemble to express their criticism of the USCCB and engage in religious observance.

### 4.2 St. Michael's Media Has Been Irreparably Injured.

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). When a plaintiff seeks injunctive relief for "an alleged violation of First Amendment rights, a plaintiff's irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Assn'n of Club Owners and Fraternal Srvs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). Thus, if the plaintiff can show a likelihood of success on the merits of its First Amendment claim for relief, injunctive relief must issue.

In this case, Defendants deprived St. Michael's of its First Amendment rights on August 5, 2021. On that date, St. Michael's was informed that it would not be permitted to hold its November 16 rally at the MECU Pavilion. When St. Michael's asked Shea why its rally had been canceled, Shea provided numerous evasive answers and false justifications, and refused to provide any evidence on which he relied in making this decision. In reality, Defendants canceled the rally because they were

instructed to do so by the USCCB and did not want to allow the existence of any speech or religious practice that might offend them.

Defendants' decision to cancel the St. Michael's rally constitutes a deprivation of St. Michael's First Amendment rights. St. Michael's respectfully requests that the Court issue injunctive relief to restore the status quo that existed before Shea canceled the November 16 rally. This Motion must be granted.

Moreover, St. Michael's will additionally be irreparably injured due to the immediate loss of goodwill with rally-goers and the general public if its rally remains canceled based on the patently false claim that it was involved in the January 6, 2021, riot and poses a risk of violence. St. Michael's is entitled to immediate injunctive relief.

### 4.3  The balance of equities tips in Plaintiff's favor.

When balancing equities, courts must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding" of injunctive relief. *Winter*, 555 U.S. at 24. In other words, the Court must determine whether the harms faced by the plaintiff in the absence of an injunction outweigh the potential harm to the defendant if the injunction is issued. *See Mt. Valley Pipeline, LLC v. Western Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019).

Here, the balance of equities tips in St. Michael's favor. Failing to grant the requested injunction will continue to deprive St. Michael's of its rights pursuant to the First Amendment of the United States Constitution. And, the requested relief must be granted by September 20, 2021, or the irreparable harm will set in, indelibly. Meanwhile, Defendants will suffer no harm if St. Michael's is granted the requested injunctive relief. Rather, an injunction will merely restore the rights guaranteed by the U.S. Constitution. Indeed, the only entity that may potentially be harmed by allowing the rally to go forward is the USCCB, and its "harm" will simply be from having to hear views it does not like. A temporary restraining order, to be converted into a preliminary injunction, must issue.

### 4.4  Injunctive relief is in the public interest.

Finally, injunctive relief is in the public interest. Generally, the public interest "favors protecting First Amendment rights." *Kelly v. City of Parkersburg*, 978 F. Supp. 2d 624, (S.D.W.V. 2013);

*see also Carey v. FEC*, 791 F. Supp. 2d 121, 135-36 (D.D.C. 2011); *Mullin v. Sussex Cnty., Del.*, 861 F. Supp. 2d 411, 428 (D. Del. 2012). Moreover, the unconstitutional regulation being enforced by Defendants in this case has the potential to harm nonparties to the case because it will limit or infringe upon the rights granted to them by the First Amendment of the United States Constitution as well. *See Wolfe Fin. Inc. v. Rodgeres*, 2018 U.S. Dist. LEXIS 64335, at *49 (M.D.N.C. April 17, 2018) (*citing McCarthy v. Fuller*, 810 F.3d 456, 461 (7th Cir. 2015)).

St. Michael's Media has shown that its First Amendment rights are being infringed and that the public interest favors protecting those rights. Moreover, the public has an interest in being further informed of the various forms of misconduct committed by the USCCB. The public interest clearly favors the issuance of the injunctive relief requested by St. Michael's.

### 4.5 At Most, a Minimal Bond Should be Required.

Rule 65 of the Federal Rules of Civil Procedure provides that a court cannot enter injunctive relief unless the moving party "gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In other words, a bond should only be required if the enjoined party will suffer any harm from the issuance of the injunction. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 285 (4th Cir. 2002).

Defendants will suffer no damages if the Court issues the requested injunction, which will simply allow St. Michael's to conduct its peaceful rally. All that the injunction will do is repair the *status quo* and allow St. Michael's to exercise its First Amendment rights. For this reason, St. Michael's requests that the injunction issue with no bond required. If a bond is required, St. Michael's requests that it be minimal and no more than $500.00.

### 5.0 CONCLUSION

For each and every reason referenced in this Motion, Plaintiff St. Michael's Media respectfully requests that this Court issue a temporary restraining order, to be converted into a preliminary injunction, requiring Defendants to instruct Royal Farms Arena to fulfill its contractual obligations with St. Michael's and enjoining Defendants from interfering with St. Michael's preparing for and

conducting its November 16, 2021, rally at the MECU Pavilion. As shown above, Plaintiff is likely to prevail on the merits of its claims and is being irreparably injured. The balance of equities tips in St. Michael's favor, and an injunction is in the public interest. Because Defendants will not be injured by the issuance of injunctive relief, a bond should not be required. However, if a bond is required, it should be minimal.

St. Michael's Media will make all reasonable efforts to notify Defendants of this request for a temporary restraining order as soon as possible, and will file a certificate of service notifying the court of such efforts.

Dated: September 13, 2021           Respectfully Submitted,

/s/ David S. Wachen
David S. Wachen (Bar No. 12790)
WACHEN LLC
11605 Montague Court
Potomac, MD 20854
(o) (240) 292-9121
(f) (301) 259-3846
david@wachenlaw.com

Marc J. Randazza (*pro hac vice* pending)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, Nevada 89117
Tel: (702) 420-2001
Email: ecf@randazza.com

Attorneys for Plaintiff
St. Michael's Media, Inc.