# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ST. MICHAEL'S MEDIA, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE CITY OF BALTIMORE, *et al.*, <br><br> Defendants. | Case No. 1:21-cv-02337-ELH <br><br> **DECLARATION OF MICHAEL VORIS** |

I, MICHAEL VORIS, declare:

1.  I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty. I have first-hand knowledge of the facts set forth herein, and if called as a witness could and would testify competently thereto.

2.  I am the Chief Executive Officer of Plaintiff St. Michael's Media, Inc.

3.  On Friday, August 6, 2021, I had a phone call with James Shea, Solicitor for the City of Baltimore. It began at 10:57 a.m. and lasted 21 minutes.

4.  Our studio was instructed to call him by Teresa Waters, our contact at the management company, Royal Farms Arena, the contract agency hired by the city of Baltimore to manage events at the MECU Pavilion, where our rally was scheduled to take place.

## BACKGROUND

5.  We had first contacted the pavilion on June 16, 2021, via phone, regarding renting the space/facility for a prayer rally on November 16, 2021 — to deliberately coincide with the annual U.S. bishops' meeting held at the Baltimore Waterfront Marriott Hotel, immediately next door to the MECU.

6.  We had done the exact same thing at the exact same facility dealing with the exact same agency in November 2018 — also to deliberately coincide with the annual meeting of the bishops at the same Marriott.

DocuSign Envelope ID: EBD4D555-7926-4A98-95E8-71D0D215E710

7. After some correspondence, we once again secured the facility and wired a deposit of $3,000 which was accepted and deposited to the account.

8. Cordial and friendly conversations ensued and continued over the following weeks related to coordinating efforts for production/live streaming of the event and dates to meet with vendors/suppliers for needed preparation.

9. We had one particular discussion about expanding the "public admission" hours because of the enormous and enthusiastic response we received from the public.

10. On June 23, 2021, we began a series of public promotions for the prayer rally and had secured over 2,000 reservations in a little over two weeks of promotion.

11. We also organized approximately 16 speakers from around the country who agreed to add their voices to the cause — specifically demanding accountability from the U.S. bishops for their sins/crimes of child sex abuse and ongoing cover-up, financial malfeasance and overall immorality.

12. The MECU only has an indoor capacity of approximately 3,000, so in just roughly two weeks, we had already filled two-thirds of the seats.

13. Word spread quickly in faithful Catholic circles as well as politically conservative groups that the prayer rally was occurring and filling up fast.

14. On Thursday, August 5, 2021, we received an email from Teresa Waters saying the event had been canceled. No explanation was given.

15. Completely befuddled, we reached out to Ms. Waters the next day via email, asking what was going on. We received an email response from her stating, "I have been told to direct you to the Baltimore City Solicitor James Shea for additional information on this matter. Please find his contact below."

16. We immediately called Mr. Shea, first on his cell phone, which went to voicemail, and then called his office.

17. A receptionist answered, took my information and transferred me to Mr. Shea.

**PHONE EXCHANGE**

DocuSign Envelope ID: EBD4D555-7926-4A98-95E8-71D0D215E710

18. After exchanging greetings, I explained the purpose of my call (to discern the reason for the cancelation of our prayer rally), at which point Mr. Shea told me that his office had received reports that our outfit (St. Michael's Media/Church Militant) had "ties to the January 6th riot" at the Capitol in Washington, D.C.

19. I expressed astonishment and asked him the source of these reports. He told me he was not very proficient on the internet, but that "people" had relayed to him that there were reports widely available on the internet expressing this.

20. I immediately told him whatever he was being told was completely untrue; that this organization had absolutely no involvement in the events that transpired in Washington, D.C. that day and further, that we had electronic proof (video and employee scan cards) that our staff was here in Detroit.

21. I further told him that the staff, including me, watched those happening unfold LIVE on TV in real time, as did the rest of the nation; that we had no advance knowledge of them; had not helped organize them; and had not participated in them.

22. I told him, again, that whatever he was being told was untrue.

23. He then went on to say that in his office's risk assessment, Church Militant posed a "risk of violence" and a threat to safety at the MECU while the bishops' meeting was going on.

24. He went further and elaborated that in his assessment, the risk of violence, such as property damage, was too great for him to permit the event and he had canceled it, instructing the Royal Farms Arena to cancel our existing contract.

25. Royal Farms Arena returned the $3,000 deposit via check, which we have not cashed.

26. He elaborated that since that specific area was right next to the harbor and there are high-scale properties there, that that was also a factor.

27. I then went into some detail with him about the purpose of the rally: to pray for and call out the bishops.

DocuSign Envelope ID: EBD4D555-7926-4A98-95E8-71D0D215E710

28.    I told him as well that we had organized the same, nearly identical type event three years earlier.  His direct response to that was: "Well, a lot has changed in three years."  I responded, "Not with us it hasn't."

29.    He remained unmoved, unwilling to provide anything specific other than repeated references to vague "internet reports" associating us with the violence of Jan. 6 in D.C.

30.    When I asked if he could forward me a link to just one of the reports, he demurred, repeating that he isn't very good with the internet.

31.    At one point, I said to him plainly, "No one would want our event cancelled except the U.S. bishops.  No one would profit from it or have a motive.  Did you receive a communication from anyone in the USCCB (U.S. Conference of Catholic Bishops) or anyone related to them asking you to cancel the event?"

32.    His response was: "I can neither confirm nor deny that."

33.    I responded, "Well, you just answered the question."

34.    We went back and forth on the core question (in his determination) that we posed a "danger," or "threat of violence" owing to our "reported" involvement in Jan. 6.

35.    Mr. Shea stuck to his position, refusing to budge that it was his call, and he was exercising his authority to cancel our event, having determined our presence at the MECU on that day posed a "risk of violence."

36.    He even noted he was only talking about that particular location on that day; that he was not necessarily restricting our ability to hold our rally in other city locations or on any other days.

37.    I thought that was an extremely odd position to stake out precisely because the sole reason we had been denied the permit for this event was because in his assessment, we posed a "risk of violence."

38.    I asked him, somewhat rhetorically: If we pose a risk of violence on that end of the street, why would we not pose the same risk of violence on the opposite end of the street?

39.    He replied vaguely, "All I'm going to discuss is this event at this location."

DocuSign Envelope ID: EBD4D555-7926-4A98-95E8-71D0D215E710

40. While the call was cordial enough, it was extremely frustrating listening to an unaccountable agent of the state simply deflect and provide nonsubstantive answers about the sources of the false and inflammatory claims, as well as the claims themselves.

41. He refused to divulge any of the actual reports and likewise who outside his office had alerted him to them, or who on his staff had brought them to him.

42. He repeated that it was within his authority to "make the call" and that he had made it.

43. We wrapped up the call, again cordially, but with me thinking we had been railroaded.

44. He provided absolutely no proof, sources or even the alleged reports. As well, he provided no opportunity for me to refute anything he had been told.

45. When I asked him toward the end of the call, why — when they were told we were supposedly connected to Jan. 6 — he didn't simply pick up a phone and call me, he said, "We don't work like that. When we receive what we consider credible threats, we act."

46. I asked him what criteria they use to determine if a threat is credible. He deflected, saying he didn't want to get into that.

47. In my opinion, the entire conversation, initiated by me to discover what happened, was an exercise in futility and frustration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 9/14/2021 .

DocuSigned by:

Michael Voris

DDD10EBB594E445...

Michael Voris