**UNITED STATES DISTRICT COUNT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| **ST. MICHAEL'S MEDIA, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Civil Action No.: 21-cv-02337 ELH** |
| **THE CITY OF BALTIMORE,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MAYOR AND CITY COUNCIL OF**
**BALTIMORE, BRANDON M. SCOTT, AND JAMES L. SHEA'S OPPOSITION TO**
**PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION**

Defendants, Mayor and City Council of Baltimore[1], Mayor Brandon M. Scott, and City Solicitor James L. Shea, (collectively and individually the "City") by undersigned counsel, submit this memorandum of law in support of their opposition to the Amended Motion for Preliminary Injunction filed by Plaintiff St. Michael's Media, Inc. a/k/a Church Militant ("Plaintiff" or "Church Militant") [ECF 15].  Plaintiff's Amended Motion for Preliminary Injunction ("Pl. Am. Mot") presents an incomplete statement of the law and facts at issue in this matter and fails to demonstrate a likelihood of success on the merits of this case.  Therefore, the City respectfully requests that the motion be denied.

---

[1] Plaintiff incorrected labeled the municipal defendant as the "City of Baltimore.  Pursuant to Balt. City Charter, Art. I, §1, the Mayor and City Council of Baltimore is the legal entity that may be sue or be sued.

i

Date:  September 23, 2021          Respectfully submitted,

*/s/ Renita L. Collins*

_____

RENITA L. COLLINS (#28637)
Chief Solicitor
HANNA MARIE C. SHEEHAN (#19531)
Chief Solicitor
Baltimore City Law Department
100 N. Holliday Street
City Hall Baltimore, MD 21202
Phone: 410-396-3930
Fax: 410-547-1025
Renita.Collins@baltimorecity.gov
Hanna.Sheehan@baltimorecity.gov
*Counsel for Defendant Mayor and City*
*Council of Baltimore, City Solicitor James L. Shea,*
*and Mayor Brandon M. Scott*

**TABLE OF CONTENTS**

I.      Introduction…………………………………………………………………......1

II.     Background…………………………………………………………………..1

III.    Plaintiff Has Failed to Meet the Factors Required for Injunctive Relief…………………9

    a.  The Status Quo is the Lack of a Contractual Relationship between Plaintiff
        and SMG………………………………………………………………. …………………10

    b.  Plaintiff is Not Likely to Succeed on the Merits……………………………………..10

        1.  Plaintiff's Free Speech Rights Are Not Abridged By the City's Action…….11

        2.  The City Did Not Violate Plaintiff's Right to Establish or Exercise
            Any Religion or Denomination…………………………………………...……22

        3.  The City Did Not Violate Plaintiff's Rights to Freedom of Assembly
            and Association………………………………………………………………...25

        4.  Plaintiff Has No Valid Contract with SMG…………………………………26

    c.  Plaintiff Will Not Suffer Immediate or Irreparable Injuries If the Injunction Is
        Not Granted……………………………………………………………………27

    d.  Granting a Preliminary Injunction Would Harm the Public Interest……………...29

    e.  The Balance of Equities Supports Denial of the Injunction…………………………30

IV.     If the Court is Inclined to Grant Plaintiff's Amended Motion for Preliminary
        Injunction, the City Respectfully Requests That Plaintiff Post Substantial Bond………31

V.      Conclusion…………………………………………………….………………………32

## I.      Introduction

Plaintiff seeks a preliminary injunction enjoining the City from any efforts "to stop St. Michael's from engaging in First Amendment protected activity, to honor the venue's contractual relationships with St. Michael's, to prevent [the City] from interfering with St. Michael's preparation for and conducting it's rally, and requiring specific performance by SMG of its contractual obligations to St. Michael's."  Pl. Am. Mot. 1.   However, Plaintiff's Amended Complaint and Amended Motion for Preliminary Injunction are flawed on their faces.   St. Michael's (which usually operates by the apt name "Church Militant") has no contract with SMG of which to demand specific performance and was never prevented by the City from engaging in a First Amendment protected activity.   As such, Plaintiff's claims fail because they lack any foundation or merit.

However, that will not be for lack of trying.   Plaintiff has pulled out all the stops, from seeking the enforcement of a non-existent contract with terms their own representative admitted were not agreed upon by the parties, to attributing a false and manufactured motive for the City's actions, to finally, and petulantly, calling the City Solicitor a "liar" several times simply because they did not get their way.   But, to no avail.   This "militant" group has not and cannot provide this Court with any legal reasons to grant it a preliminary injunction; therefore, its request must be denied.

## II.     Background

This case arises out of a dispute brought forth by Plaintiff regarding numerous alleged First Amendment violations and a breach of contract claim.   Plaintiff St. Michael's Media, Inc. seeks a preliminary injunction regarding the use of the MECU Pavilion (also known as Pier VI) on

November 16, 2021 for an event they have stylized as a "prayer rally" to protest alleged abuses by American Catholic Bishops.  The Mayor and City Council of Baltimore owns the MECU Pavilion but does not manage the operations of the venue.  SMG, a co-defendant in this matter, also known as Royal Farms Arena, manages the venue.  *See* Affidavit of Frank Remesch, attached hereto and incorporated herein as Exhibit 1 ("Remesch Aff.").

The events leading up to the current action are relatively straightforward.  In November 2018, Plaintiff held an event at Pier VI, which they state occurred without incident. Pl. Am. Mot. 3.  Wishing to hold this same event again, on or about June 16, 2021, Plaintiff began to negotiate terms for holding a similar event at Pier VI on November 16, 2021.  Pl. Am. Mot., Ex. 2, p. 36-39 of 39.  It is Plaintiff's assertion that this rally will be "peaceful" and that its purpose and location were designed to take place "at the same time and immediately adjacent to the United States Conference of Catholic Bishops ["USCCB" or "U.S. Bishop's"] Fall General Assembly."  Pl. Am. Mot. 3.  Notably, however, while the 2018 event had approximately 300 to 400 attendees,[2] the proposed 2021 event, according to Plaintiff, is projected to have approximately 3,000 people, nearly ten times the size of last year's gathering.  In preparation for the 2021 event, on or about June 22, 2021, Plaintiff wired a $3000 deposit to Royal Farms Arena to reserve the date while negotiations for the space were still ongoing. Pl. Am. Mot., Ex. 2, p. 32 and 36 of 39.  On or about July 14, 2021, Royal Farms Arena sent a draft contract to Plaintiff that included the statement "Please sign and return…for execution."  Pl. Am. Mot., Ex. 1; Pl. Am. Mot., Ex. 2, p. 30 of 39.  The contract was not signed or executed at this time, as Plaintiff continued to correspond with

---

[2] *See* David McFadden and David Crary, *Bishops weigh anti-abuse strategy after delay set by Vatican*, The Morning Call (Nov. 13, 2018), https://www.mcall.com/news/breaking/mc-nws-catholic-bishops-conference-abuse-strategy-20181113-story.html (last accessed Sept. 17, 2021); Michelle Boorstein, *The 2018 Catholic clergy sex abuse crisis brings new energy – and anti-gay activists – into the survivors' movement*, The Washington Post (Nov. 13, 2018), https://www.washingtonpost.com/religion/2018/11/13/catholic-clergy-sex-abuse-crisis-brings-new-energy-anti-gay-activists-into-survivors-movement/ (last accessed Sept. 17, 2021).

Royal Farms Arena regarding various contract terms, including when doors would open, when the event would begin and end, and additional costs to host the event.  Pl. Am. Mot., Ex. 2, p. 24--29 of 39.

At some point during the summer of 2021, Plaintiff began advertising its confirmed speakers for the event.  *See* Affidavit of Michael G. Huber, attached hereto and incorporated herein as Exhibit 2 ("Huber Aff.").    Those confirmed speakers included Steve Bannon and Milo Yiannopolous.  *See id*.  Because of the secondary effects that those speakers and the event could have on the City, during the week of July 19, 2021, Michael G. Huber, Chief of Staff to Mayor Brandon Scott, contacted SMG and instructed them to cease discussions with Plaintiff regarding the space.  *Id.* at ¶6.  Prior to the contract being finalized and executed, on or about August 5, 2021 Royal Farms Arena contacted Plaintiff and informed it that they would no longer be able to host the event at Pier VI and that the $3,000 deposit would be returned to Plaintiff.  Pl. Am. Mot., Ex. 2, p. 20-22 of 39.  Plaintiff then contacted Royal Farms Arena, who referred it to City Solicitor James L. Shea, a co-defendant in this action.  Pl. Am. Mot., Ex. 2, p. 19 of 39.

On August 6, 2021, Michael Voris, the president and founder of St. Michael's Media, contacted Solicitor Shea via telephone and requested the rationale for withdrawing the space for the November 16 event.  Pl. Am. Mot. 4.  Solicitor Shea informed Mr. Voris that the City had concerns regarding disruptions and violence that could result in Baltimore City from the event, *i.e.*, secondary effects.  *See* Affidavit of James L. Shea, attached hereto and incorporated herein as Exhibit 3 ("Shea Aff.").  Further, Solicitor Shea informed Mr. Voris that this information was obtained by the City via publicly available sources.  *Id*.  At no point in time during this conversation did Solicitor Shea indicate that the event was being cancelled due to the religious beliefs of the Plaintiff.  Pl. Am. Mot. 5.  Rather, it was conveyed that the event was being cancelled due to the

fact that guest speakers could incite disruption and violence in the City.  *Id*.  The call terminated and, approximately two and a half weeks later on August 27, 2021, Plaintiff sent a demand letter to the Baltimore City Law Department threatening legal consequences if Plaintiff was not permitted to use the space for its event.  Pl. Am. Mot. 5.

The City and Solicitor Shea's sincere concerns about the propensity for disruption and violence due to Plaintiff's event are not unfounded.  In fact, the Church Militant was an active propagandist for the claim that the November 2020 Presidential Election was stolen from Donald Trump.  On November 8, 2020, Church Militant published an article titled "*Trump Team: It's Not Over*" with the tagline that "Trump fights on amid documented cases of vote fraud, irregularities."[3] They continued expressing and disseminating this sentiment up to and including their coverage of the deadly January 6 insurrection at the United States Capitol in Washington, D.C., violence which was directly attributed to false claims of an election stolen from Trump.    This riot, where participants chanted "Fight for Trump! Fight for Trump! Traitor, traitors, traitors," resulted in five deaths, 140 injured law enforcement officers, and a cost to taxpayers of over $30 million between the significant damage to the historic building and the increased security costs.[4] Church Militant promoted and exalted these rioters in its broadcast from that evening.  Michael Voris - one of the speakers scheduled for the November 16 rally in Baltimore - glorified the Capitol insurrectionists during his broadcast on the night of January 6, stating,  "Thousands of American patriots fed up with the results of the fraudulent election stormed to the Capitol building today bringing a halt to

---

[3] Christine Niles, *Trump Team: It's Not Over* (Nov. 8, 2020), https://www.churchmilitant.com/news/article/trump-team-its-not-over (last accessed Sept. 17, 2021).

[4] MIchael S. Schmidt and Luke Broadwater, *Officers' Injuries, Including Concussions, Show Scope of Violence at the Capital Riot*, New York Times (Jul. 12, 2021), https://www.nytimes.com/2021/02/11/us/politics/capitol-riot-police-officer-injuries.html (last accessed Sep. 23, 2021), and Bill Chappell, Architect Of The Capitol Outlines $30 Million In Damages From Pro-Trump Riot, NPR (Feb. 24, 2021), https://www.npr.org/sections/insurrection-at-the-capitol/2021/02/24/970977612/architect-of-the-capitol-outlines-30-million-in-damages-from-pro-trump-riot (last accessed Sep. 23, 2021).

all business of certifying the electoral votes for Joe Biden and Kamala Harris."[5]  Voris concluded his broadcast by saying:

> As we wrap up our coverage tonight, it is unclear when any final certification vote may be done.  But given the late hour, it appears that Joe Biden and his Marxist allies have been denied their fraudulent certification at least one day.  As we prepare to sign off, we would like to show you two images, one shows the anger Trump supporters feel toward the Marxist media for their years of lies and attacks against them and Trump.  Once on Capitol grounds, they showed the media exactly what they think of them.[6]

The broadcast then showed chilling video footage of January 6 rioters approaching a team of journalists on Capitol Hill with camera tripods set up to broadcast coverage of the day's events.[7] The rioters taunt and menace the journalists before overrunning their site and destroying their equipment as reporters ran for safety.

Further, Steve Bannon - a former Trump official and another scheduled speaker for the November 16 event – regularly calls for violence against government officials and also played a key role in the events of January 6.[8]  First, shortly after the November 2020 election, Bannon was banned from Twitter after suggesting on his podcast that Dr. Anthony Fauci and FBI Director Christopher Wray be beheaded.  Bannon elaborated during an episode of his War Room podcast "I'd put the heads on pikes.  Right.  I'd put them at the two corners of the White House as a warning to federal bureaucrats."[9]  Despite the ban from Twitter, Bannon was instrumental in instructing

---

[5] Post-Election Special: Storming the Capitol, Church Militant (Jan. 6, 2021), https://www.churchmilitant.com/news/article/post-election-special-storming-the-capitol (last accessed Sept. 17, 2021).

[6] *Id.*

[7] *Id.*

[8] Rob Kuznia, Kurt Devine, and Drew Griffin, *How Trump allies stoked the flames ahead of Capitol riot*, CNN (Jan. 18, 2021), https://www.cnn.com/2021/01/18/politics/trump-bannon-stone-giuliani-capitol-riot-invs/index.html (last accessed Sept. 17, 2021).

[9] Jaclyn Diaz, *Twitter Permanently Suspends Steve Bannon Account After Beheading Comments*, npr (Nov. 6, 2021), https://www.npr.org/2020/11/06/932052602/twitter-permanently-suspends-steve-bannon-account-after-beheading-comments (last accessed Sept. 17, 2021).

President Trump to return to Washington, D.C. for the January 6 rally to try and stop the results of the election from being certified.[10]   On his podcast the day before the Capitol insurrection, Bannon told listeners "All hell is going to break loose tomorrow. Just understand this. All hell is going to break loose tomorrow. It's gonna be moving. It's gonna be quick."[11]   Bannon has since admitted that he helped plan the January 6 rally that preceded the riot at the Capitol.[12]   The goal for January 6 was to "kill the Biden presidency in the crib."[13]   Further, speaking engagements involving Steve Bannon have also devolved into violence and disruption, prompting law enforcement to utilize pepper spray and arrests on protestors to quell the disruption.[14]

Milo Yiannopoulos, another prominent far-right pundit, is also scheduled to appear at the proposed event.   Yiannopoulos was banned from Twitter after inciting racist and misogynistic abuse of an African American celebrity.[15]   Further, he has a history of making comments

---

[10] Will Steakin, Matthew Mosk, James Gordon Meek, and Ali Dukakis, *Longtime Trump advisers connected to groups behind rally that led to Capitol attack*, abc News (Jan. 15, 2021), https://abcnews.go.com/US/longtime-trump-advisers-connected-groups-rally-led-capitol/story?id=75261028 (last accessed Sept. 20, 2021).

[11] Steve Bannon, Bannon's War Room, EP 631 – Pandemic: One Day Away (Jan. 5, 2021), https://www.listennotes.com/podcasts/bannons-war-room/ep-631-pandemic-one-day-away-HzwlUt3Od0k/ (last visited Sept. 19, 2021).  Bannon's comments regarding the following day start at approximately the 29:40 mark of the episode.

[12] Andre J. Ellington, *Steve Bannon Confirms His Involvement in January 6 Insurrection on 'War Room' Podcast*, Newsweek (September 22, 2021), https://www.newsweek.com/steve-bannon-confirms-his-involvement-january-6-insurrection-war-room-podcast-1631667 (last accessed September 23, 2021).

[13] Gustaf Kilander, Steve Bannon Admits He Helped Plan 6 January Trump Rally to "Kill Biden Presidency in the Crib." (September 22, 2021), https://www.independent.co.uk/news/world/americas/us-politics/steve-bannon-capitol-riot-biden-b1925068.html last accessed September 22, 2021).

[14] Andy Takagi, *Arrests, violence at protest against Munk Debate hosting Steve Bannon*, The Varsity (Nov. 2, 2018), https://thevarsity.ca/2018/11/02/arrests-violence-at-protest-against-munk-debate-hosting-steve-bannon/ (last accessed Sept. 20, 2021); Andrea Janus, *12 People Arrested Outside Steve Bannon, David Frum Debate*, Canadian Broadcasting Corporation (Nov. 2, 2018), https://www.cbc.ca/news/canada/toronto/munk-debates-steve-bannon-david-frum-1.4890180 (last accessed Sept. 22, 2021).  Rebecca Savransky, *Berkeley City Council Votes to Let Police Pepper Spray Violent Protesters* (September 13, 2017), https://thehill.com/homenews/state-watch/350407-berkeley-council-votes-to-let-police-pepper-spray-violent-protesters (last accessed Sept. 22, 2021).

[15] Abby Ohlheiser, *Just how offensive did Milo Yiannopoulos have to be to get banned from Twitter?* Washington Post (July 21, 2017), https://www.washingtonpost.com/news/the-intersect/wp/2016/07/21/what-it-takes-to-get-banned-from-twitter/ (last accessed Sept. 21, 2021); Derek Lawrence, *Leslie Jones on Milo Yiannopoulos scandal: 'He has no space here,'* Entertainment Weekly (Feb. 20, 2017), https://ew.com/books/2017/02/20/leslie-jones-milo-yiannopoulos-book-canceled/ (last accessed Sept. 20, 2021).

advocating for pedophilia, resulting in a ban from speaking at the conservative CPAC conference in 2017.[16] His language has also shown enthusiasm for violence, including his call for "gunning journalists down" just prior to the deadly Annapolis Capital-Gazette shootings in 2018.[17] Violence and public disruption frequently follow Yiannapoulos' engagements, with at least one man being shot outside of one of his events at the University of Washington in 2017.[18] In fact, due to the violence ensuing from this event, the Seattle Police Department and the University of Washington police dispatched 124 officers, with those officers putting in over 1,000 hours of overtime *in a single day* for a speaking engagement that lasted approximately an hour.[19] The total estimated cost for overtime alone for these officers was more than $75,000, which does not include investigation into the shooting and other incidentals.[20] At another Yiannapoulos speaking event at UC Berkeley, the subsequent rioting resulted in approximately $100,000 in damages.[21]

With such a "star studded" group on the Plaintiff's program, as soon as the City became aware of Plaintiff's plan to use the Pavilion for a rally that included speakers known for encouraging violent actions that have resulted in injuries, death, and property damage, the City

---

[16] Jeremy W. Peters, *Milo Yiannopoulos's Pedophilia Comments Cost Him CPAC Role and Book Deal*, New York Times (Feb. 20, 2017), https://www.nytimes.com/2017/02/20/us/politics/cpac-milo-yiannopoulos.html (last accessed Sept. 17, 2021).

[17] Juliette Verlaque, *Milo Yiannopoulos Defends 'Gunning Journalists Down' Comment After Annapolis Shooting: It Was a 'Private Joke,'* The Wrap (June 28, 2018), https://www.thewrap.com/milo-yiannopoulos-gunning-down-journalists-annapolis-shooting/ (last accessed Sept. 17, 2021).

[18] Rebecca Morin, *Man shot at Milo Yiannopoulos protest*, Politico (Jan. 1, 2017), https://www.politico.com/story/2017/01/milo-yiannopoulos-protest-shooting-233962 (last accessed Sept. 17, 2021).

[19] Daniel Gilbert, *Milo Yiannopoulous at UW: A speech, a shooting and $75,000 in police overtime*, The Seattle Times (March 26, 2017, updated March 27, 2017), https://www.seattletimes.com/seattle-news/crime/milo-yiannopoulos-at-uw-a-speech-a-shooting-and-75000-in-police-overtime/ (last accessed Sept. 19, 2021).

[20] *Id.*

[21] Madison Park and Kyung Lah, *Berkeley protests of Yiannopoulos caused $100,000 in damage*, CNN.com (Feb. 2, 2017), https://www.cnn.com/2017/02/01/us/milo-yiannopoulos-berkeley/index.html (last accessed Sept. 19, 2021); William Wan, *Milo's appearance at Berkeley led to riots. He vows to return this fall for a week-long free-speech event*, The Washington Post (Apr. 26, 2017), https://www.washingtonpost.com/news/grade-point/wp/2017/04/26/milos-appearance-at-berkeley-led-to-riots-he-vows-to-return-this-fall-for-a-week-long-free-speech-event/ (last accessed Sept. 20, 2021).

instructed SMG not to move forward with the event out of a legitimate fear  that it would incite violence in the heart of downtown Baltimore.  *See* Huber Aff., ¶¶ 3-6.  The City did not instruct SMG to cease discussions with Plaintiff due to their religious convictions – rather, as the owner of the venue, the City terminated negotiations due to the very real potential that they would use that platform to incite violence and public disruption.  *See* Huber Aff., ¶ 4.  The proposed program would not occur in a vacuum and, as discussed above, the incendiary and hateful rhetoric of several of the scheduled speakers will provoke a strong reaction and raise the potential for clashes and disturbances.  Plaintiff makes claims that the individuals who will be coming to the rally are individuals seeking to pray the rosary and protest the USCCB, and that the event previously occurred without issue.   Pl. Am. Mot. 3.  The fact of the matter is, however, that the 2018 event was not only ten times smaller than what Plaintiff is proposing this year but also, besides Voris, did not include speakers that are specifically known for inciting violent behavior, insurrection, and disruption.

Ultimately, Plaintiff cannot present to this Court a final executed contract upon which to base their breach claim, and Plaintiff's claims of speech suppression are specious and unfounded. A preliminary injunction in this matter would cause harm to the public and the City, and would require the City to open up commercial event space in the future to other groups that incite disturbances, as long as they make false constitutional arguments to mask their violent apparent natures.  Further, the City has not stopped Plaintiff from planning and holding its event in another space, an assertion on the part of Plaintiff that is ludicrous and disingenuous.  Ultimately, the City has not infringed upon the First Amendment rights of Plaintiff and no contract existed.  Therefore, the City respectfully requests that this Honorable Court deny Plaintiff's request for preliminary injunction.

### III.   Plaintiff has Failed to Meet the Factors Required for Injunctive Relief

Preliminary injunctions are "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 22 (2008); *see also Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.,* 889 F.2d 524, 526 (4th Cir.1989) (a "preliminary injunction is an extraordinary remedy to be granted only if the moving party clearly establishes entitlement to the relief sought."). "Preliminary injunctions may be categorized as either prohibitory or mandatory." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).  "Prohibitory preliminary injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending."  *Id.* at 219.  In determining whether to issue a preliminary injunction, a court must consider four factors: (1) the likelihood that the plaintiff will succeed on the merits; (2) whether the plaintiff is likely to suffer irreparable harm unless the preliminary injunction is granted; (3) whether the "balance of equities" is in the plaintiff's favor; and (4) whether the injunction is in the public interest.  *Winter*, 555 U.S. at 20. The burden of producing evidence to show the existence of these four factors is on the moving party and "failure to show any one of the relevant factors mandates denial of the preliminary injunction."  *Hardnett v. M&T Bank*, 204 F. Supp. 3d 851, 861–62 (E.D. Va. 2016) (internal citations omitted).  Here, Plaintiff has failed to fulfill *any* of the factors that would entitle it to relief and therefore the request for a preliminary injunction must be denied.

### a.   The Status Quo in this Matter is the Lack of a Contractual Relationship between Plaintiff and SMG

The Fourth Circuit has defined the term "status quo" as the "last uncontested status between the parties which preceded the controversy."  *Pashby*, 709 F.3d at 319 (quoting *Aggarao v. MOL Ship Mngmnt Co., Ltd.*, 675 F.3d 355, 378 (4th Cir. 2012) (internal quotes omitted)).  Generally, courts refrain from issuing preliminary injunctions that "disturb the status quo."  *Stemple v. Board*

*of Ed. of Prince George's County*, 623 F.2d 893 (4th Cir. 1980). Here, the Plaintiff seeks to have it both ways – it states that preliminary injunctions have the principal function of maintaining the status quo and then, in the next sentence, immediately states "injunctive relief can also be used to restore, rather than merely preserve the status quo." Pl. Am. Mot. 7. What Plaintiff fails to acknowledge is that this latter standard applies when the status quo has been *recently disturbed*. *Aggarao*, 675 F.3d at 378. Based on the facts presented by Plaintiff and the exhibits submitted by Plaintiff, the status quo prior to the action was that *no contract existed*. Negotiations were ongoing and negotiations, as is relatively standard in contract law, do not make a contract. In fact, Plaintiff submitted the unexecuted, incomplete agreement, as an exhibit. Pl. Am. Mot., Ex. 1. Were an injunction to be issued at this point, the status quo would be disturbed, as it would force SMG to enter into a contract with Plaintiff that did not exist prior to the commencement of this action. As such, the status quo should not be disturbed and Plaintiff's request for preliminary injunction in this matter should be denied.

### b. Plaintiff is Not Likely to Succeed on the Merits

To establish the likelihood of success on the merits, the standard "is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Meredith v. Stein*, 355 F. Supp. 3d 355, 366 (E.D.N.C. 2018) (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n. 12).

In determining whether interlocutory injunctive relief should be issued, likelihood of success on the merits is merely one strong factor to be weighed alongside the likely harm to the defendant if the injunction is issued and the public interest. *North Carolina State Ports Authority v. Dart Containerline Co. Ltd.*, 592 F.2d, 749, 750 (4th Cir. 1979). Here, Plaintiff has failed to indicate that it would have any likelihood of success on the merits. Plaintiff makes a breach of

contract argument as well as a bevy of claims under the First Amendment.  All of these arguments

fail, as there is no contract to breach and Plaintiff's First Amendment rights have not been violated

in any way, shape, or form.  The City will address each issue in turn.

> **1. Plaintiff's Free Speech Rights Are Not Abridged or Even Implicated By the City's Action in Making a Reasonable Decision Related To Its Private Commercial Venue.**

Pivotal to any First Amendment free speech analysis (and absent from any filing by the

Plaintiff) is a categorization of the forum in which the speech would take place.  *See Cornelius v.*

*NAACP Legal Defense and Educational Fund, Inc*., 473 U.S. 788, 797 (1985).  "Nothing in the

Constitution requires the government freely to grant access to all who wish to exercise their right

to free speech on every type of Government property without regard to the nature of the property

or to the disruption that might be caused by the speaker's activities." *Id.* at 799-800.  As such, non-

public forums are not allotted the same free speech protections as public forums.  *Id.*  at 797.

> **a. MECU Pavilion is a Nonpublic Forum: Plaintiff's Actions Prove This Fact.**

The Supreme Court has been consistent for decades that facilities owned by the government

that are not open to the general public are considered nonpublic forums, subject to a lower level of

scrutiny than traditional public forums such as sidewalks, streets and parks. *See Perry Education*

*Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46 (1983).  The Court recognizes that the

"First Amendment does not guarantee access to property simply because it is owned or controlled

by the government." *United States Postal Service v. Greenburgh Civic Ass'n,* 453 U.S. 114, 129

(1981).  *See also Greer v. Spock*, 424 U.S. 828 (1976) (military base is a non-public forum for

First Amendment purposes); *Adderly v. Florida*, 385 U.S. 39 (1966) (jail or prison is a non-public

forum for First Amendment purposes); *Jones v. North Carolina Prisoner's Union*, 433 U.S. 119

(1977) (same); *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974) (advertising space on City transit cars and buses are non-public forum for First Amendment purposes).

Government-owned property which is not by tradition or designation a forum for public communication, is governed by different standards.  *See Perry Education Ass'n*, 460 U.S. at 46. Thus, in addition to time, place, and manner regulations, the government may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.  *Id.*  Therefore, implicit in the concept of a nonpublic forum "is the right to make distinctions in access on the basis of subject matter and speaker identity." *Id*. at 49.  The Supreme Court has noted that these distinctions may not be permitted for a public forum but are necessary and inescapable so as to allow a nonpublic forum to be used for activities compatible with the intended purpose of the property.  *Id*.

The MECU Pavilion is a City-owned commercial entertainment facility.  *See* Exhibit 1. Government-owned stadiums and piers with facilities used for meetings and entertainment, like the MECU Pavilion, are considered nonpublic forums. *See, e.g.*, *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 23 (1st Cir. 2002) (pier owned by Port Authority used as commercial fishery, conference center, eateries and offices constituted nonpublic forum); *Chicago Acorn v. Metropolitan Pier and Exposition Authority*, 150 F.3d 695, 699 (7th Cir. 1998) (Navy Pier, government owned navy facility used as recreational and commercial center is nonpublic forum); *Florida Gun Shows v. City of Fort Lauderdale*, No. 18- 62345-FAM, 2019 WL 2026496, *10 (S.D. Fl. 2019) (War Memorial Auditorium owned by city which did not honor a reservation for upcoming gun show considered nonpublic forum).

This is the first, but not the only, place where Plaintiff's analysis falls short, because they have elected to ignore the actual facts of this case and misstate the applicable analysis. Plaintiff attempts to characterize the City's actions as a regulatory time, place, and manner restriction and apply a test only applicable to a regulation of a public forum. Pl. Am. Mot. 8. It cites *Ward v. Rock Against Racism*, 491 U.S. 781 (1989); however, *Ward* involved a noise ordinance which sought to regulate a public forum, namely "a bandshell [that] was open, apparently, to all performers" located in Central Park. *Id.* at 790. In its opinion, the Court made clear that the ruling articulated did not apply when "a municipality which owns a bandstand or stage facility may exercise, in some circumstances, a proprietary right to select performances and control their quality." *Id.* (citations omitted). Therefore, the very case cited by Plaintiff contradicts its position and affirms that of the City.

The case before this Court does not involve an ordinance or regulation—that would encompass yet another area of law that the Plaintiffs have elected to ignore, and the MECU Pavilion is not a public forum "open to all performers," as demonstrated by the fact that this Plaintiff had to seek a Use License Agreement to gain access to the venue. *See* Pl. Am. Mot., Ex. 1. The draft Use License Agreement attached to Plaintiff's motion contains a provision which explicitly states that the venue and event are private:

> 8.     Ticket Sales.
>
>         (a)     SMG acknowledges that this event is a not a public, ticketed event and admission is by advance registration only.  Licensee shall have complete control over the registration process, and registrations shall not be regarded as "tickets" or "ticketing.

*Id*. at p. 6 of 20.

MECU Pavilion's designation as a non-public forum is not an honest point of contention between the parties. By Plaintiff's own admission, <u>it</u> sought to rent the facility for a "private"

event in which it meant to exclude others.  In a July 20, 2021 email exchange between Carmen Allard of St. Michael's Media ("Allard") and Teresa Waters of SMG ("Waters"), Ms. Allard stated that Plaintiff wished for the event to be a private event for which they would cease selling tickets and instead take donations and have attendees register.  *See* Pl. Mot., Ex. 2, p. 24 of 39.  By August 2, 2021, Ms. Allard confirmed that the proposed event at MECU Pavilion was to be private when she informed Ms. Waters that all previously "purchased" tickets were refunded and now Plaintiff was in "donation mode."  *See* Pl. Mot., Ex. 2, p. 17 of 39.  Thus, Plaintiff went to the trouble of refunding tickets and changing their entire funding structure for the event to ensure that the venue would be private; they cannot now claim that the forum was "public."  Plaintiff's Motion is absent any analysis or law to suggest that the MECU Pavilion is a public forum—by Plaintiff's own conduct it is not.

### b.  In a Nonpublic Forum, Like the MECU Pavilion, the Government May Impose Reasonable Restrictions That Are Viewpoint Neutral.

The public versus nonpublic forum distinction that Plaintiff has elected to ignore is vital to the analysis in this case.   In a nonpublic forum like MECU Pavilion, the government may impose "reasonable" restrictions that do not arise from "an effort to suppress the speaker's activity due to disagreement with the speaker's view." *See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679, 683 (1992) (holding that the government can impose reasonable restrictions on speech in an airport operated by a public authority). *See also Arkansas Educ. Television Com'n v. Forbes*, 523 U.S. 666, 680 (1998) (holding government broadcaster could exclude a candidate from a debate in a nonpublic forum so long as the decision was reasonable and viewpoint neutral).

Again, Plaintiff's motion contains no analysis of this pivotal issue; therefore, they concede that the City's actions are reasonable. *See* Pl. Am. Mot., *passim*.

### 1.  The City's Actions Are Reasonable.

14

"The [g]overnment's decision to restrict access to a nonpublic forum need only be reasonable; **it need not be the most reasonable or only reasonable limitation**." *Cornelius*, 473 U.S. at 808 (emphasis added).  There is no requirement that the restriction be narrowly tailored or that the government have a compelling interest.  *Id.* at 809.  Further, the reasonableness of the government's actions must be assessed in light of all the surrounding circumstances.  *Id.*  Those circumstances may include a restriction of access to certain political or free speech activities that take place near water where a municipality's police powers—health, safety, welfare—are concerned.  *See Kinton*, 284 F.3d at 24 (restrictions on handbill distribution on pier owned by Port Authority near body of water was reasonable).  Mere common sense is sufficient to uphold the reasonableness of a government's restrictions related to a nonpublic forum.  *See U.S. v. Kokinda*, 497 U.S. 720, 734 (1990).  Again, the Plaintiff has presented this Court with the wrong standard, wrong test, and wrong analysis for this case—it is becoming a pattern.

Plaintiff has made the false and bald allegation that the City elected to deny its nonpublic forum for Plaintiff's event because of its"religious" beliefs.  *See* Pl. Am. Mot. 11.  It cites no official or unofficial statement from the City in making this unfounded  claim.  In fact, Solicitor Shea's uncontradicted affidavit makes clear that he informed Mr. Voris that the City had safety concerns based on publicly available information.  *See* Exhibit 3.  Plaintiff's allegation is further contradicted by the prior relationship between these same parties.  Plaintiff admits that they held a prayer event in which they used the MECU Pavilion to protest the U.S. Bishop's conference in 2018.  *See* Pl. Am. Mot. 3.  Therefore, unless their religion or religious viewpoints have changed (and Plaintiff had presented no evidence that is the case), any claim that the City cancelled the 2021 event because of Plaintiff's religion or religious viewpoints is pure, unfounded conjecture on its part.

15

Mr. Voris claims that Solicitor Shea stated that "a lot has changed since 2018;" but those changes have come from the Plaintiff's side—not the City—and have nothing to do with their right to freedom of speech, religion, or the City's administration.  What *has* changed is the program that the Plaintiff advertised it would present at the City's nonpublic forum and the associated secondary effects that make the City's decision reasonable under these circumstances., *e.g.*, the size of the program and the confirmed speakers with the histories detailed above.

"Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *See Cornelius*, 473 U.S. at 806.  Past events that feature those speakers have resulted in raucous supporters and counter demonstrations and, at times, violence like Mr. Yiannpolous' visit to the University of Washington which resulted in a shooting and cost over $75,000 in police overtime, etc.[22]  By comparison, a two-day visit to the same municipality by then-President Obama cost the City of Seattle approximately $57,000 in police overtime pay[23]

Much like Plaintiff in this case will no doubt argue, the group that brought Mr. Yiannopolous to the University of Washington "did not expect the protests to be that bad."[24]  But, the event sponsor's intentions were of no help to the City of Seattle and its citizens—one citizen was shot while the others were left to pay the bill.  And for a city like Baltimore, with a police department already stretched thin with a well-documented police officer shortage,[25] the decision

---

[22] Daniel Gilbert, *Milo Yiannopoulous at UW: A speech, a shooting and $75,000 in police overtime*, The Seattle Times (March 26, 2017, updated March 27, 2017), https://www.seattletimes.com/seattle-news/crime/milo-yiannopoulos-at-uw-a-speech-a-shooting-and-75000-in-police-overtime/ (last accessed Sept. 19, 2021)

[23] *Id*.

[24] *Id*.

[25] Ashley Ashwell, *Baltimore's Police Officer Shortage--How Many Officers Is the City Looking For?*, Fox 45 News (July 23, 2021), https://foxbaltimore.com/news/local/consent-decree-calls-for-more-officers-bpd-confirms (last accessed Sept. 22, 2021).  According to public reports, the Baltimore Police Department ("BPD") is understaffed by nearly 400 officers.  Dan Lampariello and Chris Berinato, *Police Commissioner Formally Asks Federal Government to Help Fight Crime in Baltimore*, Fox 45 News (July 22, 2021) Police Commissioner formally asks federal government to help fight crime in Baltimore | WBFF (foxbaltimore.com) (last accessed Sept. 22, 2021).  The situation is such that

to cancel an event featuring a speaker who invites additional demonstrators, counter demonstrators, expenses, and potential violence is more than reasonable—it could prove vital for the social and financial stability of this city. *See* Declaration of Sheree Briscoe, attached hereto and incorporated herein as Exhibit 4 ("Briscoe Aff.").

And, while Mr. Yiannapolous sees his comments about gunning down journalists as a "joke,"[26] the people at the *Capital-Gazette* newspaper and the people of this region were not laughing.[27]

Even when Mr. Bannon speaks at events that are deemed "private" and in nonpublic forums requiring admission, the result has been violence and protest that the local municipality must cope with.[28] So, restricting access to his presence to only Plaintiff's private invited guests will not save the City from the secondary effects of his inclusion.

Further, even if the planned guest speakers were not included in the 2021 program, the recent statements by Mr. Voris regarding January 6 make the City's cancellation of his company's event more than reasonable.

The location of the proposed event presents other notable safety issues. While the MECU Pavilion itself is a nonpublic forum, it sits on the end of Pier VI in the Inner Harbor—a public park to which any counter demonstrations or protesters could gain access from, *inter alia*, Pratt Street, one of the neighboring piers, the Pier V hotel, the bridge connecting Pier VI to the Marriott, or the

Baltimore Police Commissioner Michael Harrison has formally requested that federal agents come to Baltimore to assist the BPD with its normal police activities. *Id*. According to Judge Bredar, this officer shortage has been a critical challenge to the City's efforts in the Consent Decree case.
[26] Juliette Verlaque, *Milo Yiannopoulos Defends 'Gunning Journalists Down' Comment After Annapolis Shooting: It Was a 'Private Joke,'* The Wrap (June 28, 2018), https://www.thewrap.com/milo-yiannopoulos-gunning-down-journalists-annapolis-shooting/ (last accessed Sept. 17, 2021).
[27] *Id*.
[28] Andrea Janus, *12 People Arrested Outside Steve Bannon, David Frum Debate*, Canadian Broadcasting Corporation (Nov. 2, 2018), https://www.cbc.ca/news/canada/toronto/munk-debates-steve-bannon-david-frum-1.4890180 (last accessed Sept. 22, 2021).

surrounding water.  The location of the venue presents another safety issue, Pier VI is surrounded by water on three sides—any disturbance from a demonstration or counterdemonstration could result in a dangerous result because of the water and potential for drowning, etc.  *See* Exhibit 5 attached hereto and incorporated herein.

Judicial review of similar actions taken by other jurisdictions have found that the government's decision was reasonable under the circumstances.  As referenced, *supra*, in *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9 (1st Cir. 2002) the Supreme Court ruled that because the proposed First Amendment speech activity was to be conducted near the entrance to a municipal owned pier, it was reasonable for the municipality to ban the planned activity for safety reasons.  *Id*. at 24.  The Court reasoned that it was within the municipality's general police power to protect the citizen's health and safety and the location of the planned activity was close to any area where pedestrians can access with little room to allow for high traffic activity, that the ban was permissible.  *Id*.  The same is true here.  Pier VI is generally accessible to the general public, and the area near the MECU Pavilion is close to areas where uninvited pedestrians have access, near a large body of water on all available sides.  The City has a vital police power interest in protecting those who may be placed in danger because of a counter demonstration near the Plaintiff's event.

Further, in *Florida Gun Shows v. City of Fort Lauderdale*, No. 18- 62345-FAM, 2019 WL 2026496 (S.D. Fl. 2019), the court found that the City's decision to not honor a reservation for a gun show, even when past gun shows were nonviolent, based on recent mass shootings was reasonable.  *Id*. at *10.  As detailed above, past events featuring the speakers that Plaintiff advertised would be present at their November event have resulted in violent confrontations, demonstrations, and even shootings.  The allegedly peaceful 2018 event is not material because it

18

was a smaller event that did not feature these same speakers and took place before the events of

January 6, 2021.  The City's decision to cancel the November 2021 event considering the above

is reasonable by the standards articulated by the Supreme Court, by rulings of other courts, and by

plain common sense.

The prospect of property damage and violence is a real and valid concern for the Mayor

and City Council of Baltimore.  Shortly after the peaceful protests following the death of Freddie

Gray, violence and property damage erupted throughout the City resulting in damage to public and

private property.[29]  As a result, a group of local business owners filed suit against the City, claiming

that the City knew or should have known that protesters and counterprotesters could cause a

disturbance and the City's failure to prevent that disturbance entitles the plaintiffs to millions of

dollars in damages.  *See Chae Brothers, Limited Liability Company d/b/a Fireside North Liquors,*

*et al., v. Mayor and City Council of Baltimore, et al*., No. 17-CV-01657 (SAG) (D. Md., filed Jun.

19, 2017).  That case is currently headed for trial before Judge Gallagher in this courthouse, with

the City facing millions of dollars in claims under the Maryland Riot Act.  *Id*.  The City is the only

defendant remaining in that matter—the original "peaceful" protesters and those who caused the

disturbance and destruction are long gone.  The City does not welcome the invitation to be held

liable and pay for another such event.

Plaintiff's arguments do nothing to advance its claims.  They argue that the MECU Pavilion

is the only venue where they can achieve their goal of confronting the bishops.  *See* Pl. Am. Mot.

3.  However, this is factually untrue and legally irrelevant.  Plaintiffs have presented no evidence

---

[29] Jean Marbella and Colin Campbell, *After the Protests, Calm Sought for Freddie Gray's Burial,* Baltimore Sun (Apr. 26, 2015), https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-freddie-gray-follow-20150426-story.html (last accessed Sept. 22, 2021) and Sabrina Toppa, *The Baltimore Riots Cost an Estimated $9 Million in Damages*, Time (May 14, 2015), https://time.com/3858181/baltimore-riots-damages-businesses-homes-freddie-gray/ (last accessed September 22, 2021).

that the U.S. Bishops will be at or near Pier VI—at best they would be across a body of water from the MECU Pavilion.  Further, even if the assertion was correct, the First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message. *See Greenburgh Civic Assns*., 453 U.S., at 129 (simply because access to a nonpublic forum is more convenient, that does not create a First Amendment right to that access).

In fact, "[r]arely will a nonpublic forum provide the only means of contact with a particular audience." Here, as in *Perry Education Assn*., *supra*, 460 U.S., at 53–54, the speakers have access to alternative channels.  As the City noted during the conference call between counsel and the Court on September 14, 2021, there are a number of other public and private venues open to Plaintiff for its event.  Its efforts to force itself into the City's nonpublic forum, in light of the valid safety and health concerns articulated above is unreasonable.

### 2.   The City's Actions Are Viewpoint Neutral

Plaintiff has failed in its burden to prove that the City's actions are an attempt to suppress its speech because the City disagrees with its content.  *See* Pl. Am. Mot. 9.  The most persuasive evidence contrary to Plaintiff's position is that the City allowed it to hold an event at the MECU Pavilion in 2018 to protest this same U.S. Bishop's conference.  There is simply no evidence that the City disagrees with Plaintiff's viewpoint or that the reasons for cancelling the evidence relate to the deep conspiracy that the Plaintiff invited in its head—that the City or its officials are somehow in the pockets of the U.S. Bishops.  Again, if that were true, there would not have been a 2018 event.

As articulated above, the City was concerned with the potential secondary effects of the event, *e.g*., the size of the event compared to 2018, the advertised speakers, and the residual damage and

potential violence that has flowed from events featuring these same speakers in the past, the health and safety concerns with holding the event so close to the Inner Harbor, and ultimately the cost to the City for the additional police presence required for the speakers and event proposed. This is in addition to the ongoing pandemic that still grips this City and the nation.

### 3. In This Case, the City is Not Regulating, The City is Acting As A Proprietor.  As Such the City's Actions Need Only Be Reasonable and "Not Arbitrary, Capricious or Invidious".

Another fallacy of Plaintiff's argument is that it cites to cases wherein the government was acting as a regulator, rather than as a proprietor.  *See, e.g.*, Pl. Mot. 8.  For instance, Plaintiff cites *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622 (1994); however, at no time does that ruling discuss free speech rights in the context of a non-public forum.  It is another case involving enforcement of a law (not at issue here) related to cable news programming over public airwaves, *i.e.*, a public forum.  *Id.* at 635.  Therefore, Plaintiff is again applying the wrong standard.

Closely tied to the notion that the government as property owner has greater control over its own property and can restrict expression more freely when the property is treated as a nonpublic forum is the principle that when the City acts as a proprietor in a commercial venture, as opposed to a regulator, its restrictions are subject to a lower level of scrutiny. *See United States v. Kokinda*, 497 U.S. 720, 725 (1990). When acting in a proprietary capacity, the government has a "freer hand" than when it restricts or bans activities pursuant to a law or regulation.  *See National Aeronautics and Space Admin. v. Nelson*, 562 U.S. 134, 148 (2011).  This is for good reason, because the government is not acting as a regulator, imposing a heightened scrutiny on it interferes with the government's proprietary need to compete with private entities.  *See Gilles v. Blanchard*, 477 F.3d 466, 470 (7th Cir. 2007) ("[c]ourts hesitate to impose in the name of the Constitution extravagant burdens on public [entities] that private [entities] do not bear."  Therefore, when the

21

government is acting as a proprietor, state action is not unconstitutional unless it is unreasonable or "arbitrary, capricious, or invidious." *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974).

As detailed above, the City did not act in an unreasonable manner nor were its actions "arbitrary, capricious, or invidious."  Instead, the City's actions were focused on the potential secondary effects of the Plaintiff's proposed event and the resultant harm to the City.  Plaintiff has conceded this point, as nothing in their motion asserts or even attempts to prove that the City acted in an unreasonable manner considering the circumstances at hand.

Any attempt to force the City to host an event in a space that it holds as a proprietor as opposed to the enforcement of an ordinance would place an extravagant burden on its commercial interest that a privately owned venue would not face.  This is perhaps why the Plaintiff is so set on having its event at the City owned MECU Pavilion—it certainly could not force any of the other nonpublic venues that sit closer to the U.S. Bishop's conference to host their event.  This fact alone places the City at an unfair disadvantage when attempting to compete with these nearby private companies and a restraint that the courts do not place on municipalities acting as a proprietor of a commercial space.  If the court requires the City to host any group whose scheduled attendees could bring disruption to the City under the thinly veiled guise of free speech rights, the City cannot compete with private businesses who can safeguard their property and reputations by simply refusing to do business with these same groups.  *See Lee*, 505 U.S. at 685 (restriction reasonable where if the government is forced to open a nonpublic forum to a subject group, it could be forced to open the same forum to all similarly situated groups who could cause disruption).

   **2.  The City Did Not Violate Plaintiff's Right to Establish or Exercise Any Religion or Denomination**

At this point, Plaintiff has elected to be intentionally obtuse.  It states, without any actual evidentiary support, that the City is somehow hostile to their religion.  Plaintiff's assertion is patently false, and they have presented no evidence to support their claim.  However, there is one point on which the parties agree, the court's analysis for the Plaintiff's purported claims related to its freedom to establish and exercise its religion is the same as that for its free speech claims.  *See* Pl. Mot. 11.

But, Plaintiff has again articulated the wrong standard to this court.  Plaintiff urges the court to apply a strict scrutiny standard and cites to a line of cases factually and legally opposite to the one at bar.  *See* Pl. Mot. 9-10.  It has, yet again, ignored that the proposed forum for the speech dictates the standard of review; just as with free speech, restrictions on the free exercise and establishment of religion in a nonpublic forum is permissible so long as the restriction is viewpoint neutral and reasonable.  *See Peck v. Upshur County Bd. of Educ*., 155 F.3d 274, 278 (4th Cir. 1998)(J. Motz *concurring*).  *See also Archdiocese of Washington v. Washington Metro. Area Transit Authority*, 897 F.3d 314, 324 (D. D.C. 2018) (restriction of a religious group's access to advertising on public transportation permissible because the space was a nonpublic forum and the action was viewpoint neutral and reasonable under the circumstances).  The MECU Pavilion is a nonpublic forum to which the City is the proprietor.  As such, no action of the City can be viewed under a strict scrutiny standard.  *See Forbes*, 523 U.S. at 680.  Further, as articulated above, the City's decision to request that SMG cease negotiations with Plaintiff was both viewpoint neutral and reasonable under the circumstances; Plaintiff has presented no evidence to the contrary.

However, this court need not even reach that analysis because the Plaintiff has not and cannot prove that the City's decision had anything whatsoever to do with the exercise or establishment of any religion—their bald, unsupported allegations are not enough.  *See Nixon v.*

*Shrink Missouri Government PAC*, 528 U.S. 377, 392 (2000) ("[the Supreme Court has] never accepted mere conjecture as adequate to carry a First Amendment burden...")  Plaintiff's motion is absent any suggestion or proof that the City is hostile to the religious views of Plaintiff and its proposed attendees.  The Court need look no further than the fact that the City allowed this same group to host an event at the MECU Pavilion in 2018 protesting this same U.S. Bishops conference.  Unless and until Plaintiff can pinpoint any reference to their religion or religious viewpoint that the City has articulated as a reason for why contract negotiations ceased, they cannot prevail on this claim.

Perhaps the most insidious notion in the Plaintiff's motion (other than when it attempts to smear the sitting City Solicitor by calling him a "liar" on multiple occasions) is when it claims that the City is somehow "taking sides" with the U.S. Bishops conference.  *See* Pl. Am. Mot. 11.  It even goes as far as to argue that the City is unfairly "allowing the USCCB Fall General Assembly [*i.e.*, the U.S. Bishops's conference] to go forward" as some sort of violation of Plaintiff's rights. *Id*.  To be clear, the City is not "allowing" anything involving the U.S. Bishops conference; that conference is scheduled to be held at a private hotel owned and operated by Marriott—not the City.  The City is not "playing favorites" by refusing to interfere with a private event taking place at a private facility with which the City has no relationship.  Plaintiff presents the Court with the perverse notion that the City should be interfering with the U.S. Bishops' constitutional rights to exercise/establish their religious beliefs on private property simply because Plaintiff has not gotten its way.  If Plaintiff desires the same benefits that the U.S. Bishops enjoy, it should do as the other group has done and book a private facility for the November 2021 event.  It certainly cites no law that *requires* the City to open its commercial facility to the Plaintiff because of their religion—as that would be a violation of the First Amendment Establishment Clause.

24

Plainly, there is no evidence that the City is preferring one denomination or group over another; nor is it restricting access to Plaintiff because of its religious beliefs.  The City has been religion neutral as the law requires.  The law is clear that so long as the government acts in an even handed religion and, denomination neutral way, it will survive a Religious Freedom/Establishment Clause attack.  *See Walz v. Tax Commission of City of New York*, 397 U.S. 664, 672-73 (1970).  Therefore, none of Plaintiff's freedom of religion claims warrant the grant of a preliminary injunction.  Even if Plaintiff's constitutional religious rights were implicated, which they are not, all articulated reasons for the City's request that SMG cease negotiating a contract for Plaintiff to use the MECU Pavilion has been neutral and reasonable as required by law.  Therefore, Plaintiff has, yet again, failed to prove any entitlement to a preliminary injunction in this matter.

### 3. The City Did Not Violate Plaintiff's Rights To Freedom of Assembly and Association

Again, the court's analysis turns on the fact that the MECU Pavilion is a nonpublic forum.  *See Christian Legal Soc. Chapter of the Univ. of California, Hastings School of Law v. Martinez*, 561 U.S. 661, 679 (2010).  Therefore, the government's restriction need only be viewpoint neutral and reasonable under the circumstances.  *Id.  See also Lavite v. Dunstan*, 982 F.3d 1020, 1029 (7th Cir. 2019) (holding that because a county office building was a nonpublic forum, the government's restriction to a person's access need only be viewpoint neutral and reasonable).  Further, safety concerns are a viewpoint neutral basis to deny access to government owned property.  *Id.* at 1030.

Plaintiff's analysis again falls short because the cases cited by it only apply to public forums or matters involving legal process, rather than when the government is acting as a commercial proprietor.  *See, e.g., Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980)(holding that criminal trials must be made public); *NAACP v. Ala. Ex. rel. Patterson*, 357 U.S. 449, 460-461 (holding that government could not subpoena names and addresses for all

members of a civil rights group);  *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937) (overturning a criminal conviction for attending a Communist Party meeting).  None of the cases cited by Plaintiff relate to restrictions placed on nonpublic forums used for commercial purposes or those that involve viewpoint neutral, reasonable security concerns.  Therefore, Plaintiff has again not provided the Court with the applicable analysis for their claims.

As articulated above, Plaintiff has not and cannot present any evidence to this Court that the City's decision to discontinue contract negotiations with it relates to their assembly or association rights.  Again, the City permitted the Plaintiff to hold a rally at the same facility in 2018; Plaintiff cannot now argue that the City is denying itthe right to assemble/associate in the same location that it was permitted to do so before.  Even if the City was restricting their right to assemble, which it is not, the stated concerns about public safety are both viewpoint neutral and reasonable under the articulated circumstances.  Therefore, they are more than enough to pass constitutional muster.  *See Lavite*, 982 F.3d at 1030.

### 4. Plaintiff Has No Valid Contract With SMG; Their Claim for Specific Performance Fails As A Matter of Law.

For the first time, Plaintiff's motion includes the proper legal standard for its claim. Plaintiff is correct that under Maryland law, the formation of a contract requires the mutual assent of the parties.  *Cockran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (Md. 2007).  Mutual assent has two requirements: (1) intent to be bound and (2) definiteness of terms.  *Id*.  Although acceptance can be accomplished by "acts as well as words," there must be evidence that the party against whom enforcement is sought intended to be bound.  *See Porter v. Gen. Boiler Casing Co*., 284 Md. 402, 396 A.2d 1090, 1094 (Md. 1979) and *Cockran*, 919 A.2d at 714.  As a general rule, silence and inaction upon receipt of an offer cannot operate as acceptance.  *See International Broth. of Teamsters v. Willis Corroon Corp.,* 369 Md. 724, 738 n. 3, 802 A.2d 1050, 1058 n. 3 (Md.

2002).   Further, when reviewing the existence of a contract, courts rely on parol evidence. *Cockran*, 919 A.2d at 708.

Here, there was neither an intent to be bound by either party or definiteness of terms. Exhibit 1 to Plaintiff's amended motion is a draft Use License Agreement dated July 14, 2021. *See* Pl. Am. Mot., Ex. 1.  According to Plaintiff's motion, it was e-mailed from Teresa Waters of SMG to Carmen Allard of St. Michael's Media, Inc. on July 14, 2021.  Pl. Am. Mot., Ex. 2, p. 15 of 39.  At that time, Ms. Waters makes clear that execution of the contract by Plaintiff and then by SMG is a required term, "Please sign and return to me for execution."  *Id*.  Instead of executing the document, Ms. Allard continued to negotiate and change essential terms of the same with Ms. Waters—these changes continued up to the time when SMG cancelled the contract and returned Plaintiff's deposit on August 5, 2021.  *See* Pl. Am. Mot., Ex. 2, p. 20 of 39.   In the end, none of the details discussed in the post-July 14, 2021 e-mail exchanges were ever memorialized in the draft Use License Agreement.  *See, e.g.,* Pl. Am. Mot., Ex. 1, p. 15 of 39 (detailing the move in and move out times as of July 14, 2021).  Nor was a written agreement executed between SMG and Plaintiff—the e-mail exchanges between Ms. Waters and Ms. Allard make clear that both anticipated a written, executed, final agreement was required before any contract was formed. Further, Plaintiff has presented no evidence that either Ms. Waters or Ms. Allard had the authority to bind either of their organizations.  Simply, there is not now and never was an agreement to be bound or a definiteness of terms constituting any enforceable contract for which Plaintiff can seek specific performance.

### c.   Plaintiff will not suffer immediate and irreparable injuries if the injunction is not granted

Plaintiff argues that it will be "irreparably harmed" should it not be permitted to proceed with the rally at Pier VI on the basis of its imaginary breach of contract claim due to the expense

it has put out for the proposed event and the assertion that it will lose "goodwill with rally-goers and the general public."  Pl. Am. Mot. 15.  Plaintiff also argues that the deprivation of its First Amendment rights are the irreparable harm.  While it is true that denial of a constitutional right *generally* constitutes irreparable harm for the purposes of a preliminary injunction, the right needs to first 1) actually exist under the circumstances and 2) actually be denied.  *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520–21 (4th Cir. 2002).  As discussed *supra,* Plaintiff's First Amendment rights have not been violated by the City.  Further, and also as previously discussed, Plaintiff's breach of contract claim also fails as it did not have a valid, executed contract with any of the Defendants.

In fact, Plaintiff has not been barred or prevented from holding their event.  It can rally and pray at other locations in the area.  Plaintiff essentially attempts to state that if they are unable to hold their event *specifically at Pier VI* then they cannot rally and protest the USCCB.  This claim is patently false; the City has already detailed alternative local venues.  None of the Defendants interfered with Plaintiff's ability to contract or seek usage of space in other venues and for Plaintiff to attempt to imply that they can *only* hold their event at a single location in the entirety of Baltimore City is ludicrous.

Further, Plaintiff's delay in instituting this action, when they allege that their cause of action actually accrued on August 5, 2021, further highlights that a preliminary injunction is not necessary.  "Since an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required."  *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (1989)(quoting *Skehan v. Bd. of Trustees of Bloomsburg State College*, 353 F.Supp 542, 543 (M.D.Pa. 1973). While Plaintiff may argue that they failed to file this action sooner because they were seeking to

"negotiate" a solution with the City, that assertion is also overstated, as the letter Plaintiff remitted to the City was more akin to a demand letter boiling down to "hold our event or else."  November 16, 2021 is not far from the current date and, it was not far from August 5, 2021, the date of the alleged accrual of Plaintiff's cause of action.  Plaintiff's lack of urgency in filing their request for an injunction provides credence to the argument that "speedy action is not required" and that irreparable harm would not have been the result.  While it may have been convenient for Plaintiff to hold their event at Pier VI, convenience and constitutional rights are not one in the same or tied together.

### d.  Granting a Preliminary Injunction Would Harm the Public Interest

Plaintiff is indeed correct that the public interest favors protecting First Amendment rights. *Kelly v. City of Parkersburg*, 978 F.Supp.2d 624, 631–32 (S.D.W.V. 2013).  However, as stated *supra*, Plaintiff's First Amendment rights have not been violated.  More importantly, the public interest would be specifically harmed by not only forcing Defendants to enter into a contract with Plaintiff, but the public interest would also be harmed due to the likelihood of disruption and violence as a consequence of the volatile nature of some of the scheduled speakers.  With regard to First Amendment cases, the Supreme Court and this Circuit have both agreed that decisions made by municipalities to ensure public safety are substantial, particularly because municipal authorities act as "trustees for the public" and therefore have an interest in maintaining public order.  *Schneider v. State of N.J.*, 308 U.S. 147, 160 (1939) (discussing issues regarding the use of an ordinance prohibiting certain types of speech and the municipalities interest in maintaining public safety and order on public streets).  Presumably, in cases where there are no First Amendment violations, the municipality still maintains this interest.  As has been demonstrated in

other venues where some of the scheduled speakers have had engagements, there is a very real threat of disruption and threat to public safety as a result of their presence. *See supra*.

### e.   The Balance of Equities Supports Denial of the Injunction

"In exercising their sound discretion, courts of equity should pay particular regard **for the public consequences in employing the extraordinary remedy of injunction**." *Weinberger v. Romere-Barcelo*, 456 U.S. 305, 312 (1982)(emphasis added).   Further, "[t]he award of an interlocutory injunction by the courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," and "where an injunction is asked which will **adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, a court may in the public interest withhold relief until a final determination of the rights of the parties though the postponement may be burdensome to the plaintiff.**"   *Yakus v. United States*, 321 U.S. 414, 440 (1944) (emphasis added).   Plaintiff has stated that "irreparable harm" will result if a preliminary injunction is not granted in this matter.   They then continue on to state "Defendants will suffer no harm" if the requested injunctive relief is not granted.   There is simply no way for Plaintiff to make this statement in good faith, particularly considering the background and behavior of some of the scheduled speakers.

Violence and disruption have followed at least two of the speakers slated to speak at the proposed event. *See supra*.   Further, the disruption that occurred following previous engagements cost the locations they occurred in thousands of dollars in damages.   It should also be noted that should there be violence or disruption, the Baltimore Police Department, which is currently understaffed, would be required to respond. *See* Exhibit 4.   While the Defendants also cannot predict the future, the culmination of a "perfect storm" of pre-existing issues – between speakers

who actively incite disruption, an understaffed police force, and a location that could result in damages to the downtown area of the City – lends credence to the argument that Defendants have the potential to suffer much more harm than the Plaintiff's alleged "harms" in this matter should the event occur.

In light of the City's pending Maryland Riot Act litigation following the death of Freddie Gray, how Plaintiff can state that the City "will suffer no harm" without the gift of clairvoyance is a mystery to Defendants.

Finally, Plaintiff's effort to essentially force Defendants into a contract with it sets a dangerous precedent for future potentially disruptive events.  Should Plaintiff's request for a preliminary injunction be granted, any denial of a contract for the use of Pier VI could have a constitutional argument shoehorned into it after the fact.  Not only would such actions harm the Defendants as well as the public and City in general, but those actions would also create excessive litigation and more "emergency" actions that the Defendants would need to address.  In effect, this honorable Court could get drawn into any dispute over the denial of contracts to use Pier VI if an aggrieved party believes their constitutional rights are being infringed upon.   Accordingly, Plaintiff's motion for a preliminary injunction should be denied.

**IV.    If The Court Is Inclined To Grant Plaintiff's Amended Motion for Preliminary Injunction, The City Respectfully Requests that Plaintiff Be Required to Post Substantial Bond**

The BPD's officer shortage is well documented.  Also well known are the substantial costs to other local governments who experienced property damage after events featuring the speakers confirmed for Plaintiff's event, *e.g.*, Seattle, Berkeley, and Toronto.  Those facts coupled with the claims for relief sought by the plaintiffs against the City in the Freddie Gray Maryland Riot Act case pending before Judge Gallagher demand that this Court require Plaintiff to post a substantial

bond should their amended motion for preliminary injunction be granted.  Plaintiff would not be prejudiced if required to post a substantial bond; according to it, there is no danger of any violence at their event.  But, if Plaintiff is wrong and the City is correct on this point, the City would be forced to pay for another "peaceful" protest gone wrong.  That is simply not fair to the citizens of Baltimore.  Therefore, the City requests that Plaintiff be required to post a bond in the amount of at least $1 million.

## V.     Conclusion

For the reasons stated herein, Defendants Mayor and City Council of Baltimore, Brandon M. Scott, and James L. Shea, respectfully request that this Honorable Court deny Plaintiff's Amended Motion for Preliminary Injunction, as well as order any and all other relief it deems appropriate.

Date:  September 23, 2021                  Respectfully submitted,

*/s/ Renita L. Collins*
_____
RENITA L. COLLINS (#28637)
Chief Solicitor
HANNA MARIE C. SHEEHAN (#19531)
Chief Solicitor
Baltimore City Law Department
100 N. Holliday Street
City Hall Baltimore, MD 21202
Phone: 410-396-3930
Fax: 410-547-1025
Renita.Collins@baltimorecity.gov
Hanna.Sheehan@baltimorecity.gov
*Counsel for Defendant Mayor and City*
*Council of Baltimore, City Solicitor James L. Shea, and*
*Mayor Brandon M. Scott*