## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ST. MICHAEL'S MEDIA, INC.,

        Plaintiff,

v.

THE CITY OF BALTIMORE, *et al.*,

        Defendants.

Case No. 1:21-cv-02337-ELH

**PLAINTIFF'S REPLY IN SUPPORT OF
AMENDED MOTION FOR
PRELIMINARY INJUNCTION**

### 1.0 INTRODUCTION

Defendants' Opposition to Plaintiff's Motion contains admissions that the Government is openly restricting Plaintiff's First Amendment rights on the basis of viewpoint. It argues such discrimination is justified based on an erroneous view of relevant legal standards, as well as unsupported speculation that two speakers out of many more *may* draw counter-protesters who would try to enact a heckler's veto. Defendants support this heckler's veto, but the First Amendment does not. Defendants have provided no factual basis or evidence that any violence might occur at Plaintiff's rally – and no support for the notion that Plaintiff would cause enough violence to disturb a poorly positioned wine glass, much less enough to warrant a suspension of the First Amendment.

### 2.0 FACTUAL BACKGROUND

The majority of the factual background of this case is laid out in Plaintiff's Motion (*see* Dkt. No. 15 at 3-7) and incorporated by reference. In short, St. Michael's is a Catholic organization that plans to have a peaceful rally at the MECU Pavilion on November 16, 2021, for the purpose of, *inter alia*, criticizing the U.S. Conference of Catholic Bishops ("USCCB"). It was in the process of making arrangements for the rally and entered into a contractual relationship with the manager of the property, Defendant SMG, for the event, when the Government unilaterally canceled this contract. Michael Voris of St. Michael's then spoke with Defendant James Shea

about the cancellation, and Shea told Mr. Voris that he had heard of unspecified reports that St. Michael's had ties to the January 6 insurrection in Washington, D.C. and that the City decided Plaintiff's rally was a security risk.

Since the suit was filed and the Court entered a TRO against the Government Defendants, St. Michael's and SMG resumed their arrangements for the November 16 rally and agreed to all terms of the contract for the event. SMG sent a completed contract to St. Michael's for signature. St. Michael's accepted the terms, sent a deposit, and signed the contract. Suddenly, again, SMG declined to sign the contract on the advice of its counsel, who also work for and represent the Government Defendants in an obvious conflict of interest. (*See* Dkt. No. 19-2.)

Defendants' Opposition clarifies some issues, while misrepresenting others. They admit that they own MECU Pavilion. (Dkt. Nos. 25-2 & 25-3.) They also admit that they ordered SMG to "cease talks with . . . St. Michael's . . . to use the MECU Pavilion." (Dkt. No. 25-4 at ¶ 3.)

Defendants admit either that Defendant Shea was lying to Mr. Voris when explaining the reason for canceling the contract, or that Defendants are now misrepresenting their reasoning. The Opposition argues that Defendants canceled the contract because they were concerned about the possibility of violence resulting from Steve Bannon and Milo Yiannopoulos speaking at Plaintiff's rally, citing a number of inadmissible media articles that discuss either politically-charged statements from these speakers or times where they drew counter-protesters who became violent. (*See* Dkt. No. 25-1 at 8-10.)[2] Defendants also claim that they canceled the contract because of

---

[2]     This proffered rationale is not credible. Mr. Voris spoke at length with Shea regarding the reasons Defendants canceled the November 16 rally. Not once did Shea mention that any of the speakers created a risk of violence. (Dkt. No. 8-1.) He mentioned only that someone found something on the Internet which falsely claimed St. Michael's had "ties to the January 6 riot" (Dkt. No. 8-1 at ¶¶ 18-19) and that St. Michael's was a security risk for unspecified reasons. (*Id.* at ¶¶ 23-24.) But even if this were, in fact, the Government's initial reasoning for canceling Plaintiff's rally, it would not help Defendants. It is worth noting that in the interest of compromise, St. Michael's even offered to remove whichever speakers the Government wanted from the rally. The Government refused this. St. Michael's also offered to let the Government pre-approve any speeches. The Government refused. The Government is so hostile to St. Michael's that it rejected these offers, presumably because the Government simply disagrees with St. Michael's to such an extent that its belated new excuse, that it doesn't like two of the speakers, is itself pretextual.

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

statements Mr. Voris made in an online video that expressed an opinion about the legitimacy of the 2020 Presidential election and the events of January 6. This is apparently the extent of the alleged "ties"[3] between St. Michael's and the people who participated in the events of that day.[4] Meanwhile, Plaintiff will present extensive evidence at hearing, including witness statements, that there is no such tie, that the City's evidence of such "rumors" is flawed, and that security will not be an issue.[5]

## 3.0 LEGAL ARGUMENT

### 3.1 St. Michael's Media is Likely to Succeed on the Merits of its Claims

St. Michael's Media asserts claims under 42 U.S.C. § 1983 for violation of the First Amendment: (1) freedom of speech; (2) free exercise of religion; (3) violation of the establishment

---

[3] Tellingly, Defendants do not even attempt to identify the source of this claim and do not bother to repeat it in their Opposition. This calls Shea's credibility into question.

[4] Defendants also briefly try to impute some sinister meaning to the name "Church Militant" that St. Michael's uses for itself. This argument is a bigoted statement, trying to smear Plaintiff's faith. In Catholic theology, there are "three states of the Church." The Church Triumphant, which consists of Christians who have ascended to Heaven; the Church Penitent (Christians currently in purgatory); and Church Militant (Christians who struggle on earth to combat sin). The only "church" to which a living human can belong is the "Church Militant." And in fact, every Christian is thus a member of "The" Church Militant. The name does not suggest that St. Michael's is violent, and Defendants cannot point to a single incident of St. Michael's ever being violent or promoting violence. The City claims that it has extensive evidence "from the Internet" that St. Michael's is violent. However, if it simply googled the term "Church Militant," it should have found this information. See, e.g., https://en.wikipedia.org/wiki/Churches_Militant,_Penitent,_and_Triumphant. The attempt to smear Plaintiff by trying to imply that the term "Militant" has a violent connotation is not clever, but is a terribly disappointing demonstration of bigotry – such as when an Islamophobe might refer to "Jihad" to smear Muslims – as if it had no other meaning than the violent interpretation (it literally means "the spiritual struggle within oneself against sin" – or how an anti-Semite would use the term "zionist" to infer that a Jewish citizen has "divided loyalties" or is practicing bigotry. See, e.g., https://www.ajc.org/translatehate/Zionism-is-racism; Rahm Emanuel, "I've Faced the Charge of Dual Loyalty, It was anti-Semitic then, and it's anti-Semitic now." The Atlantic, March 7, 2019 (available at https://www.theatlantic.com/ideas/archive/2019/03/ilhan-omars-dual-loyalty-charge-was-anti-semitic/584314/)

[5] The Plaintiff intends to call Kent Campbell as an expert in online reputation, to rebut the City's testimony. See **Exhibit 8**. Further, the Plaintiff intends to proffer its security chief's assessment of the security risks. Given the tight deadline, these reports are not completed, but will be filed as errata the moment they are.

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

clause; and (4) freedom of assembly. It also asserts a claim for specific performance on the contract between St. Michael's and SMG. St. Michael's is likely to succeed on all its claims, though for purposes of this Motion there is no need to argue the free exercise and establishment clause claims in light of Defendants' Opposition, which surprisingly confesses to violations of the first two claims.

### 3.1.1 Free Speech Claim

#### 3.1.1.1 The MECU Pavilion is a Designated Public Forum

Defendants admit they own Pier VI and the MECU Pavilion, which is merely managed by private entity SMG. (Dkt. Nos. 25-2 & 25-3.) This requires a discussion of whether the Pavilion is a public forum and, if so, what kind. Courts in First Amendment public forum cases use a three-part test to determine the proper analytical framework: (1) whether the speech is protected; (2) the nature of the forum where the speech is to occur and the proper standard for restrictions in that forum; and (3) whether the government justification satisfies the applicable standard. *Cornelius v. NAACP Legal Defense & Education Fund*, 437 U.S. 788, 797 (1985).

There are three categories of government spaces: (1) traditional public forums; (2) designated public forums; and (3) non-public forums. Traditional public forums are "places which by long tradition or by government fiat have been devoted to assembly and debate," and restrictions on speech in them are subject to strict scrutiny, meaning the Government must "show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983). The typical example of a traditional public forum is a public park, street, or sidewalk. *See Hassay v. Mayor of Ocean City*, 955 F. Supp. 2d 505, 519 (D. Md. 2013) (Hollander, J.) A designated public forum "is a nonpublic government site that has been made public and 'generally accessible to all speakers.'" *Sons of Confederate Veterans v. City of Lexington*, 722 F.3d 224, 230 (4th Cir. 2013) (quoting *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 382 (4th Cir. 2006)). This kind of forum "may be made available 'for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects.'"

*Id*.  The Government makes property a public forum when it "purposefully open[s it] to the public, or some segment of the public, for expressive activity."  *ACLU v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005).  "As long as a dedicated public forum remains open, 'it is bound by the same standards as apply in a traditional public forum,'" *i.e.,* the Government must satisfy strict scrutiny.  *City of Lexington*, 722 F.3d at 231 (quoting *Perry*, 460 U.S. at 46).[6]  A non-public forum is "[p]ublic property which is not by tradition or designation a forum for public communication," such as an airport or an election polling place.  *See Perry*, 460 U.S. at 45-46.  A non-public forum may be identified by whether "opening it to expressive conduct would 'somehow interfere with the objective use and purpose to which the property has been dedicated.'"  *Davison v. Randall*, 912 F.3d 666, 681-82 (4th Cir. 2019) (quoting *Mote*, 423 F.3d at 443).  A restriction on speech in a non-public forum is permissible if it "'is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'"  *Multimedia Pul'g Co. of S.C. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154-159 (4th Cir. 1993) (quoting *Perry*, 460 U.S. at 46).

The Supreme Court's first explicit statement of the designated public forum doctrine came in *Southeastern Promotions v Conrad*, 420 U.S. 546 (1975).  Southeastern Promotions sought permission to use Chattanooga, Tennessee's municipal auditorium for performances of the musical "Hair."  Although the auditorium had been rented for a wide variety of expressive activities prior to Southeastern's application, Chattanooga city officials refused Southeastern's request, citing Hair's nudity, tacit approval of drug use, sexual themes, and bad language.  The Court found the municipal auditorium to be a designated public forum, and the city's refusal to permit use of its auditorium to be an unconstitutional prior restraint.  *Id*. at 557-58, 562.  The degree of protection afforded to an event in a public forum is not affected by a subjective determination of the expressive merit of speech.  *See Norma Kristie, Inc. v. Oklahoma City*, 572 F. Supp. 88, 91-92 (W.D. Okla. 1983) (applying *Conrad*, finding <u>publicly owned convention center managed by</u>

_____

[6]    There is also a sub-category of designated public forums known as limited public forums, which exist where "the government creates a channel for a specific limited type of expression where one did not previously exist."  *Child Evangelism*, 457 F.3d at 382.  The MECU Pavilion is not a limited public forum, as it is not a space reserved for particular kinds of speech.

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

<u>private company</u> was designated public forum, and finding national contest for female impersonators in "Miss Gay American Pageant" entitled to full First Amendment protections upon rejecting government argument that it was contrary to community standards).

The MECU Pavilion is a designated public forum. It is dedicated to general use by the public for a wide variety of reasons, with SMG managing it for the City, as SMG admits. The Royal Farms website states "*Royal Farms Arena is Baltimore's premier multi-use sports and entertainment facility and is a great place to host a wide variety of events. Our flexible and dynamic space has the ability to accommodate major concerts, family shows, sporting events, college commencements, conferences, corporate events and political function . . . We can also facilitate booking your event at the legendary MECU Pavilion . . . MECU offers the perfect space to enjoy entertainment along Baltimore's famed Inner Harbor.*" ("Book an Event" page of Royal Farms website, attached as **Exhibit 1**.)[7] The Government allows a wide variety of people to use the venue for a wide variety of purposes. Indeed, Defendants permitted St. Michael's to hold the same kind of rally for the same purpose in 2018;[8] they can hardly argue now that the November 16 rally falls outside the purposes to which the Pavilion has been dedicated.

Defendants argue that MECU Pavilion is a nonpublic forum because not all members of the public are automatically capable of entering it at any time. This misapprehends public forum analysis. *Goulart v. Meadows*, 345 F.3d 239 (4th Cir. 2003) dealt with publicly owned community centers requiring permission to use. However, "the Recreation Coordinators at the community centers make only ministerial judgments because they are allowed to deny an application only if it is 'not in accordance with the provisions outlined in the [Use Policy].' In other words, if a

---

[7]    Available at: http://www.royalfarmsarena.com/business-opportunities/book-an-event (last accessed Sept. 26, 2021).

[8]    Defendants argue that the November 16 rally is distinct from the 2018 one because more people are planned to attend this year's rally. This does not much matter, however, as the event is scheduled for a maximum of 3,000 people, while the MECU Pavilion can accommodate 4,500, leaving plenty of room for rally-goers. (*See* Ticketmaster "Venue Guide" for the MECU Pavilion, attached as **Exhibit 4**) (available at: https://blog.ticketmaster.com/venue-faq-mecu-pavilion-baltimore-md/) (last accessed Sept. 26, 2021).

proposed user falls within the confines of the Use Policy, the application will be granted." *Id*. at 250-51. It then found the community centers to be either designated or limited public forums. *Id*. at 251. Access to a forum is thus not "selective" merely because the Government must approve the use of the forum by the public, but rather it is selective only when the Government has chosen to limit the acceptable uses of the forum. That is not the case - MECU Pavilion may be used by essentially anyone.

Defendants' cases are inapposite. *New Eng. Reg'l Council of Carpenters v. Kington*, 284 F.3d 9 (1st Cir. 2002) dealt with a fishing pier that had traditionally been used for commercial fishing but expanded to include a conference center, eateries, and offices. The court found that "the dominant character of the property is still that of a commercial fishery" and the government agency running the commercial fishery at most "tolerates the presence of some members of the public on the Fish Pier." *Id*. at 22-23. Notably missing was an affirmative act showing a government intent to designate the property "as a place for public expression." *Id*. at 23. Here, however, the MECU Pavilion is dedicated specifically for the purpose of allowing expressive speech of the general public; it is not a factory that private businesses happened to form around.[9]

Defendants cite *Chicago Acorn v. Met. Pier & Expo. Auth.*, 150 F.3d 695, 699 (7th Cir. 1998), which dealt with a government-owned pier containing public and non-public facilities and found that *private meeting rooms within one of the facilities* were not designated public forums. It came to this conclusion, because the entire pier was being managed as a commercial entity, and

---

[9] The Pavilion has a tribute band for PRIMUS scheduled soon. (*See* Royal Farms page for "PRIMUS – A Tribute to Kings," attached as **Exhibit 5**) (available at: https://www.livenation.com/event/1AvfZp7GkSIX97m/primus-a-tribute-to-kings) (last accessed Sept. 26, 2021.) The Pavilion hosted Garrison Keillor's Prairie Home "Love and Comedy" tour in September 2017. (*See* MECU Pavilion Facebook post advertising Prairie Home tour, attached as **Exhibit 6**) (available at: https://m.facebook.com/MECUPavilion/photos/a.93704663441/10155375883013442/?type=3) (last accessed Sept. 26, 2021.) In August 2015, it hosted comedian Jim Gaffigan. (*See* MECU Pavilion Facebook posting for "Jim Gaffigan at Pier Six Pavilion, attached as **Exhibit 7** (available at: https://www.facebook.com/events/1603807349834417/?acontext=%7B%22event_action_history%22%3A[%7B%22surface%22%3A%22page%22%7D]%7D) (last accessed Sept. 26, 2021).)

RANDAZZA | LEGAL GROUP

that conduct occurring at or people attending one facility could have positive or negative economic effects for another facility; "[s]electivity and restriction are of the essence of the commercial strategy that informs the MPEA's management of the pier." *Id*. at 700. Here, however, there is no suggestion that the City of Baltimore or SMG carefully curate who may book which events at the MECU Pavilion as part of a comprehensive strategy for the economic area. Rather, nearly any member of the public may book nearly any kind of event there. Similarly, the court in *Fla. Gun Shows v. City of Fort Lauderdale*, No. 18-62345-FAM, 2019 U.S. Dist. LEXIS 26926 (S.D. Fla. Feb. 19, 2019) found that an auditorium was a non-public forum because the government previously denied use of the venue to other events that it found to be unsuitable and that "access to the venue is not open to all who apply for a lease." *Id*. at *29-30. There is no evidence of such selectivity here. Defendants' position is precisely that of Chief Justice Rehnquist's dissent in *Conrad* decrying the possibility of municipally owned theatres and other entertainment venues not being able to discriminate on the basis of content or viewpoint. *Conrad*, 420 U.S. at 572-73 (Rehnquist, J., dissenting). The Supreme Court rejected Rehnquist's position.

Defendants finally argue the MECU Pavilion is a non-public forum because St. Michael's requires tickets to attend.[10] This is a non-sequitur. A venue's public forum status is not determined by what the organizers do with their event, but by whether it has been dedicated by the government for public use. The MECU Pavilion will not be open to anyone who simply wanders by during the rally, but anyone can reserve the Pavilion for almost any kind of event, whether it be political, musical, or educational. Defendants' argument, if accepted, would mean that a public park is a non-public forum because the government allows a Shakespeare festival to perform in it a few days a year and charges an admission fee. Needless to say, this is wrong.

### 3.1.1.2 Defendants' Exercise of Unfettered Discretion is Unconstitutional

Regardless of the type of public forum, "there is broad agreement that . . . investing

---

[10] Defendant rely heavily on the "heckler's veto" as a reason to censor the event, yet requiring tickets would seemingly be the most effective way to keep hecklers separated from the faithful.

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

governmental officials with boundless discretion over access to the forum violates the First Amendment." *Child Evangelism*, 457 F.3d at 386. "For this reason, even in cases involving nonpublic or limited public forums, a policy . . . that permits officials to deny access for any reason, or that does not provide sufficient criteria to prevent viewpoint discrimination, generally will not survive constitutional scrutiny." *Id*. at 387. A "corollary of the prohibition on viewpoint discrimination is the principle that administrators may not possess unfettered discretion to burden or ban speech, because 'without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or view-point of the speaker.'" *Child Evangelism Fellowship v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1068 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763-64 (1988)). Rules without guardrails like this—where the City can veto any event it wants—run the risk (a proven risk) that the government will use claimed neutral standards in pretextual and censorial ways, "hiding the suppression from public scrutiny." *Child Evangelism*, 457 F.3d at 386. Accordingly, the City's position that it has this power has unwittingly walked the City into a scenario where the entire regulation should be struck down as facially unconstitutional, as well as unconstitutionally applied in this case.

The government may not "condition speech on obtaining a license or permit from a government official in that official's boundless discretion." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (deciding whether an official has unbridled discretion in setting permit fee for public speaking events, parades, or assemblies); *see Se. Promotions v. Conrad*, 420 U.S. 546 (1975) (addressing whether municipal board charged with leasing city auditorium had unbridled discretion); *Saia v. People of N.Y.*, 334 U.S. 558, 559-60 (1948) (addressing whether licensing use of amplifiers gave police chief unfettered discretion); *Am. Entert. v. City of Rocky Mount*, 888 F.3d 707, 720 (4th Cir. 2018) (deciding licensing scheme for sexually oriented businesses gave licensing official unfettered discretion).

The standard form contract SMG presented to St. Michael's for use of the MECU Pavilion has content-neutral requirements, and SMG approves applicants who meet these requirements.

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

However, Defendants may then swoop in with the unilateral right to interfere with the contracts for any reason – without guardrails.  (*See* Dkt. No. 8-2 at 3.)  Defendants have not identified any standards used to determine when the Government may order SMG to cancel a contract for use of the MECU Pavilion.  When Mr. Voris asked Shea what standards were used to cancel Plaintiff's contract with SMG, Shea refused to answer.  (Dkt. No. 14 at ¶ 33.)  Government Defendants have given themselves unfettered discretion to deny any event at the MECU Pavilion for any reason, despite dedicating it as a public space for expression.  This unfettered discretion adds another layer of constitutional infirmity to the Government's conduct and requires application of strict scrutiny. If the Fourth Circuit has ever upheld such governmental discretion, Plaintiff has not found it.

Relatedly, Government Defendants argue they should be held to a lower level of scrutiny because they are a "proprietor" of MECU Pavilion instead of a "regulator."  (Dkt. No. 25-1 at 24-25.)  They want it both ways, by arguing they own the property but are not responsible for what happens there.  This argument is inconsistent, as they have given themselves the unilateral authority to disallow any event for any reason.  They are directly regulating speech here by exercising unfettered veto power.

The City argues inconsistently that MECU Pavilion is a privately run, but city owned property.  They cannot use "private" where it helps and "public" where it does not.  "The Supreme Court never has circumscribed forum analysis solely to government-owned property."  *Davison v. Randall*, 912 F.3d 666, 682-683 (4th Cir. 2019).  Certainly, the converse is true - that government ownership, with management delegated to a private entity will not flip the analysis.  Private property is a public forum when the government retains substantial control over the property by regulation or contract.  *See, e.g., Conrad*, 420 U.S. at 547, 555 (finding "a privately owned Chattanooga theater under long-term lease to the city" was a "public forum[] designed for and dedicated to expressive activities"); *Christian Legal Soc'y Chapter v. Martinez*, 561 U.S. 661, 679 (2010) ("this Court has employed forum analysis to determine when a governmental entity, in regulating property in its charge, may place limitations on speech"); *First Unit. Church v. Salt Lake City Corp.*, 308 F.3d 1114, 1122 (10th Cir. 2002) ("forum analysis does not require that the

government have a possessory interest in or title to the underlying land. Either government ownership or regulation is sufficient for a First Amendment forum of some kind to exist"). Government ownership of the property triggers Constitutional obligations. The Government Defendants cannot avoid this.

### 3.1.1.3    Defendants' Restriction on Speech is Viewpoint-based

Because MECU Pavilion is a public forum, the Government must pass strict scrutiny. But even if the Pavilion were not a public forum, Defendants' restriction on Plaintiff's speech, namely not allowing St. Michael's to conduct its rally, is impermissible because it is viewpoint-based.

A restriction on speech is content-based when it seeks to restrict a particular subject matter. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Any restriction on speech based on the message conveyed is presumptively unconstitutional. *See Turner B'casting Sys. v. FCC*, 512 U.S. 622, 641-43 (1994). This presumption becomes stronger when a government restriction is based not just on subject matter, but on a particular viewpoint expressed about that subject. *See R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992). The government cannot impose restrictions on speech where the rationale for the restriction is the opinion or viewpoint of the speaker. *See Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983). A content-based restriction on speech must satisfy strict scrutiny, meaning it furthers a compelling government interest and is narrowly tailored to achieve that interest. *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011). "The 'government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Saltz v. City of Frederick*, Civil Action No. ELH-20-0831, 2021 U.S. Dist. LEXIS 88283, at *42-43 (D. Md. May 10, 2021) (Hollander, J.) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). Because of this, "'a viewpoint-based restriction of private speech rarely, if ever, will withstand strict scrutiny review.'" *Id*. (quoting *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v.*

*Mayor & City Council of Balt.*, 721 F.3d 264, 288 (4th Cir. 2013)).[11]

The Supreme Court has found that "[g]iving offense is a viewpoint." *Matal v. Tam*, 137 S. Ct. 1744, 1749 (2017). "[D]isparaging the views of another to support one's own cause is protected by the First Amendment." *Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015) (en banc) (finding government enacted heckler's veto by failing to protect, and eventually removing, evangelical group at Arab International Festival who "parad[ed] around with banners, signs, and tee-shirts that displayed [anti-Muslim sentiments] associated with" their religious beliefs); *see Gerber v. Herskovitz*, 2021 U.S. App. LEXIS 27674, *34-35, 2021 Fed. App. 0219P, *21-22 (6th Cir.) (approving of *Bible Believers* and finding that synagogue members could not assert § 1983 claims against government for permitting anti-Israel picketers to demonstrate outside synagogue). Viewpoint neutrality requires the Government not only to refrain from overt discrimination based on viewpoint of speech, but also to "provide adequate safeguards to *protect* against the improper exclusion of viewpoints." *Child Evangelism Fellowship*, 457 F.3d at 384.

Mayor Scott's Chief of Staff, Michael G. Huber, declares that speakers confirmed for the November 16 rally include "*Steve Bannon and others whose speaking engagements and statements have a track record inviting protesters and counter protesters and supporting the January 6 attack on the Capitol in Washington, D.C. According to available media reports, their events and statements have a demonstrated history of inciting property destruction, physical assaults, and other violence, i.e., secondary effects.*" (Dkt. No. 25-3 at ¶ 4 (emphasis added).) Huber tellingly fails to identify any such "media reports." Defendants cites them (without attaching them) as

---

[11]    Just as the government cannot compel speech it likes, it equally cannot punish or deter speech, assembly, or religious exercise based on its content or viewpoint. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 61-63 & n.5 (1963) (state decency commission told book distributors that particular publications were objectionable and that it had the power to recommend action by the attorney general - this was unconstitutional); *cf. Chernin v. Lyng*, 874 F.2d 501, 502-03, 506-08 (8th Cir. 1989) (government told employer it would have to fire employee to obtain government inspection services, so employee entitled to due process).

though they are conclusive evidence that the speakers will be violent.[12] Even if these articles were admissible, none claims that Messrs. Bannon or Yiannopoulos directly incited audiences to imminent lawless action. Rather, they discuss either politically charged speech not made in front of a crowd (none of which constitutes a true threat or any other category of unprotected speech), or instances of *others*, wishing to shut them down, becoming violent.[13] There is not a scintilla of evidence to suggest that these speakers have engaged in *unprotected* speech before, much less that they will on Nov. 16. The alleged danger of violence is purely theoretical and insufficient to outweigh Plaintiff's First Amendment rights. "If the First Amendment guarantee means anything, it means that, absent clear and present danger, government has no power to restrict expression because of the effect its message is likely to have on the public." *Central Hudson Gas & Elec. Corp. v. Public Service Commission*, 447 U.S. 557, 575 (1980) (Brennan, J., concurring).

Defendants do not argue that St. Michael's or anyone at the November 16 rally will engage in conduct that is not protected by the First Amendment. They do not allege, much less provide evidence of, any speech that will incite rally-goers to violence or contain "fighting words" (to the extent such things even exist anymore). The primary concern Defendants express in presenting this fictitious scenario is the *possibility* of a *counter-protest*, meaning violence committed not by St. Michael's, but others who wish to harm St. Michael's or censor its speech. The City is worried that third parties will be so offended by the speech at the rally that counter-protesters[14] will attack

---

[12] A fundamental problem with this "evidence" is that it is inadmissible hearsay. These are media reports, which cannot be considered to prove the truth of the matter asserted. *See, e.g., Green v. Scott*, 637 Fed. Appx. 749, 751-52 (4th Cir. 2016) (finding media article asserting party opponent made statement was inadmissible to prove that statement was made). St. Michael's does not dispute that media sources have made false claims about Steve Bannon and Milo Yiannopoulos, but Defendants' articles cannot be used to show that these speakers have actually incited or caused violence.

[13] Some of these articles may falsely characterize Bannon or Yiannopoulos's speech as encouraging others to violence, but neither has ever been criminally charged with such conduct and a newspaper's biased reporting on an unpopular public figure is not a substitute for legal analysis. The Court should never accept a newspaper's legal conclusions.

[14] Furthermore, *what counter-protesters*? One of the main purposes of St. Michael's holding its rally at MECU Pavilion is to ensure that U.S. Bishops cannot avoid their history of covering up

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

rally-goers. This means that Defendants' restriction on Plaintiff's speech is based on the *past* unpopular viewpoints of St. Michael's and two of its scheduled speakers, specifically that their speech will give such offense to third parties that these third parties will become violent.[15] St. Michael's appreciates the admission that Defendants are inclined to effectuate a heckler's veto, despite the First Amendment commanding otherwise.

"Historically, one of the most persistent and insidious threats to First Amendment rights has been that posed by the 'heckler's veto,' imposed by the successful importuning of government to curtail 'offensive' speech at peril of suffering disruptions of public order." *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985). "A heckler's veto involves burdening speech 'simply because it might offend a hostile mob.'" *Bennett v. Metro. Gov' t & Davidson Cnty.*, 977 F.3d 530, 544 (6th Cir. 2020) (quoting *Forsyth*, 505 U.S. at 134-35). Granting a heckler's veto is an impermissible and unconstitutional content-based restriction. *Terminiello v. City of Chicago*, 337 U.S. 1 (1949). The Government has a responsibility to permit controversial speech even when there could be a hostile reaction by others. *See, e.g., Ovadal v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005); *Smith v. Ross*, 482 F.2d 33, 37 (6th Cir. 1973); *Grider v. Abramson*, 994 F. Supp. 840, 845-46 (W.D. Ky. 1998).

"When a peaceful speaker, whose message is constitutionally protected, is confronted by a hostile crowd, the state may not silence the speaker as an expedient alternative to containing or snuffing out the lawless behavior of the rioting individuals . . . If the speaker, at his or her own risk, chooses to continue exercising the constitutional right to freedom of speech, he or she may do so without fear of retribution from the state, for the speaker is not the one threatening to breach the peace or break the law." *Bible Believers*, 805 F.3d at 252. The *Bible Believers* court noted

---

for the sexual abuse of minors by Catholic priests. Do Defendants fear that a violent gang of pedophilia advocates will attack? St. Michael's does not say this to be glib; it is forced to speculate as to the identity of counter-protesters because Defendants do not identify any, nor do they even claim to have received reports of possible counter-protesters. These violent agitators are figments of the Government's imagination or, more likely, a pretext for its viewpoint-based discrimination.

[15] Meanwhile, the City has no idea what these speakers are going to say. St. Michael's offered to let the City pre-screen their prepared remarks, but the City refused this offer.

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

that the plaintiffs, who were expressing religious beliefs at a festival only to be physically attacked by protesters, may have conveyed their message in a manner that was "vile and offensive to most everyone who believes in the right of their fellow citizens to practice their faith of his or her choosing; nonetheless, they had every right to espouse their views." *Id*. at 254-55. The court found it impermissible for the police not to prevent the violence against the speakers, but rather to tell them to leave the festival for "being disorderly" by allegedly causing such violence. *Id*. at 255. It concluded that the government "effectuated a heckler's veto, thereby violating the Bible Believers' First Amendment rights." *Id*.

Imagine if all a white supremacist needed to do to end a "Black Lives Matter" rally would be to get very angry at the content of the rally. Would the City do what it is doing now, or would it abide its duty to suppress the threat, but permit the rally? This analogy is apt, as the City's argument is that third parties will instigate violence in response to the predicted content and viewpoint of the speeches. Rather than protect St. Michael's from such alleged violence, Defendants wish to prevent St. Michael's from speaking. Just as in *Bible Believers*, any allegedly offensive message communicated at Plaintiff's rally will "not advocate, condone, or even embrace imminent violence or lawlessness," and so no restriction is warranted. *Id*. at 244. Defendants' conduct is a heckler's veto and is unconstitutional.

Defendants claim that Baltimore police are understaffed and that the rally would require significant diversion of police. A group's First Amendment rights is not contingent on whether a city's budget can accommodate them. It would serve as a perverse end-run around the First Amendment to allow a city to invent a security threat, use a police officer relying on non-specific "training, education, and experience" to make an arbitrary prediction of the number of police needed to secure the public against this fictitious threat (Dkt. No. 25-5), as a basis for censoring a religious rally.[16] Further, it is premature to even predict what security measures would be

---

[16] Deputy Commissioner Sheree Briscoe claims that nearly 200 police officers would be needed to hold back these unidentified attackers. King Leonidas held back 100,000 Persians with 300 Greeks. Meanwhile, the access point to MECU is a tiny foot-bridge a magnitude more narrow

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

necessary – as making that assessment this far in advance is poor policing.[17]

To remove any doubt as to Defendants' motives in restricting Plaintiff's speech, Defendants argue that, even if St. Michael's were to have no guest speakers at the rally, cancellation would be justified because of "the recent statements by Mr. Voris regarding January 6." (Dkt. No. 25-1 at 20.) Defendants do not contend that Mr. Voris or St. Michael's was in any way involved in the January 6, 2021 riot at the Capitol. They allege only that Mr. Voris referred to the participants as "patriots." (Dkt. No. 25-1 at 7.) They allege that St. Michael's "promoted and exalted these rioters in its broadcast from that evening" (*Id.*), but St. Michael's did no such thing and never condoned any violence. The video approvingly quoted former President Trump's calling on everyone involved to be peaceful, highlighted Catholics peacefully praying the "Our Father" on the Capitol lawn, and pointed out the hypocrisy of those who condemned the events of January 6 while refusing to condemn the nationwide violence caused at Antifa and Black Lives Matter events, which St. Michael's has routinely denounced. Furthermore, this video was published before the extent of violence became known. Defendants do not argue that St. Michael's spurred anyone to violence, or to participation in the events of that day, nor could they. Defendants' position appears to be that since Voris had an opinion they do not like, the whole rally should be censored. This is a stunning admission of unconstitutionality which should, by itself, justify the requested injunctive relief.

### 3.1.1.4 Defendants Cannot Satisfy Strict Scrutiny

Whether MECU Pavilion is a designated public forum or a nonpublic forum does not change the Constitutional analysis. Defendants' actions are subject to strict scrutiny due to the viewpoint-based nature of their restriction on Plaintiff's speech and assembly. This requires the Government to show its restriction furthers a compelling government interest and is narrowly tailored to achieve that interest. *Bennett*, 564 U.S. at 734.

_____

than the pass at Thermopylae. Plaintiff is engaging an expert who will show this claim to be utterly unsupportable.

[17] Plaintiffs intend to proffer an expert in this, but have not yet come to terms with one.

Any governmental interest in ensuring public safety is not furthered by not allowing St. Michael's to hold its rally. Defendants never received any information that could lead them to believe St. Michael's is in any way violent or that allowing the rally to go forward would even potentially lead to violence. Defendants' restriction is not narrowly drawn either, as Defendants made no effort to negotiate a safer means of conducting the rally, such as by requesting that St. Michael's excise the two speakers that Defendants claim are especially problematic.[18] Defendants argue that St. Michael's may hold its rally at a different location, but (1) forbidding a speaker from using its chosen public forum as a venue is not a narrowly drawn restriction; and (2) holding the rally at a different time or in a different place would make Plaintiff's speech ineffective for its intended purpose.[19]

Defendants argue that their restriction is not that burdensome because MECU Pavilion is in no way necessary for St. Michael's and its rally-goers to express their message to the USCCB, reasoning that there is no evidence that any Catholic Bishops will be at or near MECU Pavilion. This ignores that the USCCB's Fall General Assembly is taking place in a hotel immediately across the water from MECU Pavilion. This body of water provides a physical obstruction between the two venues, but it does not create any obstruction to seeing or hearing St. Michael's rally. And that is the point – that the USCCB hears and sees the rally-goers. Even then, this is a public forum; St. Michael's is under no obligation to justify why it chose to rally in a particular forum. The City must show a compelling interest to stop the rally. *Bennett*, 564 U.S. at 734

Defendants argue that the location of MECU Pavilion provides special danger because it is surrounded on three sides by water, meaning any violence could result in people drowning. This is truly ridiculous. It seems that a greater danger would be posed by an event serving alcohol, with drunken patrons potentially falling into the water and drowning, yet there is no evidence of any

---

[18] Defendants refer to alleged violence associated with only two speakers, Steve Bannon and Milo Yiannopoulos, while the rally will feature at least 10 other speakers with whom Defendants have voiced no objection. (Dkt. No. 25-3 at ¶ 5.) This solution would not be Constitutional either, but it would at least be *more* narrowly tailored than censoring the whole event.

[19] If Defendants are truly concerned about safety, how would a different location help?

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

ban on alcohol at MECU Pavilion events. And in either case, less restrictive alternatives are obvious; erect temporary barriers near the water's edge to prevent anyone from falling into it, or provide flotation devices, or station lifeguards nearby – or better yet, recognize this argument for what it is – a pretext for the City's unconstitutional actions.

Defendants next attempt to use the "secondary effects" doctrine to claim rally-goers or counter-protesters will be worked into a frenzy and become violent. This betrays a profound failure to understand the secondary effects doctrine, which permits restrictions focused on addressing the secondary effects of speech, where the restriction makes no reference to the content. *See Saltz*, 2021 U.S. Dist. LEXIS 88283, at *42-43 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) and *Renton v. Playtime Theatres*, 475 U.S. 41, 47-49 (1986)). This doctrine has been used almost exclusively to justify zoning restrictions targeted at sexually oriented businesses. *See, e.g., Renton*, 475 U.S. 41. To counsel's knowledge, it has *never* been used to restrict political speech. In fact, the Supreme Court has counseled against this very application of the doctrine. *Chase v. Town of Ocean City*, 825 F. Supp. 2d 599, 619 (D. Md. 2011) (Hollander, J.) (citing *Boos v. Barry*, 485 U.S. 312, 320-21 (1988) (subjecting to strict scrutiny D.C. ordinance prohibiting signs critical of foreign government within 500 feet of embassy, and explaining that "[l]isteners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton*")).

Defendants conflate the secondary effects of speech with the primary, intended effect of the speech. Regulations on the primary effects, *i.e.,* the intended persuasive effects caused by the speech or "the direct impact of speech on its audience," are presumptively invalid. *Barry*, 485 U.S. at 320-21. Where a regulation "focuses only on the content of the speech and the direct impact that speech has on its listeners," it is aimed at the primary effects of speech. *Id*. at 321. Defendants argue that rally-goers and/or imaginary counter-protesters will engage in violence as a direct result of being persuaded or offended by speech at the rally. The "secondary effects" doctrine has no application here.

Defendants bring up destructive riots following the death of Freddie Gray, claiming that even though such protests started peacefully, they became violent and caused extreme property

RANDAZZA | LEGAL GROUP

damage. Yet they do nothing to explain how these events have anything to do with St. Michael's holding a rally criticizing Catholic Bishops. The argument appears to be that because on one occasion a peaceful demonstration against police killing led to violent riots, the Government can assume that every peaceful demonstration in the future will lead to riots. Defendants do not actually believe this, as evidenced by the fact that the City has allowed other public events and demonstrations to go forward. The Court should not give this argument any credence.[20]

### 3.1.2    Right of Assembly Claim

Defendants agree that the analysis for the right of assembly claim is largely identical to the analysis of St. Michael's freedom of speech claim. Defendants premise their argument on the assertion that MECU Pavilion is a non-public forum. As explained above, however, it is a public forum. Even if it were not, Defendants have exercised unfettered discretion in restricting Plaintiff's speech and have discriminated on the basis of viewpoint. Defendants' restriction must satisfy strict scrutiny.

### 3.1.3    Free Exercise and Establishment Clause Claims

St. Michael's Second and Third Claims for Relief are brought pursuant to the First Amendment's Free Exercise and Establishment Clauses. St. Michael's intends to continue to pursue these claims, but detailed argument supporting them would be merely cumulative – the burdens on speech and assembly are equally applicable to the Free Exercise claims.

### 3.1.4    Specific Performance Claim

SMG and St. Michael's have a valid contract between them. Now that SMG is conveniently represented by the main defendant, SMG seems to disagree. However, without the City's interference, there would be no debate about this.

Prior to the Government Defendants' unconstitutional interference, St. Michael's and SMG

---

[20]    If this justification were given any respect at all, it would seem to stamp a judicial imprimatur on banning Black Lives Matter rallies. The Constitutional repugnance of doing so should be clear. Further, if the Court gave this even the slightest respect in dicta, it would likely be a very short time before a racist city elsewhere pointed to it to ban civil rights marches. The constitutional tone-deafness of Defendants' argument here should be embarrassing.

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

had a meeting of the minds regarding the November 16 rally. They agreed on all material terms, such as the venue, date, purpose of the rally, and pricing, and were discussing only minor alterations to the language in the written memorialization of their agreement. (*See* Dkt. Nos. 14-1 & 14-2.) This meets the "definiteness of terms" discussed in *Cochran v. Norkunas*, 919 A.2d 700, 708 (Md. 2007). In reliance on SMG's agreement on these terms, St. Michael's expended significant time, money, and resources preparing for its November 16 rally at MECU Pavilion, including paying a $3,000 deposit to SMG, which SMG accepted. In its discussions with Shea, SMG showed that it was willing and able to go forward with its contract with St. Michael's, and the only reason it did not do so is because the Government Defendants unconstitutionally told it to cancel the contract. (Dkt. No. 14-3.)

St. Michael's and SMG were thus in a contractual relationship at the time the Government Defendants interfered. To remove any ambiguity on this point, once the Court entered a TRO against the Government Defendants, St. Michael's and SMG resumed their conversations about arranging the November 16 rally and agreed to a new, revised contract for the event. (*See* updated contract between SMG and St. Michael's, attached as **Exhibit 2**)[21] (laying out terms of contract); Dkt. No. 19-2 (showing assent to terms).) The only reason SMG and St. Michael's did not enter into a formal written agreement at this point was because SMG's counsel, who also represents the Government Defendants, ordered it not to. (*See id*.) St. Michael's had fulfilled all of its obligations under this agreement or was making preparations to fulfill obligations which were not yet due at the time of the contract's cancellation. But for the Government Defendants' unconstitutional interference, SMG had no reason not to fulfill its contractual obligations to St. Michael's.

Astoundingly, Defendants claim that SMG and St. Michael's did not have a meeting of the minds because signing the contract was a material term, and the parties had not yet signed it. (*See* Dkt. No. 25-1 at 27.) This argument hardly warrants a response, as a signature on a contract is an

---

[21]    Though this draft of the contract is dated July 14, 2021, it was provided by SMG to St. Michael's following the Court's entry of the TRO.

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

indication of affirmative consent to the agreement, not a material term of the agreement.[22] Furthermore, the only reason the parties did not sign the contract is *because the Government ordered SMG to cancel it*, by operation of its unconstitutionally unfettered claim to have the authority to do so on a whim, and its use of that whimsical power to suppress speech it disapproves of. St. Michael's is likely to prevail on this claim.

### 3.2 St. Michael's Media Has Been Irreparably Injured.

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). When a plaintiff seeks injunctive relief for "an alleged violation of First Amendment rights, a plaintiff's irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Assn'n of Club Owners and Fraternal Srvs. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). Thus, if Plaintiff can show a likelihood of success on the merits of its First Amendment claim, injunctive relief must issue.[23] This presumption is arguably of lesser force in regard to the specific performance claim against SMG, but Plaintiff's First Amendment rights will be harmed just as significantly if injunctive relief is not granted against SMG.

Defendants deprived St. Michael's of its First Amendment rights on August 5, 2021. On that date, St. Michael's was informed that it would not be permitted to hold its November 16 rally at MECU Pavilion. As explained above, the Government had no valid basis for canceling the contract between St. Michael's and SMG, and instead did so because of it disapproved of the views

---

[22]   Defendants continue their kitchen-sink approach by claiming Carmen Allard and Teresa Waters did not have authority to bind their respective organizations. (*Id.*) This ignores that: (1) Waters is a Manager of SMG, and an officer with authority to bind SMG; (2) St. Michael's also negotiated with Jason Smith, SMG's Director of Events, who *also* had authority; and (3) everyone involved believed the other participants had authority to enter into the contract on behalf of their respective organizations, creating apparent authority. This is not a serious argument from Defendants.

[23]   Defendants argue that Plaintiff's First Amendment rights will not be harmed in the absence of injunctive relief because it can simply hold its rally at another venue. This ignores the fact that denying Plaintiff its venue of choice is a constitutional injury, and *any* constitutional injury *per se* establishes irreparable harm. Further, what other venue would suffice? And if St. Michael's is so violent and dangerous (as the City claims), what other venue in Baltimore would be acceptable?

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

of St. Michael's and two of its scheduled speakers. The Court should issue injunctive relief to restore the status quo that existed before Defendants unlawfully canceled the November 16 rally.

Defendants argue there is no urgency in Plaintiff's request for injunctive relief because it waited over a month to file suit. This ignores that Plaintiff attempted to resolve its dispute with Defendants informally before resorting to litigation. Defendants acknowledge these efforts—in particular, Plaintiff's August 27 demand letter giving Defendants a week to allow the rally to go forward. Plaintiff, apparently naively, did not think Defendants would double down on their obviously unconstitutional conduct and insist on litigation, but it should not be punished for thinking the Government would be reasonable. Furthermore, there is nothing egregious about taking a little over a month to learn of a constitutional violation, evaluate one's options, attempt to negotiate a resolution, hire counsel, and prepare a complaint and motion for injunctive relief. Defendants cite no authority to support this proposition because there is none.[24]

Defendants make the bad-faith argument that the status quo here is actually the absence of a contract between St. Michael's and SMG for use of MECU Pavilion on November 16. This ignores that, by the time of the Government's interference, St. Michael's and SMG had already agreed to all material terms of the contract and were only negotiating small details. They were in privity of contract, and a signed written agreement was imminent. Indeed, after the Court enjoined the Government from further interfering with this contractual relationship, the parties agreed to all terms all that was missing was a counter-signature. (*See* Dkt. No. 19-2.) The only reason this contractual agreement was not formally signed by SMG is the Government interfered.

The Government cannot violate the Constitution to create a new status quo, thereby necessitating a lawsuit, and then claim that a preliminary injunction would disturb the status quo it unlawfully created. Preliminary injunctive relief is appropriate not only to maintain the existing status quo, **but also to restore the status quo prior to a defendant's unlawful or**

---

[24] The one case Defendants cite to support this, *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75 (4th Cir. 1989), dealt with a request for an injunction halting construction of a road *six months* after all necessary federal approvals for the road had been granted.

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

**unconstitutional actions**. *See Aggarao v. MOL Ship Management Co.*, 675 F.3d 355 (4th Cir. 2012) (holding that "it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions ..., [but] such an injunction restores, rather than disturbs, the status quo ante"). Other circuits agree. *See Savoie v. Merchants Bank*, 84 F.3d 52, 58-59 (2d Cir. 1996) (upholding preliminary injunction that restored the status quo by ordering bank to escrow $500,000, noting logistical hurdles to restoring status quo were "properly laid at the doorstep of the Bank, which acted precipitously, not the plaintiffs, who appropriately pursued their legal remedies"); *United Steelworkers v. Textron, Inc.*, 836 F.2d 6, 10 (1st Cir. 1987) (upholding preliminary injunction requiring defendant to resume paying insurance premium payments, in part because during the "last uncontested status," defendant had paid premiums).

### 3.3    The Balance of Equities Tips Decidedly in Plaintiff's Favor.

Courts "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding" of injunctive relief. *Winter*, 555 U.S. at 24. In other words, the Court must determine whether the harms faced by the plaintiff in the absence of an injunction outweigh the potential harm to the defendant if the injunction is issued. *See Mt. Valley Pipeline, LLC v. Western Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019).

The balance tips in Plaintiff's favor. Failing to grant the requested injunction will deprive St. Michael's and its adherents of their First Amendment rights. Meanwhile, Defendants will suffer no harm if St. Michael's obtains injunctive relief. An injunction will merely restore the rights guaranteed by the U.S. Constitution. There is no evidence the City of Baltimore will suffer any hardship, because Defendants have not shown any likelihood that violence will result from the rally. SMG will not suffer any hardship, and will instead be allowed to perform the now-existing Contract with St. Michael's, which it was planning to do anyway before the Government Defendants unconstitutionally interfered. Indeed, the only entity that may potentially be harmed by allowing the rally to go forward is the USCCB, and its "harm" will simply be having to hear views it does not like.

### 3.4 Injunctive Relief is in the Public Interest.

The public interest "favors protecting First Amendment rights." *Kelly v. City of Parkersburg*, 978 F. Supp. 2d 624, (S.D.W.V. 2013); *see also Carey v. FEC*, 791 F. Supp. 2d 121, 135-36 (D.D.C. 2011); *Mullin v. Sussex Cnty.,* 861 F. Supp. 2d 411, 428 (D. Del. 2012). Moreover, the unconstitutional regulation being enforced by Defendants in this case has the potential to harm nonparties because it will limit or infringe upon the rights granted to them by the First Amendment as well. *See Wolfe Fin. Inc. v. Rodgeres*, 2018 U.S. Dist. LEXIS 64335, at *49 (M.D.N.C. April 17, 2018) (*citing McCarthy v. Fuller*, 810 F.3d 456, 461 (7th Cir. 2015)).

St. Michael's has shown that its First Amendment rights are being infringed and that the public interest favors protecting those rights. Moreover, the public has an interest in being further informed of the various forms of misconduct committed by the USCCB. There is no demonstrated danger to public health or safety by allowing the rally to go forward, as Defendants have not shown any violence or property destruction is a likely result of it.[25] The public interest favors the issuance of the injunctive relief requested by St. Michael's.

### 3.5 At Most, a Minimal Bond Should be Required.

A bond should be required only if the enjoined party will suffer any harm from the issuance of the injunction. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 285 (4th Cir. 2002). Defendants will suffer no damages if the Court issues the injunction, which will simply allow St. Michael's to conduct its peaceful rally. St. Michael's requests that the injunction issue with no bond. If a bond is required, St. Michael's requests that it be minimal and no more than $500.00.

Defendants argue that St. Michael's should be required to post a bond of $1,000,000 due to the possibility of violence and/or property damage breaking out, which could result in litigation against the City. First, without any showing that any violence is likely to break out, there is no justification for this outrageous bond. Second, such a bond is unnecessary because St. Michael's

---

[25] Defendants also claim that requiring them to allow Plaintiff's rally to go forward will set the "dangerous precedent" of requiring the Government not to engage in viewpoint-based discrimination in a designated public forum. (Dkt. No. 25-1 at 34.) Providing a remedy for unconstitutional Government conduct is necessary, not dangerous.

Reply in Support of Amended Motion for Preliminary Injunction
1:21-cv-02337-ELH

already contractually agreed to obtain insurance for millions of dollars for such damages, with SMG, the City of Baltimore, and Mayor Scott as insured parties. (*See* Dkt. No. 14-1 at p. 5, ¶ 11.) St. Michael's has already obtained this insurance policy, and thus a bond already exists. (St. Michael's insurance policy, attached as **Exhibit 3**.) By allowing the rally to go forward, Defendants will already be insured against the harm they pretextually claim to fear.

## 4.0    CONCLUSION

For the foregoing reasons, the Court should grant the requested preliminary injunction, should compel SMG to perform under the contract, and should enjoin the City from any further interference or actions that would have the intent or effect of suppressing St. Michael's First Amendment rights to free speech, free assembly, or free exercise of their religion. The event planned for November 16, 2021 should go forward, as planned without any further interference by the government.

Dated: September 27, 2021          Respectfully Submitted,

/s/Marc J. Randazza

Marc J. Randazza (*pro hac vice*)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, Nevada 89117
Tel: (702) 420-2001
Email: ecf@randazza.com

David S. Wachen (Bar No. 12790)
WACHEN LLC
11605 Montague Court
Potomac, MD 20854
(o) (240) 292-9121
(f) (301) 259-3846

david@wachenlaw.com

Attorneys for Plaintiff
St. Michael's Media, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 27th day of September 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ Marc J. Randazza
Marc J. Randazza