IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ST. MICHAEL'S MEDIA, INC.,
    *Plaintiff*

        v.

THE MAYOR AND CITY COUNCIL OF
BALTIMORE, *et al*.
    *Defendants.*

Civil Action No. ELH-21-2337

## MEMORANDUM OPINION

The right to speak freely and to promote diversity of ideas . . . is . . . one of the chief distinctions that sets us apart from totalitarian regimes . . . [A] function of free speech under our system of government is to invite dispute. . . . Speech is often provocative and challenging. . . [F]reedom of speech, though not absolute, is nevertheless protected against censorship . . . .

*Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) (citations omitted).

\*     \*     \*

In this First Amendment case, the Court must determine whether to enjoin the Mayor and City Council of Baltimore (the "City")[1] from banning a prayer rally and conference at a City-owned concert venue, based on alleged public safety concerns arising from the provocative and controversial nature of some of the speakers.

On September 13, 2021, plaintiff St. Michael's Media, Inc. ("St. Michael's") filed suit against the City; Baltimore Mayor Brandon M. Scott; and Baltimore City Solicitor James L. Shea, Esquire (collectively, the "City Defendants"). ECF 1. Soon after, St. Michael's filed a "First Amended Verified Complaint" ("Amended Complaint"). ECF 14. Plaintiff claims that

---

[1] Plaintiff sued "The City of Baltimore" but, the City's proper name is "Mayor and City Council of Baltimore." *See* Balt. City Charter, Art. I, § 1; ECF 25-1 at 1 n.1. Accordingly, I have used the correct name in the caption of the Memorandum Opinion. And, I shall direct the Clerk to correct the docket to reflect the proper name.

the City Defendants have violated its rights under the First Amendment to the Constitution by denying plaintiff the right to hold a prayer rally and conference on November 16, 2021, at the MECU Pavilion (the "Pavilion"), situated in downtown Baltimore on Pier VI, in an area known as the "Inner Harbor."  ECF 14, ¶ 7.  The City owns the Pavilion, but it is managed by SMG, a private company that operates under the name "Royal Farms Arena."  *Id.*

St. Michael's, a non-profit organization, "is a vocal critic of the mainstream Catholic Church," including the United States Conference of Catholic Bishops ("USCCB").  ECF 1, ¶ 66; *see* ECF 14, ¶ 75; ECF 1, ¶ 3.  Plaintiff seeks to hold the prayer rally and conference to criticize the Church, particularly with respect to child sexual abuse committed by members of the clergy, and it wants to do so on a date that coincides with the USCCB's Fall General Assembly.  ECF 1, ¶¶ 8-10, 42.  The USCCB plans to meet from November 15 – 18, 2021 at the Waterfront Marriott Hotel ("Hotel"), a private facility located near Pier VI.  *Id.* ¶¶ 8, 9.

On or about August 5, 2021, weeks after plaintiff had paid a $3,000 deposit to SMG for use of the Pavilion, SMG, on instruction of the City, notified St. Michael's that plaintiff could not rent the Pavilion.  *Id.* ¶¶ 13, 14.  The City cited safety concerns linked to some of the people who were identified as speakers at the event.  *Id.* ¶¶ 15-19.

St. Michael's sent a demand letter to defendants on August 27, 2021, giving defendants until September 3, 2021, to permit the rally to proceed.  ECF 1, ¶ 23.  Defendants did not respond.  *Id.* ¶ 34.  This suit followed.

Along with the suit, St. Michael's moved for a temporary restraining order ("TRO") and a preliminary injunction.  ECF 2 at 13.  St. Michael's asked the Court to compel SMG to "fulfill its contractual obligations with St. Michael's" and to enjoin the defendants from "interfering with St. Michael's preparing for and conducting" its rally on November 16, 2021.  *Id.* at 13-14.

St. Michael's also submitted a declaration from its founder and CEO, Michael Voris, describing a telephone conversation with Shea on August 6, 2021 (ECF 8-1), and a declaration from Christine Niles, a senior producer and investigative reporter at St. Michael's, describing emails she obtained from the City pursuant to a request under the Maryland Public Information Act. ECF 8-2.[2]

St. Michael's subsequently filed its Amended Complaint (ECF 14), adding SMG as a defendant, and adding a new claim, directed only at SMG. Plaintiff also appended several exhibits. *See* ECF 14-1, ECF 14-2, ECF 14-3. The Amended Complaint contains five "Claim[s] for Relief," the first four of which are lodged against the City Defendants, pursuant to 42 U.S.C. § 1983. I shall refer to each claim as a count.

Count I alleges that the City Defendants violated plaintiff's First Amendment right to free speech. ECF 14, ¶¶ 48-61. Count II alleges that the City Defendants violated plaintiff's "Right of Free Exercise of Religion," as guaranteed by the First Amendment. *Id.* ¶¶ 62-72. In Count III, plaintiff claims that the City Defendants violated the Establishment Clause of the First Amendment. *Id.* ¶¶ 73-83. And, Count IV asserts that the City Defendants violated plaintiff's right of assembly, as protected by the First Amendment. *Id.* ¶¶ 84-98. Count V is lodged against SMG, and seeks specific performance of the alleged contract between plaintiff and SMG. *Id.* ¶¶ 99-113.

St. Michael's also filed an amended preliminary injunction motion. ECF 15 (the "Motion"). The Motion is supported by three exhibits (ECF 16), which are identical to the

---

[2] I granted the TRO, in part. ECF 9. In particular, I ordered the City Defendants not to prevent St. Michael's from making arrangements for the rally. *Id.* But, I did not order SMG, a non-party at the time, to execute a contract with plaintiff. And, during a conference call with counsel on September 14, 2021, I established a briefing schedule and set a motion hearing for September 30, 2021. ECF 10.

exhibits submitted with the Amended Complaint (ECF 14-1; ECF 14-2; ECF 14-3).  And, the Motion seeks the same relief that was set forth previously in regard to the original motion.

Defendants oppose the Motion (ECF 25), supported by a memorandum (ECF 25-1) (collectively, the "Opposition") and five exhibits.  ECF 25-2 to ECF 25-6.  SMG joined the Opposition.  ECF 26.[3]

St. Michael's replied.  ECF 31 (the "Reply").  With the Reply, plaintiff submitted nine exhibits.  ECF 31-1 to ECF 31-9.  Thereafter, the Court requested additional briefing from defendants with respect to particular issues presented in the Reply.  ECF 34.  In response, defendants filed a surreply.  ECF 37.

On September 29, 2021, one day before the scheduled Motion hearing (ECF 10), St. Michael's filed 17 witness declaration, as well as the curriculum vitae of a proffered expert witness, James P. Derrane, Ph.D.  *See* ECF 41; ECF 41-1 to ECF 41-18.  That night, shortly before 9:00 p.m., plaintiff filed Dr. Derrane's expert report, providing his safety risk assessment with regard to the proposed rally.  ECF 42.[4]

The Court held an evidentiary Motion hearing on September 30, 2021, and October 1, 2021, at which six witnesses testified for plaintiff: James Grein; Father Paul John Kalchik; Milo Yiannopoulos; Christine Niles; Michael Voris; and Dr. Derrane.  ECF 43; ECF 44.[5]  The parties also agreed to admit into evidence all exhibits previously submitted with their filings.

---

[3] Counsel for the City Defendants also represents SMG in this action.

[4] Also on September 29, 2021, defendants gave notice of an expert witness.  ECF 40. But, the City never called that witness.

[5] Dr. Derrane testified via Zoom.  The other witnesses appeared in person.

For the reasons that follow, I shall grant the Motion in part and deny it in part.[6]

## II. Factual Background[7]

### A.  The Parties and the Pavilion

St. Michael's is a Michigan-based nonprofit organization that "publishes news stories about societal issues" and "current events of interest to Catholics," with "a particular focus on the Catholic Church."  ECF 14, ¶¶ 3, 8.  It has a subsidiary organization, "Church Militant," which is a 501(c)(4) organization.  ECF 3 (Disclosure Statement).  Defendants sometimes refer to the plaintiff by the name "Church Militant."  *See, e.g.*, ECF 25-1 at 1; ECF 25-3 (Decl. of Michael G. Huber, Scott's Chief of Staff), ¶ 3 n.2.

Plaintiff notes that it "sometimes dissents from Catholic Church hierarchy, and is vocal about this dissent."  ECF 14, ¶ 3.  Moreover, it "often criticizes the current leadership" of the Catholic Church for what it perceives as "corruption in the Church," including the Church's protection of priests and others implicated in the sexual abuse of minors.  *Id.* ¶ 8. In addition, St. Michael's "is a vocal critic of what it perceives as politicization of the Catholic Church by the USCCB."  *Id.* ¶ 75.  In particular, it "disagrees with, and criticizes, a number of the USCCB's positions on religious doctrine and morality, as well as the Catholic Church's covering up of the

---

[6] The Court has endeavored to issue this opinion as expeditiously as possible, mindful of the time-sensitive nature of the case. Nevertheless, as the opinion hopefully reflects, the Court was required to undertake a great deal of research on legal questions not fully developed in the parties' briefing.

[7] The facts are derived from the evidence presented at the Motion hearing, the exhibits, and, where appropriate for background, from the Amended Complaint.  I do not have a transcript of the testimony presented at the hearing. Therefore, in recounting any testimony, I have relied on my notes.  I do not represent that any quotes correspond verbatim to the testimony.

Moreover, some of the witnesses who testified also provided declarations.  To the extent that the testimony corresponds to an averment in a declaration, I sometimes cite to the declaration.

sexual abuse committed by priests." *Id.*   The testimony of several witnesses for plaintiff, including Voris, Niles, and Grein, a victim of sexual child abuse committed by a high-ranking member of the clergy, made clear the passionate beliefs held by many of those affiliated with St. Michael's. *See, also, e.g.*, ECF 41-6 (Decl. of Niles), ¶¶ 3-9 (describing herself as a devout Catholic, but disdainful of the Church's treatment of sex abuse victims and "whistleblowers").

The Mayor and City Council of Baltimore is a municipal corporation.  ECF 14, ¶ 4; *see* Balt. City Charter, Art. I, § 1.  Scott is the Mayor of Baltimore.  ECF 14, ¶ 6.  Shea is the City Solicitor for Baltimore. *Id.* ¶ 5.  As City Solicitor, Shea is the City's chief legal advisor and the head of its Department of Law.  ECF 25-4 (Decl. of Shea), ¶ 4; Balt. City Charter, Art. VII, §§ 22-26.[8]  Both Shea and Scott have been sued in their official and individual capacities.  ECF 14, ¶¶ 5, 6.

The Pavilion, owned by the City, opened in 1981 as the Pier Six Pavilion.  ECF 25-2, ¶ 2 (Decl. of Frank Remesch, Royal Farms Arena General Manager); ECF 31-4 (Ticketmaster MECU Pavilion Venue Guide) at 2-3.[9]  It is a tent-like structure that functions primarily as a summer concert and entertainment venue.  ECF 25-2, ¶ 3; ECF 31-1, Royal Farms Arena website; ECF 31-4.  Located at 731 Eastern Avenue, the Pavilion is situated "in the heart of downtown Baltimore."  ECF 25-3 (Huber Decl.), ¶ 3; *see also* ECF 14, ¶ 7, ECF 25-2, ¶ 3; ECF 25-6; ECF 37-1 (Remesch Supplemental Decl.), ¶ 3.  As mentioned, the area where it is located is sometimes referred to as the Inner Harbor.  ECF 25-3, ¶ 4; ECF 14, ¶ 7.

---

[8] The Mayor, as the chief executive officer of the City, appoints the City Solicitor, subject to confirmation by the City Council.  Balt. City Charter, Art. IV, §§ 4, 6.

[9] The venue "acquired the MECU name in 2018, when the Municipal Employees Credit Union of Baltimore purchased the naming rights."  ECF 21-4 at 2.  According to the City's attorneys, "Pier VI" is the correct terminology, although "Pier Six" is sometimes used in the parties' submissions. And, I also saw a reference to "Pier 6."

Promotional literature describes the Pavilion as a Baltimore "landmark," ECF 21-4 at 2, and a facility that is "instantly identifiable" given its "white big-top tent." ECF 31-4 at 2. The Pavilion has a total capacity for 4,600 persons, "split between covered seating and an open-air lawn." *Id*. at 2-3.[10]

Although the City owns the Pavilion, the venue is operated and managed by defendant SMG, pursuant to a contractual relationship with the City. ECF 25-2, ¶¶ 2, 4.[11] SMG is a Pennsylvania general partnership that operates under the name "Royal Farms Arena," a reference to another Baltimore venue that it manages. ECF 14, ¶ 7; ECF 16-1 at 3; ECF 25-2, ¶ 2.[12]

The Pavilion and the surrounding geographic area are depicted in various exhibits introduced by defendants. I have included three of them. *See* ECF 25-6 at 4, 5, 6. The depictions show the proximity of the Pavilion to the Hotel where the USCCB is scheduled to meet in November 2021. ECF 14, ¶ 9. They also show that the Pavilion is located on a pier surrounded by water on three sides, with direct access to two busy streets, Pratt Street and Eastern Avenue. And, there is a footbridge connecting Pier VI to the area where the Hotel is located. In addition, one of the depictions is a photograph that illustrates the downtown setting and the tent-like structure used for covered seating.

---

[10] The parties seem to agree that there is covered seating for about 3,000 people. *See* ECF 8-1, ¶ 2.

[11] Only an excerpt of the contract between the City and SMG has been provided to the Court. *See* 16-3 at 2.

[12] SMG is a subsidiary of ASM Global, a venue management conglomerate formed in 2019 by the merger of SMG with another company. *See* ECF 16-1 at 3; *ASM Global*, ROYAL FARMS ARENA, http://www.royalfarmsarena.com/arena-info/asmglobal (last visited Sept. 23, 2021).







According to defendants, the Pavilion "is a commercial venture that is reserved to selected speakers and performers based on the subjective criteria of the operator," *i.e.*, SMG, with the ultimate purpose of making money "as an entertainment venue." ECF 37 at 2. Per the contractual relationship between the City and SMG, the City receives rent payments for use of the Pavilion as well as "a percentage of proceeds from ticketed event sales" at the Pavilion. ECF 25-2, ¶ 5; *see* ECF 37-1, ¶¶ 4-6. The "leftover proceeds" are "utilized to pay facilities expenses," and remaining funds "are profit to Live Nation and SMG." *Id.* ¶¶ 4-7.[13]

Ticket sales for events at the Pavilion are handled by Ticketmaster. *See* ECF 16-2 at 24. The Ticketmaster Venue Guide for the Pavilion describes the facility as "Baltimore's premiere venue for outdoor summer concerts." ECF 31-4 at 3. And, the Royal Farms Arena describes the Pavilion as "the perfect space to enjoy entertainment along Baltimore's famed Inner Harbor."

---

[13] The role played by Live Nation, another company, has not been clarified by the parties.

ECF 31-1.[14]  It appears undisputed that many musical and comedy events have been held over the years at the Pavilion.  ECF 31 at 7 n.9; ECF 31-4 at 3; ECF 31-5; ECF 31-6; ECF 31-7.[15] There is no indication that any of the concerts or performances took place during business hours on a work day.

According to Frank Remesch, General Manager of the Royal Farms Arena, SMG "contracts with outside parties for use of the venue," *i.e.* the Pavilion.  ECF 25-2, ¶ 4.  To that end, St. Michael's interacted exclusively with a representative of SMG to make arrangements to use the Pavilion for its rally.  ECF 14, ¶¶ 14-19.  But, according to the City, it has the authority to reject a request for use of Pier VI.

The contract between the City and SMG provides, in part, ECF 16-3 at 2:

> 11.    **Schedule of Events, Objections.**  During the Term, Operator shall use good faith efforts to advise City each month during the event season as to the dates of events and the artists or users for scheduled events.  Operator agrees that it will not allow any public event to be held at the Facilities which utilizes artists that have not performed at a similarly situated venue owned or operated by Live Nation.  The City shall provide Operator with notice of any objections or complaints that result from a public event held at the Facilities.  Prior to booking any such objectionable performer at the Facilities in future years, the Operator will provide the City with notice, at which time the City shall have 48 hours to object to such performer, and the Operator will not book such objectionable performer unless the Operator has provided assurances to the City that the issues giving rise to the objections and complaints will be addressed in a manner satisfactory to the City.

It is not clear whether the portion of the contract cited above provides the only basis on which the City may intervene with regard to the use of the Pavilion.  In an email of August 5,

---

[14] At ECF 31 at 6, plaintiff points to the following passage from the same web page: "Royal Farms Arena is Baltimore's premier multi-use sports and entertainment facility and is a great place to host a wide variety of events. Our flexible and dynamic space has the ability to accommodate major concerts, family shows, sporting events, college commencements, conferences, corporate events and political functions."  *See* ECF 31-1.  However, this text refers to the Royal Farms Arena, an entirely distinct venue located near the federal courthouse in Baltimore.

[15] Concerts were not held during the peak of the COVID-19 pandemic.

2021, sent from Shea to Teresa Waters, an SMG representative, Shea referred to the above clause and said: "The City's basis for the decision to decline to provide a forum for the event encompasses more than the provision you cite." ECF 16-3 at 2.[16] However, the City did not furnish the Court with a contractual provision on which it relies for its decision. Moreover, no standards, policies, or procedures were submitted to the Court that pertain to the City's exercise of its discretion as to use of the Pavilion.

### B.  Plaintiff's Event and Efforts to Secure the Pavilion

### 1.

The United States Conference of Catholic Bishops will hold its Fall General Assembly in Baltimore from November 15 to November 18, 2021. *See* ECF 14, ¶ 9. In particular, the USCCB will meet at the Hotel, located directly across from the Pavilion, and separated by a narrow waterway and a footbridge. *Id.* ¶¶ 9, 10; ECF 19-3 at 2. "Numerous bishops and other high-ranking members of the Catholic Church will be in attendance at this event." ECF 14, ¶ 9.

In order to "criticiz[e] elements of the power structure of the Catholic Church," St. Michael's seeks to hold a "Prayer Rally & Conference" at the Pavilion on November 16, 2021. ECF 14, ¶¶ 10-11; ECF 25-3, ¶ 5. The event will also include "praying the Rosary." ECF 14, ¶ 12; *see* ECF 8-1, ¶ 11. In November 2018, during a USCCB conference at the Hotel, plaintiff held the "same kind of rally" at Pier VI. ECF 14, ¶¶ 13, 25. According to plaintiff, a central topic of the 2021 rally, like the one in 2018, is the issue of sexual abuse of minors by clergy.

As in 2018, St. Michael's purposely chose the Pavilion for its 2021 event because it is "immediately adjacent" to the Hotel, where the USCCB Fall Assembly is held. ECF 14, ¶ 11; *see also* ECF 8-1, ¶ 5. Plaintiff asserts that proximity to the Hotel is critical, because "[t]he

---

[16] The email is a bit garbled in the exhibit but the quote appears to be accurate.

entire purpose" of the "rally is to communicate the ideas of [its] members and attending speakers to the USCCB in a format and in a venue that they cannot ignore." ECF 14, ¶ 42. In plaintiff's view, holding the rally at a different location or at a different time would "neuter" both the rally's "expressive elements" and its "religious significance." *Id*. ¶¶ 42, 43. According to St. Michael's, word of the 2021 event spread quickly. Over 2,000 reservations were secured following just two weeks of public promotion. ECF 8-1, ¶ 10.

At the Motion hearing, rally organizers and attendees confirmed the importance of the Pier VI location. *See also* ECF 41-1, ¶ 14. For example, Niles testified that the Pavilion is important because the bishops would be in the direct view of the rally by means of a large window at the Hotel that overlooks the Pavilion.

Evidence was also presented as to the subject matter of the 2021 event. Father Paul John Kalchik, a Roman Catholic priest in Chicago, testified that he was abused by a priest when he was a child. *See also* ECF 41-1 (Decl. of Father Kalchik), ¶¶ 5, 6. Now 60 years old, *id.* ¶ 4, Father Kalchik plans to speak at the rally "about the evils of sexual predation," a topic for which he claims he was "silenced for 39 years." *Id.* ¶ 10. He also complains that "Church officials have been stone deaf" in "ridding the Church of these predators." *Id.* As he explained in his Declaration, the rally will also provide "comfort" to victims of sexual child abuse and demonstrate that they are "not invisible anymore." *Id.* ¶ 13.

In his testimony, Father Kalchik characterized the City's concerns about violence as "ludicrous." In his view, the City's conduct would once again "silence" the victims.

Grein, a resident of Virginia, describes himself as "a devout" Catholic who is opposed to violence. ECF 41-2 (Grein Decl.), ¶¶ 2, 6, 14-20. He testified that he, too, was the victim of child sexual abuse, committed by a high-ranking member of the clergy. He plans to attend the

event "to speak and pray with faithful Catholics in such a way that communicates to the USCCB that they can no longer make [him] and other victims of their abuse hide in secret."  ECF 41-2, ¶ 11.  Moreover, he maintains that those who have "covered up the sexual abuse committed by Catholic priests need to see the victims they have tried . . . to ignore."  *Id.* ¶ 12.

At the hearing, Grein poignantly explained the significance of his experience in speaking publicly for the first time about his abuse at plaintiff's 2018 rally in Baltimore.  He offered that he is looking forward to attending the 2021 rally to "heal by speaking."

Other individuals who plan to attend the 2021 event submitted declarations expressing similar sentiments.  The declarations reflect the declarants' interest in the issue of child sexual abuse by Catholic clergy, as well as their opposition to violence.  *See, e.g.*, ECF 41-4 (Decl. of Maris Bentley, a resident of Nebraska); ECF 41-5 (Decl. of Maria Barrientos, a resident of California), ¶¶ 8-12; ECF 41-8 (Decl. of Violet Burgard, a resident of Louisiana), ¶¶ 8-12.

St. Michael's has arranged for 16 speakers at the event.  ECF 8-1, ¶ 11.  According to a social media advertisement (ECF 25-3, ¶ 5), the "confirmed speakers" include Voris; media personalities Milo Yiannopoulos and Michelle Malkin; political strategist Stephen ("Steve") Bannon; as well as Archbishop Carlo Viganò.  *Id.*  Voris testified that two of the high-profile speakers, Bannon and Yiannopoulos, will help bring "notoriety" to the event, thereby increasing attendance and attention.  However, based on emails between St. Michael's and SMG, it is not clear that all the speakers will attend in person.  *See* ECF 16-2 at 6 ("We may also want to Skype in a speaker or two.").

Bannon did not testify or submit a declaration.  Voris testified that, for the most part, he has not had detailed discussions with any of the speakers as to the content of their remarks.  But,

when asked, Voris testified that Bannon would most likely speak about efforts of various Catholic dioceses to shelter money so as to avoid payments to victims.

Yiannopoulos states in his Declaration (ECF 41-3), and in his testimony, that his role is primarily that of host or "emcee."  *Id.* ¶ 5.  He recounted that he was "raped" by a priest, and he wants to speak about his experience to help others confront their abusers and the enablers.  He stated that the Catholic bishops are not his "enemy," but he views some of them as "very lost" and "failing in their pastoral duties," and he believes they deserve to be held "to account."  As Yiannopoulos put it, confronting those who cover up the abuse is the "crux" of the prayer rally.  And, given the proximity of the location to the Hotel, the bishops will not be able to overlook the 3,000 attendees.

## 2.

As noted, St. Michael's previously held the "same kind of rally" at the Pavilion in November 2018.  ECF 14, ¶¶ 13, 25.  Like the 2021 rally, the 2018 rally was timed to coincide with the USCCB Fall General Assembly.  *Id*. ¶ 13. According to St. Michael's, the 2018 rally "was entirely peaceful, lawful, and uneventful," without any harm to people or property.  *Id*.  No evidence was introduced to contradict that claim.[17]

In anticipation of the 2021 event, St. Michael's reached out to SMG on or about June 16, 2021, in an effort to secure the Pavilion for its rally on November 16, 2021.  ECF 14, ¶ 10.  Thereafter, St. Michael's "spent several weeks" communicating with SMG employees as to arrangements and logistics.  *Id*. ¶ 14.  Voris describes these communications as "[c]ordial and friendly."  ECF 8-1, ¶ 8.  However, the parties disagree as to the legal effect of these communications.

---

[17] As discussed, *infra*, the City argues that the two events differ significantly in size.

Carmen Allard, an employee of St. Michael's who is responsible for "Development, Special events, Media relations[, and] Travel," placed a call on June 16, 2021, to Teresa Waters, the "Human Resources Manager/Executive Assistant to General Manager" at Royal Farms Arena, inquiring as to the availability of the Pavilion on November 16, 2021.  ECF 16-2 at 38. Waters responded via email the same day, stating, in part (*id.*):

> We have the date you inquired about available. We do require a $3000 non-refundable deposit to hold the date. I have attached the prior contract [for the 2018 event] for your review…the rental rate is still the same, however production costs will have changed over the years.
>
> Please advise if you would like to proceed with a deposit and contract confirming the event.

Allard responded, in relevant part: "Yes, we would like to proceed. Kindly provide directions for payment of the deposit and a new contract."  *Id.* at 37.  On June 21, 2021, plaintiff wired the $3,000 deposit to SMG, which was received on June 22.  *Id.* at 32; ECF 41-7 (Allard Decl.), ¶ 8.

At Waters's request, on June 18, 2021, Allard provided details to Waters for the drafting of a new contract, such as event name and times.  ECF 16-2 at 36.  On July 14, 2021, Waters sent an email to Allard with "the contract for the 11.16.2021 Baltimore Conference and Prayer event."  *Id.* at 30.  She continued: "Please sign and return to me for execution. If you have any requested edits please do so in a redline format."  *Id.*

The proposed contract is titled "Pier Six Pavilion" and "Use License Agreement."  The parties were identified as SMG and "St. Michael [sic] Media."  ECF 16-1 at 1.  It outlines various terms, procedures, and fees relating to St. Michael's use of the Pavilion.  Paragraph 2(a) provided that the Pavilion "is to be used solely for the purpose of holding a conference, Baltimore Conference & Prayer Meeting 2021.  Licensee shall not use the Facility or permit the

Facility to be used by any of its officers, directors, agents, employees, licensees, or invitees, for any unlawful or immoral purpose or in any manner so as to injure persons or property in, on, or near the Facility." *Id*. at 4. The document was not signed by SMG. *Id*. at 14.

Allard sent back several corrections and changes on July 15, 2021. ECF 16-2 at 28-29. Waters responded the same day that she would make the requested changes and "get this [the contract] back to you." *Id*. at 27. Then, between July 16, 2021 and August 2, 2021, Allard and Waters exchanged a series of emails concerning aspects of the event and the Pavilion. *Id*. at 10-12, 17-18, 24-27. These included, *inter alia*, extending the length of the event on November 16 and associated costs; the technology available at the Pavilion; and whether the event would be classified as "private" or "ticketed." *Id*. at 10-12, 17-18, 24-27. Text in the Use Agreement might have been subject to change, depending on the outcome of the discussions. *See* ECF 16-1, § 8(a) (event not "ticketed"), Ex. A (hours).

On July 20, 2021, Allard emailed Waters, stating that St. Michael's had "sold tickets to 800 persons." ECF 16-2 at 24. Waters sent an email to Allard on July 20, 2021, stating, in part: "[B]efore we quote any additional costs we have an issue to discuss. When the Pier is rented as a private event that means guests do not purchase tickets to the event . . . It was recently brought to our attention you are charging a $25 ticket fee for attendees . . . if that is the case we have to change your event to a ticketed event . . . tickets will need to be sold through Ticketmaster and you [sic] event will be subject to TM fees and amusement tax." *Id*.

As a result, plaintiff decided not to hold a ticketed event. Instead, plaintiff planned either to refund money to those who had purchased tickets or to retain the payments as donations. *Id*. at 17-18.

Between June 21, 2021 and July 20, 2021, Allard also exchanged emails with Jason Smith, the Royal Farms Arena "Director of Event Services."  ECF 16-2 at 2-10.  The exchanges concerned technology matters and other logistical issues, as well as a possible visit by St. Michael's staff to the Pavilion to plan the event.  *Id.*

On August 2, 2021, Waters emailed Allard, providing "answers to the remaining questions to try and finish the contract," and discussing certain issues mentioned above.  *Id.* at 17-18.  Allard responded the same day regarding each of the issues.  *Id.* at 17.  However, it does not appear that an updated contract was sent to St. Michael's prior to August 5, 2021.

Plaintiff's preparation for the rally was not limited to its interactions with SMG.  As mentioned, St. Michael's selected the speakers for the rally.  ECF 14, ¶ 14; ECF 8-1, ¶ 11.  And, on June 23, 2021, St. Michael's began publicly promoting the rally, resulting in "over 2,000 reservations."  ECF 14, ¶ 14; ECF 8-1, ¶ 10.  Further emails from Allard referenced the expectation of 3,000 attendees.  ECF 16-2 at 5, 12, 26.

### C.  The City's Rejection of Plaintiff's Request

### 1.

Michael Huber, Mayor Scott's Chief of Staff, avers that the discussions between SMG and St. Michael's "came to the attention" of the City in July 2021.  ECF 25-3 (Huber Decl.), ¶ 3. In particular, the City learned that St. Michael's planned a rally featuring speakers "known for encouraging violent actions that have resulted in injuries, death, and property damage."  ECF 25-1 at 10.  In the City's view, some of the speakers would "provoke a strong reaction and raise the potential for clashes and disturbances," given the "very real potential [that the speakers] would use [the rally] to incite violence and public disruption."  *Id.* at 11; *see* ECF 25-3, ¶ 4.  Because the prospect of property damage and violence "is a real and valid concern . . . .," ECF 25-1 at

22, the City decided to reject plaintiff's request to use the Pavilion for the rally.  *Id.* at 10-11;

ECF 25-3, ¶ 6.

> In his Declaration, Huber avers, ECF 25-3, ¶ 4:
>
> According to the Church Militant's website and other social media sources, Church Militant is attempting to hold an event on November 16, 2021 with confirmed speakers including Steve Bannon and others whose speaking engagements and statements have a track record of inviting protestors and counter protestors and supporting the January 6 attack on the Capitol in Washington, D.C. According to available media reports, their events and statements have a demonstrated history of inciting property destruction, physical assaults, and other violence, *i.e.*, secondary effects.  The City believes that the event proposed by Church Militant will bring those secondary effects to the City of Baltimore generally, and the downtown area around the Inner Harbor and Pier IV [sic], specifically.

"For the reasons stated above," Huber contacted SMG during the week of July 19, 2021,

and "instructed them to cease discussions" with St. Michael's.  ECF 25-3, ¶ 6; *see* ECF 25-1 at 6.

It appears that the City's concerns about the speakers and the potential "secondary effects" were

based primarily if not entirely on "available media reports."  ECF 25-3, ¶ 4.[18]

Notably, there is no indication in the record that any other concerns or justifications were

considered by the City at the time it decided to cancel the rally.  Rather, the City focused on its

view of St. Michael's as an organization, and it also expressed concern about certain speakers,

claiming they are individuals who have a history of promoting violence.  The Opposition cites

several news reports to support its concerns.[19]

---

[18] Specific information as to how the City learned of plaintiff's plans has not been provided to the Court.

[19] St. Michael's argued in its Reply that the news reports cited in the Opposition are "inadmissible hearsay."  ECF 31 at 13 n.12.  But, I may rely on hearsay in the context of a preliminary injunction proceeding.  *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated on other grounds*, __ U.S. __, 137 S. Ct. 1239 (2017) (Mem.).  In any event, the parties subsequently agreed to the admission of the exhibits.  Of course, this does not mean that the content of a particular exhibit is necessarily accurate.

18

For example, in the Opposition defendants cite "incendiary and hateful rhetoric" from certain confirmed speakers, particularly Voris, Bannon, and Yiannopoulos.  ECF 25-1 at 11. And, according to defendants, St. Michael's "was an active propagandist for the claim that the November 2020 Presidential Election was stolen from Donald Trump."  *Id.* at 7.  Further, defendants assert that plaintiff continued "expressing and disseminating this sentiment" until the January 6 "insurrection" at the Capitol.  *Id.*  According to the defendants, in a broadcast on January 6, 2021, Voris allegedly "glorified the Capitol insurrectionists" while showing video footage of the day's events and remarking: "'Once on Capitol grounds, [Trump supporters] showed the media exactly what they think of them.'"  *Id.* at 7-8 (quoting *Post-Election Special: Storming the Capitol*, CHURCH MILITANT (Jan. 6, 2021), https://www.churchmilitant.com/news/article/post-election-special-storming-the-capitol).

As for Bannon, a "former Trump Official" regarded by some as a political gadfly, the Opposition asserts that he "regularly calls for violence against government officials and also played a key role" in the lawless conduct at the Capitol on January 6, 2021.  ECF 25-1 at 8; *see id.* at 9.  Moreover,  defendants point out that Bannon, who has been banned from Twitter, made a reprehensible statement in a podcast about Dr. Anthony Fauci and FBI Director Christopher Wray:  "'I'd put the heads on pikes.'"  *Id.* at 8 (citing Jaclyn Diaz, *Twitter Permanently Suspends Steve Bannon Account After Beheading Comments*, NPR (Nov. 6, 2020), https://www.npr.org/2020/11/06/932052602/twitter-permanently-suspends-steve-bannon-account-after-beheading-comments).   And, defendants contend that "speaking engagements involving Steve Bannon have also devolved into violence and disruption."  ECF 25-1 at 9.  The City cites a November 2018 debate involving Bannon, held in Toronto, which led to a clash

between police and protestors, as well as an event in September 2017 at the University of California, Berkeley. *Id*. at 9 n.14.

With respect to Yiannopoulos, the Opposition characterizes him as a "far-right pundit" who has "incit[ed] racist and misogynistic abuse of an African American celebrity," with "a history of making comments advocating for pedophilia." *Id*. at 9-10. His comments are so outrageous, according to the City, that he was banned from Twitter and even barred from "the conservative CPAC Conference in 2017." *Id*. Further, the City argues that Yiannopoulos's "language has also shown enthusiasm for violence," including a call in June 2018 for "'gunning journalists down . . . .'" *Id*. at 10.[20] And, the City claims that "[v]iolence and public disruption frequently follow [his] engagements." *Id*.

To illustrate, defendants point to Yiannopoulous's speaking engagement at the University of Washington in Seattle in January 2017, where one man was shot, and which required a substantial investment from area police. *Id*. Defendants also cite a separate engagement at the University of California, Berkeley in early 2017, which resulted in riots and significant property damage. ECF 25-1 at 10.

The City explains that, "[w]ith such a 'star studded' group on the plaintiff's program," known for inciting violence, *id.*, it "instructed SMG not to move forward with the event out of a legitimate fear that it would incite violence in the heart of downtown Baltimore." *Id*. at 11 (citing Huber Decl., ECF 25-3, ¶¶ 3-6). But, the City notes that it "has not stopped Plaintiff from planning and holding its event in another space . . . ." ECF 25-1 at 11.

---

[20] Such invective might be deemed offensive to many Marylanders, given the tragic and senseless murders of five employees of the Capital Gazette, a newspaper in Annapolis. Those murders occurred in June 2018, just two days after Yiannopoulos's comments. However, it does not appear that the gunman, Jarrod Ramos, was motivated by political considerations. Nor is there any ground to believe that Ramos was aware of Yiannopoulos's comment.

In the Opposition, defendants also argue that the City's concerns are particularly valid given that the Pavilion "sits on the end of Pier VI in the Inner Harbor," accessible from Pratt Street, the Pier V Hotel, the bridge connecting Pier VI to the Marriott, and because there is water on three sides. *Id.* at 20-21. To be sure, in July 2021, Huber noted that the Pavilion is located "in the heart of downtown Baltimore." ECF 25-3, ¶ 3. But, Huber did not otherwise cite the particulars of the location of Pier VI as a justification for the City's actions. Nor did he mention the time of the event or the number of attendees as a particular concern.

Additional evidence as to the basis for the City's decision at the time is provided in an email from Waters, "sent on behalf of Frank Remesch" to Shea on August 4, 2021. ECF 16-3 at 2. Waters confirmed that the City "wishes to exercise its right to deny an event at the MECU Pavilion." *Id.* She also referenced a clause in the City's contract with SMG, authorizing the City to object to bookings of performers, quoted *supra*. As mentioned earlier, however, Shea responded to Waters by email on August 5, 2021, and said: "The City's basis for the decision to decline to provide a forum for the event encompasses more than the [contract] provision you cite." ECF 16-3 at 2. But, Shea did not elaborate.

Moreover, in its Opposition, the City articulates several other justifications for its decision to block the event at the Pavilion. However, there is no evidence that these justifications were part of the calculus for the City's decision at the relevant time. For example, the City Defendants contend that permitting the rally will require a significant response from the Baltimore Police Department, which is already severely understaffed. ECF 25-1 at 24, 33; ECF 25-5 (Decl. of Sheree Briscoe, Deputy Comm'r of Operations, Balt. Police Dep't). The City also points to the litigation in which it is now embroiled in federal court as a result of the riots that followed the death of Freddie Gray in 2015, while he was in police custody. ECF 25-1 at 22; *see*

*Chae Brothers, LLC d/b/a Fireside North Liquors, et al. v. Mayor and City Council of Baltimore*, SAG-17-01657.

Defendants do not dispute the characterization of plaintiff's 2018 rally as peaceful. *See* ECF 25-1 at 5. However, in their Opposition and in argument, they highlighted what they consider critical differences between the 2018 rally and the proposed 2021 rally: the 2021 rally is projected to be substantially larger in size, and several of the individuals slated to speak at the 2021 event are regarded as inflammatory. *Id.* at 5, 11, 24; ECF 25-5, ¶ 3.

There is no disagreement that as many as 3,000 attendees are expected at the 2021 rally. That number far exceeds the number of people who attended in 2018. *See* ECF 16-2 at 5, 12, 26. But, there is conflicting evidence concerning the size of the 2018 crowd. In their submissions, the defendants assert that in 2018 there was a crowd size of only 300-400 people. *See, e.g.*, ECF 25-1 at 5. But, Niles and Voris testified that, in actuality, about 900 to 1,000 people attended in 2018, without incident. Even assuming the accuracy of plaintiff's account, the 2021 event would be three times larger than the 2018 event.

In any event, although the Opposition discusses the "size of the program" (*id.* at 19), this was not a factor cited by Huber or Shea in their declarations as a basis for the City's decision to cancel the event at the Pavilion. Indeed, it is unclear if the City was even aware of the rally's projected size at the time it made its decision. Nor did Huber or Shea mention in their declarations the burden on the police or the concern about a potential lawsuit should violence erupt that results in property damage.

Notably, no cases have been cited to the Court to suggest that the City had an obligation to inform plaintiff of the reason(s) for its decision to cancel the rally. But, Shea did provide an explanation to Voris. *See, e.g.*, ECF 25-4, ¶ 4. The explanation concerned "disruptions based on

publicly available media reports and other public information about the Church Militant and the confirmed speakers for the event." *Id.*   Additional new grounds were presented during the litigation.  Significantly, the City offered no evidence to demonstrate that the additional grounds were also considerations at the time the City made the decision to cancel the event.

Therefore, the only information available to the Court with respect to the City's basis for its decision is that which is contained in the declarations from Huber and Shea recounting the City's actions.  *See* ECF 25-3; ECF 25-4.  Given the addition of new grounds, this raises the question of whether these added concerns were actually factors in the decision at the time or, instead, developed after the fact to justify what took place.  In the absence of any contrary evidence, reference to these reasons creates a strong suggestion of post hoc rationalization.

For its part, plaintiff vigorously disputes any suggestion that it intends to promote violence.  *See* ECF 31 at 13 n.13, 16.  In particular, the declarations and testimony of its witnesses support the claim of purely peaceful intentions.  *See, e.g.*, ECF 41-1, ¶¶ 19-24; ECF 41-2, ¶¶ 14-20; ECF 41-4 (Decl. of Maris Bentley), ¶¶ 13-25; ECF 41-5, ¶¶ 14-19; ECF 41-11 (Decl. of Marianne Thomas Sibal), ¶¶ 11-16.  Voris, for example, testified that St. Michael's has a history of hospitality towards counter protestors, such as by providing them with water.

In his testimony, Yiannopoulos called the City's accusation of pedophilia "revolting" and "grotesque." Although he acknowledged his history of "biting commentary," ECF 41-3, ¶ 12, which is sometimes quite "caustic," *id.* ¶ 13, he maintains that he is not the provocateur that he once was.  Although in the past he participated in some "purposefully" provocative events, Yiannopoulos stated that he has since become a more "prayerful" person.  And, he claims that he has "fallen off the radar of all but the most determined violent agitators." *Id.* ¶ 13.  Moreover, he expressly condemned the use of violence.  *See id.* ¶¶ 6, 20, 24.

According to Yiannopoulos, his "voice" is the most effective means for political change. And, he testified that at other events he was "wrongly accused" of inciting violence or looking the other way, noting that he has, in fact, always reported serious safety risks to law enforcement. He also anticipates that those attending the prayer rally would be more peaceful, well-behaved individuals than those who have appeared at his past events.[21]

## 2.

As mentioned, the City's decision to bar St. Michael's from booking the Pavilion was communicated to St. Michael's on August 5, 2021.  ECF 14, ¶ 19.  That afternoon, Waters emailed Allard: "Per our contract with the City, we are no longer able to host your event."  ECF 16-2 at 22.  Allard immediately wrote back, requesting the relevant contractual text, and asked Waters to call her back "as soon as possible."  *Id*. at 21.  Waters responded: "As stated previously due to our contract with the City we are no longer able to host your event."  *Id*. at 20. She provided no additional information, beyond informing Allard that SMG had initiated a return of St. Michael's' $3,000 deposit.[22]  In reply, Allard asked for a "proper and honest explanation" as to "what suddenly transpired" between August 2, 2021, when they last emailed, and August 5. *Id*. at 19-20.  Waters responded that she had been "told to direct [Allard] to the Baltimore City Solicitor James Shea for additional information on this matter," and she provided Shea's contact information.  *Id*. at 19.

Thereafter, Voris spoke with Shea by telephone on August 6, 2021.  ECF 14, ¶¶ 21-38; ECF 8-1, ¶¶ 15-47; ECF 25-4, ¶ 4.  Shea avers in his Declaration (ECF 25-4) that during the call,

---

[21] Yiannopoulos also stated (albeit curiously) that political conditions have calmed in the years since his prior engagements.  He claims that what has occurred since the 2020 election, including the events of January 6, 2021, is not comparable to the "rage" that followed the 2016 election.

[22] St. Michael's has not cashed the returned $3,000 check. ECF 8-1, ¶ 25.

he informed Voris that "the City was concerned that the proposed event would cause disruptions based on publicly available media reports and other public information about the Church Militant and the confirmed speakers for the event." *Id.* ¶ 4.

Voris provided his version of events in two declarations and through testimony. According to Voris, Shea told him that his office had received reports of ties between St. Michael's and the events of January 6, 2021. ECF 8-1, ¶ 18. Voris recounted that Shea cited the existence of "reports widely available on the internet . . . ." *Id.* ¶ 19. Voris responded that the allegation was "completely untrue" and that St. Michael's had no involvement in the events of January 6, 2021. *Id.* ¶¶ 20-22. Nonetheless, Shea maintained that "in his office's risk assessment, Church Militant posed a 'risk of violence' and a threat to safety," and the risk was too great for "him" to allow the event. *Id.* ¶¶ 23, 24. But, Shea was unwilling to provide a more specific explanation or the criteria he used in reaching the decision, other than references to "reports" concerning January 6. *Id.* ¶¶ 29, 30, 41, 44; ECF 14, ¶¶ 24, 33.

According to Voris, he informed Shea that St. Michael's held a similar rally at the Pavilion in 2018. Shea replied that "'a lot has changed in three years.'" ECF 8-1, ¶ 28.[23] However, Shea indicated that he "was not necessarily restricting [plaintiff's] ability to hold [the] rally" elsewhere. *Id.* ¶ 36. Voris asserts that Shea did not explain why the risk of violence would be less elsewhere. *Id.* ¶¶ 36-39. When Voris asked Shea why the City had not reached out to St. Michael's to discuss its concerns, Shea responded, "'We don't work like that. When we receive what we consider credible threats, we act.'" *Id.* ¶ 45.

Voris commented to Shea: "'No one would want our event cancelled except the U.S. bishops.'" *Id.* ¶ 31. Thereafter, he claims to have asked Shea if the USCCB asked the City to

---

[23] Scott was not the Mayor at the time of plaintiff's rally in 2018, nor was Shea the City Solicitor.

cancel the St. Michael's event.  Shea supposedly replied that he could "'neither confirm nor deny that.'"  *Id*. ¶ 32.

St. Michael's alleges that "Shea has ties to the USCCB" (ECF 14, ¶ 26), and that the USCCB asked the City to block plaintiff's rally.  *Id.* ¶¶ 36, 37.  Voris testified that he recently learned that Shea has engaged in fundraising for Baltimore's Catholic Charities, and he believes that the USCCB is a client of Shea's former law firm.[24]  In his Declaration, Shea avers that he has "not had any contact or discussions with representatives of the Catholic Church or the [USCCB] related to the November 16 event and those groups have played no role whatsoever in the decision not to move forward with the Church Militant event."  ECF 25-4, ¶ 5.  No evidence was presented to contradict that assertion.  And, as plaintiff's counsel acknowledged in argument at the Motion hearing, plaintiff has no evidence to support the allegation of Shea's ties to USCCB or communications between USCCB and Shea.

After the Court issued the TRO described earlier, St. Michael's reached out to SMG.  *See* ECF 19-1 (Decl. of plaintiff's counsel, Mark Randazza, Esquire), ¶ 9.  Waters sent Allard a revised contract reflecting certain changes to which the parties had agreed prior to August 5, 2021, as discussed above, and asked St. Michael's to "review, sign and return . . . the contract for final signature."  ECF 19-2 at 5.  Allard returned a signed contract, indicating that she looked forward to "receiving the countersigned copy at your earliest convenience."  *Id*. at 3-4; ECF 31-2.  However, Waters replied the next day that she had been "advised that we cannot fully execute your contract until the lawsuit is officially settled later this month."  ECF 19-2 at 2.  Plaintiff's counsel avers that he then spoke with Bruce Hanson, an attorney for SMG, who told him that SMG did not "'want to get sideways with the City.'"  ECF 19-1, ¶ 15.

---

[24] The Court takes judicial notice of the fact that Shea previously served as Chair of Venable LLP, a large and distinguished law firm headquartered in Baltimore.

Voris testified that St. Michael's has not looked for alternatives to the Pavilion since learning of the City's decision.  He explained that, from plaintiff's experience with Pier VI for the 2018 rally, there are no other locations that are suitable for plaintiff's purpose.  As mentioned, plaintiff seeks proximity to the Hotel at which the USCCB Fall Assembly will be held.  Moreover, St. Michaels avers that it "operated and incurred expenses on the understanding" that it had a contractual relationship with SMG.  ECF 14, ¶ 16.  Further, it asserts that if the rally does not go forward, "[i]t will not be possible for St. Michael's to recoup all" of the "significant sums of money" it has expended.  *Id.* ¶ 44.

Plaintiff represents in its Reply that, "in the interest of compromise, St. Michael's . . . offered to remove whichever speakers the [City] wanted from the rally," and "also offered to let the [City] pre-approve any speeches," but the City refused.  ECF 31 at 2 n.2.  At argument, defense counsel claimed that this was not an "accurate representation" of what occurred, and objected to any reference to settlement discussions.[25]  In any event, Voris made clear that he is unwilling to withdraw any speakers to allay the City's safety concerns.  And, Yiannopoulos testified that he would agree to withdraw "under the most extreme protest," in order to allow the rally to proceed.  But, he also stated that he would then sue the City.  ECF 41-3, ¶ 15.

Additional facts are included, *infra*.

### III.      Standard of Review

Plaintiffs seek a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure.

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see Benisek v. Lamone*, ____ U.S.

---

[25] It goes without saying that the Court will not consider the content of settlement discussions.  The fact that the parties had such discussions, however, is of no consequence.

____, 138 S. Ct. 1942, 1944 (2018); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 300, 339 (4th Cir. 2021) (en banc); *Roe v. Dep't of Defense*, 947 F.3d 207, 219 (4th Cir. 2020); *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 170-71 (4th Cir. 2019); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc).    Rather, a preliminary injunction is "'granted only sparingly and in limited circumstances.'"  *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)).  "This principle reflects the reality that courts are more likely to make accurate decisions after the development of a complete factual record during the litigation." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 979 F.3d 219, 225 (4th Cir. 2020), *rev'd on other grounds*, 2 F.4th 330 (4th Cir. 2021).

To qualify for a preliminary injunction under Rule 65, a plaintiff bears the burden to satisfy four requirements.  First, a plaintiff "must establish that he is likely to succeed on the merits[.]"  *Winter*, 555 U.S. at 20.  Although that standard does not require "a 'certainty of success,'" the plaintiff "must make a clear showing that he is likely to succeed at trial.'"  *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citation omitted).  However, "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits."  *Benisek*, 138 S. Ct. at 1943-44 (citing *Winter*, 555 U.S. at 32).  "Rather, a court must also consider whether the movant has shown 'that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Benisek*, 138 S. Ct. at 1943-44 (quoting *Winter*, 555 U.S. at 20, 129 S. Ct. 365); *see Leaders of a Beautiful Struggle*, 2 F.4th at 339; *Centro Tepeyac*, 722 F.3d at 188.

A preliminary injunction cannot issue absent a "clear showing" that all four requirements are satisfied. *Leaders*, 979 F.3d at 226; *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). And, the "'[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction.'" *Direx Israel*, 952 F.2d at 812 (quoting *Tech. Publ'g Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984); *Shaffer v. Globe Prod, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983)); *see Winter*, 555 U.S. at 22 (recognizing that because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that plaintiff is entitled to such relief"). Accordingly, a court need not address all four *Winter* factors if one or more factors is not satisfied. *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018).

The irreparable harm factor is satisfied if there is a likely constitutional violation. *Leaders of a Beautiful Struggle*, 2 F.4th at 346. In particular, "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *W.V. Ass'n of Club Owners and Fraternal Services, Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (citation omitted). As the Fourth Circuit said in *Legend Night Club v. Miller*, 637 F.3d 291, 301 (4th Cir. 2011), in the context of permanent injunctive relief, "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* at 302 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Ordinarily, such a threatened injury to a plaintiff will "easily outweigh[ ] whatever burden the injunction may impose," because the government "is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club*, 637 F.3d at 302-03. When a state is precluded from enforcing restrictions that are

likely to be deemed unconstitutional, then "the balance of the equities favors preliminary relief . . . ." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (citing *Centro Tepeyac*, 722 F.3d at 191; *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)).  Furthermore, "it is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (citing *Centro Tepeyac*, 722 F.3d at 191).

"Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated on other grounds*, __ U.S. __, 137 S. Ct. 1239 (2017) (Mem.); *see Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 753 (D. Md. 2020).

### IV. Challenge to Dr. Derrane

### A.

I first resolve defendants' challenge to the testimony of plaintiff's proposed expert, James P. Derrane, Ph.D.  On the eve of the hearing, plaintiff offered Derrane as an expert in "special event security planning, among other security-related fields."  ECF 42 at 1; *see* ECF 41-18 (Curriculum Vitae).  At the Motion hearing, plaintiff's counsel proffered Dr. Derrane as an expert in "crowd control" and law enforcement planning and risk assessment for large events.[26]

The City objected to the testimony based on the late disclosure of the witness.  But, this case had only been pending for about two weeks when the disclosure was made.  And, plaintiff circulated the report as soon as it became available.  In the posture of the case, it is difficult to

---

[26] Given the posture of the case, neither side provided any briefing on the issue of experts.

conceive of how plaintiff could have acted more quickly. Certainly, there is no indication of purposeful delay. However, I need not resolve the objection based on the timing of the disclosure, because I decline to receive Dr. Derrane as an expert.

Dr. Derrane graduated from the Naval Academy and earned a doctorate in 2013 from an online institution, Capella University, in the field of "Public Safety Leadership/Emergency Management." ECF 41-18 at 1, 8. He has an impressive and extensive background in law enforcement. For almost 20 years, Derrane worked as a Special Agent with the Federal Bureau of Investigation, where he "specialized in white-collar crime," and had a host of other significant assignments, including electronic surveillance, and held supervisory positions. *Id*. at 2. As an FBI agent he was involved in the agency's response to several high-profile incidents, including the 2013 Boston Marathon bombing and the 2014 riot in Ferguson, Missouri. *Id.* at 6. He was also involved in crisis management and readiness as well as coordinating for major events, such as Pope Francis's visit to the United States in 2015 and the Republican National Convention in 2016. *Id*.

Dr. Derrane left the FBI in 2017. *Id.* at 3. Upon leaving government service, Dr. Derrane has worked in the private sector, and now supervises security at a manufacturing plant for Merck Pharmaceuticals in Virginia. *Id.* at 2.

Of course, while Dr. Derrane served as an FBI Special Agent, he testified several times in court and before grand juries. ECF 41-18 at 5-6. But, there is no indication that he ever testified as an expert, or that he testifed about the topics for which he has been proposed as an expert in this case. *Id*. And, since leaving the FBI, Derrane has never qualified as an expert in court. Nor is he particularly familiar with Baltimore or its geography. He is also unfamiliar with the Consent Decree under which the Baltimore Police Department now operates. And, he did not

testify about any training or experience with actual "crowd control."  Moreover, the Court does not have a clear understanding of any special skills in the matter of risk assessment with regard to security issues and public safety at large events.  As an FBI agent, Dr. Derrane would have had access to sources of intelligence as well as information from local law enforcement partners.  But, it does not appear that he had such access with respect to the evaluation of the safety risks presented by the 2021 prayer rally.

In his report, Derrane opines that the "threat of violence stemming from, or in response to, St. Michael's Media's planned November 16th protest" is "very unlikely."  ECF 42-1 at 3. Derrane's conclusion was largely based on his review of "open source" information, *i.e.*, Internet searches that he conducted for proposed speakers, and searches using various terms.  His search covered only the past two years, despite the fact that for about the past 18 months, most public appearances have been curtailed due to the COVID-19 pandemic.

## B.

Pursuant to Rule 104(a) of the Federal Rules of Evidence ("F.R.E."), the court is responsible for determining "preliminary questions concerning the qualification of a person to be a witness" and "the admissibility of evidence."  This includes the admissibility of expert testimony under F.R.E. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). The party seeking to present expert testimony has the burden to establish its admissibility by a preponderance of the evidence.  *See Cady v. Ride-Away Handicap Equipment Corp.*, 702 Fed. App'x 120, 124 (4th Cir. 2017) (citing *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)); *Maryland Casualty Co. v. Therm-O-Disc., Inc.*, 137 F.3d 780, 783 (4th Cir. 1998); *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011);

*Casey v. Geek Squad ® Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011).

"[D]istrict courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm*, 822 F.3d at 725–26.  The Fourth Circuit has said that "although admissible evidence may be more persuasive than inadmissible evidence in the preliminary injunction context, it was error for the district court to summarily reject G.G.'s proffered evidence because it may have been inadmissible at a subsequent trial." *Id.* at 725.

Thus, Dr. Derrane's testimony is not necessarily subject to exclusion simply because it might be inadmissible at trial.  However, the standards articulated in F.R.E. 702 and *Daubert* are useful guideposts to determine whether to allow him to opine, as proffered.  *See, e.g., Parks v. City of Charlotte*, No. 3:17-CV-00670, at *4 (W.D.N.C. Sept. 27, 2018) ("[R]ather than making a final determination under Rule 702 and *Daubert* of whether [the proposed experts] qualify as experts for purposes of this trial, the Court will make a less formal review of the affidavits to see if they present the indicia of reliability common to expert testimony.").

In *Daubert*, 509 U.S. at 597, the Supreme Court made clear that expert testimony is admissible if "it rests on a reliable foundation and is relevant."  It must constitute scientific knowledge that will assist the trier of fact to understand or determine a fact in issue.  Thereafter, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999), the Supreme Court extended the principles pertaining to scientific expert testimony to all expert testimony requiring technical or specialized knowledge.

F.R.E. 702 governs the admission of expert testimony.  It provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Thus, pursuant to Rule 702, a properly qualified expert witness may testify regarding technical, scientific, or other specialized knowledge in a given field if the testimony would assist the trier of fact in understanding the evidence or to determine a fact in issue, and the testimony is both reliable and relevant. *See Sardis v. Overhead Door Corp.*, 10 F. 4th 268, 281 (4th Cir. 2021); *United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019); *United States v. Young*, 916 F.3d 368, 379 (4th Cir. 2019). However, to be admissible, the proffered expert opinion must not be based on speculation. *United States v. Landersman*, 886 F.3d 393, 412 (4th Cir. 2018) (citation omitted).

Under *Daubert*, the "hallmarks of reliability" are "testing, peer review, literature, rate of error or general acceptance . . . ." *Sardis*, 10 F. 4th at 295. To be reliable, the testimony must be grounded "in the methods and procedures of science," and it must be something more than subjective belief or unsupported assumptions. *Daubert*, 509 U.S. at 589–90; *see Sardis*, 10 F. 4th at 290; *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019); *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).

*Daubert* articulated five non-exhaustive factors that the trial court should consider in evaluating the reliability of an expert's reasoning or methodology: (1) whether the particular scientific theory has been or can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether there are standards controlling the method; and (5) whether the technique has gained general acceptance in the

relevant scientific community.  *Daubert*, 509 U.S. at 593–94; *see United States ex rel. Lutz v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021); *Belville*, 919 F.3d at 233; *United States v. Crisp*, 324 F.3d 261, 265–66 (4th Cir. 2003).

As mentioned, the factors are "'not exhaustive.'"  *Belville*, 919 F.3d at 233 (citation omitted).  Moreover, the evaluation "is always a flexible one . . . ."  *Oglesby*, 190 F.3d at 250. As a whole, the factors are meant to ensure that "an expert, whether basing his testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co.*, 526 U.S. at 152.  Thus, the factors are meant to be "helpful, not definitive," and not all factors necessarily apply in a given case.  *Id.* at 151; *see Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017).  Indeed, the Supreme Court has said that the factors are not a "checklist." *Kumho Tire Co.*, 526 U.S. at 150.

As to relevancy, an expert's testimony is relevant if it has "'a valid scientific connection to the pertinent inquiry.'"  *Belville*, 919 F.3d at 232 (citation omitted).  Put another way, the evidence or testimony is relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Daubert* 509 U.S. at 591; *see also In re Lipitor*, 892 F.3d at 631; *United States v. Wolf*, 860 F.3d 175, 194 (4th Cir. 2017); *Nease*, 848 F.3d at 229; *United States v. Forrest*, 429 F.3d 73, 80–81 (4th Cir. 2005).

Helpfulness to the trier of fact is "the 'touchstone'" under Rule 702.  *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (citation omitted).  And, "'[d]oubt regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility.'"  *Mack v. Amerisource Bergen Drug Corp.*, 671 F. Supp. 2d 706, 709 (D. Md. 2009) (citation omitted).  In effect, a tie goes to the proponent of the evidence.

With regard to an expert's qualifications, the Advisory Committee's notes to Rule 702 provide that experience alone, or in conjunction with "other knowledge, skill, training or education," can provide sufficient foundation for expert testimony.  *See Kumho Tire Co.*, 526 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").  On the other hand, an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise.  *See Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *see also Smith v. Central Admixture Pharm. Servs., Inc.*, AW–07–3196, 2010 WL 1137507, at *3 (D. Md. Mar. 19, 2010) ("It is well established that 'general expertise is not sufficient to qualify [an expert] to testify on a matter that requires particularized knowledge, training, education, or experience.'" (quoting *Fitzgerald v. Smith & Nephew Richards, Inc.*, JFM-95-3870, 1999 WL 1489199, at *3 (D. Md. Dec. 30, 1999), *aff'd sub nom. Fitzgerald v. Smith & Nephew, Inc.*, 11 F. App'x 335 (4th Cir. 2001))).

To be sure, the trial court "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate."  *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004); *see Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017).  And, expert testimony need not be "'irrefutable or certainly correct'" in order to be admissible.  *United States v. Moreland*, 437 F. 3d 424, 431 (4th Cir. 2006) (citation omitted); *see Daubert*, 509 U.S. at 596; *Bresler*, 855 F.3d at 195; *Westberry v. Gislaved Gummi AB*, 178 F. 3d 257, 261 (4th Cir. 1999).  Therefore, "'questions regarding the factual underpinnings of the [expert witness's] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility."  *Bresler,* 855 F.3d at 195 (citation omitted).

On the other hand, and as mentioned, a court should exclude testimony if it is based on "belief or speculation," *Oglesby*, 190 F.3d at 250, or when not supported by the record. *See Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005); *Tyger Const. Co. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *Casey*, 823 F. Supp. 2d at 340. Moreover, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Indeed, "*ipse dixit*" is the "hallmark of an unreliable opinion." *Sardis*, 10 F.4th at 295, 296.

Further, proposed testimony that concerns matters within the common knowledge and experience of a lay person does not pass muster. *United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995); *Kopf*, 993 F.2d at 377. "While the fit between an expert's specialized knowledge and experience and the issues before the court need not be exact . . . an expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, 'only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion.'" *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 392–393 (D. Md. 2001) (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998)).

Dr. Derrane's opinions were predicated on the same kind of online media searches conducted by the City to formulate its opinions. Ironically, plaintiff is highly critical of that approach, yet it is the one that was used by its own expert. Dr. Derrane did little more than turn to the Internet to learn about the speakers. *See* ECF 42-1 at 11-19 (describing the Internet searches). The undertaking does not involve a scientific methodology, nor is it clear that the endeavor draws "'on some special skill, knowledge or experience.'" *Shreve*, 166 F. Supp. 2d at

392–393 (quoting *Ancho*, 157 F.3d at 518).  In any event, there was no testimony pertaining to Dr. Derrane's special skills or training in regard to use of the Internet.

Certainly, Dr. Derrane brings to the table his years of training and experience as a federal law enforcement officer.  But, he did not explain how that training enabled him to determine whether any of the speakers pose public safety concerns.  As noted, he did not mention that he had access to law enforcement intelligence, nor does it appear that he sought to confer about the matter with anyone from the Baltimore Police Department.  Moreover, his online searches (such as "protest against Steve Bannon speaking engagements," ECF 42-1 at 16), were limited to the past two years, even though the existence of the COVID-19 pandemic has drastically curtailed speaking opportunities during that period.[27]  Nor was Dr. Derrane particularly familiar with the geography of downtown Baltimore and the area surrounding the Pavilion, an issue of obvious relevance in offering his conclusions.

In addition, Dr. Derrane sought to opine, without any foundation, that when Bannon called for putting the heads of Dr. Fauci and Christopher Wray "on pikes," he was merely speaking "rhetorically."  *Id.* at 6.  He offered no basis to support his conclusion that, in effect, Bannon was joking, and did not mean to suggest that Fauci or Wray should suffer harm in any way.  In short, Dr. Derrane's conclusion was little more than *ipse dixit*.

I recognize that Dr. Derrane expedited the preparation of his report.  Nevertheless, at this juncture I decline to consider his risk assessment with respect to the 2021 rally.

## V. Discussion

The First Amendment to the Constitution is at the heart of this case.  It provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free

---

[27] Plaintiff's counsel indicated that he is the one who told Dr. Derrane to limit the search to the most recent two-year period.

exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

Plaintiff alleges multiple violations of its rights by the City Defendants under the First Amendment: free speech; free exercise of religion; the Establishment Clause; and the right of assembly.[28]  And, St. Michael's alleges a specific performance claim against SMG.  ECF 14, ¶¶ 48-113.

### A.  Free Speech Claim

In Count I, St. Michael's contends that the City Defendants violated plaintiff's right to free speech by directing SMG not to rent the Pavilion to plaintiff.  ECF 14, ¶¶ 48-61.  According to St. Michael's, the City Defendants plainly engaged in viewpoint-based discrimination, seeking to suppress plaintiff's specific viewpoint without satisfying the exacting requirements of strict scrutiny.  ECF 15 at 8-9.

Defendants counter that the Pavilion is a nonpublic forum, and therefore it is permitted to set reasonable, viewpoint-neutral restrictions on speech.  ECF 25-1 at 14-17.  Furthermore, defendants argue that their actions *were* reasonable and viewpoint-neutral; the decision was based on a sound and legitimate interest in ensuring public safety.  *Id*. at 17-25.

In its Reply, St. Michael's argues that the Pavilion is a designated public forum and that, in any case, defendants' restrictions on plaintiff's speech are viewpoint-based.  ECF 31 at 4-8, 11-16.  In addition to the City's failure to satisfy strict scrutiny, St. Michael's contends that the City Defendants' "unfettered discretion" in blocking use of the Pavilion violated plaintiff's

---

[28]  "The First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council Inc.*, 425 U.S. 748, 749 n.1 (1976); *see Lovell v. Griffin*, 303 U.S. 444, 450 (1983).  Plaintiff fails to mention the Fourteenth Amendment in the Amended Complaint.  However, St. Michael's references the Fourteenth Amendment in the Motion, ECF 15 at 9-10, 12, albeit not in the context of its Free Speech claim.

constitutional right to free speech.  *Id*. at 8-11.  In the surreply, defendants dispute plaintiff's arguments as to the status of the Pavilion as a designated public forum.  And, they also disagree that the City's exercise of discretion was proper.  ECF 37.

### 1.   General Principles

"The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (citations omitted).  "'Premised on mistrust of governmental power" the First Amendment "stands against attempts to disfavor certain subjects or viewpoints.'" *Am. Civil Liberties Union of N. Carolina v. Tata*, 742 F.3d 563, 565-66 (4th Cir. 2014) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)).  Pursuant to the First Amendment, "government generally has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Barr v. Am. Assoc. of Political Consultants, Inc.*, ––– U.S. –––, 140 S. Ct. 2335, 2346 (2020) (quotation marks and citation omitted).

The Supreme Court has said: "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 365 (2003) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). A "core postulate of free speech law" is that the "government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, ––– U.S. –––, 139 S. Ct. 2294, 2299 (2019). Put another way, the government "'ordinarily'" may not "'prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence.'" *Black*, 538 U.S. at 365; *see Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994); *Police Dep't of*

*City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972); *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 328 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986).

"The first inquiry a court must undertake when a First Amendment claim is asserted is whether the plaintiff has engaged in 'protected speech.'" *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)).  Plaintiff's proposed activity—a rally and conference featuring both political and religious content—is plainly protected speech, and the defendants do not appear to assert otherwise.  *See, e.g.*, *Hotel Employees & Restaurant Employees Union, Local 100 v. New York Dep't of Parks and Recreation*, 311 F.3d 534, 544 (2d Cir. 2002) ("Political . . . rallies, demonstrations, and leafletting are forms of speech protected under the First Amendment." (internal citations omitted)).  Likewise, it is clear that the City Defendants' conduct in barring plaintiff from the use of the Pavilion constitutes state action within the meaning of the Fourteenth Amendment.  Thus, it was an action taken under color of state law for the purposes of 42 U.S.C. § 1983.  *See Davison v. Randall*, 912 F.3d 666, 679-81 (4th Cir. 2019).

### 2. What Type of Forum?

"The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).  Notably, "[e]ven protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799-800.  Therefore, the Court must first "'identify the nature of the forum, because the

extent to which the Government may limit access depends on whether the forum is public or nonpublic.'" *Goulart*, 345 F.3d at 246 (quoting *Cornelius*, 473 U.S. at 797).

"The three recognized types of fora are the traditional public forum, the nonpublic forum, and the designated or limited public forum." *Goulart*, 345 F.3d at 248.   St. Michael's acknowledges that the Pavilion is not a traditional public forum.   But, it maintains that the Pavilion is a designated public forum, because it is "dedicated to general use by the public for a wide variety of reasons" (ECF 31 at 6), and therefore subject to the same strict scrutiny standard that applies to a traditional public forum.   *Id*. at 4-8.   Conversely, defendants argue that the Pavilion is nothing more than a nonpublic forum.   ECF 25-1 at 14-17; ECF 37 at 1-8.

"The first category of government property, the traditional public forum, is a place that 'by long tradition or by government fiat ha[s] been devoted to assembly and debate.'" *Goulart*, 345 F.3d at 248 (quoting *Perry*, 460 U.S. at 45).   Such locations "'have the characteristics of a public thoroughfare, a purpose that is compatible with expressive conduct, as well as a tradition and history of being used for expressive public conduct.'" *Davison*, 912 F.3d at 681 (quoting *Am. Civil Liberties Union v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005)).   Public streets, sidewalks, and parks are the "archetype of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988).

"In the traditional public forum, which includes the streets, sidewalks, parks, and general meeting halls, speakers' rights are at their apex." *Steinburg v. Chesterfield Cnty., Planning Comm'n*, 527 F.3d 377, 384 (4th Cir. 2008).   These locations occupy a "special position in terms of First Amendment protection" because, for "[t]ime out of mind," they "have been used for public assembly and debate." *Snyder v. Phelps*, 562 U.S. 443, 456 (2011) (citations and internal quotation marks omitted) (alteration in *Snyder*).

The First Amendment "strictly limit[s]" government entities "in their ability to regulate private speech in . . . 'traditional public fora.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) (citation omitted).  For a public forum, content-based restrictions on speech must satisfy strict scrutiny.  This means that "'the restriction must be narrowly tailored to serve a compelling government interest.'"  *Christian Legal Soc'y Chapter of the Univ. of California, Hastings College of Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (quoting *Pleasant Grove City*, 555 U.S. at 469); *see Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015); *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011).  As to narrow tailoring, the government must "prove that no 'less restrictive alternative' would serve its purpose."  *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016) (citing *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)).  However, "[a] regulation that serves purposes unrelated to the content of expression is deemed [content] neutral, even if it has an incidental effect on some speakers or messages but not others."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Notably, "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech ...."  *Ward*, 491 U.S. at 791 (citation omitted); *see City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428 (1993).  But, a "time, place, and manner" restriction on speech must (1) be "'justified without reference to the content of the regulated speech'"; (2) be "'narrowly tailored to serve a significant governmental interest'"; and (3) "'leave open ample alternative channels for communication of the information'" that the speaker wishes to communicate.  *Ward*, 491 U.S. at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)); *see Perry*, 460 U.S. at 45.  The government bears the burden of showing that the regulation satisfies the applicable level of scrutiny.  *See Deegan v.*

43

*City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006) (holding that government bears the burden of showing the restriction is narrowly tailored and justified by the interest asserted).

Although "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests," and the regulation may not "burden substantially more speech than is necessary to further the government's legitimate interests," it "need not be the least restrictive or least intrusive means of doing so.  Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'"  *Ward*, 491 U.S. at 799 (internal citations and footnote omitted).  In other words, "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."  *Id.* at 800.

At the other end of the spectrum is the nonpublic forum.  A nonpublic forum is "not open by tradition or designation to the public for expressive activity."  *Goulart*, 345 F.3d at 238.  Moreover, "opening it to expressive conduct would 'somehow interfere with the objective use and purpose to which the property has been dedicated.'"  *Davison*, 912 F.3d at 682 (citation omitted).  "These forums are defined by 'selective access,' with permission 'contingent upon non-ministerial judgments.'"  *Child Evangelism Fellowship of S.C. v. Anderson School Dist. Five*, 470 F.3d 1062, 1067 (4th Cir. 2006) (internal citations omitted).  The government may restrict access to a nonpublic forum—even on the basis of subject matter and speaker identity— as long as "'the distinctions drawn are reasonable in light of the purpose served by the forum and

44

are viewpoint neutral.'"  *Goulart*, 345 F.3d at 248-49 (quoting *Cornelius*, 473 U.S. at 806); *see also Perry*, 460 U.S. at 47; *Child Evangelism Fellowship of S.C.*, 470 F.3d at 1067.

There is an intermediate tier of forum, which has been variously referred to as a "designated public forum" or a "limited public forum."  *See Christian Legal Soc'y*, 561 U.S. at 679 n.11.  Sometimes the terms are used interchangeably, but sometimes they are not.

A governmental entity creates a designated public forum when "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose[.]"  *Id.*  "A designated public forum can only be created by 'purposeful government action' in which 'the government must intend to make the property generally available.'"  *Goulart*, 345 F.3d at 249 (quoting *Ark. Educ. Television Com'n v. Forbes*, 523 U.S. 666, 678 (1998)).  And, as with a traditional public forum, content-based speech restrictions are subject to strict scrutiny.  *Pleasant Grove City*, 555 U.S. at 469-70.

A limited public forum is established when the government property is "limited to use by certain groups or dedicated solely to the discussion of certain subjects."  *Id.* at 470.  For a limited public forum, a government "may impose restrictions on speech that are reasonable and viewpoint-neutral."  *Id.*

Notably, "[t]o maintain a nonpublic forum, the government must employ 'selective access' policies, whereby forum participation is governed by 'individual, non-ministerial judgments.'"  *Child Evangelism Fellowship of MD, Inc. v. Montgomery County Public Schools*, 457 F.3d 376, 381 (4th Cir. 2006) (quoting *Forbes*, 523 U.S. at 680).  And, the Supreme Court explained in *Forbes*, 523 U.S. at 679: "[T]he government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission' . . . to use it."

(quoting *Cornelius*, 473 U.S. at 804).   Moreover, "[s]elective access does not transform government property into a public forum," unless this access is "granted as a matter of course." *Perry*, 460 U.S. at 47.

Nevertheless, the precise boundaries between designated, limited, and nonpublic fora seem somewhat amorphous.  In *Warren v. Fairfax County*, 196 F.3d 186, 193-94 (4th Cir. 1999), the Fourth Circuit regarded the terms "designated public forum" and "limited public forum" as interchangeable, a conclusion it restated in *Goulart*, 345 F.3d at 250-51, and *Mote*, 423 F.3d at 443.  In *Goulart*, 345 F.3d at 250-51, the Fourth Circuit classified certain community centers as designated or limited public forums because "permission to use the community centers is not 'selective,' but is 'granted as a matter of course' to all individuals or groups who fall within the Use Policy [for the centers]."  (quoting *Perry*, 460 U.S. at 47).

But, in *Child Evangelism Fellowship of MD, Inc.*, 457 F.3d at 382, the Fourth Circuit distinguished between designated and limited public forums.  It explained that "[i]n a designated public forum . . . the government makes public property (that would not otherwise qualify as a traditional public forum) generally accessible to *all* speakers," but "[i]n a limited public forum, the government creates a channel for a *specific or limited* type of expression where one did not previously exist."  (Emphasis added).  Further, "[i]n a limited public forum . . . the government may restrict access to 'certain groups' or to 'discussion of certain topics,' subject to two limitations: the government restrictions must be both reasonable and viewpoint neutral."  *Id*. at 383 (quoting *Good News Club v. Milford Central School*, 533 U.S. 98, 106-07 (2001)).

The Fourth Circuit also observed that the "most recent opinions" of the Supreme Court "suggest that there is indeed a distinction" between designated and limited public forums, pointing to *Good News Club*, 533 U.S. at 106-07.  And, the Fourth Circuit noted that other

46

circuits have held that a limited public forum is actually a subset of the larger category of a designated public forum. *Child Evangelism Fellowship of MD*, 457 F.3d at 382 n.3. Yet, in a more recent decision of the Fourth Circuit, the Court referred to "'[l]imited' or 'designated' forums," perhaps suggesting that they are interchangeable. *See Davison*, 912 F.3d (citing *Mote*, 423 F.3d at 443)).

The Ninth Circuit has opined that, based on the Supreme Court's most recent jurisprudence, "limited public forum" has replaced "nonpublic forum" as the appropriate term for anything short of a traditional or designated public forum. *See Seattle Midwest Awareness Campaign v. King Cty.*, 781 F.3d 489, 496 n.2 (9th Cir. 2015) ("We will refer to this last category [of forum] as 'limited public forums,' although in past cases they've sometimes been labeled 'nonpublic' forums." (Internal citations omitted)). The court reasoned, *id*.: "The label doesn't matter, because the same level of First Amendment scrutiny applies to all forums that aren't traditional or designated public forums."

In any event, as the discussion indicates, the standard of First Amendment scrutiny for a limited public forum appears to be identical to the standard for nonpublic forums. In a limited public forum, just as in a nonpublic forum, restrictions on speech must be reasonable and viewpoint neutral. *See, e.g.*, *Christian Legal Soc'y*, 561 U.S. at 679 ("[T]he Court has permitted restrictions on access to a limited public forum . . . with this key caveat: Any access barrier must be reasonable and viewpoint neutral."); *Pleasant Grove City*, 555 U.S. at 470 ("The Court has also held that a government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects. In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." (internal citation omitted)); *Good News Club*, 533 U.S. at 106-07 ("[In a limited public forum], [t]he State's

power to restrict speech . . . is not without limits.  The restriction must not discriminate against speech on the basis of viewpoint, and the restriction must be 'reasonable in light of the purpose served by the forum.'" (internal quotations omitted)); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("Once it has opened a limited forum . . . the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' nor may it discriminate against speech on the basis of its viewpoint." (internal quotations omitted)); *Steinburg*, 527 F.3d at 385 ("In a limited public forum . . . the government still 'must not discriminate against speech on the basis of viewpoint, and any restriction must be reasonable in light of the purpose served by the forum.'" (internal quotations omitted)); *Page v. Lexington Cty. School Dist. One*, 531 F.3d 275, 286 (4th Cir. 2008) ("Regardless of whether the newsletter was a nonpublic or limited public forum, '[c]ontrol over access to [the forum] can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'") (internal quotation omitted) (alterations in *Page*).

Moreover, forum analysis cases recognize that it is appropriate to impose a more lenient standard of scrutiny on the government when it acts as a proprietor, rather than as a lawmaker or regulator.  "It is a long-settled principle that governmental actions are subject to a lower level of First Amendment scrutiny when 'the governmental function operating . . . [is] not the power to regulate or license, as lawmaker, . . . but, rather, as proprietor, to manage [its] internal operation[s] . . . .'"  *United States v. Kokinda*, 497 U.S. 720, 725 (1990) (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 896 (1961)) (alterations in *Kokinda*).  "[T]he Government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. . . .'"  *Cornelius*, 473 U.S. at 800 (quoting

*Greer v. Spock*, 424 U.S. 828, 836 (1976)).  This principle applies when a government is acting "as part of a commercial venture."  *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1990).

Understandably given the posture of the case, and the lack of discovery, the record is not fully developed as to the appropriate status of the Pavilion.  However, based on the evidence that has been presented, the Pavilion appears to qualify as a nonpublic forum, or perhaps a limited public forum.  The Pavilion is a commercial, proprietary facility owned by the City and operated by a private company, largely as a for-profit music and entertainment venue.  ECF 25-2, ¶¶ 2-5. Defendants describe the Pavilion as "selective and commercial in nature," and as "a commercial venue that is reserved to selected speakers and performers based on the subjective criteria of the operator."  ECF 37 at 1-2.  They represent that, "[a]t the end of the day, the purpose of [the Pavilion] is to make money as an entertainment venue – not suppress or elevate certain types of speech."  *Id*. at 2.

The City's characterization is supported by the limited financial details introduced in evidence with respect to the facility; rent and a percentage of ticket sales are paid to the City, with surplus payable to Live Nation and SMG.  *See* ECF 25-2, ¶ 5; ECF 37-1, ¶¶ 4-7.  The Ticketmaster Venue Guide for the facility describes the Pavilion as "Baltimore's premiere venue for outdoor summer concerts."  ECF 31-4 at 3.  And, the Royal Farms Arena calls the Pavilion "the perfect space to enjoy entertainment along Baltimore's famed Inner Harbor." ECF 31-1.

And, it is undisputed that the Pavilion has previously hosted various musical and comedy acts.  *See* ECF 31 at 7 n.9; ECF 31-4; ECF 31-5; ECF 31-6; ECF 31-7.  Although the venue is marketed to musical artists and other performers, use of the Pavilion is not "granted as a matter of course" to any performer.  *Perry*, 460 U.S. at 47.  According to defendants, "individuals seeking use of [the Pavilion] must still obtain permission via negotiations and a contract to

utilize the space."  ECF 37-1 at 3.  Indeed, as plaintiff's own interactions with SMG regarding the use of the Pavilion reflect, making arrangements to use the Pavilion is an involved process, requiring negotiations as to numerous topics.

St. Michael's argues that "there is no suggestion that the City of Baltimore or SMG carefully curate who may book which events at the Pavilion as part of a comprehensive strategy for the economic area.  Rather, nearly any member of the public may book nearly any kind of event there."  ECF 31 at 8.  Defendants disagree.  *See* ECF 37 at 1-6.  And, the record simply does not support the conclusion that "*nearly any* member of the public may book *nearly any* kind of event" at the Pavilion.  ECF 31 at 8 (emphasis added).

It is certainly true that plaintiff's rally in 2018 took place at the Pavilion.  However, this does not alter the conclusion that an applicant is required to obtain a contract for use of the facility, as plaintiff did in 2018.  And, the discussions between St. Michael's and SMG in 2021 involved commercial considerations of the type that would not be typical of a public space available to all comers.  For example, when St. Michael's sold tickets for the rally, SMG warned St. Michael's that this would require the rally to be reclassified as a ticketed event, with tickets to be sold only through Ticketmaster.  ECF 16-2 at 24.

The excerpt of the City's contract with SMG also supports the conception that the Pavilion is not a designated public forum.  The clause provides: "[SMG] agrees that it will not allow any public event to be held at the Facilities [including the Pavilion] which utilizes artists that have not performed at another similarly situated venue owned or operated by Live Nation." ECF 14-3 at 2 (quoting Clause 11 of the contract).  SMG must provide notice to the City of any bookings of performers, so as to give the City the opportunity to object, and the clause creates a process by which the City may provide SMG with objections or complaints.  *Id*.  This hardly

suggests a generally available expressive space not informed by selectivity or commercial factors.

In short, the City cannot be said to have taken "'purposeful government action'" to make the Pavilion "'generally available,'" *Goulart*, 345 F.3d at 249 (quoting *Forbes*, 523 U.S. at 678)—much less "generally accessible to *all* speakers," as is required to constitute a designated public forum. *Child Evangelism Fellowship of MD*, 457 F.3d at 382 (emphasis added).  To the contrary, access to the Pavilion is "selective," with "permission 'contingent upon non-ministerial judgments.'"  *Child Evangelism Fellowship of S.C.*, 470 F.3d at 1067 (internal citations omitted).

This conclusion is also supported by case law concerning similar facilities.  For example, in *Chicago Acorn v. Metropolitan Pier and Exposition Authority*, 150 F.3d 695, 698-701 (7th Cir. 1998), the Seventh Circuit held that Chicago's Navy Pier, including a convention hall with meeting rooms available for rental, was a nonpublic forum.  As Judge Posner wrote, this was because, "[i]n deciding whom to rent to and at what price, the [Metropolitan Pier and Exposition Authority] seeks to maximize positive spillovers and minimize negative ones, since as we have said the spillovers affect the MPEA's revenues from its other customers . . . . Selectivity and restriction are of the essence of the commercial strategy that informs the MPEA's management of the pier."  *Id*. at 700.  Despite plaintiff's argument that this does not describe the Pavilion, the basic concept of a commercial-based selection approach seems  likewise to mark the Pavilion.

And, more than a decade later, again in regard to the Navy Pier, the Seventh Circuit reiterated: "The pier's designation as a nonpublic forum appropriately reflects its commercial nature. Though it is a recreational area open to the public, the pier itself primarily consists of event spaces, stores, restaurants, theaters, and an amusement park. Its nature is one of private enterprise with tangential public benefit; . . . the revenue-generating outlets that support the pier

fuel tourism and make these public benefits possible." *Marcavage v. City of Chicago*, 659 F.3d 626, 633 (7th Cir. 2011).

Numerous cases reach similar results. *See*, *e.g.*, *Pomicter v. Luzerne Cty. Convention Ctr. Auth.*, 939 F.3d 534, 539-41 (3d Cir. 2019) (concourse of the Mohegan Sun Arena); *United Church of Christ v. Gateway Econ. Development Corp. of Greater Cleveland, Inc.*, 383 F.3d 449, 453 (6th Cir. 2002) (plazas and interior streets within a sports complex); *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 22-23 (1st Cir. 2002) (pier primarily still a commercial fishery, but also containing conference center and offices); *Hawkins v. City and Cty. of Denver*, 170 F.3d 1281, 1287-88 (10th Cir. 1999) (open air walkway for a performing arts center); *Hubbard Broadcasting, Inc. v. Metro. Sports Facilities Comm'n*, 797 F.2d 552, 555 (8th Cir. 1986) (expressing doubt that the Metrodome arena is a public forum, because it is a "commercial venture" designed to meet the area's need for a major sports facility while providing economic benefits); *Calash v. City of Bridgeport*, 788 F.2d 80, 83-84 (2d Cir. 1982) (stadium for which some organizations were granted selective access, but not opened to the general public for all uses); *Int'l Soc. for Krishna Consciousness, Inc. v. N.J. Sports and Exposition Auth.*, 691 F.2d 155, 159-61 (3d Cir. 1982) (Meadowlands race track and stadium, a "commercial venture by the state . . . designed to bring economic benefits to northern New Jersey, and . . . expected to generate at least enough revenue to meet its current expenses and debt service," which "earns money by attracting and entertaining spectators"); *Florida Gun Shows v. City of Fort Lauderdale*, No. 18-62345-FAM, 2019 WL 2026496, at *9-*10 (S.D. Fla. ) (arena and convention center with some history of selective access).

The instant case is distinguishable from *Southeastern Promotions v. Conrad*, 420 U.S. 546, 547-558 (1975), which is cited by St. Michael's. As the Seventh Circuit explained in

*Chicago Acorn*, 150 F.3d at 700, with respect to the municipally-leased theater at issue in *Southeastern Promotions*, "any member of the public was welcome who could pay the admission price." This was unlike Navy Pier, where the rental strategy was based on "[s]electivity and restriction." *Id.* Or, as the Fourth Circuit put it in *Goulart*, 345 F.3d at 249, the *Southeastern Promotions* theater was "designed for and dedicated to expressive activities." And, in *Ward*, 491 U.S. at 790-91, the Supreme Court struck down municipal noise regulations for a publicly owned park bandshell "open, apparently, to all performers," remarking: "We need not here discuss whether a municipality which owns a bandstand or stage facility may exercise, in some circumstances, a proprietary right to select performances and control their quality."

In the posture of the case, I conclude that the Pavilion is a nonpublic forum or, at most, a limited public forum, "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Pleasant Grove City*, 555 U.S. at 470. Whether Pier VI is classified as a nonpublic forum or a limited public forum, the analysis would be the same. This is because the standards concerning restrictions on speech for a limited public forum and a nonpublic forum are essentially the same.

### 3. Viewpoint Discrimination

The Court next considers whether the City's "'justifications for exclusion from the relevant forum satisfy the requisite standard.'" *Goulart*, 345 F.3d at 246 (quoting *Cornelius*, 473 U.S. at 797). As noted, the government may restrict access to a nonpublic forum or a limited forum, even on the basis of subject matter and speaker identity, so long as "'the distinctions drawn are reasonable in light of the purpose served by the forum *and are viewpoint neutral*.'" *Goulart*, 345 F.3d at 248-49 (quoting *Cornelius*, 473 U.S. at 806) (emphasis added); *see also*

*Perry*, 460 U.S. at 47; *Child Evangelism Fellowship of S.C.*, 470 F.3d at 1067; *Child Evangelism Fellowship of MD*, 457 F.3d at 383.

St. Michael's makes the serious charge that, in rejecting plaintiff's effort to rent the Pavilion for the rally, the City Defendants engaged in viewpoint discrimination. Even under the more lenient standard applied to nonpublic and limited fora, viewpoint discrimination is constitutionally impermissible. *See Child Evangelism Fellowship of S.C.*, 470 F.3d at 1067 ("The ban on viewpoint discrimination is a constant."). I conclude that plaintiff is likely to succeed on the merits of its claim that the City was not viewpoint-neutral in barring the rally. Therefore, I need not consider whether the City's actions would have been reasonable in the absence of viewpoint discrimination.

"Viewpoint-based discrimination occurs when a government official 'targets not subject matter, but particular views taken by speakers on a subject.'" *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting *Rosenberger*, 515 U.S. at 829). Viewpoint-based restrictions are a subset of content-based restrictions. *See Barr*, 140 S. Ct. at 2346. Indeed, viewpoint discrimination is "an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829; *see McCullen v. Coakley*, 573 U.S. 464, 484-85 (2014) (noting than an exemption for a group on only one side of the abortion debate would constitute a clear form of viewpoint discrimination); *Davison*, 912 F.3d at 687 (stating that viewpoint discrimination "'targets'" a speaker's view on a subject and concluding that public official's conduct in banning a constituent from the public official's Facebook page constituted viewpoint discrimination) (citation omitted); *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Virginia Dep't of Motor Vehicles*, 288 F.3d 610, 623 (4th Cir. 2002) ("Viewpoint discrimination is a kind of content discrimination, but is not always easily distinguishable.").

However, "[t]he protections afforded by the First Amendment . . . are not absolute . . . ." *Black*, 538 U.S. at 358.  The Supreme Court has "long recognized that the government may regulate certain categories of expression . . . ."  *Id.*  For instance, certain categories of speech deemed to be "of such slight social value'" do not receive the protections of the First Amendment.  *Id.* (citation omitted).  These categories include "fighting words," words "'inherently likely to provoke violent reaction,'" incitement of "imminent lawless action," and a "'true threat'", among others.  *Id.* at 359 (citations omitted); *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992); *Glenn v. Holder*, 690 F.3d 417, 421 (6th Cir. 2012); *United States v. Bly*, 510 F.3d 453, 458 (4th Cir. 2007).

Because "the First Amendment protects speech along a spectrum," *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019), laws burdening speech "receive different levels of judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it." *Stuart v. Camnitz*, 774 F.3d 238, 244 (4th Cir. 2014).  But, "[r]estrictions on speech based on its content are 'presumptively invalid' and subject to strict scrutiny."  *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (citation omitted); *see Barr*, 140 S. Ct. at 2346 ("Content-based laws are subject to strict scrutiny."); *Rosenberger* 515 U.S. at 829–830 (characterizing viewpoint discrimination as "presumptively unconstitutional"); *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 248 (6th Cir. 2015) ("Both content- and viewpoint-based discrimination are subject to strict scrutiny.").  As discussed earlier, strict scrutiny applies to content-based restrictions of speech in a traditional public forum.  Strict scrutiny requires that "'the restriction must be narrowly tailored to serve a compelling government interest.'"  *Christian Legal Soc'y*, 561 U.S. at 679 n.11 (quoting *Pleasant Grove City*, 555 U.S. at 469).

Notwithstanding the traditional strict scrutiny approach that applies to viewpoint-based discrimination, content-based distinctions may occur in a nonpublic or limited public forum. *See, e.g.*, *Minn. Voters Alliance v. Mansky*, ___ U.S. ___, 138 S. Ct. 1876, 1885-86 (2018) ("[O]ur decisions have long recognized that the government may impose some content-based restrictions on speech in nonpublic forums . . . ."); *Am. Freedom Defense Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 491 (6th Cir. 2020) (noting that in forums "sometimes called" either nonpublic or limited public, "the government may make content-based distinctions that would largely be invalid in public forums."); *Nat'l Assoc. for Advancement of Colored People v. City of Philadelphia*, 834 F.3d 435, 441 (3d Cir. 2016) (in "category . . . sometimes called a limited public forum and other times labeled a nonpublic forum. . . . Content-based restrictions are valid as long as they are reasonable and viewpoint neutral."); *Child Evangelism Fellowship of S.C.*, 470 F.3d at 1067 (stating that in both nonpublic and limited public forums, "the state may reserve the forum 'for certain groups or for the discussion of certain topics,' but it 'must not discriminate against speech on the basis of viewpoint'" (internal citations omitted)).   But, the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Mosley*, 408 U.S. at 95. Therefore, "'a viewpoint-based restriction of private speech rarely, if ever, will withstand strict scrutiny review.'" *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 288 (4th Cir. 2013) (en banc) (citation omitted).

"Moreover, viewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints."   *Child Evangelism Fellowship of MD*, 457 F.3d at 384 (emphasis in original).  However, "[a] regulation that serves purposes unrelated to the content of

expression is deemed [content] neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791; *see, e.g.*, *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–49 (1986) (upholding zoning regulations for adult movie theaters against First Amendment challenge because regulations were justified by city's concern for "secondary effects" on surrounding neighborhoods, even though the regulations "treat[ed] theaters that specialize in adult films differently from other kinds of theaters").

"The Supreme Court has made clear that the 'principal inquiry' in assessing a claim of viewpoint discrimination 'is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.'" *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 795 (4th Cir. 2004) (quoting *Ward*, 491 U.S. at 791) (alteration in *Rose*). Of course, "the government rarely flatly admits it is engaging in viewpoint discrimination." *Ridley v. Mass. Bay Trans. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004), *partially abrogated on other grounds by Matal v. Tam*, ___ U.S. ___, 137 S. Ct. 1744 (2017). Therefore, the courts have employed various factors to determine if the government's justification for a restriction on speech was actually a pretext for viewpoint discrimination.

In *Am. Freedom Defense Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 365-66 (D.C. Cir. 2018), the D.C. Circuit compared the endeavor to the test to ferret out racial discrimination, articulated by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267 (1977). Relevant factors include consideration of statements made by government officials concerning the reasons for an action; disparate treatment towards people or things sharing the characteristic that was the nominal justification for the action; a "loose or nonexistent" "fit between means and ends," *Ridley*, 395 F.3d at 86; the historical background of the decision; the specific sequence of events leading up to the decision;

departures from normal procedures or substance; and post hoc rationalization.  *See also Am. Freedom Defense Initiative*, 901 F.3d at 365-66; *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cty.*, 653 F.3d 290, 297-99 (3d Cir. 2011); *Ridley*, 390 F.3d at 87.

"[W]here an evaluation of a given restriction and the surrounding circumstances indicates that one or more speakers are favored over others, and further that the basis for the restriction is in fact the message the disfavored speaker seeks to convey, the restriction violates the First Amendment."  *Sons of Confederate Veterans, Inc. ex rel. Griffin*, 288 F.3d at 624.  "Moreover, where restrictions or regulations of speech discriminate on the basis of the content of speech, there is an 'inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion…'—in other words, to exercise viewpoint discrimination."  *Id*. (quoting *Turner Broadcasting Sys., Inc*., 512 U.S. at 642-43).

In the Huber and Shea declarations and in the City's briefing, the City Defendants invoked controversial, inflammatory speech by rally speakers, as well as plaintiff's alleged support of the attack on the Capitol, as grounds for cancellation of plaintiff's event.  This is suggestive of viewpoint discrimination.

At length, the Opposition recounts the history of "incendiary and hateful rhetoric" of Voris, Bannon, and Yiannopoulos.  ECF 25-1 at 11.  Perhaps to show plaintiff's "propensity for disruption," the Opposition also describes plaintiff's position as an "active propagandist for the claim that the November 2020 Presidential Election was stolen from Donald Trump," chronicling statements by Voris "glorif[ying] the January 6 "Capitol insurrectionists."  *Id*. at 6-7. And, Huber averred in his Declaration that Bannon and other intended speakers "support[ed] the January 6 attack on the Capitol. . . ."  ECF 25-3, ¶ 4.  Voris subsequently testified that in August

2021, when he spoke to Shea about the City's decision, Shea claimed that St. Michael's had "ties" to the January 6 attack on the Capitol.  *See* ECF 8-1, ¶ 18.

Two additional concepts are relevant to the analysis of viewpoint discrimination.  The first is the constitutional danger imposed by "unfettered discretion."  The second concerns the so-called "heckler's veto."

"The Supreme Court has long held that the government violates the First Amendment when it gives a public official unbounded discretion to decide which speakers may access a traditional public forum."  *Child Evangelism Fellowship of MD*, 457 F.3d at 386.  "[T]he danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use."  *Southeastern Promotions*, 420 U.S. at 553.

This principle is important for two reasons.  "First, [unbridled discretion's] existence, 'coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused.'"  *Child Evangelism Fellowship of MD*, 457 F.3d at 386 (quoting *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988)).  "Second, 'the absence of express standards' renders it difficult to differentiate between a legitimate denial of access and an 'illegitimate abuse of censorial power.'"  *Child Evangelism Fellowship of MD*, 457 F.3d at 386 (quoting *City of Lakewood*, 486 U.S. at 758).

In *Child Evangelism Fellowship of MD*, 457 F.3d at 386-87, the Fourth Circuit determined that the matter of unfettered discretion also applies to nonpublic and limited public forums.  It said, *id.*: "[T]he dangers posed by unbridled discretion—particularly the ability to hide unconstitutional viewpoint discrimination—are just as present in other forums. Thus, there

is broad agreement that, even in limited public and nonpublic forums, investing governmental officials with boundless discretion over access to the forum violates the First Amendment."

To be sure, in the context of a nonpublic or limited public forum, the unbridled discretion analysis is not identical to the analysis in a public forum.  But, it by no means disappears entirely.  As the Fourth Circuit explained, *id*. at 387 (internal citations omitted) (emphasis added):

> This does not mean that the unbridled discretion analysis is precisely the same when a limited public or nonpublic forum, rather than a traditional public forum, is involved. The unbridled discretion inquiry is "not [a] static inquir[y], impervious to context"; rather, a court will review a grant of discretion "in light of the characteristic nature and function of that forum." "[T]hat discretionary access is a defining characteristic of the nonpublic forum suggests that more official discretion is permissible in a nonpublic forum than would be acceptable in a public forum," but even so, this does not "insulate" restrictions on nonpublic or limited public forums "from an unbridled discretion challenge." For this reason, *even in cases involving nonpublic or limited public forums, a policy (like the one at issue here) that permits officials to deny access for any reason, or that does not provide sufficient criteria to prevent viewpoint discrimination, generally will not survive constitutional scrutiny.*

Therefore, the Fourth Circuit struck down a policy of a county public school system in Maryland that gave the system "unfettered discretion" to deny access to a procedure by which community groups could send flyers home with students.  *Id*. at 387-89.  What the defendant could not do, the Court ruled, was "what it has done here: assertedly limit access to certain purportedly neutral speakers but actually reserve to itself unbridled discretion to permit or deny access to any speaker for any reason it chooses. . . . Because the policy offers no protection against the discriminatory exercise of [defendant's] discretion, it creates too great a risk of viewpoint discrimination to survive constitutional scrutiny."  *Id*. at 389.

This principle seems to apply even if there is no formal "policy," but merely ad hoc discretion.  *See, e.g.*, *Summum v. Callaghan*, 130 F.3d 906, 910 (10th Cir. 1997) ("The County

does not have any written or unwritten rules, regulations, policies or practices governing the placement of permanent displays on county property to guide the Commissioners in making [decisions as to such displays].").  And, it applies even when the government is acting in a proprietary capacity, rather than in a regulatory or licensing capacity.  *See, e.g.*, *Atlanta Journal and Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1301, 1310-11 (11th Cir. 2003) (applying the unrestrained discretion analysis to an airport newspaper sales system implemented by a government agency that was "statutorily charged to be self-sufficient and acting in such proprietary capacity").

As mentioned, the second concept is that of a "heckler's veto."  "Historically, one of the most persistent and insidious threats to first amendment rights has been that posed by the 'heckler's veto,' imposed by the successful importuning of government to curtail 'offensive' speech at peril of suffering disruptions of public order." *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir.1985).

It is a fundamental principle of First Amendment jurisprudence that the "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992) (invalidating ordinance that allowed county administrator to adjust parade permit fees based on anticipated cost of security); *see Gathright v. City of Portland*, 439 F.3d 573, 578 (9th Cir. 2006) ("First Amendment jurisprudence is clear that the way to oppose offensive speech is by more speech, not censorship, enforced silence or eviction from legitimately occupied public space."); *Ovadal v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005) (a content-based restriction of speech is likely when "every proffered justification" for the restriction is "directly related to the reactions" of the audience).

"Speakers of protected speech—even speech that is offensive to many listeners—may not be punished because their critics 'might react with disorder or violence.'" *Deferio v. City of Syracuse*, 306 F. Supp. 3d 492, 510 (N.D.N.Y. 2018) (quoting *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966)).  In *Boos v. Barry*, 485 U.S. 312, 322 (1988), the Supreme Court said: "[I]n public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." (citations and internal quotation marks omitted).  Indeed, "[s]peech that stirs passions, resentment or anger is fully protected by the First Amendment." *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996).

Fourth Circuit case law makes clear that permitting a heckler's veto is a content-based restriction on speech.  *See, e.g.*, *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 554 (4th Cir. 2010) ("Courts have recognized a heckler's veto as an impermissible form of content-based speech regulation for over sixty years.").  But, to my knowledge, the Fourth Circuit has not clarified whether or when the heckler's veto amounts to viewpoint discrimination.  This is important because, as discussed, content-based regulations may be permissible in the context of a nonpublic or limited public forum, but viewpoint-based restrictions are not.

However, other circuits that have addressed this issue have concluded that a heckler's veto can, at least in some contexts, implicate viewpoint discrimination.  In *Bible Believers*, 805 F.3d at 228, the Sixth Circuit squarely held that "[t]he heckler's veto is precisely that type of odious viewpoint discrimination."  And in *Seattle Mideast Awareness Campaign*, 781 F.3d at 502-03, the Ninth Circuit remarked that concerns regarding a heckler's veto "do not carry the same weight" outside of a traditional or designated public forum, but may sometimes raise concerns as to viewpoint discrimination.  "A claimed fear of hostile audience reaction could be

used as a mere pretext for suppressing expression because public officials oppose the speaker's point of view. That might be the case, for example, where the asserted fears of a hostile audience reaction are speculative and lack substance, or where speech on only one side of a contentious debate is suppressed." *Id*.

Applying these principles to the facts before the Court, plaintiff is likely to succeed on its claim that the City's conduct was not viewpoint-neutral.  Without question, the City reacted to a perceived safety concern arising from past use of inflammatory remarks by some of the rally speakers.  In thwarting the rally, the City essentially invoked or relied on the heckler's veto. And, in doing so, it exercised complete, unfettered discretion; it acted on an ad hoc basis, without any standards.   Further, it has presented somewhat shifting justifications for its actions, with little evidence to show that the decision was premised on these justifications.

As to the matter of discretion, the City apparently has unbridled discretion to determine whether, when, and how to intervene in bookings of the Pavilion.  The record before the Court indicates that the process used here was entirely ad hoc.  After plaintiff's plans came to the attention of the City, the City decided to intervene with SMG, requiring SMG to terminate negotiations with St. Michael's.  *See* ECF 25-3, ¶¶ 3-6.  No policies, guidelines, or procedures have been brought to the attention of the Court providing any factors or systematized approach governing the City's actions here.  As far as the Court is aware, none exist.

When the Court sought additional briefing from defendants, the Court specifically asked for "facts as to the discretion exercised by the City defendants in making determinations as to the use of the Pavilion, and any existing standards that govern such determinations."  ECF 34.  But, defendants' surreply provided no such facts or standards.  *See* ECF 37 at 8-9.

In their surreply, defendants argue: "Issues around unfettered discretion only occur when the government is acting as a regulator or lawmaker." *Id*. at 8. Although such issues commonly occur in that context, the general prescription against unfettered discretion applies in the proprietary context as well. Certainly, nothing in the Fourth Circuit's opinion in *Child Evangelism Fellowship of MD* exempts the City, acting as proprietor, from the Court's holding concerning the exercise of unbridled discretion. And, as noted, other cases have applied the doctrine in the proprietary context.

At the hearing, the defense argued that it is unrealistic for the City to have a policy in place regarding the Pavilion because determinations as to use of the Pavilion must be made on a case-by-case basis, with latitude afforded to the City to respond to particular circumstances. Indeed, according to Voris, when he spoke with Shea in August 2021, Shea told him: "When we [*i.e.*, the City] receive what we consider credible threats, we act." ECF 8-1, ¶ 45.

There are, no doubt, true emergencies in the life of a city, when officials must act immediately to protect life and property. A municipality cannot anticipate every crisis or eventuality, with a written policy or guidelines in place.[29] Therefore, the City must be afforded some flexibility in the face of unexpected events or circumstances. And, in regard to the First Amendment, nonpublic, proprietary status of a venue can confer a greater degree of discretion than in other contexts. *See Child Evangelism Fellowship of MD*, 457 F.3d at 387 ("The unbridled discretion inquiry is 'not [a] static inquir[y], impervious to context'; rather, a court will review a grant of discretion 'in light of the characteristic nature and function of that forum.'" (internal citations omitted)).

---

[29] The unprecedented horrors of September 11, 2001, sadly illustrate this point.

But, the matter at hand does not constitute an emergency.  And, the occurrence is of a kind that certainly could be anticipated, especially given that the venue has been open since 1981.  The need for flexibility does not preclude at least some standards for the exercise of the City's discretion in regard to Pavilion bookings.

"[E]ven in cases involving nonpublic or limited public forums, a policy . . . that permits officials to deny access for any reason, or that does not provide sufficient criteria to prevent viewpoint discrimination, generally will not survive constitutional scrutiny." *Child Evangelism Fellowship of MD*, 457 F.3d at 387.  Unbridled discretion is disfavored because "'the absence of express standards' renders it difficult to differentiate between a legitimate denial of access and an 'illegitimate abuse of censorial power.'"  *Id.* at 386 (quoting *City of Lakewood*, 486 U.S. at 758).  Here, the City has asserted public safety justifications for its action.  Determining whether that assertion is a pretext for suppression of viewpoint has been made difficult precisely because of the City's ad hoc, standard-free approach to its intervention in the Pavilion booking process.

In *Atlanta Journal and Constitution*, 322 F.3d at 1303-04, the City of Atlanta's Department of Aviation adopted a newspaper distribution system for Hartsfield-Jackson International Airport.  The Eleventh Circuit struck down the policy as unconstitutional for its "boundless discretion."  *Id.* at 1310-11.  In particular, the official charged with administering the system had no "clear standards by which to accept or reject a publisher's request to use the newsracks" at the airport.  *Id.* at 1311.  The court remarked, *id.* (emphasis added): "None of the Department's proffered reasons for regulation, including its interest as a proprietor, can justify this grant of discretion. . . . [under the unconstitutional system] the City, even acting as a proprietor, retains its power to censor."

The City's invocation of a heckler's veto also raises serious concerns that its decision was motivated by viewpoint discrimination.  Huber cited the prospect of counter protestors when explaining the City's decision.  ECF 25-3, ¶¶ 4, 6.  And, at the hearing, counsel for the City placed considerable weight on the City's concerns as to counter protestors and the disruption and potential violence that might ensue.  In other words, the City seems to have based its decision on the anticipated reaction of counter protestors, which is precisely the "persistent and insidious threat[s] to first amendment rights" discussed in *Berger*, 779 F.2d at 1001: the "successful importuning of government to curtail 'offensive' speech at peril of suffering disruptions of public order."

At argument, counsel for defendants cited *Int'l Soc. for Krishna Consciousness v. Lee*, 505 U.S 672 (1992), for the proposition that a heckler's veto is permissible in a nonpublic forum.  But, nothing in that case supports such a broad proposition.  At most, the case notes that if the defendant were to have to give the plaintiff group permission to solicit at airports, it would have to give other groups the same right, creating crowd control issues.  *Id.* at 685.

To my knowledge, the concept of the heckler's veto is applicable even as to a nonpublic forum.  As the Ninth Circuit put it in *Seattle Mideast Awareness Campaign*, 781 F.3d at 502-03, although this concern might receive less weight outside of a traditional or designated public forum context, it is still relevant when "used as a mere pretext for suppression expression" based on viewpoint.  This includes, for example, "where the asserted fears of a hostile audience reaction are speculative and lack substance."  *Id.* at 503.

Such is the case here.  The City cannot conjure up hypothetical hecklers and then grant them veto power.

66

Moreover, invocation of the events of January 6, 2021, as horrifying as they were, cannot, without more, serve as a license for the City to dispense with its obligations under the First Amendment.  The relevance of any of the City's discussion of plaintiff's stance regarding the January 6 events to the City's public safety concerns is attenuated at best.  This is underscored by the fact that the City never accuses St. Michael's of actual involvement in the events of January 6, 2021.  Rather, it is critical of plaintiff for its coverage and support of the occurrence.  Likewise, the City mentions racist rhetoric by Yiannopoulos, with little clear connection to public safety concerns.  ECF 25-1 at 9-10.

Without question, many people might be offended by plaintiff's alleged support for those who stormed the Capitol, or for plaintiff's alleged promotion of the belief that Mr. Trump was the true winner of the 2020 presidential election.  But, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

As indicated, in its Opposition, the City also advanced several justifications for its actions that are not reflected in the Huber or Shea declarations.  This is problematic.

In particular, the City added as a consideration the understaffed, burdened Baltimore Police Department.  The shortage of police officers is documented in separate litigation between the Baltimore Police Department, the City, and the Department of Justice, which culminated in a consent decree.  *See United States v. Balt. Police Dep't, et al.*, JKB-17-099.  The City also expressed concern about the litigation risk the City could face if violence were to ensue.  In this regard, it suggests that this concern is quite legitimate, given the suit now pending against the City in federal court, arising from property damage to businesses as a result of the riots in 2015

67

that followed the death of Freddie Gray while in police custody.  *See Chae Brothers, LLC, supra*, SAG-17-01657.

The City also now focuses on the size of the 2021 event as the basis for a safety concern. *See, e.g.*, ECF 25-1 at 19.  But, the size of the crowd was not mentioned in the Huber Declaration or the Shea Declaration.  *See* ECF 25-3; ECF 25-4.  And, if size were actually the City's concern, it could have made an effort to limit the size of the event, instead of blocking it entirely.

As mentioned, no case law has been cited by plaintiff to suggest that the City was required to disclose to plaintiff any basis for its decision, or every ground on which its decision was premised.  But, the City did provide a reason.  That reason related to provocative speakers and St. Michael's alleged support for the assault on the Capitol on January 6, 2021.  The appearance during the litigation of additional justifications, not reflected in the evidence regarding the City's concerns when it made the decision to cancel the rally, creates an inference of post hoc rationalization.  This is especially so because the City presented no evidence to rebut that inference.

Post hoc rationalizations by a government can be evidence of viewpoint discrimination. As the D.C. Circuit has said, in the context of a decision to close a forum: "[I]f the Government proffers one reason when closing the forum but another when it later defends the closing, then that in itself is evidence of pretext."  *Am. Freedom Defense Initiative*, 901 F.3d at 366.  The concern regarding post-decision justifications that surface during litigation also aligns with the importance of standards to prevent viewpoint discrimination.  "Without [such] guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is

permitting favorable, and suppressing unfavorable, expression." *City of Lakewood*, 486 U.S. at 758 (emphasis in original).

The City's stated justification at the relevant time, coupled with its subsequent rationale, strengthen the argument that the City's decision was the product of viewpoint discrimination. *See Ridley*, 390 F.3d at 87 (stating that "suspicion arises where the viewpoint-neutral ground is not actually served very well by the specific governmental action at issue; where, in other words, the fit between means and ends is loose or nonexistent"); *Sons of Confederate Veterans, Inc. ex rel. Griffin*, 288 F.3d at 624 (considering the "given restriction and the surrounding circumstances").

In his Declaration, Huber avers that the City was also concerned about the "secondary effects" of the rally—referring to "property destruction, physical assaults, and other violence" that could be "incit[ed]" by the "events and statements" of rally speakers.  ECF 25-2, ¶ 4; *see* ECF 25-1 at 6, 19, 20, 23, 25.  Insofar as the City is attempting to invoke the "secondary effects" doctrine, it is inapposite.

As plaintiff notes (ECF 31 at 18), the secondary effects doctrine is often applied to local regulation of certain kinds of businesses, such as sexually-oriented businesses.  The restrictions are frequently justified on the basis of the "secondary effects" caused by such businesses, such as crime or reduced property values.  *See, e.g.*, *City of Los Angeles v. Alameda Books*, 535 U.S. 425, 430-32 (2002) (O'Connor, J., plurality opinion) (city ordinance prohibiting sexually-oriented businesses near schools, parks, and churches); *Renton*, 475 U.S. at 44 (similar ordinance); *American Entertainers, L.L.C. v. City of Rocky Mount*, 888 F.3d 707, 712-13 (4th Cir. 2018) (licensing scheme for sexually-oriented businesses); *Maages Auditorium v. Prince George's Cty.*, 681 F. App'x 256, 259 (4th Cir. 2017) (zoning ordinance regulating adult

entertainment businesses); *Cricket Store 17, L.L.C. v. City of Columbia*, 676 F. App'x 162, 163-64 (4th Cir. 2017) (ordinance prohibiting adult businesses near "sensitive use" locations).

Legislation considered under the secondary effects doctrine may be classified as a content-neutral time, place, and manner distinction because typically it does not ban regulated businesses, but merely restricts them in some way. *See Renton*, 475 U.S. at 46. But here, the City's action has prevented St. Michael's from using the Pavilion altogether. Applicability of the secondary effects doctrine in this context, excluding a group because of specific speakers, is dubious.

Regardless, the justification offered by the City does not fall within the ambit of this doctrine. *Boos v. Barry*, 485 U.S. 312, seems to be the most relevant case, although the case *sub judice* does not involve an ordinance. There, the Supreme Court struck down a District of Columbia ordinance prohibiting the display of signs outside of foreign embassies when intended to bring a foreign government into "disrepute." *Id*. at 315-16. The Court held that if the city had cited an interest such as "congestion," "visual clutter," or embassy security, then the secondary effects doctrine might apply. *Id*. at 320. But, the city had explicitly cited the "content of the speech and the direct impact that speech has on its listeners," "[l]isteners' reactions to speech," and the "emotive impact of speech on its audience," which took the ordinance outside of the doctrine. *Id*. at 321.

In sum, the unbridled discretion exercised by the City; its use of the heckler's veto as an explicit justification; its shifting, post hoc rationalizations; and the City's invocation of political rhetoric by rally organizers and speakers point to the conclusion that plaintiff is likely to succeed on the claim that the City engaged in viewpoint discrimination with respect to plaintiff's political views.

Under the standard of strict scrutiny, the City must "'prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Reed*, 576 U.S. at 171 (quoting *Arizona Free Enterprise Club's Freedom Club PAC*, 564 U.S. at 734). And, as mentioned, with respect to narrow tailoring the City must "prove that no 'less restrictive alternative' would serve its purpose." *Cent. Radio Co*., 811 F.3d at 633 (citing *Playboy Entm't Grp., Inc*., 529 U.S. at 813). The City has not shown that there was no less restrictive alternative to an outright ban on the rally at the Pavilion.

The City raises an understandable concern about being forced to host any group that desires to use the Pavilion, regardless of the potential for disruption. ECF 25-1 at 25. To be clear, nothing in this opinion is meant to prevent the City from lawfully restricting or limiting access to the Pavilion. But, such a decision must be viewpoint neutral.

I conclude that plaintiff is likely to succeed on the merits with regard to the claim that the City violated its rights to free speech under the First Amendment.[30]

---

[30] As indicated, based on the state of the record, I have concluded that the Pavilion is a nonpublic forum or a limited public forum. Notably, the City's "decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation. In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." *Cornelius*, 473 U.S. at 808-09 (emphasis in original). "Nor is there a requirement that the restriction be narrowly tailored or that the Government's interest be compelling. . . . The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Id*. at 809. As discussed, the same standard applies to a limited public forum.

The Court expresses no opinion as to the ability of the City to implement reasonable, viewpoint-neutral limitations anchored in lawful justifications. But, St. Michael's does not have carte blanche to hold whatever rally it wants, in whatever size or format it wants. For example, it is possible that reasonable, adequately justified limitations on the size, length, or time of the rally would pass legal muster, given the location of the Pavilion in the heart of downtown Baltimore, and the fact that the rally is scheduled to be held on a work day during business hours. *See id*. at 806; *Perry*, 460 U.S. at 47; *Child Evangelism Fellowship of S.C.*, 470 F.3d at 1067; *Goulart*, 345 F.3d at 248-49.

## B.  Other Claims Against City Defendants

St. Michael's brings three additional First Amendment claims against the City Defendants.  In particular, it asserts violations of the Free Exercise Clause (Count II, ECF 14, ¶¶ 62-72), the Establishment Clause (Count III, *id*. ¶¶ 73-83), and the right to assembly (Count IV, *id*. ¶¶ 84-98).

At the hearing, plaintiff's counsel seemed to concede that its claims based on the Free Exercise Clause and the Establishment Clause are weak.  Indeed, there is no evidence to support these claims.  Because plaintiff is not likely to succeed on these claims, I decline to discuss them further.

Both sides accept that the analysis for the assembly claim is essentially the same as the analysis for the free speech claim.  *See* ECF 15 at 12 ("The analysis as to the merits of this claim is thus largely identical to the analysis of St. Michael's freedom of speech claim."); ECF 25-1 at 28 ("Again, the court's analysis turns on the fact that the Pavilion is a nonpublic forum."); ECF 31 at 19 ("Defendants agree that the analysis for the right of assembly claim is largely identical to the analysis of St. Michael's freedom of speech claim.").

The same forum-based standards, discussed for the free speech claim, apply to assembly claims.  *See, e.g.*, *Lavite v. Dunstan*, 932 F.3d 1020, 1028-31 (7th Cir. 2019) ("Any regulation of speech or assembly on government property must be able to withstand some degree of constitutional scrutiny," and analyzing an assembly claim using the public forum framework);

---

In an attempt to thwart restrictions based on the size and time of the 2021 event, plaintiff noted in argument that during the baseball season the Orioles sometimes host daytime, midweek games at the baseball stadium, attended by thousands of people, with a significant police presence. The point is not frivolous. That stadium, known as "Oriole Park at Camden Yards," is, indeed, in downtown Baltimore. However, the stadium is owned by the Maryland Stadium Authority, not the City. And, the stadium is not situated in the heart of the business district. In addition, it is not on the water.

*Green v. City of Raleigh*, 523 F.3d 293, 297, 300-07 (4th Cir. 2008) (analyzing plaintiff's free speech and peaceable assembly challenges to a picketing ordinance together).

Therefore, I find that St. Michael's has established a substantial likelihood that it will succeed on the merits of its assembly claim.

### C.  Specific Performance Claim

Plaintiff's fifth claim is lodged against SMG.  And, it is not based on the Constitution. Rather, plaintiff asserts that St. Michael's entered into a valid contract with SMG for its use of the Pavilion, and that SMG has refused to fulfill its contractual obligations.  Therefore, it asks the Court to order specific performance of SMG's asserted contractual obligations.  Defendants respond that no contract was ever formed between St. Michael's and SMG.  ECF 21 at 29-30.

"[I]nterpretation of private contracts is ordinarily a question of state law."  *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989); *accord James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004).  Here, the Court's jurisdiction over plaintiff's breach of contract claim is premised on its supplemental jurisdiction, *see* 28 U.S.C. § 1367.  And, "[w]hen choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state."  *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011).  The forum state is, of course, Maryland.

As to contract claims, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state.  *See, e.g., Am. Motorists Ins. Co. v. ARTRA Group, Inc*., 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co*., 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014).

SMG sent a proposed Use License Agreement to St. Michael's on July 14, 2021, and then on September 16, 2021.  Both contain choice of law clauses providing that Maryland law controls.  *See* ECF 16-1, § 19(a) ("This Agreement shall be deemed to be made, governed by, and construed in accordance with the laws of Maryland without giving effect to the conflict of law principles thereof."); ECF 31-2, § 19(a) (same).

The parties dispute whether a contract was formed.  But, when a contract contains a choice of law provision, Maryland courts apply § 187(2) of the Restatement (Second) of Conflict of Laws (Am. L. Inst. 1971) ("Restatement of Conflicts"), which states: "The law of the state chosen by the parties to govern their contractual rights will be applied."  *See Ace American Ins. Co. v. Grand Banks Yachts, Ltd*., 587 F. Supp. 2d 697, 704 (D. Md. 2008) (applying Restatement of Conflicts § 187(2)). "In Maryland, choice of law provisions in contracts are enforceable unless the choice of law jurisdiction has no substantial relationship to the transaction, or there is a fundamental policy difference in the laws of another jurisdiction with a more substantial interest in the parties or the transaction." *United States for use & benefit of Tusco, Inc. v. Clark Constr. Grp*., 235 F. Supp. 3d 745, 752 n.9 (D. Md. 2016) (citing *Jackson v. Pasadena Receivables, Inc*., 398 Md. 611, 921 A.2d 799, 803-05 (2011)); *see* Restatement of Conflicts § 187.

Although the parties dispute whether a contract was formed, both St. Michael's and defendants appear to agree that Maryland law should apply here, albeit without discussion.  *See* ECF 15 at 13-14 (citing Maryland law); ECF 21 at 29-30 (same); ECF 31 at 19-21 (same). Therefore, I shall apply Maryland law.

In general, under Maryland law, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."  RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1 (4th ed. 1990);

*accord* RESTATEMENT (SECOND) CONTRACTS § 1 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006).  "'A contract is formed when an unrevoked offer made by one person is accepted by another.'"  *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's Cty. v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)).  Thus, mutual assent is an integral component of every contract.  *See, e.g.*, *Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

A contract may be oral or written, as well as express or implied.  "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'"  *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cnty. Comm'rs of Caroline Cnty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)).  Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement.  *Forty W. Builders, Inc.*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974).  If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable.  *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md.

119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

In determining whether there is an enforceable contract, courts begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708. Generally, "[s]ilence is ... not to be considered an acceptance of an offer." *Id*. at 23-24, 919 A.2d at 714. But, "acceptance may be manifested by actions as well as words." *Galloway*, 819 F.3d at 87 (citing *Porter v. General Boiler Casing Co.*, 284 Md. 402, 396 A.2d 1090, 1095 (1979) ("The purpose of a signature is to demonstrate 'mutuality or assent' which could as well be shown by the conduct of the parties.")); *see also* Restatement (Second) of Contracts § 53(1) ("An offer can be accepted by the rendering of a performance only if the offer invites such acceptance.").

Of relevance here, "parties may 'enter into a binding informal or oral agreement to execute a written contract; and, if the parties contemplate that an agreement between them shall be reduced to writing before it shall become binding and complete, there is no contract until the writing is signed.'" *Cochran*, 398 Md. at 18, 919 A.2d at 711 (quoting *Eastover Stores, Inc. v. Minnix*, 219 Md. 658, 665, 150 A.2d 884, 888 (1959)). In other words, "[i]f the parties do not

intend to be bound until a final agreement is executed, there is no contract." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

The Maryland Court of Appeals has enumerated "several factors that may be helpful in determining whether the parties have manifested an intention to be bound." *Id*. at 15, 919 A.2d at 708. These include the language of the preliminary agreement; the existence of open terms; whether partial performance has occurred; the context of the negotiations; the custom of such transactions, such as whether a standard form contract is widely used in similar transactions; whether the agreement has few or many details; whether the amount involved is large or small; and whether it is a common or unusual contract. *Id*. at 15-16, 919 A.2d at 708-09.

Parties who contemplate that their agreement would be reduced to a final writing before it would become binding are at liberty to withdraw from negotiations before the final writing is signed. *Cochran*, 398 Md. at 19, 919 A.2d at 711; *Eastover Shores, Inc.*, 219 Md. at 665, 150 A.2d at 888. Likewise, "parties can make the completion of their contract depend upon the execution of a written instrument. The question whether the parties negotiating a contract intended to be bound by their oral agreement but contemplated a written instrument merely as evidence of their agreement, or whether they did not intend to bind themselves until a contract was prepared and signed by them, must be decided from the facts and circumstances in each particular case." *Peoples Drug Stores v. Fenton Realty Corp.*, 191 Md. 489, 493, 62 A.2d 273, 275 (1948).

Applying these principles to the facts here, the evidence does not show a contract was formed between St. Michael's and SMG. It is clear that the parties contemplated the execution of a written document. And, the document was not executed as of the time that the City withdrew its approval for the event.

As discussed, the record reflects that on June 16, 2021, Carmen Allard, as a representative of St. Michael's, reached out to SMG to inquire about renting the Pavilion. ECF 16-2 at 38. Teresa Waters, a representative of SMG, responded to confirm that the date of November 16, 2021, was available, and that a "$3000 non-refundable deposit" was required to "hold the date." *Id.* She attached the "prior contract" for plaintiff's review and said: "Please advise if you would like to proceed with a deposit and contract confirming the event." *Id.* Allard responded: "Yes, we would like to proceed. Kindly provide directions for payment of the deposit and new contract." *Id.* at 37. Waters then requested certain information for the contract, which Allard promptly provided. *Id.* at 35-36. About a month later, on July 14, 2021, Waters emailed Allard with "the contract for the 11.16.2021 Baltimore Conference and Prayer event." *Id.* at 30. She said: "Please sign and return to me for execution. If you have any requested edits please do so in a redline format." *Id.* Notably, the attached "Use License Agreement" had spaces for signature, but was not signed by any party. *See* ECF 16-1 at 14.

Moreover, when Waters asked Allard to "sign and return" the contract to her "for execution," this indicates that SMG did "not intend to be bound until a final agreement [was] executed." *Cochran*, 398 Md. at 14, 919 A.2d at 708. Waters also told Allard that if she had "any requested edits" she should make those to the contract "in a redline format," which reinforces this point. Plainly, SMG realized that there might be changes to the terms; redlining would enable SMG to easily locate and review them in order to determine if they were acceptable.

To be sure, well before August 5, 2021, St. Michael's had paid the requested deposit of $3,000 to SMG in order to hold the date of November 16, 2021. But, this deposit was paid in good faith, merely for the purpose of securing the date while negotiations continued. ECF 16-2

78

at 38 ("We do require a $3000 non-refundable deposit *to hold the date*." (emphasis added)). Indeed, payment was made on June 21, 2021, weeks before Waters even sent the draft contract on July 14.  *Id*. at 32; ECF 41-7, ¶ 8.  In the overall context of the discussions, payment of a deposit does not constitute the "intent to be bound" nor the "definiteness of terms" required for creation of a contract.  *Cochran*, 398 Md. at 14, 919 A.2d at 708

This conclusion is supported by the parties' conduct after Waters sent the document to Allard.  It does not appear Allard, or anyone else at St. Michael's, ever signed or returned the contract, as requested by Waters.  Indeed, plaintiff acknowledges the "lack of final signatures" on the document.  ECF 14, ¶ 18.  Instead, Allard replied the next day that she was still reviewing the document and offered a "slight correction" as to the correct name of St. Michael's.  ECF 16-2 at 29.  Shortly thereafter, Allard emailed again with a request to change the "doors" time, as well as a question about a provision of the document that was apparently in error.  *Id*. at 27-28. Allard and Waters were exchanging emails through August 2, 2021, concerning various details of the event, including potential changes to the event time and associated costs; the technology available at the Pavilion; whether the rally would be classified as "private" or "ticketed"; and the import of plaintiff selling tickets to the event.  *Id*. at 10-12, 17-18, 24-27.

On August 2, 2021, Waters emailed Allard, providing "answers to the remaining questions to try and finish the contract."  *Id.* at 17.  However, the conversation did not result in an updated contract sent to St. Michael's prior to August 5, 2021.

These conversations indicate that the terms of the contract were still very much in flux. St. Michael's argues the parties "had already agreed on all material terms . . . and were discussing only minor alterations to the language in a written contract."  ECF 15 at 13.  Allard herself avers she did not "immediately sign" the contract sent on July 14, 2021, "because [the

parties] were still discussing a few small details."  ECF 41-17, ¶ 7.  But, not all of the concerns seem so minor.  Changing the times of the rally, for example, led to an increase in costs for St. Michael's, including an additional $8,000 in rent plus production expenses—a significant percentage of an ultimate cost of $23,000 plus other expenses (*see* ECF 31-2, Ex. B).  ECF 16-2 at 17-18.  And, whether the event would be private or ticketed was clearly an important and evolving issue.  *Id*. at 24.

Furthermore, SMG clearly did not intend to be bound until the contract was executed, which never occurred.  In fact, prior to August 5, 2021, the final contract was never even sent by SMG to St. Michael's.  This is reflected in Waters's email of August 2, providing answers "to try and finish the contract."  *Id*. at 17-18.

This conclusion is not altered by anything that occurred following the filing of the lawsuit on September 13, 2021, or the Court's entry of a TRO the next day.  On September 16, 2021, Waters emailed Allard an unsigned "revised contract" with certain changes that had been discussed prior to August 5.  ECF 19-2 at 5 (email exchange); ECF 31-2 (revised Use License Agreement).  She asked Allard to "[p]lease review, sign and return . . . the contract for final signature."  ECF 19-2 at 5.  She also requested that any changes be made in a redline format for review by SMG.  *Id*.  The same day, Allard responded, indicating that "[a]ll changes appear to be correct."  *Id*. at 3.  She attached the document signed by her and wrote: "We look forward to receiving the countersigned copy at your soonest convenience."  *Id*. at 4.  However, the next day, Waters responded: "I have been advised that we cannot fully execute your contract until the lawsuit is officially settled later this month."  *Id*. at 2; ECF 41-7, ¶ 18.

These communications suggest that SMG still lacked the requisite "intent to be bound" in the absence of an executed contract.  *Cochran*, 398 Md. at 14, 919 A.2d at 708.  As noted, "[i]f

the parties do not intend to be bound until a final agreement is executed, there is no contract." *Cochran*, 398 Md. at 14, 919 A.2d at 708.  Instead, Waters emailed an unsigned contract and asked Allard to review and sign it before returning it "for final signature," which indicates that SMG did not intend to be bound until execution.  This is reinforced by Waters's language that they could not "fully execute" the contract even after it had been signed by Allard.  The "context of the negotiations" is also helpful in determining whether SMG manifested an intention to be bound.  *Id.* at 15-16, 919 A.2d at 708-09.

Because no contract was entered into between SMG and St. Michael's, SMG cannot be in breach of the contract, and there is no basis to order specific performance.  Accordingly, St. Michael's has failed to establish a likelihood of success on the merits of its specific performance claim.

I recognize that SMG and plaintiff were headed towards finalizing the terms of a contract, and the City intervened to cancel the event before the contract was finalized.  However, this does not alter the conclusion that, as of the cancellation on August 5, 2021, SMG and plaintiff were not bound by a contract; a written contract was clearly contemplated but not yet finalized and certainly not fully executed.  The same analysis applies as to the contact circulated on September 16, 2021.  Thus, the Court declines to issue an injunction compelling SMG to fulfill its contractual obligations with St. Michael's.

Clearly, an executed contract between SMG and plaintiff is necessary for plaintiff to utilize the Pavilion for its rally.  Although there is no contract to enforce, the parties were obviously engaged in earnest negotiations until the City called the matter to a halt.  *Cf. Cochran*, 398 Md. at 12 n.5, 919 A.2d at 707 n.5 (noting that, in certain circumstances, a "binding preliminary agreement" may exist when "the parties accept a mutual commitment to negotiate

81

together in good faith regarding any remaining open terms"); *see also Teachers Ins. and Annuity Ass'n of America v. Tribune Co.*, 670 F. Supp. 491, 498-99 (S.D.N.Y. 1987).  The City may not impede the contract negotiation process based on a particular viewpoint.

### D.  Other Injunction Factors

I have found that St. Michael's has succeeded in establishing a substantial likelihood of success on its claims as to free speech (Count I) and assembly (Count IV).  A preliminary injunction cannot issue absent a "clear showing" that all four requirements for such an injunction are satisfied. *Leaders*, 979 F.3d at 226; *Pashby*, 709 F.3d at 320.  Accordingly, it is necessary for the court to consider the remaining three factors: "whether the movant has shown 'that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Benisek*, 138 S. Ct. at 1943-44 (quoting *Winter*, 555 U.S. at 20, 129 S. Ct. 365); *see Leaders of a Beautiful Struggle*, 2 F.4th at 339; *Centro Tepeyac*, 722 F.3d at 188.

As noted, the irreparable harm factor is satisfied if there is a likely constitutional violation. *Leaders of a Beautiful Struggle*, 2 F.4th at 346.  In particular, "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *W.V. Ass'n of Club Owners and Fraternal Services, Inc.*, 553 F.3d at 298 (citation omitted).  As the Fourth Circuit said in *Legend Night Club*, 637 F.3d at 301, albeit in the context of permanent injunctive relief, "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id*. at 302 (quoting *Elrod*, 427 U.S. at 373).

Ordinarily, such a threatened injury to a plaintiff will "easily outweigh[ ] whatever burden the injunction may impose," because the government "is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club*, 637 F.3d at 302-03.  When a state is precluded from enforcing restrictions that are likely to be deemed unconstitutional, then "the balance of the equities favors preliminary relief . . . ." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (citing *Centro Tepeyac*, 722 F.3d at 191; *Giovani Carandola, Ltd.*, 303 F.3d at 521).  Furthermore, "it is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (citing *Centro Tepeyac*, 722 F.3d at 191).

Defendants argue that plaintiffs' delay between August 5, 2021, when they learned of the City's decision, and September 13, 2021, when they filed this lawsuit, militates against a finding of irreparable harm.  ECF 25-1 at 31-32.  "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek*, 138 S. Ct. at 1944.  Voris testified convincingly that St. Michael's began seeking legal advice immediately after learning of the defendants' decision, and that the delay in filing suit was primarily due to difficulties in obtaining willing and adequate legal representation.  Given the circumstances, and the clear preference for finding irreparable harm for a First Amendment injury, plaintiff's delay does not alter the analysis.

"'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury,'" *Legend Night Club*, 637 F.3d at 302 (quoting *Elrod*, 427 U.S. at 373).  Therefore, St. Michael's is likely to suffer irreparable harm in the absence of preliminary relief.

Further, I find that the balance of equities favors awarding preliminary relief to St. Michael's when, as here, the City is barred from enforcing a restriction likely to be deemed

unconstitutional. *See Leaders of a Beautiful Struggle*, 2 F.4th at 346. Moreover, "the public interest favors protecting constitutional rights." *Id*. And, because plaintiff has established a likelihood of success in regard to the claim of violation of its First Amendment rights, an injunction is in the public interest.

### E.  Security

Rule 65(c) of the Federal Rules of Civil Procedure provides that a court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Fourth Circuit has explained that this rule "is mandatory and unambiguous." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp*., 174 F.3d 411, 421 (4th Cir. 1999). Ordinarily, "failure to require a bond upon issuing injunctive relief is reversible error." *Id*. Although a court "is not free to disregard the bond requirement altogether," a court "has discretion to set the bond amount 'in such sum as the court deems proper.'" *Id*. (quoting rule).

"The purpose of [Fed. R. Civ. P. 65(c)] is to enable a restrained or enjoined party to secure indemnification for any costs . . . and any damages that are sustained during the period in which a wrongfully issued equitable order remains in effect." 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2954 (Apr. 2021). Accordingly, "[t]he amount of the bond . . . ordinarily depends on the gravity of the potential harm to the enjoined party." *Hoechst*, 174 F.3d at 421.

"Security [under Fed. R. Civ. P. 65(c)] is generally fixed in an amount covering 'the potential incidental and consequential costs' as well as either the losses the wrongly enjoined party will suffer or the amount of the complainant's unjust enrichment during the period of prohibited conduct." *Metro. Reg'l Information Sys., Inc. v. Am. Home Realty Network, Inc*., 904

F. Supp. 2d 530 (D. Md. 2012) (quoting *Hoechst*, 174 F.3d at 421). "Given the court's discretionary power under Rule 65(c), the imprecise measure of some of the elements of damage, and the varying ability of defendants to establish their contemplated injuries, courts have responded to the obligation to set security by requiring a variety of dollar amounts to be posted by a successful applicant as a prerequisite to the issuance of injunctive relief." 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2954.

As the Seventh Circuit has explained, "[w]hen setting the amount of security, district courts should err on the high side. If the district judge had set the bond at $50 million, as [the defendant in this case] requested, this would not have entitled [the defendant] to that sum; [The defendant] still would have had to prove its loss, converting the 'soft' numbers to hard ones. An error in setting the bond too high thus is not serious. . . . Unfortunately, an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883, 888 (7th Cir. 2000).

Defendants seek a bond of $1 million. They cite the Baltimore Police Department's officer shortage and ongoing federal litigation against the City by business owners in the aftermath of the death of Freddie Gray. ECF 25-1 at 31-33.

Plaintiff argues for either no bond or a minimal bond, asserting the defendants will suffer no damages under the injunction from plaintiff's "peaceful rally." ECF 15 at 16. At argument, counsel for plaintiff also pointed to the contractual obligation of plaintiff to provide security for

the rally, and the $2 million insurance policy it was required to obtain under the contract, to indemnify the City in the event of injury or property damage.[31]

As noted, the court "has discretion to set the bond amount 'in such sum as the court deems proper.'"  *Hoechst*, 174 F.3d at 421 (quoting rule).  Applying the principles above, I find that there is a case for a meaningful bond.  Defendants have articulated real, serious harms that could result if, as a result of a wrongfully issued injunction, disruption and violence ensue at the rally.  In view of the lack of any precise supporting calculation, and in reliance on the $2 million insurance policy apparently obtained by plaintiff for the event (*see* ECF 31-3), I will set a bond of $250,000.  That sum is conditioned on the City's satisfaction that the insurance policy supposedly procured by plaintiff is actually in place.

## VI. Conclusion

In light of the foregoing, I will grant the Motion in part and deny the Motion in part.  I shall issue the injunction specified in the accompanying "Order and Preliminary Injunction."

Date: October 12, 2021                                _____/s/_____

                                                                 Ellen L. Hollander
                                                                 United States District Judge

---

[31] The Court is mindful that merely having an insurance policy is not a guaranty that the insurer will pay a claim.