IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ST. MICHAEL'S MEDIA, INC.,
    *Plaintiff*

    v.

THE MAYOR AND CITY COUNCIL OF
BALTIMORE, *et al*.
    *Defendants.*

Civil Action No. ELH-21-2337

**MEMORANDUM OPINION**

Plaintiff St. Michael's Media, Inc. ("St. Michael's") filed suit in September 2021 against the Mayor and City Council of Baltimore (the "City");[1] Baltimore Mayor Brandon M. Scott; and Baltimore City Solicitor James L. Shea (collectively, the "City Defendants"), challenging on First Amendment grounds the City Defendants' refusal to allow plaintiff to hold a prayer rally and conference on November 16, 2021, at the Pier VI Pavilion ("Pier VI" or the "Pavilion").[2] Pier VI is a City-owned concert venue located in the "Inner Harbor" area of Baltimore. Although the venue is owned by the City, it is managed by SMG, a private company, pursuant to a contract with the City. ECF 1, ¶¶ 8-14, 33-38; ECF 25-2, ¶¶ 2, 4; ECF 16-3 at 2.[3] Along with the suit, St. Michael's moved for a temporary restraining order ("TRO") and a preliminary injunction ("P.I."). ECF 2; ECF 15.

---

[1] Plaintiff sued "The City of Baltimore," but the City's proper name is "Mayor and City Council of Baltimore." *See* Balt. City Charter, Art. I, § 1; ECF 25-1 at 1 n.1. Accordingly, I directed the Clerk to correct the docket to reflect the proper name. ECF 45 at 1 n.1; ECF 46 at 1.

[2] The venue is sometimes identified as Pier Six.

[3] SMG is a subsidiary of ASM Global, a venue management conglomerate. *See* ECF 16-1 at 3.

St. Michael's subsequently filed a "First Amended Verified Complaint," which is the operative pleading. ECF 14 (the "First Amended Complaint"). Among other things, the First Amended Complaint added SMG as a defendant, and added a new count, alleging a contract claim against SMG.

On October 12, 2021, this Court issued a preliminary injunction that, *inter alia*, barred the City Defendants from prohibiting or impeding SMG from entering into a contract with St. Michael's for plaintiff's use of the Pavilion for its prayer rally and conference. ECF 45 (Memorandum Opinion); ECF 46 (Order). The Fourth Circuit upheld the Court's decision. ECF 86; ECF 87; ECF 91; ECF 92. SMG and St. Michael's ultimately executed a contract for plaintiff's use of the Pavilion, and plaintiff's event was held on November 16, 2021, without incident. *See* ECF 90; ECF 95 at 2; ECF 102 at 6.

St. Michael's now seeks to amend its suit a second time, to add, among other things, additional claims; to include SMG as a defendant as to certain constitutional claims; and to obtain additional relief. ECF 95 (the "Motion"). The Motion is accompanied by an email exhibit (ECF 95-1); the proposed "Second Amended Verified Complaint" (ECF 95-2); and a redlined version of the Second Amended Complaint. ECF 95-3.[4]

Defendants oppose the Motion (ECF 102, the "Opposition"), supported by several exhibits. ECF 102-1 to ECF 102-7. And, St. Michael's has replied. ECF 103 (the "Reply").

---

[4] It appears that St. Michael's is not content with its legal victory. Rather, it seeks to protract and expand the litigation with additional claims. But, regardless of the number of defendants and the number of claims, it is only entitled to one recovery. *See, e.g.*, *Gen. Tel. Co. of the Northwest, Inc. v. E.E.O.C.*, 446 U.S. 318, 333 (1980) ("It also goes without saying that the courts can and should preclude double recovery by an individual."); *Bender v. City of New York*, 78 F.3d 787, 793 (2d Cir. 1996) ("If two causes of action provide a legal theory for compensating one injury, only one recovery may be obtained."); *Seuss v. Champion Industries*, BEL-06-851, 2010 WL 11549554, at *3 (D. Md. May 26, 2010) ("It is well established that a plaintiff is entitled to only one compensation for an injury.").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I.      Factual and Procedural Background

The parties are familiar with the factual and procedural background.  Therefore, I need not recount the background in detail.  Rather, I shall incorporate the factual summary set forth in my Memorandum Opinion of October 12, 2021.  *See* ECF 45 at 5-27.  And, I shall include recent developments.

### A.

The litigation began on September 13, 2021, when St. Michael's filed suit against the City; Scott; and Shea.  ECF 1. The First Amended Complaint (ECF 14) alleges that the City Defendants violated plaintiff's rights under the First Amendment to the Constitution by denying plaintiff the right to hold a prayer rally and conference at the Pavilion on November 16, 2021.  It is situated in a commercial area of downtown Baltimore known as the "Inner Harbor."  *Id.* ¶ 7.  As noted, the City owns the Pavilion, but it is managed by SMG, a private company that operates under the name "Royal Farms Arena."  *Id.*

St. Michael's, a non-profit organization, "is a vocal critic of the mainstream Catholic Church," including the United States Conference of Catholic Bishops ("USCCB").  ECF 1, ¶ 66; *see* ECF 14, ¶ 75; ECF 1, ¶ 3.  From November 15 – 18, 2021, the USCCB was scheduled to meet in Baltimore at the Waterfront Marriott Hotel (the "Hotel"), a private facility located near Pier VI. *Id.* ¶¶ 8, 9.  At least in part, plaintiff sought to hold the prayer rally and conference in order to criticize the Church, particularly with respect to child sexual abuse committed by members of the clergy, and the Church's alleged protection of the clergy.  *Id.* ¶¶ 3, 7-10.  And, plaintiff wanted to

do so on a date that coincided with the USCCB's Fall General Assembly, in a location near the site of the USCCB's meeting, so that the clergy would be aware of the rally.  *Id.* ¶¶ 8-10, 42.

Notably, this was not plaintiff's first event at Pier VI.  In 2018, St. Michael's held a rally at the Pavilion, also while the USCCB met at the Hotel.  *Id.* ¶ 12.  And, plaintiff made arrangements for that rally with SMG.  *Id.* ¶ 9, 12.

With regard to the 2021 rally, plaintiff engaged in contract negotiations with SMG to rent the Pavilion for the desired date.  And, it paid the requested $3,000 deposit.  *Id.* ¶ 13.  However, on or about August 5, 2021, weeks after plaintiff had paid the $3,000 deposit to SMG for use of the Pavilion on November 16, 2021, SMG, on instruction of the City, notified St. Michael's that plaintiff could not rent the Pavilion.  *Id.* ¶¶ 13, 14.  The City cited safety concerns linked to some of the people who were identified as speakers at the event.  *Id.* ¶¶ 15-19.  At the time of the cancellation, plaintiff's contract with SMG had not yet been executed, although plaintiff claims that all of the terms had actually been finalized.  ECF 14, ¶¶ 15, 18, 101.

This suit followed.  As noted, along with the suit, St. Michael's moved for a TRO and a P.I.  ECF 2 at 13.  St. Michael's asked the Court to compel SMG to "fulfill its contractual obligations with St. Michael's" and to enjoin the defendants from "interfering with St. Michael's preparing for and conducting" its rally on November 16, 2021.  *Id.* at 13-14.  I granted the TRO, in part.  ECF 9.  In particular, I ordered the City Defendants not to prevent St. Michael's from making arrangements for the rally. *Id.*  But, I did not order SMG, a non-party at the time, to execute a contract with plaintiff.

Thereafter, St. Michael's filed its First Amended Complaint (ECF 14), adding SMG as a defendant, and adding a contract claim, directed only at SMG.  The Amended Complaint contains five "Claim[s] for Relief."  The first four are constitutional claims under the First Amendment,

lodged only against the City Defendants pursuant to 42 U.S.C. § 1983.  SMG is the sole defendant in the fifth claim.  I shall refer to each claim as a count.

Count I alleges that the City Defendants violated plaintiff's First Amendment right to free speech.  ECF 14, ¶¶ 48-61.  Count II alleges that the City Defendants violated plaintiff's "Right of Free Exercise of Religion," as guaranteed by the First Amendment.  *Id*. ¶¶ 62-72.  In Count III, plaintiff claims that the City Defendants violated the Establishment Clause of the First Amendment.  *Id*. ¶¶ 73-83.  And, Count IV asserts that the City Defendants violated plaintiff's right of assembly, as protected by the First Amendment.  *Id*. ¶¶ 84-98.  Count V, lodged against SMG, seeks specific performance of the alleged contract between plaintiff and SMG.  *Id.* ¶¶ 99-113.

St. Michael's also filed an amended P.I. motion.  ECF 15 (the "P.I. Motion").  Defendants opposed the P.I. Motion (ECF 25), and St. Michael's replied.  ECF 34.  At the Court's request (ECF 34), defendants filed a surreply.  ECF 37.

On September 21, 2021, St. Michael's filed an "Emergency Motion for Immediate Status Conference And For Order to Show Cause Why Defendants Should Not Be Held in Contempt."  ECF 19.  The Court held a telephone conference on the same day, and I denied the motion.  ECF 22.  But, I required SMG to maintain the availability of the Pavilion for the date of November 16, 2021, in the event plaintiff were to prevail with regard to the P.I. Motion.  *Id*. at 2.

The Court held an evidentiary hearing on the P.I. Motion on September 30, 2021, and October 1, 2021, at which testimony was presented by plaintiff.  ECF 43; ECF 44.  Defendants elected not to present any testimony.  However, both sides submitted multiple exhibits.

In a Memorandum Opinion (ECF 45) and an Order and Preliminary Injunction (ECF 46) dated October 12, 2021, I granted the P.I. Motion in part and denied it in part.  As to Count I,

plaintiff's free speech claim, I found, based on the record, that the Pavilion was either a nonpublic forum or a limited public forum.  ECF 45 at 41-53.  As a result, the City would be entitled to impose reasonable restrictions in light of the purpose served by the forum, so long as its reasons were viewpoint neutral.  *Id*. at 44-48, 53-54.  But, I found that plaintiff was likely to succeed on the merits of its free speech and free assembly claims because, based on the record, the City's decision was not viewpoint-neutral.  *Id.* at 53-73.

In concluding that the City's conduct was not viewpoint-neutral, I focused on the following: 1) the City's stated reasons for cancelling plaintiff's event, including its reliance on prior inflammatory rhetoric of some of the rally speakers, and the alleged ties of plaintiff to the events of January 6, 2021, which, in the City's view, could lead to violence; 2) the City's unfettered, standards-free discretion; 3) its invocation of the "heckler's veto;" and 4) the emergence during the litigation of justifications for the City's decision that were not reflected in the evidence as to the City's reasons when it made the decision to terminate the event.  *Id*. at 53-71.

I also found that plaintiff would suffer irreparable harm in the absence of an injunction, that the balance of equities favored plaintiff, and that an injunction was in the public interest.  *Id*. at 82-84.  But, I observed that, given the nature of the forum, the City had the right to implement reasonable, viewpoint-neutral limitations anchored in lawful justifications.  *Id*. at 71 n.30.

Therefore, I issued a tailored preliminary injunction providing that, until the conclusion of the litigation or further Order of the Court, the City Defendants and their officers, agents, servants, employees, and all persons in active concert or participation with them, could not prohibit or impede SMG from entering into a contract with St. Michael's for plaintiff's use of the Pavilion for its prayer rally and conference on November 16, 2021.  ECF 46 at 1-2.  I also required St. Michael's

to provide a $250,000 bond as security.  And I required plaintiff to provide proof of satisfaction of its procurement of $2 million in liability insurance, consistent with the terms in the unexecuted contract.  *Id*.; ECF 45 at 84-86.

In contrast, I found that St. Michael's was not likely to succeed on the merits of its free exercise and Establishment Clause claims.  ECF 45 at 72.  In addition, I determined that St. Michael's was not likely to succeed on the merits of its specific performance claim against SMG, because the evidence did not reflect the formation of a contract between the two parties.  *Id*. at 73-82.  Thus, I denied plaintiff's request for an injunction to require SMG to execute or comply with a particular proposed contractual document.  ECF 46 at 2.

On October 13, 2021, the City Defendants noted an appeal to the Fourth Circuit.  *See* ECF 47.  For its part, on October 21, 2021, St. Michael's filed a cross-appeal as to the Court's ruling with respect to the specific performance claim and the $250,000 bond.  *See* ECF 74.

The City Defendants filed a motion to dismiss the First Amended Complaint on October 13, 2021, alleging failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6), or alternatively, for summary judgment.  ECF 52. The motion is supported by a memorandum (ECF 52-1, collectively the "Motion to Dismiss") and five exhibits.  ECF 52-2 to ECF 52-6. [5]

Then, on October 15, 2021, the City Defendants filed a motion to stay the signing of any contract between St. Michael's and SMG, pending the resolution of their appeal.  ECF 61.  St.

---

[5] SMG was not named as a movant, although the City's lawyers also represent SMG in this case.

Plaintiff has not yet responded to the Motion to Dismiss. After the close of business on December 30, 2021, and many weeks after the Fourth Circuit ruled on the appeal, plaintiff filed a motion for extension of time to respond to the Motion to Dismiss. ECF 104. Notably, the Court was also closed the next day (December 31, 2021). *See* ECF 105. By Order of January 4, 2022 (*id*.), I granted the extension request, indicating that plaintiff did not have to respond to the Motion to Dismiss until after the Court has ruled on its Motion to Amend.

Michael's opposed that motion (ECF 64) and the City Defendants replied.   ECF 66.   By Memorandum (ECF 69) and Order (ECF 70) of October 19, 2021, I denied the motion to stay.

On November 3, 2021, as to the City's appeal, the Fourth Circuit affirmed.  *See* ECF 86; ECF 87.   And, as to plaintiff's cross-appeal, the Fourth Circuit affirmed this Court's bond ruling on November 15, 2021, and dismissed, as moot, plaintiff's challenge to the specific performance ruling.  *See* ECF 91; ECF 92.   The mandates issued on November 29, 2021 (ECF 94) and December 6, 2021.   ECF 97.

## B.

In my P.I. Order, I expressed that the "Court anticipates good faith negotiations" concerning a contract between St. Michael's and SMG for plaintiff's use of Pier VI on November 16, 2021.  ECF 46, ¶ 4.  But, this proved to be easier said than done.  Between the issuance of the P.I. on October 12, 2021, and the date of the prayer rally on November 16, 2021, the parties were involved in a series of disputes concerning, *inter alia*, the terms of the proposed contract.  And, plaintiff frequently sought the aid of the Court.

On October 13, 2021, for example, plaintiff filed an "emergency" show cause motion (ECF 48), supported by an exhibit.  ECF 48-1.  Specifically, plaintiff sought an order to show cause as to why defendants should not be held in contempt, and to disqualify counsel for the City Defendants from also representing SMG, due to an alleged conflict of interest.  ECF 48 at 7-8.  As to the contempt, plaintiff argued that an email sent by SMG representative Teresa Waters to St. Michael's CEO Michael Voris established that the City Defendants violated the P.I. by impeding SMG from entering into a contract with plaintiff.  *Id*. at 2-3.

The Court convened an evidentiary hearing regarding the Contempt Motion on October 14, 2021.  ECF 57.  At the hearing, the Court heard testimony from Frank Remesch, the General

Manager of the Pavilion, and Waters, executive assistant to Remesch and SMG's booking and contracts manager for the Pavilion. ECF 63 (Hearing Tr.) at 31-57. Their testimony, along with the defense exhibits, showed that Remesch misinterpreted emails sent by counsel for defendants and mistakenly believed that SMG was not to enter into a contract with St. Michael's. *Id.* at 46-57. Remesch then conveyed his erroneous belief to Waters. *Id.* at 31-46. The record did not reflect any attempt on the part of counsel for the City Defendants to disobey the P.I., nor any basis to hold defendants in contempt. At the hearing, plaintiff withdrew the Contempt Motion. ECF 63 at 68; *see* ECF 58.[6]

At the request of St. Michael's, the Court held telephone conferences on October 22, 2021, and October 27, 2021, regarding the status of contract negotiations. ECF 73; ECF 76. Following the second status conference, the Court issued an order directing SMG to provide plaintiff with a proposed contract for the prayer rally by later that day. ECF 79.

A central point of contention at this stage of the negotiations was the amount of liability insurance. As I noted in my P.I., St. Michael's and SMG had agreed on a requirement for St. Michael's to procure $2 million in liability insurance for the event. *See* ECF 31-3; ECF 46 at 2. On the basis of my Memorandum Opinion, however, SMG claimed that it decided to seek the opinion of its outside broker, Marsh USA ("Marsh"), as to the appropriate amount of insurance.[7]

---

[6] Following the hearing, St. Michael's filed a "Motion for Partial Reconsideration of Preliminary Injunction," arguing that certain testimony at the hearing should lead the Court to reconsider its contract analysis and order SMG to perform. ECF 71. In ECF 105, I denied ECF 71 as moot.

[7] It is unclear why the Court's Memorandum Opinion, which summarized facts already known, prompted SMG or Marsh to revise the insurance requirement. Hanson told the Court that, until he read the Court's opinion, he did not realize the 2021 event "was not the same event" as plaintiff's previous 2018 prayer rally. ECF 102-3 at 4.

ECF 102-3 (Tr. of Oct. 27, 2021) at 4-7.[8]  According to defendants, Marsh concluded that $25 million in insurance, or "$10 million at the very minimum," would be appropriate.  *Id*. at 6-7.[9] Bruce Hanson, SMG's in-house counsel, then communicated to St. Michael's that SMG required $10 million in insurance, "reserv[ing] the right to ask for up to" $25 million.  *Id*. at 7.

On October 29, 2021, St. Michael's filed a "Motion to Enforce Preliminary Injunction" (ECF 82), supported by an exhibit.  ECF 82-1.  The motion asserted that defendants were "unreasonably impeding the prayer rally" by insisting on unreasonable contract terms, and sought the Court's intervention to stop this "interference."  ECF 82 at 5.  St. Michael's identified a number of outstanding issues that it claimed were unreasonable impediments.  These included, *inter alia*, a clause permitting SMG to cancel the event at any time for "unlawful behavior" or public safety concerns, and SMG's requirement for $10 million in insurance.  *Id*. at 3-5.  St. Michael's explained in the motion that although "at the time of [SMG's new draft] Contract being sent, St. Michael's believed it had commitments to $9 million in coverage," when it attempted to obtain an additional $1 million at SMG's insistence, its insurer withdrew all supplemental coverage, leaving it with only $2 million.  *Id*. at 4-5.[10]  It characterized the requirement for additional insurance as "outrageous and prohibitively expensive."  *Id*. at 4.

The Court held additional telephone conferences with counsel on October 29, 2021, and November 2, 2021.  ECF 83; ECF 84; ECF 85.  I indicated that I could not write the contract for

---

[8] The transcript of the call on October 27, 2021, has not been docketed.  But, relevant portions were attached to the Opposition. *See* ECF 102-3.

[9] As discussed, *infra*, St. Michael's claims in its Second Amended Complaint that Marsh did not, in fact, advise SMG that it should require these amounts of insurance. *See* ECF 95 at 7; ECF 95-2, ¶ 182.

[10] At certain points St. Michael's stated that it had $4 million, rather than $2 million, in coverage. *See* ECF 82 at 4 n.2; ECF 98 at 11-12.

the parties.  ECF 98 (Tr. of Oct. 29, 2021) at 4.  But, I suggested that some of the "hurdles" erected by SMG appeared to amount to an "end run" around the P.I.  *Id.*

During the conference call on November 2, 2021, the parties reported that they had resolved nearly all their outstanding issues, including as to the insurance.  ECF 100 (Tr. of Nov. 2, 2021) at 3-4.  As described by counsel for defendants, SMG agreed to reduce the amount of insurance it would require by an unspecified amount, and to "contribute $5,000" to the event, presumably through a reduction in the rental price.  *Id.* at 4.  However, St. Michael's continued to express concerns regarding the cancelation clause.  *Id.* at 3.  I attempted to encourage the parties to resolve the dispute on their own.  *Id.* at 21-22.

On the evening of November 3, 2021, St. Michael's filed a new "Motion to Enforce Injunction."  ECF 89.  Although the parties had finalized contract language following the conference call on November 2, 2021, and St. Michael's had sent a signed version to SMG that afternoon, Frank Remesch indicated on November 3, 2021, that he would not be able to sign the contract on behalf of SMG until the morning of November 4, 2021.  *Id.* at 2-3.  Therefore, plaintiff asked the Court to "issue an unequivocal order . . . that simply states that the Contract will be signed by 9:00 AM [on November 4, 2021]."  *Id.* at 6.

The Court scheduled a conference call for the morning of November 4, 2021.  ECF 88. However, the Court was subsequently notified that the contract had been signed.  ECF 90.  As a result, the conference call was cancelled, and I denied ECF 82 and ECF 89, as moot.  *Id.*

Plaintiff's event was held at the Pavilion on November 16, 2021, and plaintiff claims it was without incident.  *See* ECF 93 at 2; ECF 95 at 2.  The defendants have not challenged plaintiff's description, but they have pointed out that Steve Bannon, one of the advertised speakers, ultimately did not attend.  ECF 102 at 6.

On November 24, 2021, St. Michael's moved for the return of plaintiff's nominal $250 bond for the TRO, and to release the obligations related to the $250,000 bond. ECF 93. The Court granted the motion on December 9, 2021, without objection. ECF 101.

## II.   Legal Standard

A complaint may be amended "once as a matter of course" within twenty-one days of service of a defendant's answer or motion under Fed. R. Civ. P. 12(b), (e), or (f), "whichever is earlier." Fed. R. Civ. P. 15(a)(1)(b). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).

In general, leave to amend should be "freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). "Rule 15(a) grants the district court broad discretion concerning motions to amend pleadings, and leave should be granted absent some reason 'such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment or futility of the amendment.'" *Booth v. Maryland*, 337 Fed. App'x 301, 312 (4th Cir. 2009) (per curiam) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

As mentioned, leave to amend may be denied if the proposed claim would be futile. Under Rule 15(a), a "proposed amendment is futile when it is 'clearly insufficient or frivolous on its face.'" *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 228 (4th Cir. 2019) (quoting *Johnson v. Oroweat Foods*, 785 F.2d 502, 510 (4th Cir. 1986)). A proposed amendment is also futile if it would add a new claim that fails to state a claim upon which relief could be granted, and thus would not survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Save Our Sound OBX*, 914 F.3d at 228; *Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019); *see also Martin v. Duffy*, 858 F.3d 239, 247-48 (4th Cir. 2017) (affirming denial of leave to amend on

futility grounds where the plaintiff's "pleading deficiency cannot be cured by amendment of his complaint"), *cert. denied*, ___ U.S. ___ 138 S. Ct. 738 (2018); *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F. 3d 312, 320 (4th Cir. 2010) (stating that a court need not grant leave to amend where the amendment would have "no impact on the outcome of the motion to dismiss").

Unlike cases in which a plaintiff seeks to amend its pleadings early in the litigation, or while a motion to dismiss is pending, the litigation to date has included evidentiary hearings and the extensive submission of materials outside the pleadings, in the context of the P.I. proceedings. But, a P.I. proceeding involves a provisional record that may include inadmissible evidence. *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated on other grounds*, __ U.S. __, 137 S. Ct. 1239 (2017) (Mem.); *see also EndoSurg Medical, Inc. v. EndoMaster Medical, Inc.*, 71 F. Supp. 3d 525, 557 (D. Md. 2014) (emphasizing the distinction between "evidence-based rulings on [a] Motion for Preliminary Injunction" and "rulings on [a] Motion to Dismiss grounded upon the allegations in the Complaint."). Thus, in deciding futility, I do so with reference to plaintiff's allegations, not the P.I. record.

At the Rule 12(b)(6) stage, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). Of course, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to

reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009).  Of import here, the rule demands more than bald accusations or mere speculation.  *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).

### III.   Discussion

### A.

The Second Amended Complaint includes a series of proposed changes to the First Amended Complaint.  First, the Second Amended Complaint seeks to add SMG as a defendant to plaintiff's constitutional claims (Counts I through IV), which are currently lodged only against the City Defendants, under the "state actor" doctrine.  ECF 95-2, ¶¶ 48-51, 78-152.  Second, the Second Amended Complaint would convert Count V, regarding specific performance, into a general breach of contract claim; add additional claims against SMG for promissory estoppel and fraud; and add a claim against the City Defendants for tortious interference with contractual relations.  *Id*. ¶¶ 153-92.  Third, the Second Amended Complaint contains a new claim against all defendants, for a declaratory judgment.  *Id*. ¶¶ 193-97.  Fourth, the Second Amended Complaint aims to expand the relief sought by plaintiff.  The First Amended Complaint sought temporary, preliminary, and permanent injunctive relief as to the rally; an order as to specific performance; compensatory and punitive damages; and attorneys' fees.  ECF 14 at 14.  The Second Amended Complaint would convert the preliminary injunction request into a request for a permanent injunction barring defendants from ever interfering in "any future rallies" hosted by St. Michael's.

ECF 95-2 at 24.  And, it adds a request for damages for breach of contract and promissory estoppel, and omits the request for an order as to specific performance.  *Id*.  Finally, the Second Amended Complaint makes various other miscellaneous changes, such as updating the Complaint's language to reflect that the rally already occurred.

Defendants oppose the Motion, claiming that amendment is not in the interests of justice, given that the rally has occurred.  ECF 102 at 1-2.  They also contend that many of the proposed changes would be futile.  For example, they point to the addition of SMG as a defendant with regard to the constitutional claims; the breach of contract claim; the promissory estoppel claim; the tortious interference claim; and the request for permanent injunctive relief as to future rallies. *Id*. at 8-14.  Moreover, they argue that the proposed fraud claim is contrary to the evidence available to St. Michael's; is brought in bad faith; and is without merit.  *Id*. at 2, 13, 14.  They warn that if the fraud claim is allowed, defendants will likely bring a counterclaim and request relief under Fed. R. Civ. P. 11.  *Id*. at 2, 13.

To be sure, plaintiff maintained that holding the rally at Pier VI on November 16, 2021, was the object of its suit and the P.I. proceedings.  *See* ECF 14 at 14.  That goal was achieved. Nevertheless, this does not foreclose plaintiff's claim for damages.

### B.

Defendants' primary argument pertains to futility.  As noted, a proposed complaint's futility is judged according to the standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Rule 15's liberal amendment standard, and the limited nature of the briefing on sometimes difficult questions of law, may counsel against finding futility when the issue is close.  *See* 6 CHARLES A. WRIGHT AND ARTHUR R. MILLER, FED. PRACTICE & PROCEDURE § 1487 (3d ed. Apr. 2021)

("Wright & Miller") ("If a proposed amendment is not clearly futile, then denial of leave to amend is improper.").

Plaintiff seeks to add SMG as a defendant in regard to plaintiff's constitutional claims, based on the contention that SMG is a state actor.[11]  To state a claim under § 1983, a plaintiff must assert that the alleged violation of law was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

"There is no precise formula to determine whether otherwise private conduct constitutes 'state action,'" *Alosoroff v. Nat'l Collegiate Athletic Assoc.*, 746 F.2d 1019, 1021 (4th Cir. 1984), and "no one fact can function as a necessary condition across the board for finding state action." *Brentwood Acad. v. Tenn. Secondary Schs. Athletic Assoc.*, 531 U.S. 288, 295-96 (2001).  To ascertain whether a private actor engaged in state action for the purposes of § 1983, the question is whether "'the alleged infringement of federal rights [is] fairly attributable to the State[.]'" *Peltier v. Charter Day School, Inc.*, 8 F.4th 251, 261 (4th Cir. 2021) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)), *rehearing en banc granted*, 2021 WL 4892153 (4th Cir. Oct. 19, 2021).  "At bottom . . . the key question remains whether there is a 'close nexus between the State and the challenged action' such that private conduct 'may be fairly treated as that of the State itself.'"  *Peltier*, 8 F.4th at 261 (quoting *Jackson v. Metro. Edison Co*., 419 U.S. 345, 349 (1974)).

In a recent case, the Supreme Court said: "[A] private entity can qualify as a state actor in a few limited circumstances—including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take

---

[11]  The Court expresses no opinion here as to the wisdom or necessity for such an amendment to the suit.  But, ordinarily, a plaintiff seeks to add an entity, such as SMG, claiming it is a State actor, in circumstances when it has no direct claim against the governmental entity.  That is not the case here.  The City Defendants have been parties to this litigation since the beginning, and they have never asserted that suit against the City is legally barred.

a particular action; or (iii) when the government acts jointly with the private entity." *Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2018); *see also Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 342 (4th Cir. 2000). Within this first category, the Court noted that it "has recognized that a private entity may, under certain circumstances, be deemed a state actor when the government has outsourced one of its constitutional obligations to a private entity." *Halleck*, 139 S. Ct. at 1929 n.1.

St. Michael's argues that SMG qualifies as a state actor on three grounds, each of which, in plaintiff's view, is independently sufficient: SMG exercised delegated obligations; the City compelled SMG to act; and SMG acted jointly or in concert with the City.

Plaintiff has alleged, *inter alia*, that the City compelled SMG to take particular actions. "[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

The proposed Second Amended Complaint plainly alleges that SMG, as an agent of the City, declined to permit plaintiff to hold the prayer rally at the Pavilion, as communicated on August 5, 2021, at the direct instruction of the City, and subsequently SMG continued to obstruct negotiations with St. Michael's, in order to prevent an agreement to use the Pavilion, all at the direction of or under pressure from the City. *See* ECF 95-2, ¶¶ 17, 21, 22, 25, 28, 34, 46, 50, 52, 54-56, 61, 80, 95-98, 113-14, 129-30, 149-50.

Of course, defendants contest many of these allegations. But, the merits are not at issue at this juncture.

Defendants also insist that it would be futile for plaintiff to add SMG as a defendant because the disputed action—the decision not to rent the Pavilion to St. Michael's—was made by the City Defendants, not SMG.  ECF 102 at 9.  And, they argue that "the alleged state action has already been pled against the party who allegedly committed the action."  *Id.*  However, the proposed Second Amended Complaint makes specific allegations as to the conduct of SMG related to the rally.  *See, e.g.*, ECF 95-2, ¶¶ 59-62, 96-98, 113-14, 129-30, 149-50.  And, the defendants have not articulated a sufficient basis to reject the Second Amended Complaint on the ground that SMG cannot be a State actor.[12]

## C.

St. Michael's seeks to convert its specific performance claim into a general breach of contract claim, and to add a claim for promissory estoppel.  ECF 95-2, ¶¶ 153-80.  As noted, based on the P.I. record, the Court previously found that no contract existed between St. Michael's and SMG, and thus a claim for specific performance was not likely to succeed.  ECF 45 at 73-82.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."  RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1 (4th ed. 1990) ("Williston on Contracts");

---

[12] Given this conclusion, I need not consider plaintiff's claims as to delegation and joint action.  But, *Manhattan Community Access Corp. v. Halleck*, ___ U.S. ___, 139 S. Ct. 1921, would seem relevant to the parties' dispute as to whether SMG may be considered a state actor based on the exercise of a delegated constitutional obligation.

In that case, a divided Supreme Court concluded that a private nonprofit designated by New York City to operate Manhattan's public access cable channels was not a state actor subject to the First Amendment. *Id.* at 1926-27. The Court rejected the argument that providing a forum for speech was a traditional, exclusive public function, which would render the nonprofit a state actor, noting that private entities also often provide such forums.  *Id.* at 1930-31. But, the Court remarked that its "point should not be read too broadly," and that the outcome might be different if, for example, the public access channels were themselves the property of New York City. *Id.* at 1934; *see id.* at 1933-34.

*accord* RESTATEMENT (SECOND) CONTRACTS § 1 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006).  "'A contract is formed when an unrevoked offer made by one person is accepted by another.'"  *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's Cty. v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)).  Thus, mutual assent is an integral component of every contract.  *See, e.g.*, *Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

In determining whether there is an enforceable contract, courts in Maryland begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ."  *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)).  "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms."  *Cochran*, 398 Md. at 14, 919 A.2d at 708.

The Maryland Court of Appeals has enumerated "several factors that may be helpful in determining whether the parties have manifested an intention to be bound."  *Id*. at 15, 919 A.2d at 708.  These include the language of the preliminary agreement; the existence of open terms; whether partial performance has occurred; the context of the negotiations; the custom of such

transactions, such as whether a standard form contract is widely used in similar transactions; whether the agreement has few or many details; whether the amount involved is large or small; and whether it is a common or unusual contract. *Id*. at 15-16, 919 A.2d at 708-09.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cnty. Comm'rs of Caroline Cnty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders, Inc.*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable"); *cf. Southern Power Co. v. Cleveland Cty.*, ___ F.4th ___, 2022 WL 128488, at *2 n.3 (4th Cir. Jan. 14, 2022) (noting that "'[b]eginning preparations, though they may be essential to carrying out the contract or to accepting the offer, is not enough'" for acceptance by performance) (quoting RESTATEMENT (SECOND) CONTRACTS § 45, cmt. f).

Parties may, if they intend as such and the terms are adequately agreed upon, enter into a written contract, without signatures, or enter into a contract that is not written. *Cochran*, 398 Md. at 14-21, 919 A.2d at 708-13; *Peoples Drug Stores v. Fenton Realty Corp.*, 191 Md. 489, 493, 62

A.2d 273, 275 (1948).  But, of relevance here, "if the parties contemplate that an agreement between them shall be reduced to writing before it shall become binding and complete, there is no contract until the writing is signed.'" *Cochran*, 398 Md. at 18, 919 A.2d at 711 (quoting *Eastover Stores, Inc. v. Minnix*, 219 Md. 658, 665, 150 A.2d 884, 888 (1959)) (alteration mine).  In other words, "[i]f the parties do not intend to be bound until a final agreement is executed, there is no contract." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

"[P]arties can make the completion of their contract depend upon the execution of a written instrument.  The question whether the parties negotiating a contract intended to be bound by their oral agreement but contemplated a written instrument merely as evidence of their agreement, or whether they did not intend to bind themselves until a contract was prepared and signed by them, must be decided from the facts and circumstances in each particular case." *Peoples Drug Stores*, 191 Md. at 493, 62 A.2d at 275; *cf.*

"Generally, a breach of contract is defined as a 'failure, without legal excuse, to perform any promise that forms the whole or part of a contract.'" *Weaver v. ZeniMax Media, Inc*., 175 Md. App. 16, 51, 923 A.2d 1032 (2007) (citing Williston on Contracts § 63:1).  Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F.Supp.3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 198 Md. App. 337, 17 A.3d 744, 749 (2011)); *see also RRC Ne., LLC v. BAA Md., Inc*., 413 Md. 638, 658, 994 A.2d 430, 442 (2010) (noting the elements of contractual obligation and breach); *Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015) (same).

Further, in Maryland "a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing'" the existence, and the breach, of a contractual obligation.  *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012)

(emphasis in original) (citation omitted).   The agreement, or alleged agreement, between the parties "ultimately determines" whether a breach occurred.   *See Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005).

Promissory estoppel "is an alternative means of obtaining contractual relief."   *Md. Transp. Auth. Police Lodge #34 of the Fraternal Order of Police, Inc. v. Md. Transp. Auth.,* 195 Md. App. 124, 215, 5 A.3d 1174, 1227 (2010), *rev'd on other grounds*, 420 Md. 141, 21 A.3d 1098 (2011); *see also Pavel Enterprises, Inc. v. A.S. Johnson Co.*, 342 Md. 143, 169, 674 A.2d 521, 534 (1996) ("[T]here are different ways to prove that a contractual relationship exists . . . .   Traditional bilateral contract theory is one.   Detrimental reliance [a.k.a. promissory estoppel] can be another."); *Suburban Hosp., Inc. v. Sampson*, 807 F. Supp. 31, 33 (D. Md. 1992) (applying Maryland law and stating that "the nature of a lawsuit in which promissory estoppel is invoked remains that of an action to enforce a contract").

In Maryland, the elements of a claim for promissory estoppel, or detrimental reliance, were established in the touchstone case of *Pavel Enterprises, Inc.*, 342 Md. at 166, 674 A.2d at 532 (emphasis and footnote omitted):

1) a clear and definite promise;
2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;
3) which does induce actual and reasonable action or forbearance by the promisee; and
4) causes a detriment which can only be avoided by the enforcement of the promise.

*Accord Citiroof Corp. v. Tech Contracting Co.*, 159 Md. App. 578, 589, 860 A.2d 425, 432 (2004);

*Konover Prop. Trust, Inc. v. WHE Assocs.,* 142 Md. App. 476, 484, 790 A.2d 720, 724 (2002).

On the P.I. record, I found that the evidence indicated that the parties contemplated a signed and executed written document, which had not happened when the City decided not to permit the

rally.  ECF 45 at 77-81.  Furthermore, some terms were still in flux through August 2021.  *Id*. at 78-80.

St. Michael's spends much of its briefing challenging the Court's reasoning in its P.I. decision, as it has in the past.  *See* ECF 95 at 4 n.2; ECF 107 at 6-7.  The Court declines to revisit its analysis here.  Nevertheless, as indicated context, the futility of plaintiff's proposed breach of contract claim must be evaluated in light of the proposed Second Amended Complaint, not according to the provisional P.I. record.

The proposed Second Amended Complaint alleges that the terms of the contract were finalized and definite, both during the summer of 2021 and particularly by September 16, 2021, when SMG sent St. Michael's a revised contract.  *See* ECF 95-2, ¶¶ 15, 18, 54, 155, 159, 163.  Moreover, the proposed pleading adequately alleges that the parties had agreed to all terms, that SMG intended to be bound, and that the agreement was not signed only because the City barred SMG from executing it.  *Id*. ¶¶ 15, 20, 54, 163, 166.  Therefore, in my view, St. Michael's has adequately alleged the existence of a contract with SMG.

This is not to say that St. Michael's will prevail on its breach of contract claim.  But, given the allegations in the Second Amended Complaint, it is appropriate to permit St. Michael's to convert its specific performance claim to one for breach of contract and to litigate the claim.  This determination also disposes of the challenge to plaintiff's proposed promissory estoppel claim.

## D.

Plaintiff seeks to sue the City Defendants for tortious interference with contractual relations.  ECF 95-2, ¶¶ 187-92.  The tort "has five elements: (1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting

damages to the plaintiff." *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466, 598 A.2d 794, 802 (1991).

As for the third element, "any act by defendant which is 'wrongful or unlawful . . . done intentionally without cause or excuse,' which is 'for the indirect purpose of injuring the plaintiff, or of benefitting the defendant at the expense of the plaintiff,' will constitute tortious interference." *Id*. at 470, 590 A.2d at 804 (quoting *Sharrow v. State Farm Mut. Auto. Ins. Co.*, 306 Md. 754, 764-65, 511 A.2d 492, 497-98 (1986)).  Notably, in *Sharrow*, 306 Md. at 764-76, 511 A.2d at 497-98, the Maryland Court of Appeals stated that it is "not necessary to prove express malice but only that the interference was wrongful and without justification. . . . [M]alice in this form of action means legal malice, not ill will or spite, and need be only a wrongful or unlawful act done intentionally without cause or excuse."); *see also* RESTATEMENT (SECOND) TORTS § 766 (1979).

The proposed Second Amended Complaint alleges that the City Defendants tortiously interfered with an existing contract between St. Michael's and SMG, by inducing SMG to beach its contract.  ECF 95-2, ¶¶ 187-92.  It adequately asserts that the City Defendants deliberately interfered in this contract, in order to bar plaintiff's prayer rally, purely out of a disdain for the views of the proposed speakers, or for similar unconstitutional reasons.  *See, e.g.*, *id*. ¶¶ 43, 53, 80, 83-84.

Defendants argue that no contract existed with which the City could interfere, an issue addressed above.  They also argue that plaintiff's rally "did not involve the sale of tickets and was not a profit generating undertaking."  ECF 102 at 13.  But, of course, plaintiff could be damaged even if the rally was not expected to generate a profit, as the Second Amended Complaint adequately alleges.  *See* ECF 95-2, ¶¶ 14, 18, 65-69, 172, 192.

Accordingly, I will permit the Complaint to be amended to include this claim. Again, this is not to suggest that the claim for tortious interference will ultimately be borne out. But, there is no ground to reject it at this early stage.[13]

### E.

The proposed Second Amended Complaint seeks to bring a claim of fraud against SMG. *See* ECF 95-2, ¶¶ 181-86. St. Michael's alleges that SMG knowingly made a false representation of material fact to St. Michael's when it claimed that it was advised by Marsh that it should require plaintiff to obtain $10 million to $25 million in liability insurance for the prayer rally. ECF 95-2, ¶¶ 182-83.

It is well established that a fraud claim implicates Fed. R. Civ. P. 9(b), although neither side cited the rule. Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See*, *e.g.*, *Xia Bi v. McAuliffe*, 927 F.3d 177, 182 (4th Cir. 2019); *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013).

Under Rule 9(b), a plaintiff alleging claims that sound in fraud "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (quotation omitted). In other words, "Rule 9(b) requires plaintiffs to plead the who, what, when, where, and

---

[13] Defendants note (ECF 102 at 12) that the proposed Second Amended Complaint's Prayer for Relief claims "[d]amages for breach of contract and promissory estoppel against *all* Defendants." ECF 95-2 at 24 (emphasis added). However, in the remainder of the Second Amended Complaint, it seems clear that the breach of contract and promissory estoppel claims are asserted only against SMG. *See id.* ¶¶ 153-180. If St. Michael's intended to bring these claims against any other parties, it should clarify as such in a further amended complaint.

how: the first paragraph of any newspaper story." *Crest Construction II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (quotation omitted).

Rule 9(b) serves several salutary purposes.  In *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999), the Fourth Circuit identified four purposes (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc.,* 755 F. Supp. 1055, 1056–57 (S.D. Ga. 1990)):

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . .  Second, Rule 9(b) exists to protect defendants from frivolous suits.  A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery.  Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

The plain text of Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind.  However, the Fourth Circuit has made clear that alleging such mental conditions must still satisfy the Rule 8 plausibility standard, and that conclusory allegations that merely recite the legal standard, even as to mental states, are inadequate.  *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377-78 (4th Cir. 2012).

A "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."  *Harrison*, 176 F.3d at 784.  Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'"  *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, No. HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)); *accord*

*Piotrowski v. Wells Fargo Bank, N .A.*, No. DKC 11–3758, 2013 WL 247549, at *5 (D. Md. Jan. 22, 2013).

"In Maryland, the terms 'fraud' . . . and 'intentional misrepresentation'[] are often used interchangeably, and the elements necessary to establish intentional misrepresentation are identical to those required for fraud." *Simms v. Mut. Benefit Ins. Co.*, 137 F. App'x 594, 600 (4th Cir. 2005) (alterations added); *see B.N. v. K.K.*, 312 Md. 135, 149, 538 A.2d 1175, 1182 (1988) (referring to the tort "variously known as fraud, deceit, or intentional misrepresentation"); *see also In re Reecher*, 514 B.R. 136, 155 (Bankr. D. Md. 2014) (stating that "intentional misrepresentation" is "also known in Maryland simply as fraud or deceit").

To state a claim for intentional misrepresentation, a plaintiff must plausibly allege: "(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation." *Nails v. S & R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *see Thomas v. Nadel*, 427 Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Gourdine v. Crews*, 405 Md. 722, 758, 955 A.2d 769, 791 (2008); *Sass v. Andrew*, 152 Md. App. 406, 429, 832 A.2d 247, 260 (2003); *see also Womack v. Ward*, DKC-17-3634, 2018 WL 3729038, at *5 (D. Md. Aug. 6, 2018).

To be actionable, a false representation "must be of a material fact." *Gross v. Sussex, Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993). "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as

important.'"  *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted).

Ordinarily, intentional representation cannot be predicated on statements that are merely "'expressions as to what will happen in the future.'"  *Sass*, 152 Md. App. at 438, 832 A.2d at 265 (citation omitted); *see Highlands Office Park Three, LLC v. GE Commercial Fin. Bus. Prop. Corp*., WDQ-08-2972, 2009 WL 10682225, at *4, n.7 (D. Md. Feb. 25, 2009); *Cooper v. Berkshire Life Ins. Co.*, 148 Md. App. 41, 73, 810 A.2d 1045, 1064 (2002).  However, Maryland cases distinguish "between statements that are 'a prediction or an expression of expectation concerning external events' and those that are 'relate[d] to matters within the speaker's control.'"  *Carroll Co.*, 848 F. Supp. 2d at 569 (citation omitted) (alteration in *Carroll*).  Therefore, a predictive statement by a speaker who holds himself out as "knowledgeable in a particular field" can support a claim of fraud "where the circumstances indicate . . . that the speaker has a factual basis for his predictions so that the existence of facts is implied by the representations."  *Cooper*, 148 Md. App. at 73-74, 810 A.2d at 1064 (citation omitted); *see also Hale Trucks of Md., LLC v. Volvo Trucks North Am., Inc*. 224 F. Supp. 2d 1010, 1031-32 (D. Md. 2002).  Further, as with negligent representation, vague, indefinite, conjectural, and exaggerated statements, along with puffing, do not give rise to a claim of intentional misrepresentation.  *See Goldstein*, 159 Md. App. at 436, 859 A.2d at 332; *Fowler v. Benton*, 229 Md. 571, 579, 185 A.2d 344, 349 (1962).

Defendants oppose the fraud claim, arguing that it is asserted in bad faith.  ECF 102 at 7, 13-14.  Specifically, on November 23, 2021, defendants provided counsel for plaintiff with a copy of an email communication from Marsh, which defendants contend contains the $10-$25 million insurance recommendation and thus indicates that SMG's representation to St. Michael's was not

false.  *Id.* at 7.[14]  Citing this email provided to plaintiff's counsel, defendants assert that St.

Michael's "has opted to seek an amendment in this matter via blatant misrepresentations to the

Court." *Id.* at 13.  Further, they advise that if the Court permits the fraud amendment to go forward,

"the result will likely be a counterclaim and request for Rule 11 relief."  Defendants also argue

that, because this communication indicates there is no merit to plaintiff's fraud claim, the claim is

futile.  *Id.* at 14.

St. Michael's acknowledges that "SMG has shared an email from Marsh, wherein on some

level it supports that Marsh did, indeed, tell SMG that these limits were recommended."  ECF 95

at 7 n.11.  However, it asserts that "discovery is expected to show that this was part of a subterfuge

on SMG's part."  *Id.*  In its Reply, it describes the email as "unauthenticated [and] out-of-context,"

and asserts that the email "does not support SMG's contention, does not include any prior

correspondence between Marsh and SMG, and provides no factual basis for Marsh's alleged

conclusions."  ECF 103 at 10; *see also id.* at 9 n.6.  St. Michael's argues, *id.* at 10-11:

> At this early stage of the litigation, St. Michael's is not required to accept
> Defendants' version of events as the established truth. St. Michael's intends to show
> during discovery that any estimate or recommendation from Marsh was not
> legitimate and Defendants instructed Marsh to provide an unreasonable
> recommendation for the purpose of making it more difficult for St. Michael's to
> obtain the required insurance. A brief email cannot defeat Plaintiff's fraud claim at
> this stage and does not show St. Michael's is seeking leave to add a fraud claim in
> bad faith.

Bad faith is sometimes found with regard to a sudden switch in positions or similar tactical

mischief.  *See* Wright & Miller § 1487 nn. 30, 31 (collecting cases).  However, there is some

---

[14] Per the agreement between the parties under which counsel for defendants shared the
Marsh email with counsel for plaintiff, the content of the Marsh communication has not been
provided to the Court. *See* ECF 102 at 7 n.1; ECF 102-7; ECF 103 at 10. Defendants have offered
to provide the text of the Marsh communication to the Court under seal. *See* ECF 102 at 7 n.1. The
Court concludes this is unnecessary to resolve the Motion to Amend.

authority for finding bad faith when a proposed amended complaint makes factual allegations that blatantly contradict the factual record.  *See Wonasue v. Univ. of Md. Alumni Ass'n*, 295 F.R.D. 104, 108-09 (D. Md. 2013) (factual allegations contrary to plaintiff's deposition testimony in discovery buttressed finding of bad faith); *Billy Baxter, Inc. v. Coca-Cola Co.*, 47 F.R.D. 345, 346 (S.D.N.Y. 1969), *judgment aff'd on other grounds*, 431 F.2d 183 (2d Cir. 1970), *cert. denied*, 401 U.S. 923 (1971) ("A finding of good faith must have at least prima facie showing of a possibility of the amender's ability to establish factual support for the new matters sought to be pleaded.").

Plaintiff's attempt to bring a fraud claim in the face of the Marsh communication may not rise to the level of "bad faith."  Regardless, given the particularity demanded by Fed. R. Civ. P. 9(b), plaintiff has failed plausibly to state a claim for fraud in its Second Amended Complaint.

A complaint must contain facts sufficient to "state a claim to relief that is plausible on its face," and must include more than bald accusations or mere speculation.  *Twombly*, 550 U.S. at 555, 570.  As discussed, Rule 9(b) imposes a particular hurdle for fraud claims, and even mental states that may be alleged generally must be alleged plausibly, with more than conclusory allegations. *Mayfield*, 674 F.3d at 377-78.  For example, *Mayfield*, *id.* at 378, rejected as "entirely insufficient" an allegation as to actual malice that simply parroted the relevant legal standard (alleging that the statements in question "were known by [defendants] to be false at the time they were made, were malicious or were made with reckless disregard as to their veracity"), remarking: "This kind of conclusory allegation—a mere recitation of the legal standard—is precisely the sort of allegations that *Twombly* and *Iqbal* rejected."

The allegations in the relevant section of the proposed Second Amended Complaint (*see* ECF 95-2, ¶¶ 181-86) are sparse, and are often little more than inadequate "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  The

Second Amended Complaint never specifies when SMG made the allegedly false representation to St. Michael's, nor offers any more detail about this communication or its contents beyond the basic description that SMG "claimed that it was advised by its insurance agent/broker, Marsh, that it should require $25 million in liability insurance from St. Michael's for the prayer rally, or, at a minimum, $10 million in liability insurance." ECF 95-2, ¶ 182; *see, e.g.*, *Owens*, 612 F.3d at 731 (plaintiff "must, at a minimum, describe the time, place, and contents of the false representations . . . ." (quotation omitted)).

In particular, for two of the most crucial allegations in the fraud count—that SMG's representation regarding Marsh's advice was false, and that SMG knew that its representation was false (ECF 95-2, ¶¶ 182-83)—the Second Amended Complaint essentially offers conclusory allegations and speculation bereft of any alleged factual support. The Second Amended Complaint makes a variety of factual allegations as to how SMG's request for greater insurance coverage was unsupported by the facts and pretextual. *See, e.g.*, ¶¶ 56-62, 98, 114, 130, 150, 168-71. But, as to the specific charge that SMG falsely represented that Marsh advised it to require $10 million to $25 million in insurance, when in fact Marsh did not, the Complaint includes no factual allegations that would make such an assertion plausible, aside from the bare assertions in paragraphs 182 and 183.

Indeed, the communication from Marsh to SMG, which defense counsel provided to plaintiff's counsel, is the sole item of evidence the parties have cited on this issue. *See* ECF 95 at 7 n.11; ECF 102 at 7, 13-14; ECF 102-7; ECF 103 at 9 n.6, 10-11. Even St. Michael's admits that, in this email, it appears that "someone from Marsh allegedly claims that the $25 million insurance requirement was justified by *something* in the Court's order." ECF 103 at 9 n.6 (emphasis in original); *see also* ECF 95 at 7 n.11 ("SMG has shared an email from Marsh, wherein on some

level it supports that Marsh did, indeed, tell SMG that these limits were recommended.").  Of course, St. Michael's contests that this communication provides the complete story or resolves the issue.  And, St. Michael's is surely correct that it is not required to accept defendants' version of events based upon this one email.

But, St. Michael's does not offer a single fact that might support its own version of events. Instead, it merely asserts: "St. Michael's intends to show during discovery that any estimate or recommendation from Marsh was not legitimate and Defendants instructed Marsh to provide an unreasonable recommendation for the purpose of making it more difficult for St. Michael's to obtain the required insurance."  ECF 103 at 10.  Similarly, plaintiff states in the Motion that "discovery is expected to show that this [the Marsh communication] was part of a subterfuge on SMG's part."  ECF 95 at 7 n.11.  These are significant and serious assertions.  And yet, as in the Second Amended Complaint, St. Michael's fails to substantiate them with any facts, evidence, or specific allegations.

The Second Amended Complaint may not be used as a fishing expedition.  *See, e.g.*, *Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1163 (10th Cir. 2010) ("Rule 26(b), although broad, has never been a license to engage in an unwieldy, burdensome, and speculative fishing expedition."); *R. Ernest Cohn, D.C., D.A.B.C.O. v. Bond*, 953 F.2d 154, 159 (4th Cir. 1991) ("Discovery should not become a fishing expedition.") (internal quotations omitted).  Yet, plaintiff's apparent inability to support its fraud claim strongly suggests that plaintiff hopes to use discovery as an inappropriate fishing expedition, in the hope of uncovering evidence to support its speculation.  But, Rule 9(b) aims "to eliminate fraud actions in which all the facts are learned after discovery."  *Harrison*, 176 F.3d at 784 (internal quotation omitted).

A "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied . . . that plaintiff has substantial prediscovery evidence of [the] facts." *Id.* Here, plaintiff has offered little prediscovery evidence. And, given that there was no signed contract, SMG and the City Defendants may well have been within their rights to demand more insurance coverage.

In sum, plaintiff's proposed fraud claim goes too far. It does not satisfy the plausibility and particularity requirements of the federal Rules. Therefore, I will deny leave to amend the Complaint to include the fraud claim.

**F.**

The proposed Second Amended Complaint seeks to add a request for permanent injunctive relief that bars defendants from "preventing St. Michael's from conducting and making arrangements for any future rallies." ECF 95-2 at 24. Defendants argue that this amendment is futile because "no pleading in this case alleges any claim or danger of future harm." ECF 102 at 14. Plaintiff does not address this issue in its Reply.

Article III of the Constitution limits judicial power to "actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted); *see Carney v. Adams*, ___ U.S. ___, 141 S. Ct. 493, 498 (2020); *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 488 (2013); *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020). "Indeed, 'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Dreher v. Experian Info. Solutions, Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)); *see Ansley v. Warren*, 861 F.3d 512, 517 (4th Cir. 2017) ("An essential element" of the case-or-controversy requirement "is that any party who invokes the court's authority must establish standing").

"Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *Uzuegbunam v. Preczewski*, __ U.S.__, 141 S.Ct. 792, 798 (2021) (citations omitted). Therefore, during the pendency of a case, an actual controversy must exist. *See Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974); *Int'l Bhd. of Teamsters, Local Union No. 639 v. Airgas, Inc.*, 885 F.3d 230, 234 (4th Cir. 2019); *Williams v. Ozmint*, 716 F.3d 801, 808 (4th Cir. 2013). In the absence of a case or controversy, "the court's subject matter jurisdiction ceases to exist . . . ." *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see Gardner v. GMAC, Inc.*, 796 F.3d 390, 395 (4th Cir. 2015) (same).

"Two related doctrines…each originating in the case-or-controversy requirement of Article III…underlie [the] determination [of whether a case is justiciable]. First, a plaintiff must demonstrate standing…. Second, the case must be 'ripe.'" *Trump v. New York*, __ U.S. __, 141 S.Ct. 530, 535 (2020) (internal citations omitted); *see Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("One element of the case-or-controversy requirement" is that a plaintiff must establish standing to sue.); *Spokeo, Inc.*, 136 S. Ct. at 1547 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."); *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) ("The standing doctrine derives from the Constitution's limitation on Article III courts' power to adjudicate cases and controversies.") (internal quotation marks and citations omitted).

The doctrine of standing consists of two distinct "strands": constitutional standing, pursuant to Article III, and prudential standing. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). Thus, "the standing inquiry asks whether a plaintiff ha[s] the requisite stake in the outcome of a case . . . ." *Deal v. Mercer County Board of Ed.*, 911 F.3d 183, 187 (4th Cir. 2018) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)).

To establish Article III standing, a plaintiff must satisfy three elements.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). They are, *id.* (internal quotation marks and citations omitted):

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

The cases are legion with regard to these elements.  *See*, *e.g., Uzuegbunam*, 141 S.Ct. at 798; *Spokeo, Inc.*, 136 S. Ct. at 1548; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014); *Clapper*, 568 U.S. at 409; *Friends of the Earth, Inc.*, 528 U.S. at 180-81; *Bryant v. Woodall*, 1 F.4th 280, 287 (4th Cir. 2021); *Episcopal Church in South Carolina v. Church Insurance Co. of Vermont*, 997 F.3d 149, 155 (4th Cir. 2021); *Outdoor Amusement Business Ass'n., Inc. v. Dept. of Homeland Security*, 983 F.3d 671, 680 (4th Cir. 2020); *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 361 (4th Cir. 2020); *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 226-27 (4th Cir. 2019); *South Carolina*, 912 F.3d at 726; *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018); *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 207 (4th Cir. 2017); *Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015); *Lane v. Holder*, 703 F.3d 668, 671 (4th Cir. 2011); *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011).

Under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a particularized injury," which is a requirement that "serves vital interests going to the role of the judiciary in our system of separated powers."   *Hollingsworth v. Perry*, 570 U.S. 693, 696 (2013). As the Fourth Circuit explained in *Deal*, 911 F.3d at 189, with respect to injury-in-fact, the two concepts—actual, ongoing injury or imminent injury—are "disjunctive."  An "allegation of future

injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk"

that the harm will occur.'" *Susan B. Anthony*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414

n.5); *see Lujan*, 504 U.S. at 564; *South Carolina*, 912 F. 3d at 726.  In contrast, "'[a]llegations of

*possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (emphasis in original) (quoting

*Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  This requirement serves "to ensure that the

alleged injury is not too speculative for Article III purposes." *Wikimedia Found.*, 857 F.3d at 208.

Thus, to satisfy the injury-in-fact requirement of standing, the plaintiff must plausibly

allege "an invasion of a legally protected interest" that is both "concrete and particularized" and

"actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quotation marks

and citation omitted).  And, crucially, "[b]ecause 'past exposure to illegal conduct does not in itself

show a present case or controversy regarding injunctive relief . . . if unaccompanied by any

continuing, present adverse effects,' a plaintiff seeking 'declaratory or injunctive relief . . . must

establish an ongoing or future injury in fact.'" *Davison v. Randall*, 912 F.3d 666, 677 (4th Cir.

2019) (quoting *Kenny v. Wilson*, 885 F.3d 280, 287-88 (4th Cir. 2018)) (alteration here); *see also*

*Los Angeles v. Lyons*, 461 U.S. 95, 105-110 (1983) (past injury confers standing for damages, but

does not confer standing for prospective injunctive relief).

For plaintiff's claim for injunctive relief as to future rallies to be viable, then, St. Michael's

must adequately allege a future injury-in-fact.  Notably, the Fourth Circuit "has held that 'standing

requirements are somewhat relaxed in First Amendment cases,' particularly regarding the injury-

in-fact requirement." *Davison*, 912 F.3d at 678 (quoting *Cooksey v. Futtrell*, 721 F.3d 226, 235

(4th Cir. 2013)).  In *Kenny*, the Fourth Circuit "explained that 'there is a sufficiently imminent

injury in fact if plaintiffs allege [1] an intention to engage in a course of conduct arguably affected

with a constitutional interest, but proscribed by a statute, and [2] there exists a credible threat of

prosecution thereunder.'"  *Davison*, 912 F.3d at 678 (quoting *Kenny*, 885 F.3d at 288).  So, in *Kenny*, 885 F.3d at 288-89, high school students had standing to challenge disorderly conduct statutes because they alleged that they attended school, which inevitably involved expressive conduct implicating the statutes in question.  And, in *Davison*, 912 F.3d at 678-79, a plaintiff who had been banned from the Facebook page of a county board chair had standing to challenge the ban because the evidence established that the plaintiff intended to continue to use the Facebook page.[15]

St. Michael's has not alleged facts sufficient to establish a viable claim for future injunctive relief.  The Second Amended Complaint simply does not include any allegation as to any planned, intended, or contemplated future conduct on the part of the City or St. Michael's, whether at the Pavilion, in Baltimore, or otherwise.

The Second Amended Complaint references *past* conduct.  ECF 95-2, ¶ 13.  And, it makes a generic assertion that the City's contract with SMG as to the Pavilion "must be struck down lest the City invoke it again."  *Id*. ¶ 92.  But, it is devoid of allegations as to the *future* plans or intentions of any party.  Given the absence of any allegations as to a future injury-in-fact, I agree with defendants that plaintiff's proposed amendment to seek permanent injunctive relief as to "any future rallies" is futile.  *Id*. at 24.[16]

_____

[15] *Davison* concerned standing for prospective declaratory relief, rather than injunctive relief, but the principles are the same. *See id*. at 678-79; *Kenny*, 885 F.3d at 287-88.

Relatedly, St. Michael's seeks to add a claim for declaratory relief, which is unchallenged. *See* ECF 95-2, ¶¶ 193-97. But, this claim does not appear to be prospective, but rather to concern defendants' past actions relating to the prayer rally.

[16] "Separately, there is an ongoing injury in fact if plaintiffs make a 'sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'" *Kenny*, 885 F.3d at 288 (quoting Cooksey, 721 F.3d at 235). But, the Second Amended Complaint does not allege ongoing self-censorship.

## IV.   Conclusion

For the reasons stated above, I shall grant the Motion in part and deny it in part.  I shall permit St. Michael's to file a revised Second Amended Complaint.  It may not include the proposed fraud claim against SMG or the claim for future injunctive relief.

The Second Amended Complaint, once filed, will replace and supersede the First Amended Complaint, to which the Motion to Dismiss is directed.  *See, e.g., Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021); *Young v. City of Mount Ranier*, 238 F.3d 567, 573 (4th Cir. 2001).  Therefore, I will deny the Motion to Dismiss (ECF 52), as moot, and without prejudice.  Plaintiffs must file its Second Amended Complaint by January 28, 2022.

Defendants shall have 21 days from the date St. Michael's files its Second Amended Complaint to answer or otherwise respond to the Second Amended Complaint.

An Order follows.


Date:   January 14, 2022.                              _____/s/_____
                                                       Ellen Lipton Hollander
                                                       United States District Judge