**UNITED STATES DISTRICT COUNT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| **ST. MICHAEL'S MEDIA, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Civil Action No.: 21-cv-02337 ELH** |
| **MAYOR AND CITY COUNCIL OF** | ) | |
| **BALTIMORE, et al.** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MAYOR AND CITY COUNCIL OF**
**BALTIMORE, BRANDON M. SCOTT, JAMES L. SHEA, AND SMG'S MOTION TO**
**DISMISS OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**

Defendants, Mayor and City Council of Baltimore, Mayor Brandon M. Scott, and City Solicitor James L. Shea, (collectively and individually the "City Defendants") and SMG ("SMG"; the City Defendants and SMG shall be individually and collectively known as the "Defendants") by undersigned counsel, submit this memorandum of law in support of their motion to dismiss or in the alternative motion for summary judgment related to the second amended verified complaint filed by Plaintiff St. Michael's Media, Inc. a/k/a Church Militant ("Plaintiff" or "Church Militant") [ECF 114].  Even after been granted another attempt to provide any legal basis for their claims against the Defendants, Plaintiff's Second Amended Complaint ("Am. Comp.") fails to do so. Instead, it presents a series of disjointed claims lacking in both legal and factual substance. Therefore, the Defendants respectfully request that the complaint be dismissed.

i

## TABLE OF CONTENTS

I.    Introduction......................................................................................................1

II.   Background.......................................................................................................1

III.  Legal Standard.................................................................................................7

IV.   Argument..........................................................................................................9

    A.    Plaintiff's Claims Against Mayor Brandon Scott and City Solicitor James L. Shea Fail as a Matter of Law.................................................................9

        1.    Plaintiff Has Failed to Alleged Any Wrongdoing on Behalf of Defendants Scott and Shea.........................................................................9

        2.    Defendants Scott and Shea are Immune from Suit.........................10

        3.    Defendants Scott and Shea Cannot Be Sued in Their Official Capacities.........................................................................................11

        4.    Mayor Scott and Solicitor Shea Cannot Be Sued in Their Individual Capacities.........................................................................................11

    B.    The City Did Not Violate Any of Plaintiff's Constitutional Rights.............................................................................................................12

        1.    Plaintiff's Free Speech Rights Are Not Abridged or Even Implicated By the City's Action in Making a Reasonable Decision Related to Its Private Commercial Venue.............................................................13

            a)    MECU Pavilion is a Nonpublic Forum; this Court has Already Established this Fact...................................................13

            b)    In a Nonpublic Forum, Like the MECU Pavilion, the Government May Impose Reasonable Restrictions That Are Viewpoint Neutral...........................................................15

                1.    The City's Actions Were Reasonable...........................15

                2.    The City's Actions Are Viewpoint Neutral....................20

                3.    In This Case, the City is Not Regulating, the City is Acting As A Proprietor.  As Such, the City's Actions Need Only Be

Reasonable and "Not Arbitrary, Capricious or Invidious."……………………………………………………..21

2. The City Did Not Violate Plaintiff's Right to Establish or Exercise Any Religion or Denomination…………………………………………………22

3. The City Did Not Violate Plaintiff's Rights to Freedom of Assembly and Association……………………………………………………………24

C. Plaintiff's Second Amended Complaint Fails to State A Claim Related to Any Allegation that SMG is a State Actor……………………………………..25

D. Plaintiff's Second Amended Complaint Fails to State a Claim for Breach of Contract and Promissory Estoppel Against the Defendants…………………27

E. Plaintiff's Purported Claim for Tortious Interference Fails as a Matter of Law………………………………………………………………………30

F. Plaintiff's Claim for Punitive Damages Fails as a Matter of Law……………31

V. Conclusion…………………………………………………………………31

## I.     Introduction

Plaintiff seeks monetary and declaratory relief against the Mayor and City Council of Baltimore, two public officials, and an entertainment and venue management company related to their rental of a commercial entertainment facility owned by the City, a nonpublic forum. However, Plaintiff's Second Amended Complaint is flawed on its face.  It seeks relief from immune public officials based on facts contradicted by its own complaint, seeks monetary relief to which it is not entitled, and seeks recovery for alleged First Amendment protected activity that the Defendants never prevented them from engaging.  As such, Plaintiff's claims fail as a matter of law.

## II.     Background

This case arises out of a dispute brought forth by Plaintiff regarding numerous alleged First Amendment violations and contract related claims.  Plaintiff St. Michael's Media, Inc. seeks 28 U.S.C. §1983 damages for alleged First Amendment violations regarding the use of the MECU Pavilion (also known as Pier VI) on November 16, 2021 for an event they stylized as a "prayer rally" to protest alleged abuses by American Catholic Bishops.  The Mayor and City Council of Baltimore owns the MECU Pavilion but does not manage the operations of the venue.  SMG, a co-defendant in this matter manages the venue.

In November 2018, Plaintiff held an event at Pier VI, which they state occurred without incident. ECF 114 ¶13.  Wishing to hold this same event again, on or about June 16, 2021, Plaintiff began to negotiate terms for holding a similar event at Pier VI on November 16, 2021.  ECF 114 ¶10.  Plaintiff asserts that the rally's purpose and location were designed to take place adjacent to the United States Conference of Catholic Bishops ["USCCB" or "U.S. Bishop's"] Fall General Assembly at the Marriott Waterfront Hotel, a private venue.  ECF 114 ¶10.  Notably, the proposed

2021 event, according to Plaintiff, was projected to have approximately 3,000 people, many multiples more than the 2018 event gathering.  In preparation for the 2021 event, on or about June 22, 2021, Plaintiff sent a $3000 deposit to Royal Farms Arena to reserve the date while negotiations for the space were still ongoing.  ECF 114 ¶10.  On or about July 14, 2021, Royal Farms Arena sent a draft contract to Plaintiff that included the statement "Please sign and return…for execution." ECF  14-1; ECF 14-2 p. 30 of 39.[1]  The contract was not signed or executed at this time, as Plaintiff continued to correspond with Royal Farms Arena regarding various contract terms, including when doors would open, when the event would begin and end, and additional costs to host the event.  ECF 14-2, p. 24--29 of 39.

At some point during the summer of 2021, Plaintiff began advertising its confirmed speakers for the event.  *See* Affidavit of Michael G. Huber, attached hereto and incorporated herein as Exhibit 1 ("Huber Aff.").   Those confirmed speakers included Steve Bannon and Milo Yiannopolous.  *See id*.  Because of the potential disruption that those speakers and the event could have on the City, during the week of July 19, 2021, Michael G. Huber, Chief of Staff to Mayor Brandon Scott, contacted SMG and instructed them to cease discussions with Plaintiff regarding the space.  *Id.* at ¶6.  Prior to the contract being finalized and executed, on or about August 5, 2021 Royal Farms Arena contacted Plaintiff and informed it that they would no longer be able to host the event at Pier VI and that the $3,000 deposit would be returned to Plaintiff.  ECF 14-2, p. 20-22 of 39.  Plaintiff then contacted Royal Farms Arena, who referred it to City Solicitor James L. Shea, a co-defendant in this action.  ECF 14-2, p. 19 of 39.

---

[1] Plaintiff references its attachments to the original complaint and First Amended Complaint in its Second Amended Complaint thereby bringing those attachments within the "4 corners" of the Second Amended Complaint.

On August 6, 2021, Michael Voris, the president and founder of St. Michael's Media, contacted Solicitor Shea via telephone and requested the rationale for withdrawing the space for the November 16 event.  ECF 114 ¶26.  Solicitor Shea informed Mr. Voris that the City had concerns regarding disruptions and violence that could result in Baltimore City from the event.  Plaintiff's operative complaint makes clear that no point in time during this conversation did Solicitor Shea indicate that the event was being cancelled due to the religious or political beliefs of the Plaintiff.  ECF 114 ¶26.

The City's sincere concerns about the propensity for disruption and violence due to Plaintiff's event are not unfounded.  In fact, the Church Militant was an active propagandist for the claim that the November 2020 Presidential Election was stolen from Donald Trump.  On November 8, 2020, Church Militant published an article titled "*Trump Team: It's Not Over*" with the tagline that "Trump fights on amid documented cases of vote fraud, irregularities."[2]  They continued expressing and disseminating this sentiment up to and including their coverage of the deadly January 6 insurrection at the United States Capitol in Washington, D.C., violence which was directly attributed to false claims of an election stolen from Trump.   This riot, where participants chanted "Fight for Trump! Fight for Trump! Traitor, traitors, traitors," resulted in five deaths, 140 injured law enforcement officers, and a cost to taxpayers of over $30 million between the significant damage to the historic building and the increased security costs.[3] Church Militant promoted and exalted these rioters in its broadcast from that evening.  Michael Voris - one of the

---

[2] Christine Niles, *Trump Team: It's Not Over* (Nov. 8, 2020), https://www.churchmilitant.com/news/article/trump-team-its-not-over (last accessed Sept. 17, 2021).

[3] MIchael S. Schmidt and Luke Broadwater, *Officers' Injuries, Including Concussions, Show Scope of Violence at the Capital Riot*, New York Times (Jul. 12, 2021), https://www.nytimes.com/2021/02/11/us/politics/capitol-riot-police-officer-injuries.html (last accessed Sep. 23, 2021), and Bill Chappell, Architect Of The Capitol Outlines $30 Million In Damages From Pro-Trump Riot, NPR (Feb. 24, 2021), https://www.npr.org/sections/insurrection-at-the-capitol/2021/02/24/970977612/architect-of-the-capitol-outlines-30-million-in-damages-from-pro-trump-riot (last accessed Sep. 23, 2021).

speakers for the November 16 rally in Baltimore - glorified the Capitol insurrectionists during his broadcast on the night of January 6, stating, "[t]housands of American patriots fed up with the results of the fraudulent election stormed to the Capitol building today bringing a halt to all business of certifying the electoral votes for Joe Biden and Kamala Harris."[4]  Voris concluded his broadcast by saying:

> As we wrap up our coverage tonight, it is unclear when any final certification vote may be done.  But given the late hour, it appears that Joe Biden and his Marxist allies have been denied their fraudulent certification at least one day.  As we prepare to sign off, we would like to show you two images, one shows the anger Trump supporters feel toward the Marxist media for their years of lies and attacks against them and Trump.  Once on Capitol grounds, they showed the media exactly what they think of them.[5]

The broadcast then showed video footage of January 6 rioters approaching a team of journalists on Capitol Hill with camera tripods set up to broadcast coverage of the day's events.[6] The rioters taunt and menace the journalists before overrunning their site and destroying their equipment as reporters ran for safety.

Further, Steve Bannon - a former Trump official and another scheduled speaker for the November 16 event – regularly calls for violence against government officials and also played a key role in the events of January 6.[7]  First, shortly after the November 2020 election, Bannon was banned from Twitter after suggesting on his podcast that Dr. Anthony Fauci and FBI Director Christopher Wray be beheaded.  Bannon elaborated during an episode of his War Room podcast

---

[4] Post-Election Special: Storming the Capitol, Church Militant (Jan. 6, 2021), https://www.churchmilitant.com/news/article/post-election-special-storming-the-capitol (last accessed Sept. 17, 2021).

[5] *Id.*

[6] *Id.*

[7] Rob Kuznia, Kurt Devine, and Drew Griffin, *How Trump allies stoked the flames ahead of Capitol riot*, CNN (Jan. 18, 2021), https://www.cnn.com/2021/01/18/politics/trump-bannon-stone-giuliani-capitol-riot-invs/index.html (last accessed Sept. 17, 2021).

"I'd put the heads on pikes.  Right.  I'd put them at the two corners of the White House as a warning to federal bureaucrats."[8]  Despite the ban from Twitter, Bannon was instrumental in instructing President Trump to return to Washington, D.C. for the January 6 rally to try and stop the results of the election from being certified.[9]  On his podcast the day before the Capitol insurrection, Bannon told listeners "All hell is going to break loose tomorrow. Just understand this. All hell is going to break loose tomorrow. It's gonna be moving. It's gonna be quick."[10]  Bannon has since admitted that he helped plan the January 6 rally that preceded the riot at the Capitol.[11]  The goal for January 6 was to "kill the Biden presidency in the crib."[12]  Further, speaking engagements involving Steve Bannon have also devolved into violence and disruption, prompting law enforcement to utilize pepper spray and arrests on protestors to quell the disruption.[13]

Milo Yiannopoulos, another prominent pundit, was also advertised to appear at the November 2021 event.   Yiannopoulos was banned from Twitter after inciting racist and

---

[8] Jaclyn Diaz, *Twitter Permanently Suspends Steve Bannon Account After Beheading Comments*, npr (Nov. 6, 2021), https://www.npr.org/2020/11/06/932052602/twitter-permanently-suspends-steve-bannon-account-after-beheading-comments (last accessed Sept. 17, 2021).

[9] Will Steakin, Matthew Mosk, James Gordon Meek, and Ali Dukakis, *Longtime Trump advisers connected to groups behind rally that led to Capitol attack*, abc News (Jan. 15, 2021), https://abcnews.go.com/US/longtime-trump-advisers-connected-groups-rally-led-capitol/story?id=75261028 (last accessed Sept. 20, 2021).

[10] Steve Bannon, Bannon's War Room, EP 631 – Pandemic: One Day Away (Jan. 5, 2021), https://www.listennotes.com/podcasts/bannons-war-room/ep-631-pandemic-one-day-away-HzwlUt3Od0k/ (last visited Sept. 19, 2021).  Bannon's comments regarding the following day start at approximately the 29:40 mark of the episode.

[11] Andre J. Ellington, *Steve Bannon Confirms His Involvement in January 6 Insurrection on 'War Room' Podcast*, Newsweek (September 22, 2021), https://www.newsweek.com/steve-bannon-confirms-his-involvement-january-6-insurrection-war-room-podcast-1631667 (last accessed September 23, 2021).

[12] Gustaf Kilander, Steve Bannon Admits He Helped Plan 6 January Trump Rally to "Kill Biden Presidency in the Crib." (September 22, 2021), https://www.independent.co.uk/news/world/americas/us-politics/steve-bannon-capitol-riot-biden-b1925068.html last accessed September 22, 2021).

[13] Andy Takagi, *Arrests, violence at protest against Munk Debate hosting Steve Bannon*, The Varsity (Nov. 2, 2018), https://thevarsity.ca/2018/11/02/arrests-violence-at-protest-against-munk-debate-hosting-steve-bannon/ (last accessed Sept. 20, 2021); Andrea Janus, *12 People Arrested Outside Steve Bannon, David Frum Debate*, Canadian Broadcasting Corporation (Nov. 2, 2018), https://www.cbc.ca/news/canada/toronto/munk-debates-steve-bannon-david-frum-1.4890180 (last accessed Sept. 22, 2021).  Rebecca Savransky, *Berkeley City Council Votes to Let Police Pepper Spray Violent Protesters* (September 13, 2017), https://thehill.com/homenews/state-watch/350407-berkeley-council-votes-to-let-police-pepper-spray-violent-protesters (last accessed Sept. 22, 2021).

misogynistic abuse of an African American celebrity.[14]   Further, he has a history of making

comments advocating for pedophilia, resulting in a ban from speaking at the conservative CPAC

conference in 2017.[15]   His language has also shown enthusiasm for violence, including his call for

"gunning journalists down" just prior to the deadly Annapolis Capital-Gazette shootings in 2018.[16]

Violence and public disruption frequently follow Yiannapoulos' engagements, with at least one

man being shot outside of one of his events at the University of Washington in 2017.[17]   In fact,

due to the violence ensuing from this event, the Seattle Police Department and the University of

Washington police dispatched 124 officers, with those officers putting in over 1,000 hours of

overtime *in a single day* for a speaking engagement that lasted approximately an hour.[18]   The total

estimated cost for overtime alone for these officers was more than $75,000, which does not include

investigation into the shooting and other incidentals.[19]   At another Yiannapoulos speaking event

at UC Berkeley, the subsequent rioting resulted in approximately $100,000 in damages.[20]

---

[14] Abby Ohlheiser, *Just how offensive did Milo Yiannopoulos have to be to get banned from Twitter?* Washington Post (July 21, 2017), https://www.washingtonpost.com/news/the-intersect/wp/2016/07/21/what-it-takes-to-get-banned-from-twitter/ (last accessed Sept. 17, 2021); Derek Lawrence, *Leslie Jones on Milo Yiannopoulos scandal: 'He has no space here,'* Entertainment Weekly (Feb. 20, 2017), https://ew.com/books/2017/02/20/leslie-jones-milo-yiannopoulos-book-canceled/ (last accessed Sept. 20, 2021).

[15] Jeremy W. Peters, *Milo Yiannopoulos's Pedophilia Comments Cost Him CPAC Role and Book Deal*, New York Times (Feb. 20, 2017), https://www.nytimes.com/2017/02/20/us/politics/cpac-milo-yiannopoulos.html (last accessed Sept. 17, 2021).

[16] Juliette Verlaque, *Milo Yiannopoulos Defends 'Gunning Journalists Down' Comment After Annapolis Shooting: It Was a 'Private Joke,'* The Wrap (June 28, 2018), https://www.thewrap.com/milo-yiannopoulos-gunning-down-journalists-annapolis-shooting/ (last accessed Sept. 17, 2021).

[17] Rebecca Morin, *Man shot at Milo Yiannopoulos protest*, Politico (Jan. 1, 2017), https://www.politico.com/story/2017/01/milo-yiannopoulos-protest-shooting-233962 (last accessed Sept. 17, 2021).

[18] Daniel Gilbert, *Milo Yiannopoulus at UW: A speech, a shooting and $75,000 in police overtime*, The Seattle Times (March 26, 2017, updated March 27, 2017), https://www.seattletimes.com/seattle-news/crime/milo-yiannopoulos-at-uw-a-speech-a-shooting-and-75000-in-police-overtime/ (last accessed Sept. 19, 2021).

[19] *Id.*

[20] Madison Park and Kyung Lah, *Berkeley protests of Yiannopoulos caused $100,000 in damage*, CNN.com (Feb. 2, 2017), https://www.cnn.com/2017/02/01/us/milo-yiannopoulos-berkeley/index.html (last accessed Sept. 19, 2021); William Wan, *Milo's appearance at Berkeley led to riots. He vows to return this fall for a week-long free-speech event*, The Washington Post (Apr. 26, 2017), https://www.washingtonpost.com/news/grade-point/wp/2017/04/26/milos-appearance-at-berkeley-led-to-riots-he-vows-to-return-this-fall-for-a-week-long-free-speech-event/ (last accessed Sept. 20, 2021).

Relying on the Plaintiff's advertised speakers for the proposed November 2021 event, as soon as the City became aware of Plaintiff's plan to use the Pavilion for a rally that included speakers known for encouraging violent actions that have resulted in injuries, death, and property damage, the City instructed SMG not to move forward with the event out of a legitimate fear that it would incite violence in the heart of downtown Baltimore. *See* Huber Aff., ¶¶ 3-6. The City did not instruct SMG to cease discussions with Plaintiff due to their religious convictions – rather, as the owner of the venue, the City terminated negotiations due to the very real potential that they would use that platform to incite violence and public disruption. *See* Huber Aff., ¶ 4. The proposed program did not occur in a vacuum and, as discussed above, the incendiary and hateful rhetoric of several of the scheduled speakers could have provoked a strong reaction and raise the potential for clashes and disturbances. Plaintiff makes claims that the individuals who came to the rally were individuals seeking to pray the rosary and protest the USCCB, and that the event previously occurred without issue. ECF 114 ¶64. The fact of the matter is, however, that the 2018 event was not only many times smaller than what Plaintiff is proposing this year but also, besides Voris, did not include speakers that are specifically known for inciting violent behavior, insurrection, and disruption.

Ultimately, Plaintiff cannot present to this Court a final executed contract upon which to base their breach claim, and Plaintiff's claims of speech suppression are specious and unfounded. The City has not infringed upon the First Amendment rights of Plaintiff and no contract existed. Therefore, the Defendants respectfully request that this Honorable Court dismiss Plaintiff's First Amended Complaint.

### III.    Legal Standard

A complaint is subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) if it does not "state a claim upon which relief can be granted." A motion filed under Rule 12(b)(6) challenges the legal sufficiency of a complaint, *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 338 (4th Cir. 2006), considered with the assumption that the facts alleged are true, *Eastern Shore Mkts, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). The legal sufficiency of a complaint is measured by whether it meets the standards for a pleading set forth in Federal Rules of Civil Procedure 8, 9, 10 and 11, as well as Rule 12(b)(6). *See Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). The aggregation of the specific requirements of these rules "reveals the countervailing policy that plaintiffs may proceed into the litigation process only when their Complaints are justified by both law and fact." *Id.* at 193. (emphasis added).

Although the pleading standard does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Moreover, the court is not obligated to accept a plaintiff's conclusory allegations regarding the legal effect of the facts alleged. *See United Mine Workers of Am. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085-86 (4th Cir. 1994).  Rather, a plaintiff has an obligation to provide grounds for his entitlement to relief and that obligation requires more than labels, conclusions, or a formulaic recitation of the elements of a cause of action. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above a speculative level." *Qwest Communications Corp. v. Maryland-National Capital Park & Planning Comm'n*, 553 F. Supp. 2d 572, 574 (D. Md. 2008) (*quoting Twombly*, 550 U.S. at 555). "Nor does a Complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft*, 129 S. Ct. at 1949 (internal quotation marks and citation omitted).

Thus, in order "[t]o survive a motion to dismiss, a Complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (*emphasis added*) (*quoting Twombly*, 550 U.S. at 570). The plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." *Id*. Rather, it requires the plaintiff to articulate facts, when accepted as true, that "show" that the plaintiff has stated a claim entitling him to relief, *i.e.*, the "plausibility of 'entitlement to relief.'" *Id*. (*quoting Twombly*, 550 U.S. at 557) (emphasis added).

A motion for summary judgment is appropriate where "there is no genuine dispute as to any material fact" and "the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56. In assessing a motion for summary judgment, all reasonable inferences must be drawn in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The party opposing summary judgment, however, "may not rest upon mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 256.

## IV. Argument

### A. Plaintiff's Claims Against Mayor Brandon Scott and City Solicitor James L. Shea Fail as a Matter of Law

#### 1. Plaintiff Has Failed to Allege Any Wrongdoing on Behalf of Defendants Scott and Shea

Plaintiff asserts very specific allegations against Messrs. Scott and Shea. As for Mayor Scott, Plaintiff only alleges that the Mayor oversees the Department of Transportation, appointed Solicitor Shea, and has authority over Shea. *See* ECF 114 ¶ 6. There are no other allegations directed at the Mayor whatsoever. *See* ECF 114 ¶ 6. As for City Solicitor Shea, Plaintiff alleges he has the authority to approve or deny permits, contract, and/or agreements. *See* ECF 114 ¶ 5.

However, there is no allegation that Mr. Shea denied any contract with anyone in this matter. Further, the City's charter includes no reference to his ability to do so in this instance. *See* BALTIMORE CITY CHARTER, art. I, *passim*. The affidavit of Michael Huber and the email communications attached to Plaintiff's complaint make clear that neither Mr. Scott nor Mr. Shea contacted SMG to discontinue contract negotiations. Further, by Plaintiff's own allegations, they are seeking recovery against Messrs. Scott and Shea based on their alleged authority to "approve or deny permits" or control the departments that do so. However, the Plaintiffs Second Amended Complaint is devoid of any allegation that it sought a permit from the City or any identified official related to any proposed rally or protest. To the contrary, the pleading makes clear that they sought a **contract** with Defendant SMG to use the Pier VI pavilion entertainment facility. *See* ECF 114 ¶ 10. During his testimony at the September 30-October 1, 2021 preliminary injunction hearing, Plaintiff's president and founder, Michael Voris testified under oath that his company never sought a permit from the City or any City official related to the November 16, 2021 event. Plaintiff cannot hold the City public officials liable for a permit that was never requested. Nor can they hold those officials liable for conduct that the complaint's exhibits make clear those officials did not engage.

## 2. Defendants Scott and Shea are Immune from Suit.

Simply put, the qualified immunity doctrine applies to all officials exercising an executive function, whatever the conduct or right at issue. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). An official sued in an individual capacity is entitled to qualified immunity when his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013). According to Plaintiff's Second Amended Complaint, they are seeking to hold both Scott and Shea liable for a failure to issue a rally permit that was never requested for a facility that this court has determined

is a nonpublic forum.  The operative pleading is devoid of any allegation that would disqualify the individual defendants in this case from qualified immunity.

### 3.  Defendants Scott and Shea Cannot Be Sued in Their Official Capacities.

Both Defendants Scott and Shea have been sued in both their official and individual capacities pursuant to 28 U.S.C. §1983 which implicates an analysis under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and its progeny.  The City's Charter establishes the Mayor and City Council of Baltimore as a municipal corporation.  BALTIMORE CITY CHARTER, art. I § 1.  The Plaintiffs naming of the City, as well as Scott and Shea, is unnecessarily redundant.  The Mayor of Baltimore City and its Solicitor are, obviously, included under the umbrella of parties that encompasses the "Mayor and City Council."  According to the Supreme Court, "[a]s long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity.  It is *not* a suit against the official personally, for the real party in interest is the entity" *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citing *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985)).  *See also, Huggins v. Prince George's Cty.*, 683 F.3d 525, 532 (4th Cir. 2012)(treating a suit against individuals in their official capacities as a suit against the county). Further, when an official is named as a party in his/her official capacity, those suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n. 55 (1978).  Accordingly, the duplicate official capacity claims against Mayor Scott and Solicitor Shea should be dismissed.

### 4.  Mayor Scott and Solicitor Shea Cannot Be Sued in Their Individual Capacities.

11

As noted above, Mayor Scott and Solicitor Shea were sued in their official and personal capacities under 28 U.S.C. §1983.  ECF 114, ¶¶ 5-6.  "Personal-capacity suits seek to impose personal liability upon a government official."  *Graham*, 473 U.S. at 165.  Therefore, if a *Monell* §1983 claim is limited to municipal entities and personal capacity concerns individuals, it follows that a *Monell* claim cannot lie against a municipal official sued in his individual capacity.  *See, e.g., Devi v. Prince George's Cty*., DKC-16-3790, 2017 WL 3592452 at *2 n.3 (D. Md. Aug. 21, 2017)(Plaintiff cannot state a *Monell* claim against on official in his individual capacity)(*Harasz v. Katz*, 239 F.Supp.3d 461, 505 (D. Conn. 2017)("'*Monell* does not apply to state officials or individuals sued in their individual capacity.'")(citation omitted); MARTIN A. SCHWARTZ, SEC. 1983 LITIG. CLAIMS & DEFENSES § 7.01 (4th Ed. 2016)(explaining that *Monell* applies to municipal liability).

Finally, to the extent Plaintiff is seeking to impose individual liability upon Messrs. Scott and Shea because of conduct of their alleged subordinates, this claim should also fail.  Public officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondent superior."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see Monell*, 436 U.S. at 691.  "Because vicarious liability is inapplicable to … §1983 suits, a Plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Plaintiff has not identified any individual unconstitutional conduct by either Messrs. Scott or Shea and having a phone conversation that Plaintiff is dissatisfied with after an official action is taken does not rise to the level of a constitutional violation.

### B.  The City Defendants Did Not Violate Any of Plaintiff's Constitutional Rights

1. **Plaintiff's Free Speech Rights Were Not Abridged or Even Implicated by the City's Action in Making a Reasonable Decision Related to Its Private Commercial Venue.**

Pivotal to any First Amendment free speech analysis (and absent from any filing by the Plaintiff) is a categorization of the forum in which the speech would take place. *See Cornelius v. NAACP Legal Defense and Educational Fund, Inc*., 473 U.S. 788, 797 (1985). "Nothing in the Constitution requires the government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.* at 799-800. As such, non-public forums are not allotted the same free speech protections as public forums. *Id.* at 797.

### a. MECU Pavilion is a Nonpublic Forum; this Court has Already Established this Fact.

The Supreme Court has been consistent for decades that facilities owned by the government that are not open to the general public are considered nonpublic forums, subject to a lower level of scrutiny than traditional public forums such as sidewalks, streets and parks. *See Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46 (1983). The Court recognizes that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Greenburgh Civic Ass'n,* 453 U.S. 114, 129 (1981). *See also Greer v. Spock*, 424 U.S. 828 (1976) (military base is a non-public forum for First Amendment purposes); *Adderly v. Florida*, 385 U.S. 39 (1966) (jail or prison is a non-public forum for First Amendment purposes); *Jones v. North Carolina Prisoner's Union*, 433 U.S. 119 (1977) (same); *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974) (advertising space on City transit cars and buses are non-public forum for First Amendment purposes).

Government-owned property which is not by tradition or designation a forum for public communication, is governed by different standards. *See Perry Education Ass'n*, 460 U.S. at 46.

Thus, in addition to time, place, and manner regulations, the government may reserve the forum for its intended purposes, communicative or otherwise, if the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. *Id.* Therefore, implicit in the concept of a nonpublic forum "is the right to make distinctions in access on the basis of subject matter and speaker identity." *Id*. at 49. The Supreme Court has noted that these distinctions may not be permitted for a public forum but are necessary and inescapable so as to allow a nonpublic forum to be used for activities compatible with the intended purpose of the property. *Id*.

The MECU Pavilion is a City-owned commercial entertainment facility. ECF 114 ¶ 7. Government-owned stadiums and piers with facilities used for meetings and entertainment, like the MECU Pavilion, are considered nonpublic forums. *See, e.g*., *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 23 (1st Cir. 2002) (pier owned by Port Authority used as commercial fishery, conference center, eateries and offices constituted nonpublic forum); *Chicago Acorn v. Metropolitan Pier and Exposition Authority*, 150 F.3d 695, 699 (7th Cir. 1998) (Navy Pier, government owned navy facility used as recreational and commercial center is nonpublic forum); *Florida Gun Shows v. City of Fort Lauderdale*, No. 18- 62345-FAM, 2019 WL 2026496, *10 (S.D. Fl. 2019) (War Memorial Auditorium owned by city which did not honor a reservation for upcoming gun show considered nonpublic forum).

The case before this Court does not involve an ordinance or regulation—that would encompass yet another area of law that the Plaintiffs have elected to ignore, and the MECU Pavilion is not a public forum "open to all performers," as demonstrated by the fact that this Plaintiff had to seek a Use License Agreement to gain access to the venue. *See* ECF 14-2. The

draft Use License Agreement attached to Plaintiff's motion contains a provision which explicitly states that the venue and event are private:

> 8.    <u>Ticket Sales</u>.
>
> (a)    SMG acknowledges that this event is a not a public, ticketed event and admission is by advance registration only.  Licensee shall have complete control over the registration process, and registrations shall not be regarded as "tickets" or "ticketing.

*Id*. at p. 6 of 20.

Further, the Court has already ruled that the MECU Pavilion is a nonpublic forum.  *See* ECF 45.

### b.  In a Nonpublic Forum, Like the MECU Pavilion, the Government May Impose Reasonable Restrictions That Are Viewpoint Neutral.

The public versus nonpublic forum distinction that Plaintiff has elected to ignore is vital to the analysis in this case.   In a nonpublic forum like the MECU Pavilion, the government may impose "reasonable" restrictions that do not arise from "an effort to suppress the speaker's activity due to disagreement with the speaker's view." *See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679, 683 (1992) (holding that the government can impose reasonable restrictions on speech in an airport operated by a public authority).  *See also Arkansas Educ. Television Com'n v. Forbes*, 523 U.S. 666, 680 (1998) (holding government broadcaster could exclude a candidate from a debate in a nonpublic forum so long as the decision was reasonable and viewpoint neutral).

### 1.  The City's Actions Were Reasonable.

"The [g]overnment's decision to restrict access to a nonpublic forum need only be reasonable; **it need not be the most reasonable or only reasonable limitation**." *Cornelius*, 473 U.S. at 808 (emphasis added).  There is no requirement that the restriction be narrowly tailored or that the government have a compelling interest.  *Id.* at 809.  Further, the reasonableness of the

government's actions must be assessed in light of all the surrounding circumstances. *Id.* Those circumstances may include a restriction of access to certain political or free speech activities that take place near water where a municipality's police powers—health, safety, welfare—are concerned. *See Kinton*, 284 F.3d at 24 (restrictions on handbill distribution on pier owned by Port Authority near body of water was reasonable). Mere common sense is sufficient to uphold the reasonableness of a government's restrictions related to a nonpublic forum. *See U.S. v. Kokinda*, 497 U.S. 720, 734 (1990). Again, the Plaintiff has presented this Court with the wrong standard, wrong test, and wrong analysis for this case—it is becoming a pattern.

Plaintiff's Second Amended Complaint is devoid of any official or unofficial statement from the City wherein the City asserts that any action was directed at Plaintiff because of its religious beliefs. Plaintiff's allegation is further contradicted by the prior relationship between these same parties. Plaintiff admits that they held a prayer event in which they used the MECU Pavilion to protest the U.S. Bishop's conference in 2018. ECF 114 ¶13. Therefore, unless their religion or religious viewpoints have changed (and Plaintiff has not alleged as much), any claim that the City cancelled the 2021 event because of Plaintiff's religion or religious viewpoints has no factual or legal basis.

Mr. Voris claims that Solicitor Shea stated that "a lot has changed since 2018;" but those changes have come from the Plaintiff's side—not the City—and have nothing to do with their right to freedom of speech, religion, or the City's administration. What *has* changed is the program that the Plaintiff advertised it would present at the City's nonpublic forum and the associated secondary effects that make the City's decision reasonable under these circumstances., *e.g.*, the size of the program and the confirmed speakers with the histories detailed above. Plaintiff presumably prayed the rosary and engaged in religious practices in 2018 without any interference from the

Defendants—they cannot claim that those proposed practice were at issue leading up to the 2021 event.

"Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *See Cornelius*, 473 U.S. at 806. Past events that feature those speakers have resulted in raucous supporters and counter demonstrations and, at times, violence like Mr. Yiannpolous' visit to the University of Washington which resulted in a shooting and cost over $75,000 in police overtime, etc.[21] By comparison, a two-day visit to the same municipality by then-President Obama cost the City of Seattle approximately $57,000 in police overtime pay[22]

The group that brought Mr. Yiannopolous to the University of Washington "did not expect the protests to be that bad."[23] But, the event sponsor's intentions were of no help to the City of Seattle and its citizens—one citizen was shot while the others were left to pay the bill. And for a city like Baltimore, with a police department already stretched thin with a well-documented police officer shortage,[24] the decision to cancel an event featuring a speaker who invites additional demonstrators, counter demonstrators, expenses, and potential violence was more than reasonable.

---

[21] Daniel Gilbert, *Milo Yiannopoulus at UW: A speech, a shooting and $75,000 in police overtime*, The Seattle Times (March 26, 2017, updated March 27, 2017), https://www.seattletimes.com/seattle-news/crime/milo-yiannopoulos-at-uw-a-speech-a-shooting-and-75000-in-police-overtime/ (last accessed Sept. 19, 2021)

[22] *Id.*

[23] *Id.*

[24] Ashley Ashwell, *Baltimore's Police Officer Shortage--How Many Officers Is the City Looking For?*, Fox 45 News (July 23, 2021), https://foxbaltimore.com/news/local/consent-decree-calls-for-more-officers-bpd-confirms (last accessed Sept. 22, 2021). According to public reports, the Baltimore Police Department ("BPD") is understaffed by nearly 400 officers. Dan Lampariello and Chris Berinato, *Police Commissioner Formally Asks Federal Government to Help Fight Crime in Baltimore*, Fox 45 News (July 22, 2021) Police Commissioner formally asks federal government to help fight crime in Baltimore | WBFF (foxbaltimore.com) (last accessed Sept. 22, 2021). The situation is such that Baltimore Police Commissioner Michael Harrison has formally requested that federal agents come to Baltimore to assist the BPD with its normal police activities. *Id.* According to Judge Bredar, this officer shortage has been a critical challenge to the City's efforts in the Consent Decree case.

Even when Mr. Bannon speaks at events that are deemed "private" and in nonpublic forums requiring admission, the result has been violence and protest that the local municipality must cope with.[25]  In the end, Plaintiff held a largely peaceful event on November 16.  However, Mr. Bannon was not present; he had just been arrested for criminal contempt related to his alleged refusal to provide discovery to Congress regarding the January 6 riot at the Capitol.  *See* Caroline Linton and Melissa Quinn, *Steve Bannon surrenders to face criminal contempt of Congress Charges*, CBS News (Nov. 16, 2021)   https://www.cbsnews.com/news/steve-bannon-surrenders-criminal-contempt-january-6-committee-subpoena/ (last accessed December 13, 2021).   Therefore the "peace" could fairly be attributed to his absence.

The location of the proposed event presented other notable safety issues.  While the MECU Pavilion itself is a nonpublic forum, it sits on the end of Pier VI in the Inner Harbor—a public park to which any counter demonstrations or protesters could gain access from, *inter alia*, Pratt Street, one of the neighboring piers, the Pier V hotel, the bridge connecting Pier VI to the Marriott, or the surrounding water.  The location of the venue presents another safety issue, Pier VI is surrounded by water on three sides—any disturbance from a demonstration or counterdemonstration could result in a dangerous result because of the water and potential for drowning, etc.

Judicial review of similar actions taken by other jurisdictions have found that the government's decision was reasonable under the circumstances.  As referenced, *supra*, in *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9 (1st Cir. 2002) the Supreme Court ruled that because the proposed First Amendment speech activity was to be conducted near the entrance to a municipal owned pier, it was reasonable for the municipality to ban the planned

---

[25] Andrea Janus, *12 People Arrested Outside Steve Bannon, David Frum Debate*, Canadian Broadcasting Corporation (Nov. 2, 2018), https://www.cbc.ca/news/canada/toronto/munk-debates-steve-bannon-david-frum-1.4890180 (last accessed Sept. 22, 2021).

activity for safety reasons. *Id*. at 24. The Court reasoned that it was within the municipality's general police power to protect the citizen's health and safety and the location of the planned activity was close to any area where pedestrians can access with little room to allow for high traffic activity, that the ban was permissible. *Id*. The same is true here. Pier VI is generally accessible to the general public, and the area near the MECU Pavilion is close to areas where uninvited pedestrians have access, near a large body of water on all available sides. The City has a vital police power interest in protecting those who may be placed in danger because of a counter demonstration near the Plaintiff's event.

Further, in *Florida Gun Shows v. City of Fort Lauderdale*, No. 18- 62345-FAM, 2019 WL 2026496 (S.D. Fl. 2019), the court found that the City's decision to not honor a reservation for a gun show, even when past gun shows were nonviolent, based on recent mass shootings was reasonable. *Id*. at *10. As detailed above, past events featuring the speakers that Plaintiff advertised would be present at their November event have resulted in violent confrontations, demonstrations, and even shootings. The allegedly peaceful 2018 event is not material because it was a smaller event that did not feature these same speakers and took place before the events of January 6, 2021. The City's decision to cancel the November 2021 event considering the above was reasonable by the standards articulated by the Supreme Court, by rulings of other courts, and by plain common sense.

The prospect of property damage and violence was a real and valid concern for the Mayor and City Council of Baltimore and was taken into consideration when the decision regarding Plaintiff's decision was made. Shortly after the peaceful protests following the death of Freddie Gray, violence and property damage erupted throughout the City resulting in damage to public and

19

private property.[26]  As a result, a group of local business owners filed suit against the City, claiming that the City knew or should have known that protesters and counterprotesters could cause a disturbance and the City's failure to prevent that disturbance entitles the plaintiffs to millions of dollars in damages.  *See Chae Brothers, Limited Liability Company d/b/a Fireside North Liquors, et al., v. Mayor and City Council of Baltimore, et al*., No. 17-CV-01657 (SAG) (D. Md., filed Jun. 19, 2017).

The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message. *See Greenburgh Civic Assns*., 453 U.S., at 129 (simply because access to a nonpublic forum is more convenient, that does not create a First Amendment right to that access).

In fact, "[r]arely will a nonpublic forum provide the only means of contact with a particular audience." Here, as in *Perry Education Assn*., *supra*, 460 U.S., at 53–54, the speakers have access to alternative channels.  As the City demonstrated during the preliminary injunction hearing in this matter, there are a number of other public and private venues open to Plaintiff for its event.  Its efforts to force itself into the City's nonpublic forum, in light of the valid safety and health concerns articulated above is unreasonable.

### 2.   The City's Actions Were Viewpoint Neutral

There is simply no evidence that the City disagrees with Plaintiff's viewpoint or that the reasons for cancelling the evidence relate to the deep conspiracy that the Plaintiff invented in its

---

[26] Jean Marbella and Colin Campbell, *After the Protests, Calm Sought for Freddie Gray's Burial,* Baltimore Sun (Apr. 26, 2015), https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-freddie-gray-follow-20150426-story.html (last accessed Sept. 22, 2021) and Sabrina Toppa, *The Baltimore Riots Cost an Estimated $9 Million in Damages*, Time (May 14, 2015), https://time.com/3858181/baltimore-riots-damages-businesses-homes-freddie-gray/ (last accessed September 22, 2021).

head—that the City or its officials are somehow in the pockets of the U.S. Bishops. Again, if that were true, there would not have been a 2018 event.

As detailed in the Affidavit of Michael Huber, before contacting SMG, the City was concerned with the potential secondary effects of the event, *e.g.*, the size of the event compared to 2018, the advertised speakers, and the residual damage and potential violence that has flowed from events featuring these same speakers in the past, the health and safety concerns with holding the event so close to the Inner Harbor, and ultimately the cost to the City for the additional police presence required for the speakers and event proposed. Therefore, the undisputed record proves that the City's decision was based on viewpoint neutral motives and nothing more.

### 3. In This Case, the City is Not Regulating, The City is Acting as A Proprietor. As Such the City's Actions Need Only Be Reasonable and "Not Arbitrary, Capricious or Invidious".

Closely tied to the notion that the government as property owner has greater control over its own property and can restrict expression more freely when the property is treated as a nonpublic forum is the principle that when the City acts as a proprietor in a commercial venture, as opposed to a regulator, its restrictions are subject to a lower level of scrutiny. *See United States v. Kokinda*, 497 U.S. 720, 725 (1990). When acting in a proprietary capacity, the government has a "freer hand" than when it restricts or bans activities pursuant to a law or regulation. *See National Aeronautics and Space Admin. v. Nelson*, 562 U.S. 134, 148 (2011). This is for good reason, because the government is not acting as a regulator, imposing a heightened scrutiny on it interferes with the government's proprietary need to compete with private entities. *See Gilles v. Blanchard*, 477 F.3d 466, 470 (7th Cir. 2007) ("[c]ourts hesitate to impose in the name of the Constitution extravagant burdens on public [entities] that private [entities] do not bear."), Therefore, when the government is acting as a proprietor, state action is not unconstitutional unless it is unreasonable

21

or "arbitrary, capricious, or invidious." *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974).

As detailed above, the City did not act in an unreasonable manner nor were its actions "arbitrary, capricious, or invidious."  Instead, the City's actions were focused on the potential secondary effects of the Plaintiff's proposed event and the resultant harm to the City.

Any attempt to force the City to host an event in a space that it holds as a proprietor as opposed to the enforcement of an ordinance would place an extravagant burden on its commercial interest that a privately-owned venue would not face.  This is perhaps why the Plaintiff was so set on having its event at the City owned MECU Pavilion—it certainly could not force any of the other nonpublic venues that sit closer to the U.S. Bishop's conference to host their event.  This fact alone places the City at an unfair disadvantage when attempting to compete with these nearby private companies and a restraint that the courts do not place on municipalities acting as a proprietor of a commercial space.  If courts require the City to host any group whose scheduled attendees could bring disruption to the City under the thinly veiled guise of free speech rights, the City cannot compete with private businesses who can safeguard their property and reputations by simply refusing to do business with these same groups.

### 2. The City Did Not Violate Plaintiff's Right to Establish or Exercise Any Religion or Denomination

At this point, Plaintiff has elected to be intentionally obtuse.  It alleges that the City is somehow hostile to their religion.  Plaintiff's assertion is patently false, and they cannot present evidence to support their claim—Mr. Huber's affidavit proves the contrary.  Just as with free speech, restrictions on the free exercise and establishment of religion in a nonpublic forum is permissible so long as the restriction is viewpoint neutral and reasonable.  *See Peck v. Upshur County Bd. of Educ.*, 155 F.3d 274, 278 (4th Cir. 1998)(J. Motz *concurring*).  *See also Archdiocese*

22

*of Washington v. Washington Metro. Area Transit Authority*, 897 F.3d 314, 324 (D. D.C. 2018) (restriction of a religious group's access to advertising on public transportation permissible because the space was a nonpublic forum and the action was viewpoint neutral and reasonable under the circumstances).  The MECU Pavilion is a nonpublic forum to which the City is the proprietor.  As such, no action of the City can be viewed under a strict scrutiny standard.  *See Forbes*, 523 U.S. at 680.  Further, as articulated above, the City's decision to request that SMG cease negotiations with Plaintiff was both viewpoint neutral and reasonable under the circumstances; Plaintiff has not alleged anything to the contrary.

However, this court need not even reach that analysis because the Plaintiff has not and cannot prove that the City's decision had anything whatsoever to do with the exercise or establishment of any religion—the record belies this assertion..  *See Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 392 (2000) ("[the Supreme Court has] never accepted mere conjecture as adequate to carry a First Amendment burden...")  Plaintiff's complaint is absent any allegation the City is hostile to the religious views of Plaintiff.  The Court need look no further than the fact that the City allowed this same group to host an event at the MECU Pavilion in 2018 protesting this same U.S. Bishops conference.  Unless and until Plaintiff can pinpoint any reference to their religion or religious viewpoint that the City has articulated as a reason for why contract negotiations ceased, they have failed to state a claim on this issue.

The law is clear that so long as the government acts in an even-handed religion and, denomination neutral way, it will survive a Religious Freedom/Establishment Clause attack.  *See Walz v. Tax Commission of City of New York*, 397 U.S. 664, 672-73 (1970).  Plaintiff has failed to articulate any facts to show the City is favoring any religious group over another.  Plaintiff's own complaint admits that the USCCB met at the Marriott Waterfront Hotel—a private facility.  ECF

114 ¶9.  The City has no control of who the Marriott chooses to contract with.  Even if Plaintiff's constitutional religious rights were implicated, which they are not, all articulated reasons for the City's request that SMG cease negotiating a contract for Plaintiff to use the MECU Pavilion has been neutral and reasonable as required by law.

### 3. The City Did Not Violate Plaintiff's Rights to Freedom of Assembly and Association

Again, the court's analysis turns on the fact that the MECU Pavilion is a nonpublic forum. *See Christian Legal Soc. Chapter of the Univ. of California, Hastings School of Law v. Martinez*, 561 U.S. 661, 679 (2010).  Therefore, the government's restriction need only be viewpoint neutral and reasonable under the circumstances.  *Id.  See also Lavite v. Dunstan*, 932 F.3d 1020, 1029 (7th Cir. 2019) (holding that because a county office building was a nonpublic forum, the government's restriction to a person's access need only be viewpoint neutral and reasonable).  Further, safety concerns are a viewpoint neutral basis to deny access to government owned property.  *Id.* at 1030.

As articulated above, Plaintiff has failed to allege that the City's decision to discontinue contract negotiations with it relates to their assembly or association rights.  Again, the City permitted the Plaintiff to hold a rally at the same facility in 2018; Plaintiff cannot now claim that the City is denying it the right to assemble/associate in the same location that it was permitted to do so before.  Even if the City was restricting their right to assemble, which it did not, the stated concerns about public safety are both viewpoint neutral and reasonable under the articulated circumstances.  Therefore, they are more than enough to pass constitutional muster.  *See Lavite*, 982 F.3d at 1030.

For these reasons, Plaintiff's constitutional and declaratory judgment claims fail as a matter of law.

### C.  Plaintiff's Second Amended Complaint Fails to State a Claim Related to Any Allegation that SMG is a State Actor.

Plaintiff claims that SMG is a state actor, acting in concert with the City and at the direction of the City, and as such seeks to claim that SMG is "equally liable for the constitutional violations" Plaintiff alleges it has suffered.  *See* ECF 114 ¶¶ 48-51.  As has been established on the record, and by this very court, SMG is a commercial entity that is in a contract with the Mayor and City Council of Baltimore to manage the Pier VI, a City owned property.  *See* ECF 14-2, p. 2 of 3; *see also* ECF 45, p. 73-81 of 86.  The First Amendment specifically constrains *governmental actors* from violating the constitutional rights of private entities.  *Manhattan Comm. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1926 (2019). "Under that doctrine…a private entity may be considered a state actor when it exercises a function 'traditionally exclusively reserved to the State.'" *Id*. (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974).  Therefore, state action depends on the relationship between the state and the private entity.  The actions of a private entity will be considered a state action when "the alleged infringement of federal rights [is] 'fairly attributable to the State.'" *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (quoting *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 937 (1982)).

Plaintiff has utterly failed to indicate how SMG could be considered a state actor in the context of this litigation.  The question that must be asked by the Court regarding whether a private actor is engaging in state action is as follows – "is the alleged infringement of federal rights fairly attributable to the State?" *Rendell-Baker v. Kohn* 457 U.S. 830, 838 (1982). Here, the answer is a resounding "no." The management of Pier VI by SMG does not constitute the delegation of a constitutional obligation to a private party.  *West v. Atkins*, 487 U.S. 42, 54–55 (1988)).  Further, the City's contract with SMG does not constitute the delegation of a public

function that is traditional reserved exclusively to the state as managing entertainment venues is not a traditional government function  (*Rendell-Baker*, 457 U.S. at 842) and the activity of running a concert venue is not "entwined with governmental policies" or government actors such that it constitutes state action (*Evans v. Newton*, 382 U.S. 296, 299 (1966); *Brentwood Academy*, 531 U.S. at 930).

The circumstances of this action are much like those seen in the *Manhattan Community Access Corp.* case.  In that case, New York City had designated a private nonprofit corporation to operate public access channels on the cable system in Manhattan.  *Manhattan Comm. Access Corp.*, 139 S. Ct. 1927.  Respondents in that case produced a film critical of the nonprofit, which was aired on the public access channel.  *Id*.  Following this, the nonprofit suspended the Respondents from all the nonprofit's services and facilities and the Respondents subsequently made claims that their First Amendment rights were being violated.  *Id*.  Ultimately, the Supreme Court found that the nonprofit was *not* a state actor subject to the First Amendment.  In order to qualify as a "traditional, exclusive public function…the government must have traditionally *and* exclusively performed the function."  *Id*. at 1929 (internal citations omitted)(emphasis in original).  Further, "'very few' functions fall into that category" and the Court continued on to state that these included, "for example, running elections and operating a company town."  *Id*. (internal citations omitted).  A number of other functions do *not* fall into that category, including "running sports associations and leagues, administering insurance payments, operating nursing homes, providing special education, representing indigent criminal defendants, resolving private disputes, and supplying electricity."  *Id*.  Much like running a public access channel, SMG was tasked with managing the MECU Pavilion for the purposes of hosting entertainment events.  While it is indeed true the City has a property interest in the Pavilion, it does not have

an interest in SMG's maintenance of the premises – that is solely left up to SMG.  Plaintiff's actions with respect to SMG confirm and reinforce this fact.

Further supporting the argument that Plaintiff's claims that SMG is a state actor should be dismissed is the fact that SMG was not the party that opted to cancel the event - it was the City.  According to the allegations and attachments to Plaintiff's pleadings, it negotiated contractual terms with SMG – a private entity – and not with the City.  SMG had no part in denying Plaintiff's use of the Pavilion – that was solely on the City and is evidenced in the correspondence between Plaintiff and representatives for SMG throughout this action.  Ultimately, the action for which the Plaintiff is complaining – the decision to not rent the MECU Pavilion to Plaintiff was done by the City, not SMG. Therefore, the alleged state action has already been pled against the party who allegedly committed the action.  Plaintiff is seeking to make a futile claim against SMG for actions it did not take – SMG was not acting as a state actor when Plaintiff was denied the use of the MECU Pavilion.  Therefore, Plaintiff is already suing the government for a government action; it is now simply attempting to shoehorn in SMG to add more duplicative claims.  However, Plaintiff should know that more parties does not mean more recovery.  Therefore, Plaintiff's claims insofar as they are related to this issue fail and should be dismissed.

### D.  Plaintiff's Second Amended Complaint Fails to State a Claim for Breach of Contract and Promissory Estoppel Against the Defendants.

Plaintiff's breach of contract claim against SMG fails as a matter of law.  The Court has already rejected Plaintiff's claim against SMG for specific performance.  ECF 45, *passim*. Plaintiff has admitted that "[w]hile the Court did not find that there was a complete contract, the Court did find that at least one material term had been agreed upon."  *See* ECF 95 at 4.  However,

as Plaintiff is well aware, a single, agreed upon "material term" does not a contract make.   As has been discussed, *ad nauseum* at this point, no contact existed between Plaintiff and SMG until November 4, 2021 as negotiations were ongoing and negotiations, as is relatively standard in contract law, do not make a contract.

Plaintiff has not and cannot allege that there was a final executed agreement prior to November 4, 2021 and the four corners of its Second Amended Complaint certainly fail to sufficiently plead the elements of any executed contract.   Further, it is not clear how Plaintiff has suffered any losses or what they will assert to allege the breach of contract claim as, in order to have a breach claim in the first place, a valid contract needs to exist.

Under Maryland law, the formation of a contract requires the mutual assent of the parties.   *Cockran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (Md. 2007).   Mutual assent has two requirements: (1) intent to be bound and (2) definiteness of terms.   *Id*.   Although acceptance can be accomplished by "acts as well as words," there must be evidence that the party against whom enforcement is sought intended to be bound.   *See Porter v. Gen. Boiler Casing Co*., 284 Md. 402, 396 A.2d 1090, 1094 (Md. 1979) and *Cockran*, 919 A.2d at 714. As a general rule, silence and inaction upon receipt of an offer cannot operate as acceptance.   *See International Broth. of Teamsters v. Willis Corroon Corp.,* 369 Md. 724, 738 n. 3, 802 A.2d 1050, 1058 n. 3 (Md. 2002).   Further, when reviewing the existence of a contract, courts rely on parol evidence.   *Cockran*, 919 A.2d at 708.

Here, as has been stated numerous times before on the record, there was neither an intent to be bound by either party or definiteness of terms prior to the execution of the final contract on November 4, 2021–a document for which no breach is alleged.   According to the Second Amended Complaint, the only issue it can come up with to assert some kind of breach is that

SMG required more than 2 million dollars in insurance for the rally. *See* ECF 114. One term does not a final agreement make and until there is a final agreement, all terms can be renegotiated. This is exemplified by the fact that Plaintiff subsequently executed a contract with SMG agreeing to provide comprehensive liability insurance for more than 2 million dollars along with other terms that were altered at Plaintiff's insistence. Further, in this Court's Memorandum Opinion granting Plaintiff's request for an injunction against the City, only, the Court agreed that no contract existed for Plaintiff to enforce. *See* ECF 45, p. 73-81 of 86.

Plaintiff's claim for promissory estoppel fails for the same reason. *See Pavel Enterprises, Inc. v. A.S. Johnson Co., Inc*., 342 Md. 143, 166 (1996). Again, the four corners of Plaintiff's First and Second Amended Complaints include the exhibits detailing the contractual negotiations between the parties. According to those communications, which are part of the pleadings, there was no "clear and definite promise" that produced any forbearance to the detriment of Plaintiff only active negotiations between arms-length parties. *See, id*. Again, the only term that Plaintiff has identified regarding the alleged "promissory estoppel" is the amount of comprehensive liability insurance requested for the event. *See* ECF 95, p.4-5 of 9. Further, Plaintiff has not identified any forbearance related to the insurance assessment–it eventually executed a Use License Agreement with SMG and contracted with vendors to hold the November 2021 event.

Simply, Plaintiff is aware that there was no executed contract or definite promise until November 4, 2021 when both SMG and Plaintiff signed the Use License Agreement for the November 16, 2021 event. As such, there is nothing for Plaintiff to seek damages for as there was no enforceable contract, agreed to by both Plaintiff and SMG to be breached and Plaintiff has offered no evidence that SMG breached the November 4, 2021 agreement.

**E.  Plaintiff's Purported Claim for Tortious Interference Fails As A Matter of Law.**

Without delving too deep into the reason this claim should fail as a matter of law, the first requirement for tortious interference is the "existence of a contract between Plaintiff and a third party." *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466 (1991). As has been discussed *supra*, no such contract existed and the exhibits attached to Plaintiff's First Amended Complaint and proposed Second Amended Complaint show that conclusively. Further, tortious interference requires a breach of contract by the third party as well as resulting damages to the plaintiff. *Id.* Again, and as discussed *supra*, the third party in question here, SMG, had no contract to breach prior to November 4, 2021, so Plaintiff's claim fails on that point as well.

Plaintiff's attempt to now imply that there was tortious interference on the part of the City with a non-existent contract between Plaintiff and SMG is completely ludicrous in light of the circumstances that have led to this point of the litigation in this matter.

### C. Plaintiff's Claim for Punitive Damages Fails as Matter of Law

Plaintiff seeks recovery for punitive damages against the Defendants filed under 28 U.S.C. § 1983. However, it is axiomatic that municipalities and individuals acting in an "official capacity", the only avenue Plaintiffs can use to sue for governmental liability, are immune from actions for punitive damages under 28 U.S.C. § 1983 in the absence of malice. *See City of Newport v. Fact Concerts, Inc*., 453 U.S. 247, 271 (1981). *See also, Angell v. Leslie*, 832 F.2d 817, 821 (4th Cir. 1987). Plaintiff has not alleged that any Defendant acted with malice. *See* ECF 114, *passim*. For that reason, Plaintiff cannot recover punitive damages for its tortious interference claim against the City Defendants. *See Alexander & Alexander, Inc. v. B. Dixon Evander & Associates, Inc*., 336 Md. 635, 650, 650 A.2d 260 (1994)(no punitive damage recovery in tortious interference claim without malice). Further, it is axiomatic under Maryland law that punitive

damages are not recoverable for contract claims so Plaintiff's punitive damages fail as against SMG. *See St. Paul at Chase Corp. v. Manufacturers Life Insurance Co*., 262 Md. 192, 278 A.2d 12, *cert denied*, 404 U.S. 857, 92 S.Ct. 104 (1971) and *Miller Bldg. Supply v. Rosen*, 61 Md. App. 187, 194, 485 A.2d 1023 (1985).  Plaintiff's punitive damages claim fails as a matter of law.

**V.     Conclusion**

For the reasons stated herein, Defendants Mayor and City Council of Baltimore, Mayor Brandon M. Scott, City Solicitor James L. Shea, and SMG respectfully request that this Honorable Court grant their motion and dismiss all claims filed against the Defendants with prejudice, as well as order any and all other relief it deems appropriate.

Date:  February 22, 2022                   Respectfully submitted,

  */s/ Renita L. Collins*
  _____
  RENITA L. COLLINS (#28637)
  Chief Solicitor
  HANNA MARIE C. SHEEHAN (#19531)
  Chief Solicitor
  Baltimore City Law Department
  100 N. Holliday Street
  City Hall Baltimore, MD 21202
  Phone: 410-396-3930
  Fax: 410-547-1025
  Renita.Collins@baltimorecity.gov
  Hanna.Sheehan@baltimorecity.gov
  *Counsel for Defendant Mayor and City*
  *Council of Baltimore, City Solicitor James L. Shea,  Mayor*
  *Brandon M. Scott, SMG*