IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ST. MICHAEL'S MEDIA, INC.,

    *Plaintiff*,

        v.

THE MAYOR AND CITY COUNCIL OF
BALTIMORE, *et al.*,

    *Defendants*.

Civil Action No. ELH-21-2337

**MEMORANDUM OPINION**

Plaintiff St. Michael's Media, Inc. ("St. Michael's") filed suit in September 2021 against the Mayor and City Council of Baltimore (the "City"); Baltimore Mayor Brandon M. Scott, in his official and individual capacities; and Baltimore City Solicitor James L. Shea, in his official and individual capacities (collectively, the "City Defendants").[1] St. Michael's challenged, on First Amendment grounds, the City Defendants' refusal to allow plaintiff to hold a rally and conference on November 16, 2021, at the Pier VI Pavilion ("Pier VI" or the "Pavilion") in Baltimore.[2]  Along with the suit, St. Michael's moved for a temporary restraining order and a preliminary injunction. ECF 2; ECF 15.

Pier VI is a City-owned concert venue located in the "Inner Harbor" area of Baltimore. Although the venue is owned by the City, it is managed by defendant SMG, pursuant to a contract

---

[1] Shea no longer serves as the City Solicitor.

[2] The venue is sometimes identified as Pier Six, the MECU Pavilion, or the Pavilion.

with the City.  ECF 1, ¶¶ 8–14, 33–38; ECF 25-2, ¶¶ 2, 4; ECF 16-3 at 2.  At the time, SMG, a private company, operated under the name "Royal Farms Arena."  ECF 114, ¶ 7.[3]

On September 15, 2021, St. Michael's filed a "First Amended Verified Complaint."  ECF 14 (the "First Amended Complaint" or "FAC").  Among other things, the FAC added SMG as a defendant, and added a claim of breach of contract by SMG.  *Id.*

As discussed, *infra*, as a result of this Court's issuance of a preliminary injunction on October 12, 2021, SMG and St. Michael's ultimately executed a contract for plaintiff's use of the Pavilion.  Plaintiff's event was held on November 16, 2021, without incident.  *See* ECF 90; ECF 95 at 2; ECF 102 at 6; ECF 114, ¶ 13.[4]

Then, on November 30, 2021, plaintiff moved to amend its suit for the second time.  ECF 95.  By Memorandum Opinion (ECF 108) and Order (ECF 109) of January 14, 2022, I granted the motion.  The Second Amended Complaint ("SAC"), filed on January 31, 2022, is the operative pleading.  ECF 114.  It asserts four claims under 42 U.S.C. § 1983 and several claims under Maryland law.

Count I alleges that all defendants violated plaintiff's First Amendment "Right of Free Speech."  ECF 114, ¶¶ 78–100.[5]  Count II alleges that all defendants violated plaintiff's "Right of Free Exercise of Religion," as guaranteed by the First Amendment.  *Id.* ¶¶ 101–16.  In Count III,

---

[3] SMG is a subsidiary of ASM Global, a venue management conglomerate.  *See* ECF 16-1 at 3.  "Royal Farms Arena" has since been renamed "CFG Bank Arena."  *See* Kim Dacey, *Former Royal Farms Arena renamed CFG Bank Arena*, WBALTV (Oct. 25, 2022 at 6:15am), https://www.wbaltv.com/article/baltimore-arena-new-name-cfg-bank-arena/41755690.

[4] Plaintiff claims, however, that, because of what transpired with the City, and the uncertainty in regard to its ability to proceed, it had a much smaller turnout than it otherwise would have had at the rally.  *See*, *e.g.*, ECF 114, ¶ 68.

[5] Plaintiff labels each claim by number, as a "Claim for Relief."  For convenience, I shall refer to each claim as a Count.

plaintiff claims that all defendants violated plaintiff's rights under the Establishment Clause of the First Amendment.   ECF 114, ¶¶ 117–32.   And, Count IV asserts that all defendants violated plaintiff's right of assembly, as protected by the First Amendment.   *Id*. ¶¶ 133–52.

Counts V and VI are lodged against SMG under Maryland law.   Count V asserts breach of contract (*id.* ¶¶ 153–72) and Count VI, alleges promissory estoppel.   *Id.* ¶¶ 173–80.   Count VII, lodged against the City Defendants, asserts tortious interference with contractual relations.   *Id.* ¶¶ 181–86.   Finally, in Count VIII, plaintiff seeks a declaratory judgment that the actions of all defendants violated plaintiff's First Amendment rights.   *Id.* ¶¶ 187–91.   As relief, plaintiff seeks compensatory damages for breach of contract and promissory estoppel, punitive damages, as well as attorneys' fees, pursuant to 42 U.S.C. § 1988, and costs.   *Id.* at Prayer for Relief.[6]

Defendants have moved to dismiss the Second Amended Complaint or, in the alternative, for summary judgment (ECF 117), supported by a memorandum (ECF 117-1) (collectively, the "Motion").   The Motion is supported by the Declaration of Michael G. Huber, the Chief of Staff for Mayor Scott.   ECF 117-2 (the "Huber Declaration").

Plaintiff opposes the Motion (ECF 133, the "Opposition"), supported by two exhibits.   ECF 133-1; ECF 133-2.   Plaintiff also states its opposition to converting the Motion to one for summary judgment.   *See* ECF 133 at 9.   Defendants have replied.   ECF 139 (the "Reply").

---

[6] As I have previously noted (*see* ECF 108 at 2 n.4), regardless of the number of defendants and the number of claims, plaintiff is only entitled to one recovery.   *See, e.g.*, *Gen. Tel. Co. of the Nw., Inc. v. E.E.O.C.*, 446 U.S. 318, 333 (1980) ("It also goes without saying that the courts can and should preclude double recovery by an individual."); *Bender v. City of N.Y.*, 78 F.3d 787, 793 (2d Cir. 1996) ("If two causes of action provide a legal theory for compensating one injury, only one recovery may be obtained."); *Seuss v. Champion Indus.*, BEL-06-851, 2010 WL 11549554, at *3 (D. Md. May 26, 2010) ("It is well established that a plaintiff is entitled to only one compensation for an injury.").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part.[7]

## I.  Factual Background[8]

St. Michael's is a non-profit organization that "publishes news stories about societal issues with a particular focus on the Catholic Church" (the "Church"). ECF 114, ¶ 3. It is "vocal" about its disagreements with the Church "hierarchy," *id.*, and "often criticizes the current leadership of the Church." *Id.* ¶ 8. The criticisms often focus on "the perception of corruption in the Church", and as to claims about child sexual abuse committed by priests and the Church's alleged protection of those "responsible for the sexual abuse of minors." *Id.* ¶¶ 8, 10.

From November 15–18, 2021, the United States Conference of Catholic Bishops ("USCCB") was scheduled to meet in Baltimore at the Waterfront Marriott Hotel (the "Hotel"). *Id.* ¶ 9. The Hotel is a private facility located "immediately adjacent" to Pier VI. *Id.* ¶ 11. At least in part, plaintiff sought to hold a prayer rally and conference in order to criticize "elements of the power structure" of the Church, in the presence of Church "leadership." *Id.* The event was titled: "Bishops: Enough is Enough Prayer Rally." *Id.* ¶ 10. Therefore, plaintiff wanted to hold its event on a date that coincided with the USCCB's Fall General Assembly, and at a location near the site of the USCCB's meeting, so that the rally's message would "reach the Church's leadership." *Id.* ¶ 11; *see also id.* ¶¶ 63, 64.[9] In addition, plaintiff asserts that the rally "was planned to, and did,

---

[7] In an Order of March 9, 2022 (ECF 123), I granted plaintiff's Motion to Stay Case and Refer to Mediation (ECF 115). Mediation was unsuccessful, however. Therefore, I shall lift the stay.

[8] I incorporate here the factual summaries set forth in my prior opinions of October 12, 2021 (ECF 45 at 5–27) and January 14, 2022 (ECF 108 at 3–11).

[9] A photograph of Pier VI and maps depicting its location and that of the Hotel appear in ECF 45 at 8–9.

include praying the Rosary, and thus was planned to be and was an explicitly religious demonstration." ECF 114, ¶ 12.[10]

Notably, this was not plaintiff's first event at Pier VI. In 2018, St. Michael's held a rally at the Pavilion while the USCCB was meeting at the Hotel. *Id.* ¶ 13. The rally occurred without incident. *Id.*

With regard to the 2021 rally, St. Michael's began contract negotiations with SMG in June 2021, seeking to rent the Pavilion for the desired date. *Id.* ¶ 10. Plaintiff paid the required $3,000 deposit on an unspecified date, but prior to August 5, 2021. *Id.* ¶ 14. SMG "accepted and deposited" the payment, without any indication of an issue in regard to the rental. *Id.* And, on July 14, 2021, SMG transmitted a draft contract to plaintiff that "memorialized the terms" to which the parties had agreed. *Id.* ¶ 15. Plaintiff began to promote the rally, "resulting in thousands of reservations and the booking of over a dozen speakers." *Id.* ¶ 14.

Then, on or about August 5, 2021, after plaintiff had paid the $3,000 deposit to SMG for use of the Pavilion on November 16, 2021, SMG "reneged on its agreement . . . ." *Id.* ¶ 17. In particular, SMG notified St. Michael's that the contract "was being unilaterally cancelled." *Id.* ¶ 24. No explanation was provided for the cancellation, and SMG told plaintiff to contact Shea for "additional information." *Id.* ¶ 24. According to plaintiff, the City "forced SMG to cancel the event." *Id.* ¶ 25. By that point, however, the parties had not yet signed "a formal written agreement for use" of the Pavilion. *Id.* ¶ 15.

The next day, August 6, 2021, Michael Voris, the CEO of St. Michael's, spoke with Shea, then the City Solicitor, regarding the cancellation. *Id.* ¶ 26. According to plaintiff, "Shea told Mr. Voris that his office had received reports that St. Michael's had 'ties to the January 6 [2021] riot'

---

[10] Plaintiff does not allege that the City was aware of the plan to pray the Rosary.

at the Capitol building in Washington, D.C." *Id.* (alteration in original). Voris disputed the assertion. *Id.* ¶¶ 26, 28. Shea also cited for his explanation that the City had safety concerns, including a risk of violence and a risk of property damage, particularly because of the Pavilion's proximity to "high-scale properties." *Id.* ¶ 28. During this call, Shea also stated that "he had the authority to decide to cancel St. Michael's contract with SMG, and that he did in fact exercise this authority to cancel the contract." *Id.* ¶ 34.

After this litigation began, the City expanded the basis for its decision to cancel the rally, referencing safety concerns with respect to two of the rally's "controversial" speakers: Milo Yiannopoulos and Steve Bannon. *Id.* ¶ 46.[11] St. Michael's alleges that "Shea unilaterally canceled St. Michael's [sic] contract with SMG because the USCCB told him to" or "because the City disagreed with St. Michael's [sic] viewpoint." *Id.* ¶ 43.

As noted, at the time of the cancellation, "St. Michael's and SMG had not yet signed a formal written agreement" for use of the Pavilion. *Id.* ¶ 15. But, plaintiff claims that "[a] contract was formed, despite the lack of final signatures on a written memorialization of that contract." *Id.* ¶ 20. And, if a contract was not formed, plaintiff claims it is "solely" because the City Defendants unconstitutionally interfered. *Id.* ¶ 53.

As mentioned, when St. Michael's filed suit, it also moved for a temporary restraining order ("TRO") and a preliminary injunction ("P.I."). ECF 2 at 13. St. Michael's asked this Court to compel SMG to "fulfill its contractual obligations with St. Michael's" and to enjoin defendants from "interfering with St. Michael's preparing for and conducting" its rally on November 16, 2021. *Id.* at 13–14. Preliminarily, I granted the TRO, in part. ECF 9. In particular, I ordered the City

---

[11] Ultimately, Mr. Bannon did not attend the event. *See* ECF 117-1 at 21.

Defendants not to prevent St. Michael's from making arrangements for the rally.  *Id.*  But, I did not order SMG, a non-party at the time, to execute a contract with plaintiff.

As to the P.I. Motion, I conducted evidentiary hearings on September 30, 2021, and October 1, 2021.  ECF 43; ECF 44.  Testimonial and documentary evidence were submitted.  Then, by Memorandum Opinion (ECF 45) and Order (ECF 46) of October 12, 2021, I concluded that St. Michael's was likely to prevail on the merits of its free speech and assembly claims under the First and Fourteenth Amendments to the Constitution, and would suffer irreparable harm in the absence of an injunction.[12]  Accordingly, I issued a preliminary injunction that, *inter alia*, barred the City Defendants from prohibiting or impeding SMG from entering into a contract with St. Michael's for use of the Pavilion for the rally.  *Id.*

Both parties appealed.  ECF 47 (defendants); ECF 74 (plaintiff).[13]  The Fourth Circuit promptly affirmed.  ECF 86; ECF 87; ECF 91; ECF 92.

St. Michael's alleges that, after the Court entered the preliminary injunction, SMG continued to refuse to "sign or perform its agreement" with St. Michaels, and SMG claimed the City again instructed it not to sign.  ECF 114, ¶ 55.  Moreover, SMG required St. Michael's to procure a $25 million insurance policy, or a $10 million policy at minimum, notwithstanding that the parties had previously agreed upon a $2 million policy.  *Id.* ¶¶ 17, 56.

---

[12] On January 24, 2022, I informed counsel (ECF 110) that the Editorial Staff at West Publishing advised me that it had selected for publication in the Federal Supplement the Court's Memorandum Opinion of October 12, 2021 (ECF 45).  In the course of reviewing the Memorandum Opinion for purposes of print publication, I made a handful of non-substantive, "bluebook" corrections.  The revised Memorandum Opinion appears at ECF 111.

[13] Plaintiff cross appealed as to the portions of the P.I. decision denying injunctive relief on its specific performance claim and "requiring Plaintiff to provide a $250,000 bond as security." ECF 74.

According to plaintiff, the exorbitant insurance policy sought by defendants far exceeded the policy coverage ever required by defendants for any other event. *Id.* ¶ 57. And, it claims that the demand was "pretextual" (*id.* ¶ 59), so as to "frustrate" the ability of plaintiff to proceed with the rally. *Id.* ¶ 61; *see id.* ¶ 62.

Plaintiff also alleges that the uncertainty as to the status of the event, until less than two weeks prior to its occurrence, "caused many people who would have attended to cancel their plans, thus diminishing the attendance at and effectiveness of the rally." *Id.* ¶ 66. But, the rally did go forward, and without incident. *Id.* ¶¶ 70, 71. Indeed, "[i]t was entirely peaceful, lawful, and uneventful." *Id.* ¶ 13.

## II.    Standard of Review

The Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. *See* ECF 117. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). Under Rule 12(d), however, a court, in its discretion, may consider matters outside of the pleadings. If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Hous., LLC v. City of Salisbury, Md.*, 672 F. App'x 220, 222 (4th Cir. 2016) (per curiam).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2004, April 2022 update). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action" and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.*

However, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Hous., LLC*, 672 F. App'x at 622 (citation omitted) ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'"). However, when the movant expressly captions its motion as one for summary judgment "in the alternative," and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin,* 149 F.3d at 261.

Summary judgment is ordinarily inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448–49 (4th Cir. 2012); *see Shaw v. Foreman*, 59 F. 4th 121, 129–30 (4th Cir. 2023); *Putney v. Likin*, 656 F. App'x 632, 638–39 (4th Cir. 2016) (per curiam); *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2015). But, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244–45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Fin., Inc.*, 514 F. App'x 378 (4th Cir. 2013) (per curiam). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874–75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md.

2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).  But, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit acts at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted).  The Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit.'" *Harrods*, 302 F.3d at 244 (internal citations omitted).

Nevertheless, the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Id.* (internal citations omitted).  Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244–45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).  And, the nonmoving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature.  On the other hand, "'[a] party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement of [Rule 56(d)] to set out reasons for the need for discovery in an affidavit.'"  *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995) (quoting *Hayes v. N. State L. Enf't Officers Ass'n*, 10 F.3d 207, 215 (4th Cir. 1993)); *see also Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970,

972 n.3 (4th Cir. 1990) ("[I]f plaintiffs genuinely were concerned that defendant's motion was premature, plaintiffs should have sought relief under Fed. R. Civ. P. 56[(d)].").

Defendants have included one exhibit with the Motion (ECF 117): the Declaration of Michael G. Huber, the Chief of Staff for Mayor Scott.  ECF 117-2 (the "Huber Declaration").

St. Michael's did not file a Rule 56(d) affidavit.  Nor has it explained its failure to do so. But, in the Opposition (ECF 133 at 9), it asks the Court to defer consideration of defendants' request for summary judgment until after discovery.  Plaintiff contends that discovery is needed to "examine Mr. Huber and Defendants' officials regarding the assertions made in the affidavit and other cited materials, and take third-party discovery into these extrinsic references, and otherwise." *Id.*

St. Michael's submitted two exhibits with its Opposition:  the November 2016 contract between the City and SMG (ECF 133-1, the "Pavilion Contract") and a video of plaintiff's "Post-Election Special: Storming the Capitol," concerning the events of January 6, 2021.  ECF 133-2 (the "Video").  But, St. Michael's asserts that this evidence "is referred to only in the context of responding to Defendants' alternative request for summary judgment" and "should not be a concession" as to its position that the Court should construe the Motion as a motion to dismiss, rather than one for summary judgment.

Despite plaintiff's failure to comply with Rule 56(d)'s requirement that it provide an affidavit to oppose conversion to summary judgment, I decline to address the Motion as one for summary judgment.  The Fourth Circuit recently reiterated that pre-discovery summary judgment is inappropriate where "the district court was on fair notice of potential disputes as to the

sufficiency of the summary judgment record." *Shaw*, 59 F. 4th at 129.  Here, plaintiff has raised

such disputes, including as to the forum classification of the Pavilion.  ECF 133 at 12–13.[14]

Because I conclude that it would be premature to construe the Motion as one for summary

judgment, I shall construe the Motion as a motion to dismiss.

I turn to the principles that apply under Fed. R. Civ. P. 12(b)(6).

## B.

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's

complaint.  *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire*

*& Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re*

*Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159,

165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*,

*McBurney v. Young*, 569 U.S. 221 (2013).  A Rule 12(b)(6) motion constitutes an assertion by a

defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of

law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading

requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d

321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).

That rule provides that a complaint must contain a "short and plain statement of the claim showing

---

[14] Although plaintiff states its opposition to converting this Motion to one for summary judgment, the Opposition often asserts arguments under the summary judgment standards, including making references to "the record."  *See, e.g.*, ECF 133 at 15, 33, 34.  Although plaintiff states, (ECF 133 at 11), that "such evidence is referred to only in the context of responding" to the request for summary judgment, plaintiff's arguments are largely directed at the merits, rather than informing the Court of the standards under which the SAC should be assessed and how it met those standards.  This makes a 12(b)(6) analysis far more burdensome on the Court than it otherwise would be.

that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions.'"); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan*, 918 F.3d at 317–18; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012). But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Fed. Credit Union*, No. 21-2323, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

In connection with a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Bing v. Brio Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond,*

*Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman*, 494 F.3d at 464 (emphasis in original) (quoting *Forst*, 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger*, 510 F.3d at 450.

However, under limited circumstances, when a court is resolving a Rule 12(b)(6) motion, it may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (internal citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

"[B]efore treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822

F. 3d at 167. "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Vol. Fire Dep't*, 684 F.3d at 467. To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). "As examples, 'courts have found integral the allegedly fraudulent document in a fraud action, the allegedly libelous magazine article in a libel action, and the documents that constitute the core of the parties' contractual relationship in a breach of contract dispute.'" *Chesapeake Bay Found.*, 794 F. Supp. 2d at 611 n.4 (quoting *Fisher v. Md. Dep't of Pub. Safety & Corr. Servs.*, JFM-10-0206, 2010 WL 2732334, at *2 (D. Md. July 8, 2010)).

In *Goines*, 822 F. 3d at 171, the Fourth Circuit determined that the plaintiff "accepted the contents of the [exhibit attached to the complaint] and based his claims on the assumed truth of the [exhibit]," because his claims were based on the statements contained therein. On this ground,

-17-

the Court concluded that it was proper for the Court to "assume the truth" of the exhibit when considering whether the plaintiff stated a claim for the purposes of a motion to dismiss.  *Id.*

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'"  *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  The Court may also "take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment."  *Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 F. App'x 200 (4th Cir.); *cf. Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990) (holding that a district court may "properly take judicial notice of its own records").

As discussed, defendants submitted the Huber Declaration (ECF 117-2) with the Motion, and plaintiff submitted two exhibits with the Opposition: the Pavilion Contract (ECF 133-1) and the Video (ECF 133-2).  Notably, the Huber Declaration was previously submitted by defendants with their opposition to plaintiff's amended motion for a preliminary injunction (*see* ECF 25-3), and plaintiff relies upon its truthfulness in the SAC, to demonstrate that the City "ordered SMG to cancel its contract with St. Michael's for use of the MECU Pavilion on November 16, 2021," as

stated in the Declaration.  *See* ECF 114, ¶ 22; ECF 25-3, ¶ 6.  St. Michael's does not object to its authenticity.

However, in the Opposition (ECF 133 at 18), St. Michael's contends: "The Court cannot rely on any of these [statements in the Declaration], particularly on a motion to dismiss the Second Amended Complaint that does not include Huber's statements."  But, this is belied by the direct citation to ¶ 6 of the Huber Declaration in the SAC, as noted above.  ECF 114, ¶ 22.  As the Eleventh Circuit has aptly said, *Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 511 (11th Cir. 2019): "The rule that attached exhibits are to be considered part of the complaint when ruling on its sufficiency usually benefits the plaintiff, but not always . . . . [A] 'litigant may be defeated by his own evidence, *the pleader by his own exhibits*' when 'he has pleaded too much and has refuted his own allegations by setting forth the evidence relied on to sustain them.'"  (Quoting *Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940)) (emphasis in *Gill*).  In this way, a complaint may be "'plagued not by what it lacks, but by what it contains.'"  *Gill*, 941 F.3d at 512 (quoting *Gen. Guar. Ins. Co. v. Parkerson*, 368 F.2d 821, 825 (5th Cir. 1966)).  As in *Gill*, *id.* at 512, St. Michael's "was not required" to incorporate the Huber Declaration in the SAC, "but [it] did."

In *Simmons*, 113 F.2d 812, the Fifth Circuit explained that "the plaintiff could have survived a motion to dismiss if he had simply pleaded a short and plain statement alleging facts that a contract existed.  But once he attached the letters to his complaint and alleged that they were the contract or at least showed that an implied contract existed, 'it became the duty of the court . . . to construe th[e] letter[s] and determine [their] legal effect.'"  *Gill*, 941 F.3d at 514 (explaining and quoting *Simmons*, 113 F.2d at 812–13) (alterations in *Gill*).

The Huber Declaration is incorporated in the SAC and credited by plaintiff.  *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (finding documents to be incorporated by reference where the plaintiff explicitly referred to and relied on the documents to make a necessary showing); *see also Goines*, 822 F.3d at 167 ("When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper.").  As the "master of the complaint," *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987), plaintiff was entitled to and chose to incorporate documents outside of the SAC.  St. Michael's cannot change this incorporation by way of its Opposition.  *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating the plaintiff "is bound by the allegations contained in [his] complaint and cannot, through the use of motion briefs, amend the complaint.").  Accordingly, I shall consider the Huber Declaration.  *See id.* at 171.

In the Opposition, St. Michael's repeatedly points to and relies on portions of the Huber Declaration.  *See* ECF 133 at 18–19.  St. Michael's maintains that defendants did not rely on media reports indicating that Steve Bannon and Milo Yiannopoulos incited violence, despite defendants' claim, and contends that this is demonstrated by the fact that, in the Declaration, "Huber does not aver that he had seen any of those cited articles at the time of cancellation—he did not even mention Mr. Yiannopoulos in the affidavit."  *Id.* (internal citation omitted).  Further, plaintiff argues that "[t]he Court correctly observed that there was no evidence to support that Defendants considered the burden on police when deciding to cancel Plaintiff's rally.  Huber himself does not aver that this was considered."  *Id.* at 22 n.9 (internal citation omitted).

However, this does not mean that I shall assume the truth of every assertion in the Huber Declaration.  Indeed, "[t]he purpose for which the document is offered is particularly important

where the document is one prepared by or for the defendant." *Goines*, 822 F.3d at 168.  The Huber Declaration was prepared by defendants.  And, "[s]uch unilateral documents may reflect the defendant's version of contested events or contain self-serving, exculpatory statements that are unlikely to have been adopted by the plaintiff." *Id.*  Here, plaintiff clearly does not adopt all assertions in the Huber Declaration; it challenges the truthfulness of Huber's asserted justifications for cancelling the rally.  *See, e.g.*, ECF 114, ¶¶ 40, 41, 43 (alleging that the decision to cancel the rally was not based on fears for public safety, as asserted by Huber in the Declaration).

I shall also consider the emails between Shea and a representative of SMG, discussing the cancellation of the rally (ECF 14-3; *see* ECF 114, ¶ 25), and emails between representatives for St. Michael's and SMG.  ECF 19-2; ECF 31-2; *see* ECF 114, ¶ 54.  This is because they are incorporated in the SAC and credited by plaintiff.

In contrast, the SAC does not expressly reference the Pavilion Contract.  But, it is clearly integral to the Second Amended Complaint.  Indeed, "'[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.'"  *Bryant v. Washington Mut. Bank*, 524 F. Supp. 2d 753, 757 n.4 (W.D. Va. 2007) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002)), *aff'd*, 282 F. App'x 260 (4th Cir. 2008).

As noted, a document is "integral" when, "by its 'very existence, . . . [it] gives rise to the legal rights asserted.'"  *Chesapeake Bay Found., Inc.*, 794 F. Supp. 2d at 611 (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)) (alteration added).  Here, St. Michael's asserts, ECF 114:

> 47. Though SMG is a private entity, the licensing of the MECU Pavilion is ultimately controlled by the City of Baltimore, which owns the MECU Pavilion.
> 48. SMG acts as a party to whom Baltimore has delegated its constitutional authority.

49. SMG acted jointly with the City to deprive St. Michael's of its First Amendment rights.
50. SMG acted under the control of Baltimore as an agent to deprive St. Michael's of its First Amendment rights.
51. SMG acted in the capacity of a "government actor."
52. SMG refused to fulfill its obligations to St. Michael's because the Government Defendants insisted that it cancel the contract.

Therefore, because St. Michael's relies on the Pavilion Contract, and its asserted legal rights against SMG as a government actor arise from that document, I shall consider the Pavilion Contract as integral to the Second Amended Complaint.

However, I shall not take into consideration the Video (ECF 133-2) provided by St. Michael's. It is neither incorporated by reference nor integral to the SAC.

In sum, I shall consider four documents outside of the pleadings: the Huber Declaration (ECF 25-3; ECF 117-2); the Pavilion Contract (ECF 133-1); the emails between St. Michael's and SMG (ECF 19-2; ECF 31-2); and the emails between Shea and SMG (ECF 14-3). They are either incorporated into the Second Amended Complaint or integral to it.

### III.    Discussion

### A.  Impact of Prior Decisions

Both plaintiff and defendants repeatedly invoke "findings" that the Court supposedly made in earlier rulings. *See, e.g.*, ECF 114, ¶ 16; ECF 117-1 at 18, 28, 32; ECF 133 at 1, 11, 16; ECF 139 at 4, 6, 8. At best, the parties misapprehend the standard under which preliminary injunctions are adjudicated; at worst, they misconstrue the legal significance of my prior decisions. Therefore, as an initial matter, I must address the legal significance and weight of my prior rulings.

As noted, by Memorandum Opinion (ECF 45) and Order (ECF 46) of October 12, 2021, I granted a preliminary injunction in favor of plaintiff. In that Opinion, I made certain determinations of law and fact, based on the evidence in the record at that time, which was not complete. These determinations included that the Pavilion is "a nonpublic forum or, at most, a

limited public forum" (ECF 45 at 53); the City exercised "unbridled discretion" over SMG's ability to contract with speakers (*id.* at 70); and "no contract was entered into between SMG and St. Michael's" (*id.* at 81).

However, as described in the Memorandum Opinion (*id.* at 28), a preliminary injunction is assessed based on the plaintiff's *likelihood* of success on the merits. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Thus, in granting the preliminary injunction, I made no determinations as to the merits of the case.

"In short, where a federal district court has granted a preliminary injunction, the parties generally will have had the benefit neither of a full opportunity to present their cases nor of a final judicial decision based on the actual merits of the controversy." *Univ. of Tx. v. Camenisch*, 451 U.S. 390, 396 (1981). Indeed, the Supreme Court has determined that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Tx.*, 451 U.S. at 395; *accord Bartels by & through Bartels v. Saber Healthcare Grp., LLC*, 880 F.3d 668, 682 (4th Cir. 2018) ("[W]e note that findings of fact made when granting a preliminary injunction are not binding at trial."); *NovaQuest Cap. Mgmt., L.L.C. v. Bullard*, 498 F. Supp. 3d 820, 830 (E.D.N.C. 2020) ("[T]he findings of fact and conclusions of law made by a court in ruling on a preliminary injunction are not binding . . . on the merits.").

To be sure, my prior rulings may provide guidance. But, any findings I made in granting the preliminary injunction have no binding authority on the disposition of the Motion or the case itself.

### B.  Section 1983

Plaintiff's federal claims are premised on 42 U.S.C. § 1983. Under § 1983, a plaintiff may file suit against any person who, acting under the color of state law, "subjects, or causes to be

subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997).  "The first step in any such claim is to pinpoint the specific right that has been infringed."  *Safar*, 859 F.3d at 245.

Accordingly, I shall first assess whether plaintiff sufficiently alleged an infringement of its rights.  If plaintiff meets its burden to demonstrate that its First Amendment rights have been infringed upon, I shall then analyze whether, as to each named defendant, the SAC states a claim for these violations.

## C.  First Amendment

All of plaintiff's § 1983 claims assert violations of the First Amendment.  It provides, U.S. Const. amend. I: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."[15]

"The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"  *Connick v. Myers*, 461 U.S. 138, 145 (1983) (citations omitted).  "'Premised on mistrust of governmental power,' the First Amendment 'stands against attempts to disfavor certain subjects or viewpoints.'"  *Am. Civ. Liberties Union of N. C. v. Tata*, 742 F.3d 563, 565–66 (4th Cir. 2014) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)); *see Terminiello v. City of Chi.*, 337 U.S. 1, 4 (1949) ("The right to speak freely and to promote diversity of ideas" and "to invite dispute" are hallmarks of the First Amendment).  Pursuant to the First Amendment, the "government generally has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, ___ U.S. ___, 140 S. Ct. 2335, 2346 (2020) (internal quotation marks and citation omitted).

St. Michael's alleges, *inter alia*, that defendants violated its First Amendment rights by refusing to permit plaintiff to use the Pavilion for its rally on November 16, 2021.  *See* ECF 114, ¶¶ 49, 50.  It lodges four violations under the First Amendment against all defendants: the right to

---

[15] Plaintiff fails to mention the Fourteenth Amendment in the SAC.  But, "[t]he First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council Inc.*, 425 U.S. 748, 749 n.1 (1976); *see Lovell v. Griffin*, 303 U.S. 444, 450 (1983).

Free Speech (Count I) (ECF 114, ¶¶ 78–100); the right to Free Exercise of Religion (Count II) (*id.* ¶¶ 101–16); the Establishment Clause (Count III) (*id.* ¶¶ 117–32); and the right to Free Assembly (Count IV) (*id.* ¶¶ 133–52).

The City does not dispute that it sought to prevent the rally from occurring at the Pavilion. *See, e.g.*, ECF 117-1 at 16–24. But, defendants contend that the City's conduct was not motivated by content, viewpoint, or religion. *Id.* at 18–24. Rather, defendants argue that the decision was based on reasonable concerns for public safety. *Id.*

I shall address each First Amendment claim, in turn.

### 1. Free Speech

St. Michael's alleges that defendants sought to prohibit the rally "specifically because they disapproved of the content and viewpoint of the speech that was expected to occur at the rally." ECF 114, ¶ 84. As noted, defendants disagree.

The Supreme Court has said: "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 365 (2003) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). A "core postulate of free speech law" is that the "government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, ___ U.S. ___, 139 S. Ct. 2294, 2299 (2019). Put another way, the government "'ordinarily'" may not "'prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence.'" *Black*, 538 U.S. at 365 (quoting *Whitney v. California*, 274 U.S. 357, 374 (1927) (Brandeis, J., concurring)); *see Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994); *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972); *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 328 (7th

Cir. 1985), *aff'd*, 475 U.S. 1001 (1986).  Moreover, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

"The first inquiry a court must undertake when a First Amendment claim is asserted is whether the plaintiff has engaged in 'protected speech.'"  *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 797 (1985)).  Here, plaintiff's proposed activity—a rally and conference featuring both political and religious content—is plainly protected speech, and the defendants do not assert otherwise.  *See, e.g.*, *Hotel Employees & Restaurant Employees Union, Local 100 v. N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 544 (2d Cir. 2002) ("Political . . . rallies, demonstrations, and leafletting are forms of speech protected under the First Amendment.") (internal citations omitted).

In general, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).  "The three recognized types of fora are the traditional public forum, the nonpublic forum, and the designated or limited public forum."  *Goulart*, 345 F.3d at 248.  Usually, a court must "'identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic.'"  *Id.* at 246 (quoting *Cornelius*, 473 U.S. at 797).[16]

---

[16] In *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 382 (4th Cir. 2006), the Fourth Circuit distinguished between designated and limited public forums.  The Court explained: "In a designated public forum . . . the government makes public property (that would not otherwise qualify as a traditional public forum) generally accessible to *all* speakers," but "[i]n a limited public forum, the government creates a channel for a *specific or limited* type of expression where one did not previously exist."  (Emphasis added).  Further, "[i]n a limited public forum . . .  the government may restrict access to 'certain groups' or to 'discussion

Viewpoint discrimination is prohibited in any forum.  *See Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 (4th Cir. 2006) ("The ban on viewpoint discrimination is a constant.  Beyond this, speakers' rights depend upon how widely the government has opened its property and its purposes in doing so.")   "The 'viewpoint discrimination' prohibited in all forums is 'an egregious form of content discrimination' in which the government 'targets not subject matter, but particular views taken by speakers on a subject.'" *Id.* at 1067 n.2 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  Content discrimination, on the other hand, "includes both viewpoint-discriminatory rules and rules that limit forums to particular subjects, irrespective of viewpoint."  *Id.* (citing *Rosenberger*, 515 U.S. at 829–30).  To summarize, "in determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate," the Court has "observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations."  *Rosenberger*, 515 U.S. at 829–30 (citing *Perry Educ. Ass'n*, 460 U.S. at 46).

In granting the preliminary injunction, I concluded that the Pavilion appeared to be a limited public forum or a nonpublic forum.  ECF 45 at 49.  The SAC does not make any assertion as to the Pavilion's status as a public or nonpublic forum.  But, in the Opposition, St. Michael's

---

of certain topics,' subject to two limitations: the government restrictions must be both reasonable and viewpoint neutral."  *Id*. at 383 (quoting *Good News Club v. Milford Central School*, 533 U.S. 98, 106–07 (2001)).  Yet, in a more recent decision of the Fourth Circuit, the Court referred to "'[l]imited' or 'designated' forums," perhaps suggesting that they are interchangeable.  *See Davison*, 912 F.3d at 681 (citing *Am. Civ. Liberties Union v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005)).

states, ECF 133 at 13 (emphasis in original): "Plaintiff maintains that the Pavilion is a *designated* public forum."   In any event, "where a plaintiff contends that the government has engaged in viewpoint discrimination, it is unnecessary to analyze whether the government's conduct was permissible based on the type of forum at issue." *Scarborough v. Frederick Cnty. Sch. Bd.*, 517 F. Supp. 3d 569, 577 (W.D. Va. 2021) (citing *Davison*, 912 F.3d at 687).  This is because, as noted, "viewpoint discrimination . . . is 'prohibited in all forums.'"   *Id.* (quoting *Child Evangelism Fellowship of S.C.*, 470 F.3d at 1067 n.2).

St. Michael's sufficiently alleges viewpoint-based discrimination, rendering a forum analysis unnecessary.  St. Michael's alleges that defendants cancelled the rally "specifically because they disapproved of the content and viewpoint of the speech that was expected to occur at the rally."  ECF 114, ¶ 84.  In support of this conclusion, St. Michael's asserts that, when Voris spoke with Shea regarding the cancellation, "Shea told Mr. Voris that his office had received reports that St. Michael's had 'ties to the January 6 [2021] riot' at the Capitol building in Washington, D.C." *Id.* ¶ 26 (alteration in original).  As I acknowledged in granting the preliminary injunction (ECF 45 at 67), "invocation of the events of January 6, 2021, as horrifying as they were, cannot, without more, serve as a license for the City to dispense with its obligations under the First Amendment."

Additionally, St. Michael's asserts that, after the lawsuit was initiated, "the City took the position that it ordered SMG to cancel Plaintiff's rally because it feared two of the planned speakers, Steve Bannon and Milo Yiannopoulos, were so controversial that they would draw violent counter-protestors."  ECF 114, ¶ 46.  As discussed in the Memorandum Opinion of October 12, 2021 (ECF 45), this invokes the concept of the "heckler's veto."

It is a fundamental principle of First Amendment jurisprudence that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992) (invalidating ordinance that allowed county administrator to adjust parade permit fees based on anticipated cost of security); *see Gathright v. City of Portland*, 439 F.3d 573, 578 (9th Cir. 2006) ("First Amendment jurisprudence is clear that the way to oppose offensive speech is by more speech, not censorship, enforced silence or eviction from legitimately occupied public space."); *Ovadal v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005) (a content-based restriction of speech is likely when "every proffered justification" for the restriction is "directly related to the reactions" of the audience). Moreover, "[s]peakers of protected speech— even speech that is offensive to many listeners—may not be punished because their critics 'might react with disorder or violence.'" *Deferio v. City of Syracuse*, 306 F. Supp. 3d 492, 510 (N.D.N.Y. 2018) (quoting *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966)).

The Fourth Circuit has recognized that "one of the most persistent and insidious threats to first amendment rights has been that posed by the 'heckler's veto.'" *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985). And, Fourth Circuit case law makes clear that permitting a heckler's veto is a *content*-based restriction on speech. *See, e.g.*, *Rock for Life–UMBC v. Hrabowski*, 411 F. App'x 541, 554 (4th Cir. 2010) ("Courts have recognized a heckler's veto as an impermissible form of content-based speech regulation for over sixty years."). However, to my knowledge, the Fourth Circuit has not further classified the heckler's veto as a form of *viewpoint*-based restriction.[17] The distinction between content and viewpoint discrimination is vital because, as

---

[17] Similarly, the Eighth Circuit has acknowledged that the heckler's veto is a form of content discrimination, without going so far as to classify it as viewpoint discrimination. *See Frye v. Kansas City Mo. Police Dep't*, 375 F.3d 785, 790 (8th Cir. 2004) (analyzing a heckler's veto claim for content neutrality).

discussed, content-based regulations may be permissible in the context of a nonpublic or limited public forum, but viewpoint-based restrictions are not permissible in any forum.

Other circuits have addressed the heckler's veto in the context of viewpoint discrimination. In *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 248 (6th Cir. 2015) (en banc), the Sixth Circuit said: "The heckler's veto is precisely that type of odious viewpoint discrimination."  The Third Circuit reached a similar conclusion in *Northeastern Pennsylvania Freethought Society v. County of Lackawanna Transit System*, 938 F.3d 424, 439 (3d Cir. 2019), stating that "censorship of messages because they are controversial is viewpoint discrimination."

In contrast, the Ninth Circuit has taken a more limited approach.  In *Seattle Mideast Awareness Campaign v. King County*, 781 F.3d 489, 502–03 (9th Cir. 2015), the court remarked that concerns regarding a heckler's veto "do not carry the same weight" outside of a traditional or designated public forum, but may sometimes raise concerns as to viewpoint discrimination.  It reasoned: "A claimed fear of hostile audience reaction could be used as a mere pretext for suppressing expression because public officials oppose the speaker's point of view.  That might be the case, for example, where the asserted fears of a hostile audience reaction are speculative and lack substance, or where speech on only one side of a contentious debate is suppressed."  *Id.* Regardless, St. Michael's sufficiently alleges viewpoint discrimination to survive the Motion.

The SAC also notes that defendants acted with "unfettered discretion" (ECF 114, ¶ 93), alleging that "Voris asked Shea what criteria he used in deciding to cancel St. Michael's [sic] contract," but "Shea refused to provide this information."  *Id.* ¶ 39.  The Fourth Circuit has made clear that, "'even in cases involving nonpublic or limited public forums,' if a policy 'does not provide sufficient criteria to prevent viewpoint discrimination,' then it 'generally will not survive

constitutional scrutiny.'"  *Child Evangelism Fellowship of S.C.*, 470 F.3d at 1069 (quoting *Child Evangelism Fellowship of Md., Inc.*, 457 F.3d at 387).

I conclude that plaintiff sufficiently alleges a violation of its First Amendment right to free speech.  Therefore, I will deny the Motion as to Count I.

### 2.  Free Exercise

In Count II, St. Michael's asserts that its rally "was planned to be and was religious expression led by St. Michael's and performed by rally-goers."  ECF 114, ¶ 102.  According to plaintiff, defendants cancelled the rally "specifically because they disapproved of the exercise of religious beliefs that was expected to occur at the rally."  *Id.* ¶ 107.

The Free Exercise Clause of the First Amendment "protects against laws that discriminate against or among religious beliefs or that restrict certain practices because of their religious conduct."  *Alive Church of the Nazarene, Inc. v. Prince William Cnty., Va.*, 59 F.4th 92 at 108 (4th Cir. 2023) (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993)).  But, the Free Exercise Clause only applies when the government burdens religious exercise.  *Kim v. Bd. of Educ. of Howard Cnty.*, ___ F. Supp. 3d ___, DKC 21-0655, 2022 WL 17082368, at *8 (D. Md. Nov. 18, 2022) (citing *Fulton v. City of Philadelphia, Pa.*, ___ U.S. ___, 141 S. Ct. 1868, 1876 (2021)).  And, a plaintiff bears the burden to "demonstrate infringement of his rights" under the Free Exercise Clause.  *Kennedy v. Bremerton Sch. Dist.*, ___ U.S. ___, 142 S. Ct. 2407, 2421 (2022).

"The government burdens religious exercise when it directly 'prohibit[s]' or 'penal[izes]' religious conduct."  *Kim*, 2022 WL 17082368, at *8 (quoting *Carson v. Makin*, ___ U.S. ___, 142 S. Ct. 1987, 1996 (2022)).  In *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), the Supreme Court stated:

> [T]he "exercise of religion" often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation.  It would be true, we think (though no case of ours has involved the point), that a State would be "prohibiting the free exercise [of religion]" if it sought to ban such acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display.

*Id.* at 877–78 (quoting U.S. Const. amend. I) (alteration in original).   Moreover, the Court concluded that the Free Exercise Clause directs courts to focus on the purpose of the government action at issue, explaining that "if prohibiting the exercise of religion (or burdening the activity . . .) is not the object" of the government action, "but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended."   *Id.* at 878.

As in *Smith*, 494 U.S. 872, Supreme Court precedent generally focuses on whether a law or ordinance compels or forbids religious practice.   *See id.* at 879–82 (collecting cases).   Put another way, these cases involve situations in which a "law proscribes (or prescribes) conduct that [a plaintiff's] religion prescribes (or proscribes)."   *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment) (alteration added); *see also Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1294 (11th Cir. 2007) ("To plead a valid free exercise claim, [a plaintiff] must allege that the government has impermissibly burdened one of his sincerely held religious beliefs."); *Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1066 (6th Cir. 1987) ("It is clear that governmental compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion, is the evil prohibited by the Free Exercise Clause."); *Tap Pilam Coahuiltecan Nation v. Alamo Tr., Inc.*, 489 F. Supp. 3d 611, 622–23 (W.D. Tex. 2020) (finding that in order to state a claim under the Free Exercise Clause, plaintiffs must plead that government action either influenced them to act in

violation of their religious beliefs or force them to choose between a "generally available, nontrivial benefit" and following their religious beliefs) (quoting *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004)).  In *Zorach v. Clauson*, 343 U.S. 306, 311 (1952), the Supreme Court even went so far as to state that "it takes obtuse reasoning to inject any issue of the 'free exercise' of religion" into a case in which "[n]o one is forced" to engage in religious exercise.  *See also Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 223 (1963) ("[A] violation of the Free Exercise Clause is predicated on coercion.").

At the motion to dismiss stage, a plaintiff is "required to plead sufficient facts to raise a 'slight suspicion' of hostility to religious beliefs."  *King v. City of N.Y.*, 2023 WL 2398679, at *2 (2d Cir. Mar. 8, 2023) (quoting *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020)); *see Kennedy*, 142 S. Ct. at 2422 n.1 (stating that a plaintiff can assert a free exercise claim by showing there was an expression of official hostility to religion); *Fulton*, 141 S. Ct. at 1877 ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."); *see also Church of the Lukumi*, 508 U.S. at 547 (stating that, in order to invoke the Free Exercise Clause, there must be "even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices"); *Stormans, Inc. v. Wiesman*, 579 U.S. 942 (2016) (denying certiorari) (Alito, J., dissenting) (stating that petitioners "raised more than 'slight suspicion'" that the challenged rules "reflect antipathy toward religious beliefs"); *Prater v. City of Burnside, Ky.*, 289 F.3d 417, 428 (6th Cir. 2002) ("We must therefore consider whether the City . . . intentionally sought to burden the Church's religious activities.").

Accordingly, St. Michael's must allege facts that, if proven, would support its assertion that defendants attempted to cancel the rally "'because of' and not 'in spite of' its effect on

religion." *Alive Church of the Nazarene*, 59 F.4th at 108 (quoting *Church of the Lukumi*, 508 U.S. at 540).  St. Michael's has not met this minimal burden.

St. Michael's alleges that the rally "was planned to, and did, include praying the Rosary, and thus was planned to be and was an explicitly religious demonstration."  ECF 114, ¶ 12.  The Second Amended Complaint also asserts that holding the rally at a location other than the Pavilion would have "neutered" the purpose of the religious expression.  *Id.* ¶¶ 63, 64.  However, the mere fact that the rally would include religious exercise is not sufficient to demonstrate a free exercise violation.  *Prater v. City of Burnside, Ky.*, 289 F.3d 417, 428 (6th Cir. 2002) ("The Free Exercise Clause . . . does not entitle a religious organization to special benefits.").  And, "mere conclusions" are not entitled to the assumption of truth at the motion to dismiss stage.  *Iqbal*, 556 U.S. at 664.

Notably, the SAC does not allege that the City compelled St. Michael's or its rally-goers to engage in an act forbidden by their religion.  Nor does it allege that they were required to disavow a belief required or encouraged by their religion.  Therefore, plaintiff's assertion that defendants cancelled the rally "specifically because they disapproved of the exercise of religious beliefs that was expected to occur at the rally" (ECF 114, ¶ 107) is "not entitled to the assumption of truth."  *Iqbal*, 556 U.S. 664 (concluding that allegations that petitioners adopted a policy "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group" were "conclusory and not entitled to be assumed true") (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

As noted earlier, St. Michael's alleges that the City cancelled the rally based on its view that St. Michael's had ties to the storming of the Capitol on January 6, 2021, and concerns related to two controversial speakers.  *See* ECF 114, ¶¶ 26, 46.  And, St. Michael's concedes that "[t]he purpose of the rally was to engage in protected speech criticizing elements of the power structure

of the Catholic Church in a situation where the speech would reach the Church's leadership." *Id.* ¶ 11. This indicates that, at a minimum, religion was not the "unquestioned object" of defendants' conduct. *See Kennedy*, 142 S. Ct. at 2422–23.

Indeed, there is no indication that defendants' conduct had anything whatsoever to do with religious exercise. No facts are alleged that defendants acted with the intention of burdening religious exercise, that defendants sought to dissuade religious activity, or that defendants harbored hostility toward the anticipated religious expression. In *Kennedy*, 142 S. Ct. at 2422–23 (quoting *Smith*, 494 U.S. at 878), the Supreme Court determined that "[p]rohibiting a religious practice" was the defendant's "unquestioned 'object'" based on statements it made in connection with its policy. Indeed, the allegations in the SAC dispel the notion that defendants were motivated by religious animosity.

In sum, the Second Amended Complaint "does not raise any plausible suspicion"—even a *slight* suspicion—that plaintiff's religious exercise was the "object" of the City's decision to cancel the rally. *King*, 2023 WL 2398679, at *2. Thus, St. Michael's has failed to state a claim for violation of its right to free exercise of religion under the First Amendment.

Accordingly, I shall grant the Motion as to Count II and dismiss plaintiff's free exercise claim.

### 3.  Establishment

In Count III, St. Michael's brings a claim under the Establishment Clause. Plaintiff asserts that defendants exhibited preference toward the USCCB to its disadvantage. *See* ECF 114, ¶¶ 117–32.[18]

---

[18] In the Memorandum Opinion of October 12, 2021 (ECF 45), I noted that at the P.I. hearing, "plaintiff's counsel seemed to concede that its claims based on the Free Exercise Clause and the Establishment Clause are weak." *Id.* at 72. Indeed, I "declined to discuss them further"

"The First Amendment mandates governmental neutrality between religion and religion . . . . The State may not adopt programs or practices . . . which 'aid or oppose' any religion . . . . This prohibition is absolute." *Epperson v. Arkansas*, 393 U.S. 97, 89 (1968) (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 225 (1963)).

Until recently, the Fourth Circuit had "long used the three-pronged" test taken from *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971), "as a one-size-fits-all Establishment Clause test." *Firewalker-Fields v. Lee*, 58 F.4th 104, 121–22 (4th Cir. 2023). Under the *Lemon* test, to withstand First Amendment scrutiny, "'government conduct (1) must be driven in part by a secular purpose; (2) must have a primary effect that neither advances nor inhibits religion; and (3) must not excessively entangle church and State.'" *Wood v. Arnold*, 915 F.3d 308, 314 (4th Cir. 2019) (quoting *Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599, 608 (4th Cir. 2012)).

"But no more." *Firewalker-Fields*, 58 F.4th at 121. In 2022, the Supreme Court "upended that approach." *Id.* Instead, the Court concluded in *Kennedy*, 142 S. Ct. at 2428 (*quoting Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 576 (2014)), that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" In other words, "[f]rom now on, historical practice and understanding 'must' play a central role in teasing out what counts as an establishment of religion." *Firewalker-Fields*, 58 F.4th at 122.

As one district court aptly noted: "Establishment Clause cases are difficult, and the legal landscape has been unsteady." *Williams v. City of Jackson*, DPJ-20-785, 2022 WL 4715706, at *9

---

because "there [was] no evidence to support those claims," in contrast to the free speech and assembly claims. *Id.*

Nevertheless, plaintiff chose to include both claims in the SAC. In doing so, plaintiff has continued to dilute its viable First Amendment free speech and assembly claims. Rather than focusing on the actual battle, plaintiff takes the Court on unnecessary detours to resolve skirmishes.

(S.D. Miss. Sept. 30, 2022).  "Establishment Clause injuries, by their nature, can be particularly elusive."  *Montesa v. Schwartz*, 836 F.3d 176, 196 (2d Cir. 2016).

At its core, though, "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."  *Larson v. Valente*, 456 U.S. 228, 244 (1982); *see Torcaso v. Watkins*, 367 U.S. 488, 495 (1961) ("Neither [a state nor the federal government] can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs.").  In *Larson*, 456 U.S. at 246, the Supreme Court explained:

> Since *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), this Court has adhered to the principle, clearly manifested in the history and logic of the Establishment Clause, that no State can "pass laws which aid one religion" or that "prefer one religion over another."  *Id.*, at 15, 67 S.Ct., at 511.  This principle of denominational neutrality has been restated on many occasions.  In *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), we said that "[t]he government must be neutral when it comes to competition between sects."  *Id.*, at 314, 72 S.Ct., at 684.  In *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), we stated unambiguously: "The First Amendment mandates governmental neutrality between religion and religion . . . . The State may not adopt programs or practices . . . which 'aid or oppose' any religion . . . .  This prohibition is absolute."  *Id*., at 104, 106, 89 S.Ct., at 270, 271, citing *Abington School District v. Schempp*, 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963).  And Justice Goldberg cogently articulated the relationship between the Establishment Clause and the Free Exercise Clause when he said that "[t]he fullest realization of true religious liberty requires that government . . . effect no favoritism among sects . . . and that it work deterrence of no religious belief."  *Abington School District*, *supra*, at 305, 83 S.Ct., at 1615.

St. Michael's asserts, ECF 114, ¶ 123: "The only reason Defendants allowed [the USCCB Assembly to go forward while cancelling Plaintiff's rally] is that they preferred the USCCB and its views over those of St. Michael's."  St. Michael's rests its claim on the assertion that defendants "have clearly and explicitly chosen to favor the USCCB and its adherence to politicized Catholic doctrine over St. Michael's [sic] more traditional view of Catholic doctrine."  *Id.* ¶ 120.  Yet, St.

Michael's does not identify itself as a religious group in the SAC.  Rather, plaintiff states that it is a nonprofit organization "that publishes news stories about societal issues with a particular focus on the Catholic Church" and "sometimes dissents from the Church hierarchy."  ECF 114, ¶ 3; *see also id.* ¶ 8 ("St. Michael's publishes news articles and videos about current events of interest to Catholics.").

As a threshold matter, it is not clear how defendants could have chosen one religious group over another, given that St. Michael's has not identified itself as a religious organization.  Even disregarding this omission, the SAC does not reflect any distinction between the two Catholic groups.  St. Michael's asserts that it "disagrees with, and criticizes, a number of the USCCB's positions on religious doctrine and morality."  *Id.* ¶ 119.  But, it does not assert that "politicized Catholic doctrine" and "traditional Catholic doctrine" constitute different religious sects or denominations within the meaning of the Establishment Clause.[19]

Perhaps most important, St. Michael's does not assert that defendants provided any support to the USCCB.  The Supreme Court has proclaimed: "[F]or the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity."  *Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 668 (1970).  A plaintiff may demonstrate a violation of the Establishment Clause by showing that an official "'confers [a] privileged status on any particular religious sect' or 'singles out [a] bona fide faith for disadvantageous treatment.'"  *Maye v. Klee*, 915 F.3d 1076, 1084–85 (6th Cir. 2019) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 724 (2005)) (alterations in *Maye*).

---

[19] The Opposition does not provide further clarity on this point.  St. Michael's asserts that it "has differing religious views from USCCB," but does not provide any indication as to those differences.  ECF 133 at 28.

St. Michael's contends that, by cancelling the rally, defendants "suppressed St. Michael's [sic] religious expression, while allowing USCCB's Fall General Assembly to go forward unhindered."  ECF 114, ¶ 121.  However, there are no allegations that defendants played any role in the USCCB event.  As alleged by St. Michael's, the USCCB Fall General Assembly took place at the Hotel (*id.* ¶ 9), which St. Michael's concedes is a private venue.  ECF 133 at 29 n.17.  Plaintiff makes no allegation that the Hotel is affiliated with either the City or SMG.  Nor are there allegations asserting that the City sponsored, financially supported, or was otherwise involved in the USCCB's Fall General Assembly.  Thus, there are no facts in the SAC that, if proved, would establish that the City "allowed" the USCCB Assembly to go forward.[20]

The only allegation in the SAC asserting City support for the USCCB is that "Shea unilaterally canceled St. Michael's [sic] contract with SMG because the USCCB told him to."  ECF 114, ¶ 43.  However, taken as true, this still does not exhibit a *religious* preference.  St. Michael's bases this assertion on its belief that "Shea was told by USCCB members that the content of speech during St. Michael's [sic] rally would be uncomfortable or offensive for the attendants of its Fall General Assembly to hear."  *Id.* ¶ 42.  Yet, the only religious element of the rally identified by St. Michael's is praying the Rosary.[21]  There are no facts alleged to support the claim that defendants chose one religious group over another.

---

[20] In the Opposition, St. Michael's explains: "Although held at a private venue, Baltimore, like every major city, had numerous tools at its disposal to hinder any private meeting, had it so desired."  ECF 133 at 29 n.17.  Of course, a suit cannot be amended by way of an opposition.  It is well settled that the sufficiency of plaintiff's allegations is assessed based on the content of the Complaint.  *See Wilson v. Susquehanna Bancshares, Inc.*, GLR-14-79, 2014 WL 2094039, at *3 (D. Md. May 19, 2014); *Driggs*, 965 F. Supp. at 748 n.4.

[21] *See* Christine Rousselle, *Praying the rosary: Understanding the tradition that helps Catholics meditate on Jesus and Mother Mary*, FOX NEWS (Nov. 13, 2022, 9:02am), https://www.foxnews.com/lifestyle/praying-rosary-understanding-tradition-helps-catholics-meditate-jesus-mother-mary.  In fact, this practice is explicitly endorsed by the USCCB.  *See How*

Moreover, the allegation of preferential treatment for one religious sect over another is merely conclusory.  Therefore, it is not entitled to the assumption of truth.  *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 681 (deeming conclusory, and thus not entitled to the presumption of truth, an allegation that petitioners adopted a policy because of its adverse effects upon an identifiable group); *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden.").

Accordingly, I shall grant the Motion as to Count III, and dismiss plaintiff's claim under the Establishment Clause.

#### 4.   Freedom of Assembly

Plaintiff asserts a "Right of Assembly" claim in Count IV.  ECF 114, ¶¶ 133–52.  "The right of peaceable assembly is a right cognate to" that of free speech and "is equally fundamental." *De Jonge v. State of Oregon*, 299 U.S. 353, 364 (1937).  Indeed, "[t]he very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances."  *United States v. Cruikshank*, 92 U.S. 542, 552 (1875).

The contours of the right to peaceably assemble are not precisely defined in case law or otherwise.  As one district court judge recently explained, *InterVarsity Christian Fellowship/USA*

---

*to Pray the Rosary*, UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, https://www.usccb.org/how-to-pray-the-rosary.

I take judicial notice of these "adjudicative facts."  *See Goldfarb*, 791 F.3d at 508 (citing *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); Fed. R. Evid. 201(b) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

*v. Board of Governors of Wayne State University*, 534 F. Supp. 3d 785, 826 (E.D. Mich.),

*reconsideration denied*, 542 F. Supp. 3d 621 (E.D. Mich. 2021):

> The Supreme Court has tied the freedom of assembly to the broad right of expressive association. "[T]he Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *City of Dallas v. Stanglin*, 490 U.S. 19, 24, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) (quoting *Roberts* [*v. U.S. Jaycees*], 468 U.S. [609,] 618, 104 S.Ct. 3244 [(1984)]); *see also Healy* [*v. James*], 408 U.S. [169,] 181, 92 S.Ct. 2338 [(1972)] ("While the freedom of association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition."). Freedom of assembly has also been referenced in the context of forum analyses. *See Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir. 1999) ("[G]overnment regulation of the speech, assembly, or association activities of members of a public speaker's audience, when triggered by fears of hostile listener response to the content of that speech, is not content neutral."); *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*, 383 F.3d 449, 452 (6th Cir. 2004) (quotations removed) ("[P]ublic streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum.").

The *InterVarsity* Court looked for guidance to the Supreme Court's analysis in *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661 (2010). The district court ultimately concluded that "the Supreme Court's *Martinez* decision demonstrated that distinctions between intertwined First Amendment rights are not always material or necessary." *InterVarsity*, 534 F. Supp. 3d at 826 (citing *Martinez*, 561 U.S. at 683). Based on this, the *InterVarsity* Court decided to "adopt *Martinez*'s logic and analyze Plaintiffs' freedom of assembly claim in conjunction with their freedom of speech and association claims." *Id.* at 827.

This is not an uncommon approach for freedom of assembly claims. Indeed, the Fourth Circuit has used the forum analysis to assess these claims. *See, e.g.*, *Alive Church of the Nazarene*, 59 F.4th at 110–12 (applying content neutrality and forum-based analysis to a freedom of assembly claim); *Green v. City Of Raleigh*, 523 F.3d 293, 307 n.4 (4th Cir. 2008) ("[F]or the same reasons [plaintiff's] free speech challenges do not succeed, [plaintiff's] peaceable assembly claim must

also fail."); *Beahn v. Gayles*, 550 F. Supp. 3d 259, 277–79 (D. Md. 2021) (applying a forum analysis to freedom of assembly claim); *accord Lavite v. Dunstan*, 932 F.3d 1020, 1028–31 (7th Cir. 2019) ("Any regulation of speech or assembly on government property must be able to withstand some degree of constitutional scrutiny," and analyzing an assembly claim using the public forum framework).

Because I conclude that St. Michael's sufficiently alleges a claim for violation of its right of free speech, I make the same finding as to its freedom of assembly claim. Accordingly, I will deny the Motion as to Count IV.

### D.  Section 1983 Defendants

Having determined that St. Michael's has alleged violations of its rights to free speech and freedom of assembly, I turn to the second step in this analysis, concerning the sufficiency of the claims as to each defendant.

As noted, to state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West*, 487 U.S. at 48; *see Davison*, 912 F.3d at 679; *Crosby*, 635 F.3d at 639; *Wahi*, 562 F.3d at 615; *Jenkins*, 119 F.3d at 1159–60.

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cnty. v. Dodson*, 454 U.S. 312, 317–18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181

(citations and internal quotation marks omitted) ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.").

### 1.   The City

In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), the Supreme Court determined that a local governmental body may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an "official municipal policy" that resulted in a violation of the plaintiff's rights.  *Id.* at 691.  "Official municipal policy includes decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see Pembaur v. Cincinnati*, 475 U.S. 469, 479–80 (1986).

Thus, a viable *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights.  *See, e.g.*, *Bd. of Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997); *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 177 (4th Cir. 2023); *Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 446, 451 (4th Cir. 2004); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

As the *Monell* Court proclaimed, 436 U.S. at 694, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004)  Indeed, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to

liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach, Fla.*, ___ U.S. ___, 138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984).

But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___ U.S. ___, 137 S. Ct. 1342 (2017). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted).

However, a municipality cannot be held liable in a § 1983 action under a theory of vicarious liability or respondeat superior. *Monell*, 436 U.S. at 693–94. In *Connick*, the Supreme Court explained, 563 U.S. at 60 (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S. at 665–83). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691; *Canton*, 489 U.S. at 392; *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (collecting cases).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the

municipality." *Bd. of Comm'rs of Bryan Cnty.*, 520 U.S. at 403–04.

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*) (citations omitted).  But, of relevance here, the Fourth Circuit has recognized that "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Semple*, 195 F.3d at 712.  "These principles are limited, however, because municipal liability attaches only when the decision maker is the municipality's governing body, a municipal agency, or an official possessing final authority to create official policy." *Id.* (first citing *Pembaur*, 475 U.S. at 481; then citing *Spell*, 824 F.2d at 1387).

St. Michael's does not expressly cite to a "policy" on which it bases its claims against the City.  It appears, however, that plaintiff intends to refer to an unspecified "term of the contract" between SMG and the City, which it alleges is "unconstitutional on its face."  ECF 114, ¶ 92.  St. Michael's also states: "This contract provides the Defendants with unfettered discretion to deny use of the MECU Pavilion on an unconstitutional basis, and it must be struck down." *Id.* ¶ 93.

Although it is unspecified in the SAC, I assume St. Michael's refers to ¶ 11 of the Pavilion Contract.  This provision states, ECF 133-1 at 8:

> 11.   **Schedule of Events, Objections.**  During the Term, Operator shall use good faith efforts to advise City each month during the event season as to the dates of events and the artists or users for scheduled events.  Operator agrees that it will not allow any public event to be held at the Facilities which utilizes artists that have not performed at a similarly situated venue owned or operated by Live Nation.  The City shall provide Operator with notice of any objections or complaints that result from a public event held at the Facilities.  Prior to booking any such objectionable performer at the Facilities in future years, the Operator will provide the City with

notice, at which time the City shall have 48 hours to object to such performer, and the Operator will not book such objectionable performer unless the Operator has provided assurances to the City that the issues giving rise to the objections and complaints will be addressed in a manner satisfactory to the City.

The City has not furnished the Court with a contractual provision on which it relies for its decision to cancel the rally.  As noted in my Memorandum Opinion of October 12, 2021 (ECF 45 at 10–11), it is not clear whether ¶ 11 of the Pavilion Contract provides the only basis for the City to intervene with regard to the use of the Pavilion.  But, in an email of August 5, 2021, sent from Shea to an SMG representative, Shea referred to the above clause and stated: "The City's basis for the decision to decline to provide a forum for the event encompasses more than the provision you cite."  ECF 16-3 at 2.

In addition to lack of specificity by the City Defendants concerning contractual provisions, they have not referenced any standards, policies, or procedures pertaining to the City's exercise of discretion as to use of the Pavilion.  Indeed, as I noted in my earlier Memorandum Opinion, ECF 45 at 63:

> No policies, guidelines, or procedures have been brought to the attention of the Court providing any factors or systematized approach governing the City's actions here.  As far as the Court is aware, none exist.
>
> When the Court sought additional briefing from defendants, the Court specifically asked for "facts as to the discretion exercised by the City defendants in making determinations as to the use of the Pavilion, and any existing standards that govern such determinations."  ECF 34.  But, defendants' surreply provided no such facts or standards.  *See* ECF 37 at 8–9.

Thus, I am left with assessing the sufficiency of plaintiff's *Monell* claim based on the theory of liability pertaining to "certain affirmative decisions of policymaking officials."  *Carter*, 164 F.3d at 218.

"[T]he concept 'of official policy' for purposes of Section 1983 extends beyond formal ordinances and policies," to include ad hoc policy choices and decisions.  *Hunter v. Town of*

*Mocksville, N.C.*, 897 F.3d 538, 554 (4th Cir. 2018); *accord Spell*, 824 F.2d at 1385 (explaining that a municipal policy can be found "in formal or informal ad hoc 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy"). As noted, a policy may be created "by making a single decision regarding a course of action in response to particular circumstances." *Semple*, 195 F.3d at 712; *see Hunter*, 897 F.3d at 554 (stating that "'municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances'") (quoting *Pembaur*, 475 U.S. at 480).

In *Pembaur*, 475 U.S. at 481–84, the plurality recognized that "the authority to make municipal policy is necessarily the authority to make final policy." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (emphasis in *Praprotnik*) (explaining *Pembaur*). Thus, municipal liability based on this theory "'attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Lane v. Anderson*, 660 F. App'x 185, 197 (4th Cir. 2016) (quoting *Pembaur*, 475 U.S. at 479). To qualify as a "final policy making official," the "'municipal official must have the responsibility and authority to implement final municipal policy with respect to a particular course of action.'" *Lane*, 660 F. App'x at 197 (quoting *Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)). It is not sufficient that the relevant decisionmaker has "'discretionary authority in purely operational aspects of government.'" *Lane*, 660 F. App'x at 197 (quoting *Spell*, 824 F.2d at 1386).

"'[W]hether a particular official has final policymaking authority is a question of state law.'" *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)) (alteration in *Starbuck*); *accord Hunter*, 897 F.3d at 555 ("'The question of who possesses final policymaking authority is one of state law.'") (quoting *Riddick*, 238 F.3d at 523). For instance, "power to make policy may be

granted by legislative enactment or through delegation by someone who does possess such authority." *Fuller v. Carilion Clinic*, 382 F. Supp. 3d 475, 492 (W.D. Va. 2019) (citing *Pembaur*, 475 U.S. at 482).  However, although a municipality may delegate policymaking authority to an official, a district court cannot "assum[e] that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Praprotnik*, 485 U.S. at 126.[22]

To determine whether an official has final policymaking authority, a court must review "the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." *Pembaur*, 475 U.S. at 482. Thus, the central question is "not just who can make policy," but instead "in the scheme of things[,] who has the final say-so." *Riddick*, 238 F.3d at 524.  To that end, "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Praprotnik*, 485 U.S. at 127.

"Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies."  *Id.* (emphasis in original); *see also Hunter*, 897 F.3d at 555 (noting the difference between making policy and implementing final policy decisions).  However, merely "going along with the discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy." *Praprotnik*, 485 U.S. at 130.

The Second Amended Complaint repeatedly alleges that "[t]he City of Baltimore . . . forced

---

[22] The *Prapotnik* Court, 485 U.S. at 126, recognized that "special difficulties can arise when it is contended that a municipal policymaker has delegated his policymaking authority to another official." *Id.*  The Court concluded, *id.* at 126–27: "It may not be possible to draw an elegant line that will resolve this conundrum, but certain principles should provide useful guidance."  In particular, the Court pointed to whether an official's decision is "constrained by policies not of that official's making" and whether the decision is "subject to review by the municipality's authorized policymakers." *Id.* at 127.

SMG to cancel the event." ECF 114, ¶ 25; *see, e.g.*, *id.* ¶¶ 22, 50, 95, 113, 114, 150.  It also incorporates the Huber Declaration by reference (*id.* ¶ 22), citing to it in order to demonstrate that the City did, in fact, instruct SMG to cancel the rally.  Huber clearly asserts that he is the one who communicated the City's decision to SMG.  He avers that, as Chief of Staff to Mayor Scott, "[d]uring the week of July 19, 2021, [Huber] contacted SMG and instructed them to cease discussions" with plaintiff.  ECF 117-2, ¶ 6; ECF 25-3, ¶ 6.  He also states that this decision was the result of the City's belief that the event would bring "property destruction, physical assaults, and other violence" to the Inner Harbor area of Baltimore.  ECF 25-3, ¶ 4.  The City affirms Huber's account and contends that these concerns were "sincere."  ECF 117-1 at 6.

Additionally, the SAC incorporates by reference the emails between Shea and a representative for SMG.  Here, the representative for SMG emailed Shea, stating: "Per my conversation with Baltimore City Chief of Staff, Michael Huber, it is [SMG's] understanding that the City of Baltimore wishes to exercise its right to deny an event at the MECU Pavilion."  ECF 14-3; see ECF 114, ¶ 25.

Notably, the Mayor and City Council of Baltimore is clearly a final policymaker for the purposes of *Monell* liability.  The Baltimore City Charter, art. III, § 11, provides: "The Mayor and City Council of Baltimore shall have power to pass all ordinances . . . ."  And, I may take judicial notice of the Charter's provisions.  *See* Fed. R. Evid. 201; *Goldfarb*, 791 F.3d at 508 (citing *Philips*, 572 F.3d at 180).

Thus, the SAC alleges that the City made the decision to cancel plaintiff's rally.  Accordingly, St. Michael's has stated a claim against the City under § 1983 for its decision to instruct SMG to cancel the rally.

### 2.   The City Officials

Defendants contend that St. Michael's failed to state claims against Mayor Scott and Solicitor Shea (the "City Officials") because: (1) the claims asserted against them in their official capacity are duplicative of the claims asserted against the City; (2) St. Michael's fails to allege any unconstitutional conduct personally committed by either Scott or Shea; (3) Scott and Shea are entitled to qualified immunity; and (4) a *Monell* claim cannot lie against a municipal official in his individual capacity.  ECF 117-1 at 12–15.

### a.   Official Capacity

As the Supreme Court explained in *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (quoting *Monell*, 436 U.S. at 690, n.55), "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  *See also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."); *Huggins v. Prince George's Cnty.*, 683 F.3d 525, 532 (4th Cir. 2012) (treating a suit against individuals in their official capacities as a suit against the county).  The *Graham* Court further proclaimed, 473 U.S. at 167 n.14: "There is no longer a need to bring official-capacity actions against local government officials, for under *Monell* . . . local government units can be sued directly for damages and injunctive or declaratory relief."

Notably, the Fourth Circuit said in *Love-Lane*, 355 F.3d at 783, that a § 1983 claim against a municipal official in his official capacity is "essentially a claim against" the municipal entity "and thus should be dismissed as duplicative."  *See also Andrews v. Balt. City Police Dep't*, CCB-16-2010, 2018 WL 3649602, at *4 n.4 (D. Md. Aug. 1, 2018) (finding that naming a city official

in his official capacity was "redundant" in a suit also asserted against the city), *remanded on other grounds*, 8 F.4th 234 (4th Cir. 2020); *accord Corral v. Montgomery Cnty.*, 4 F. Supp. 3d 739, 748 (D. Md. 2014) ("[W]hen claims are brought against a municipal official in his official capacity which are identical to claims brought against the municipality, the claims against the municipal official are redundant.").

Because the City is named as a defendant in this case, the claims brought against Scott and Shea in their official capacities are duplicative.  St. Michael's conceded this point in its Opposition, stating that "[t]o the extent naming Shea and Mayor Scott as defendants in their official capacity is equivalent to naming the City as a defendant . . . there is no reason to address the claims against them in their official capacity."  ECF 133 at 31 n.18.

Thus, I shall dismiss Counts I through IV as against Scott and Shea in their official capacities, with prejudice.  I turn to the claims brought against defendants Scott and Shea in their individual capacities.

### b.  Solicitor Shea, Individually

St. Michael's alleges that Solicitor Shea "has the authority to approve or deny permits, contracts, and/or agreements for groups of individuals to conduct rallies within Baltimore" and that he "exercised this authority in an unconstitutional manner."  ECF 114, ¶ 5.  It also asserts that Shea "unilaterally" cancelled the rally.  *Id.* ¶ 43.  Defendants urge the Court to dismiss Shea as a defendant because St. Michael's "has not identified any individual unconstitutional conduct by" Shea, other than "having a phone conversation" that St. Michael's is "dissatisfied with," which they argue "does not rise to the level of a constitutional violation."  ECF 117-1 at 15.

As noted, to state a claim under § 1983, a plaintiff must allege that the alleged violation of plaintiff's rights was committed by the defendant.  *See West*, 487 U.S. at 48.  As indicated, the

SAC plainly and repeatedly alleges that the City cancelled the rally.  *See, e.g.*, ECF 114, ¶¶ 22, 25, 46, 49, 50, 61, 94–98.  And, as discussed, the SAC incorporates by reference the Huber Declaration and the emails between Shea and SMG, both of which aver that the City was the party that decided to cancel the rally.  *See* ECF 25-3; ECF 14-3.  Moreover, defendants maintain that the City was the relevant decisionmaker.  *See* ECF 117-1 at 10.  Nevertheless, the Second Amended Complaint also alleges, albeit in a conclusory fashion, that Shea personally made the decision to cancel the rally.  *See, e.g.*, ECF 114, ¶¶ 34, 37, 38, 39, 40, 43, 45.

A litigant may plead in the alternative.  Rule 8 of the Federal Rules of Civil Procedure provides: "If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."  Therefore, I may construe the SAC as alleging that Shea alone made the decision to cancel the rally.  Under this approach, I shall assess the sufficiency of the allegations made against Shea in the SAC, without regard to the allegations to the contrary.

According to plaintiff, Shea "unilaterally" instructed SMG to cancel the rally.  ECF 114, ¶ 43.  However, pursuant to the Baltimore City Charter, Shea, as City Solicitor, lacked the authority to do so.  As City Solicitor, Shea was the "legal adviser and representative of the City" and had "general supervision and direction of the legal business of the City."  Baltimore City Charter, art. VII, § 24(a).  The City Solicitor is tasked with giving "advice and opinions in writing upon any legal questions affecting the interest of the City."  *Id.* § 24(b).  In relation to contracts "involving the interest of the City or to be executed or approved by the Mayor or other officer of the City before they are executed or accepted," the City Solicitor is required to "have endorsed upon them" his "opinion as to their legal sufficiency."  *Id.*

Although the City Solicitor provides legal advice to the City, it is the City's action based on the advice that gives any such decision or action the "authority of state law" for the purpose of

a § 1983 claim. *Classic*, 313 U.S. at 326. Indeed, even if Shea, as City Solicitor, advised the City to cancel the rally, he is not the final decisionmaker. "[D]iscretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy." *Praprotnik*, 485 U.S. at 130. And, "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Praprotnik*, 485 U.S. at 127.

In assessing the allegations made against Shea in the SAC, the Court is not required to "'accept as true allegations that contradict matters properly subject to judicial notice.'" *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)). Nor is it required "to set aside common sense." *Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp. 3d 878, 883 (S.D.W. Va. 2020) (alteration added); *see 15 Oz Fresh & Healthy Food LLC v. Underwriters at Lloyd's London Known as Syndicates AML 2001, WBC 5886, MMX 2010, & SKB 1897*, 521 F. Supp. 3d 1232, 1239 (S.D. Fla. 2021) ("Plaintiff also alleges that its losses are attributable, at least in part, to the 'presence of COVID-19.' Such conclusory allegations are insufficient.") (citation omitted), *aff'd sub nom. 15 Oz Fresh & Healthy Foods LLC v. Underwriters at Lloyd's London*, No. 21-10949, 2022 WL 6595768 (11th Cir. Oct. 11, 2022). It would contradict the powers allotted to Shea by the City Charter to accept as true the allegation of plaintiff that, on his own, Shea cancelled the rally and directed the Mayor's Chief of Staff to instruct SMG to carry out his decision.

The SAC, in combination with the incorporated exhibits, alleges that the final decision to cancel the rally was made by the City. The SAC, through the emails between Shea and SMG, asserts that Shea instructed SMG to cancel the rally *at the direction of the City*. *See* ECF 14-3. This is not sufficient to establish a claim against Shea in his individual capacity. As described, the

unconstitutional conduct at issue is the refusal to allow St. Michael's to hold an event at the Pavilion.  A City official's communication of that decision is not itself the unconstitutional conduct.  That is akin to the proverbial "shooting of the messenger."

Moreover, the instruction to cancel the rally may only form the basis for a First Amendment violation if it was made "under color of state law."  *West*, 487 U.S. at 48.  As noted, a person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *Polk Cnty.*, 454 U.S. at 317–18 (quoting *Classic*, 313 U.S. at 326).  In the emails between Shea and SMG, SMG indicates that it acted under the authority of the City, not Shea, and pursuant to a contractual provision granting rights over the Pavilion to the City, not to the City Solicitor.  And, as discussed, the City Solicitor did not possess the legal authority to cancel the rally without the City's stamp of approval.

Nevertheless, I shall assume, *arguendo*, that St. Michael's has stated a § 1983 claim against Shea in his individual capacity, for violation of its First Amendment rights.  This implicates the matter of qualified immunity.  In a skeletal, two-sentence argument, defendants contend that Shea is entitled to qualified immunity for the claims brought against him under § 1983.  *See* ECF 117-1 at 13–14.[23]

"Qualified immunity bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'"  *Barrett v. PAE Gov't Servs.,*

---

[23] Defendants' threadbare argument is both surprising and inadequate.  "Judges are not like pigs, hunting for truffles buried in briefs.'"  *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 42 F.4th 300, 315 (4th Cir. 2022) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

*Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) (quoting *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 589 (2018)) (cleaned up); *see also Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021); *Humbert v. Mayor & City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016); *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015). In *Owens*, 767 F.3d at 395, the Fourth Circuit reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (Quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

It is well established that the doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see Barrett*, 975 F.3d at 428–29; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 219 (4th Cir. 2018); *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). The cases are legion in support of these principles. *See, e.g.*, *Wesby*, 138 S. Ct. at 589; *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 288 (4th Cir. 2021); *Ray v. Roane*, 948 F.3d 222, 229–30 (4th Cir. 2020); *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019); *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Wilson*, 893 F.3d at 219; *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582–83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d

107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012).

These cases teach that qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *accord Robertson*, 989 F.3d at 288 ("'[I]n gray areas, where the law is unsettled or murky, qualified immunity affords protection to' government officials who take 'action[s] that [are] not clearly forbidden.'") (quoting *Occupy Columbia*, 738 F.3d at 118); *Braun v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (observing that qualified immunity protects government officials from liability for "'bad guesses in gray areas'") (citation omitted).  In other words, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, 571 U.S. 3, 5–6 (2013) (per curiam).

Thus, "even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d at 170).

Conversely, an official is not entitled to qualified immunity if he deprived an individual of a constitutional right, and that right was clearly established at the time of the violation. *Pearson*, 555 U.S. at 231. Put another way, qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law," *Harlow*, 457 U.S. at 818. Therefore, an officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity.

Notably, "a government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818. Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231.

As the Fourth Circuit has explained: "In determining whether defendant government officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question." *Scinto*, 841 F.3d at 235 (citations omitted); *see Cannon v. Village of Bald Head Island, N.C.*, 891 F.3d 489, 497 (4th Cir. 2018). Thus, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional [or statutory] right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see Wesby*, 138 S. Ct. at

589; *Tolan v. Cotton*, 572 U.S. 650, 655 (2014) (per curiam); *Ray*, 948 F.3d at 226; *Owens*, 767 F.3d at 395–96.

If an official is shown to have violated the rights of a plaintiff, the court must then "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct." *Wilson*, 893 F.3d at 219. This is a question of law for the court to resolve. *Ray*, 948 F.3d at 228; *Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir. 1992). The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity, because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id*. at 818–19.

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson*, 483 U.S. at 640). In other words, "'in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* (quoting *Anderson*, 483 U.S. at 640). "The 'salient question' is whether the state of the law at the time of the events in question gave the officials 'fair warning' that their conduct was unconstitutional." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006) (quoting *Hope*, 536 U.S. at 741). Moreover, "existing precedent must have placed the statutory or constitutional question beyond

debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  The Supreme Court has explained that the purpose of this standard is to protect "the balance between indication of constitutional rights and government officials' elective performance of their duties by ensuring that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'"  *Id.* (quoting *Anderson*, 483 U.S. at 639).

The Fourth Circuit recently stated, *Hicks v. Ferreyra*, ___ F.4th ___, 2023 WL 2669648, at *9 (4th Cir. Mar. 29, 2023) (emphasis added):

> The "key inquiry" is not whether a court has "considered identical factual circumstances and held that an officer's conduct violated particular constitutional rights," but whether officers within our jurisdiction have been provided fair warning, *with sufficient specificity*, that their actions would qualify as a deprivation of an individual's rights.  *Betton v. Belue*, 942 F.3d 184, 193-94 (4th Cir. 2019) (citing *Wilson*, 893 F.3d at 221).

In my view, it is clear that, in many respects, this case is not one in which the law is clearly established.  The events giving rise to this action involve an entertainment venue owned by the City and managed by a private entity, situated on a pier in a central downtown area of Baltimore. I have not firmly determined the forum type of the Pavilion because of the complexities, and the parties hotly dispute the issue.  St. Michael's maintains that Pier VI is a designated public forum (ECF 133 at 13), whereas defendants insist that it is a nonpublic forum.  *See* ECF 117-1 at 16.  As this dispute demonstrates, the status of the forum is not plainly "beyond debate," *Ashcroft*, 563 U.S. at 741, and is certainly not "clearly established" in law.  *Hope*, 536 U.S. at 739.  And, the nature of the forum is relevant with respect to its use.

As I stated in my Memorandum Opinion of October 12, 2021 (ECF 45 at 70), the evidence in the preliminary injunction record "point[ed] to the conclusion that plaintiff is likely to succeed on the claim that the City engaged in viewpoint discrimination with respect to plaintiff's political views," based on the inferences of unbridled discretion, use of a heckler's veto, shifting

rationalizations, and invocation of the rally's political rhetoric.  However, I also noted that "it is possible that reasonable, adequately justified limitations . . . would pass legal muster, given the location of the Pavilion in the heart of downtown Baltimore," among other factors.  ECF 45 at 71 n.30.  In other words, the degree to which Shea or the City may restrict access to the Pavilion is not clearly defined—there is a murky divide separating constitutional from unconstitutional restrictions.

That viewpoint discrimination is constitutionally impermissible, regardless of forum, is well established in law.  *See, e.g.*, *Child Evangelism Fellowship of S.C*, 470 F.3d at 1067.  But, in this Circuit, it is not clear that unbridled discretion over a non-public forum or use of a heckler's veto is clearly defined as *per se* viewpoint discrimination.  *See, e.g.*, *Rock for Life–UMBC v. Hrabowski*, 411 F. App'x 541, 554 (4th Cir. 2010) (classifying the heckler's veto as content-based discrimination); *Child Evangelism Fellowship of Md., Inc.*, 457 F.3d at 386–87 ("The unbridled discretion inquiry is 'not [a] static inquir[y], impervious to context'; rather, a court will review a grant of discretion 'in light of the characteristic nature and function of that forum.' . . .  For this reason, even in cases involving nonpublic or limited public forums, a policy . . . that permits officials to deny access for any reason, or that does not provide sufficient criteria to prevent viewpoint discrimination, *generally* will not survive constitutional scrutiny") (quoting *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 94–95 (1st Cir. 2004)) (emphasis added).  Moreover, the ability to impose reasonable, adequately justified limitations leaves room for uncertainty.  *See Vega v. Miller*, 273 F.3d 460, 467 (2d Cir. 2001) (finding that a right was not clearly established where "[t]he authority of educational administrators to take actions 'reasonably related to legitimate pedagogical concerns,' leaves room for uncertainty") (internal citation omitted).

In sum, from Shea's vantage point, it would not have been "sufficiently clear" that his (alleged) decision to cancel the rally contravened plaintiff's First Amendment rights. *Anderson*, 483 U.S. at 640.

To be clear, I am not making any findings of fact, nor am I excusing any actions taken by the City in violation of the First Amendment rights of St. Michael's. Rather, I am attempting to illustrate the uncertainties faced by Shea at the time if, in fact, he "unilaterally" instructed SMG to cancel plaintiff's rally. The contours of the First Amendment are far from crystal clear, such that Shea had "fair warning" that he would have known his conduct was unconstitutional. *See Ridpath*, 447 F.3d at 292. Thus, I rule only that, on the state of the law at the relevant time, Shea "could reasonably believe" that, in cancelling the rally, he was not acting in violation of "clearly established First Amendment" rights. *Id.* It follows that Shea is entitled to qualified immunity with respect to plaintiff's § 1983 claims.

Under both of these approaches, the conclusion is the same: St. Michael's has not stated a claim against Shea in his individual capacity. Accordingly, I shall grant the Motion insofar as it seeks to dismiss Shea as a defendant in this case.[24]

### c.  Mayor Scott, Individually

The Second Amended Complaint mentions Mayor Scott only once, ECF 114, ¶ 6:

Defendant Brandon M. Scott is the Mayor of Baltimore. Mayor Scott oversees the Baltimore Department of Transportation, appointed Defendant Shea to the position

---

[24] Defendants assert, ECF 117-1 at 15, that "if a *Monell* § 1983 claim is limited to municipal entities and personal capacity concerns individuals, it follows that a *Monell* claim cannot lie against a municipal official sued in his independent capacity." *See Devi v. Prince George's Cnty.*, DKC-16-3790, 2017 WL 3592452, at *2 n.3 (D. Md. Aug. 21, 2017) ("Plaintiff cannot state a *Monell* claim against an officer in his individual capacity.").

of City Solicitor, and has authority over Shea in carrying out Shea's duties as City Solicitor.  Mayor Scott is sued in both his official and individual capacities.[25]

As noted, the doctrine of respondeat superior does not apply in § 1983 cases.  *See Love-Lane*, 355 F.3d at 782.  In general, it is insufficient to show that subordinates of a sued official deprived plaintiff of his rights.  *See id.*  If a plaintiff has not alleged any personal connection between a defendant and a denial of constitutional rights, the claim against that defendant must fail.  *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *see also Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (same); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (same).

However, as the Fourth Circuit articulated in *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013), a supervisor may be held liable "for the failings of a subordinate under certain narrow circumstances."  Pursuant to § 1983, liability for supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may

---

25 For reasons unknown to the Court, St. Michael's makes reference to the Baltimore Department of Transportation.  It again invokes that agency when defining the Mayor and City Council of Baltimore, stating, ECF 114, ¶ 4: "The City of Baltimore is authorized under the laws of the State of Maryland to maintain its Department of Transportation, which acts as the City of Baltimore's agent for licensing, permitting, and approval of demonstrations such as rallies."  Additionally, the SAC asserts, *id.* ¶ 5: "Shea . . . has the authority to approve or deny permits . . . for groups of individuals to conduct rallies within Baltimore, using authority granted to him by" the City.  The relevance is not clear.  As St. Michael's itself states in the SAC, *id.* ¶ 45: "[A] permit was not required to hold an event such as the one contemplated by St. Michael's."

In the Motion, ECF 117-1 at 13, defendants contend that, "by Plaintiff's own allegations, they are seeking recovery against" Scott and Shea "based on their alleged authority to 'approve or deny permits' or control the departments that do so."  And, defendants argue that because the SAC does not make any allegation that plaintiff sought a permit from the City, it cannot hold Scott or Shea liable "for a permit that was never requested."  *Id.*  In response, St. Michael's makes the questionable argument that because the word "permit" means "'allowing by tacit consent or by not hindering,'" (ECF 133 at 15 (quoting *State v. Peters*, 112 Ohio St. 249, 147 N.E. 81, 84 (1925))), defendants denied plaintiff a permit by "not allowing" and "prohibiting" the event.

The dispute over permitting is a red herring inserted by St. Michael's and expounded upon by defendants.  By plaintiff's own assertion, ECF 114, ¶ 45, the issue of permits has no role in this dispute.  I address the issue only to highlight that plaintiff's "kitchen-sink" approach has unnecessarily complicated the case.

be a causative factor in the constitutional injuries they inflict on those committed to their care.'"
*Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)); *see Campbell v. Florian*, 972 F.3d 385, 398 (4th Cir. 2020).  This requires a plaintiff to allege, *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994):

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to. . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*See also Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014).

To qualify as "pervasive," a plaintiff must demonstrate that the challenged conduct "is widespread, or at least has been used on several different occasions." *Shaw*, 13 F.3d at 799. Therefore, it is insufficient to point "to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence . . . nor can he reasonably be expected to guard against the deliberate [unlawful] acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Id.* (quoting *Slakan*, 737 F.2d at 373) (alteration inserted).  But, a supervisor's "continued inaction in the face of documented widespread abuses . . . provides an independent basis" for § 1983 liability against that official for his deliberate indifference or acquiescence to "the constitutionally offensive conduct of his subordinates." *Slakan*, 737 F.2d at 373; *see Shaw*, 13 F.3d at 799.

In its Opposition, St. Michael's argues that Scott "knew or must have known what was being done" with the City's instruction to SMG to cancel the rally.   ECF 133 at 30.  Further, it claims that "[h]is response was inadequate—he did nothing to change the decision." *Id.*  However,

this is insufficient to sustain a claim against Mayor Scott individually.  As noted, it is improper to amend a complaint by way of an opposition.  *See Wilson*, 2014 WL 2094039, at *3; *Driggs*, 965 F. Supp. at 748 n.4.

As discussed, a plaintiff must demonstrate that the challenged conduct is "pervasive," meaning that "a single incident or isolated incidents" is insufficient for supervisory liability under § 1983.  *Shaw*, 13 F.3d at 799.  The Second Amended Complaint is devoid of reference to Scott's knowledge of the events culminating in this litigation.  And, the Opposition fails to identify any incident other than the initial cancellation of the rally.  Instead, the Opposition points to the fact that "the City Solicitor's office [is] directly involved with decisions as to how the MECU Pavilion is to be used" and that "[t]he City Solicitor is part of the Baltimore Mayor's office and Shea was appointed directly by Mayor Scott."  ECF 133 at 31.  But, this alone is insufficient to demonstrate that Scott had actual or constructive knowledge of Shea's alleged conduct.

Further, I am not persuaded by plaintiff's contention that "[d]iscovery will be necessary to learn the full extent of Mayor Scott's knowledge."  *Id.*  "Permitting plaintiffs to use discovery as a fishing expedition undermines the principle that only portions of a complaint which satisfy a plausibility standard, *i.e.*, more than possible and less than probable, should 'unlock the doors of discovery.'"  *Dudek v. Nassau Cnty. Sheriff's Dep't*, 991 F. Supp. 2d 402, 414 (E.D.N.Y. 2013) (quoting *Iqbal*, 556 U.S. at 678–79).

The Supreme Court explained in *Iqbal*, 556 U.S. at 677, that "a supervisor's mere knowledge" that his subordinates have engaged in unconstitutional conduct is insufficient to give rise to liability; instead, a supervisor is only liable for his "own misconduct."  The *Iqbal* Court also "explained that in order to state a claim for supervisory liability, 'a plaintiff must plead that *each* [supervisory] defendant, through the official's *own individual actions,* has violated the

Constitution.'" *Evans v. Chalmers*, 703 F.3d 636, 660–61 (4th Cir. 2012) (Wilkinson, J.,

concurring) (emphasis and alteration in *Evans*) (quoting *Iqbal*, 556 U.S. at 676).

Here, the Second Amended Complaint fails to point to any action or inaction by Mayor

Scott.  Accordingly, I shall dismiss Counts I through IV against Mayor Scott in his individual

capacity.

### 3.  SMG

SMG, a private entity, manages the City-owned Pavilion, pursuant to a contract with the

City.  ECF 114, ¶¶ 7, 47; *see* ECF 117-1 at 28 ("SMG is a commercial entity that is in a contract

with the Mayor and City Council of Baltimore to manage the Pier VI, a City owned property.").

St. Michael's pursues claims against SMG "as a *de facto* government actor under 42 U.S.C. §

1983," (ECF 114, ¶ 7), and alleges that SMG: (1) "acts as a party to whom Baltimore has delegated

its constitutional authority" (*id.* ¶ 48); (2) "acted jointly with the City to deprive St. Michael's of

its First Amendment rights" (*id.* ¶ 49); and (3) "acted under the control of Baltimore as an agent

to deprive St. Michael's of its First Amendment rights."  *Id.* ¶ 50.

As discussed, to state a claim under § 1983, a plaintiff must allege that a constitutional

violation was committed "by a person acting under the color of state law."  *West*, 487 U.S. at 48.

In other words, the alleged violation must have been caused by a "state actor."  *Flanagan v. Anne

Arundel Cnty.*, 593 F. Supp. 2d 803, 809 (D. Md. 2009) (citing *West*, 487 U.S. at 48).  To satisfy

the state action requirement, a plaintiff must demonstrate that the alleged unconstitutional conduct

is "fairly attributable to the State."  *Lugar*, 457 U.S. at 937.  If a defendant is not itself a state actor,

it must have a "sufficiently close relationship with state actors such that a court would conclude

that the non-state actor is engaged in the state's actions." *DeBauche v. Trani*, 191 F.3d 499, 506

(4th Cir. 1999).

The Supreme Court explained in *Manhattan Cmty. Access Corp. v. Halleck*, ___ U.S. ___, 139 S. Ct. 1921, 1928 (2019):

> [A] private entity can qualify as a state actor in a few limited circumstances— including, for example, (i) when the private entity performs a traditional, exclusive public function, *see, e.g.*, *Jackson* [*v. Metro. Edison Co.*, 419 U.S. 345, 352–54 (1974)]; (ii) when the government compels the private entity to take a particular action, *see, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 1004–1005, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); or (iii) when the government acts jointly with the private entity, *see, e.g.*, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–942, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

And, within the first category, the Court noted that it "has recognized that a private entity may, under certain circumstances, be deemed a state actor when the government has outsourced one of its constitutional obligations to a private entity." *Id.* at 1929 n.1.  St. Michael's pursues all three theories of liability.  *See* ECF 114, ¶¶ 48–50.

"Alongside the constitutional state-action limitation, § 1983 contains a distinct color-of-law requirement." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 189–90 (4th Cir. 2022) (citing *West*, 487 U.S. at 48).  A private corporation acts under color of state law when it exercises power "'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Id.* (quoting *West*, 487 U.S. at 49).

In *White Coat Waste Project*, 35 F.4th at 190, the Fourth Circuit explained:

> While the constitutional state-action and statutory color-of-law requirements are technically distinct, courts treat them "as the same thing." *United States v. Price*, 383 U.S. 787, 794 n.7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).  "The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question" as the state-action inquiry: "is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).  Often, that means asking whether there is a "close nexus" between the government and the conduct being challenged.  *See Brentwood Acad.*, 531 U.S. at 295, 121 S.Ct. 924 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).

The recent case of *Peltier v. Charter Day School, Inc.*, 37 F.4th 104 (4th Cir. 2022) (en banc), *petition for cert. docketed* Sep. 14, 2022, is instructive.  There, the plaintiffs challenged the

requirement imposed by Charter Day School, Inc. ("CDS"), a nonprofit charter school operator, that female students must wear skirts to school.  They brought § 1983 claims against CDS and Roger Bacon Academy, Inc. ("RBA"), a management contractor responsible for the day-to-day operations of CDS, for violation of the Equal Protection Clause of the Fourteenth Amendment.  *Id.* at 112.  The Court explained, *id.* at 116 (internal citations omitted) (alteration in *Peltier*):

> The common foundation underlying these various and sometimes overlapping circumstances is that (1) there is no bright-line rule separating state action from private action, and that (2) the inquiry is highly fact-specific in nature. In other words, the state action analysis "lack[s] rigid simplicity" and, thus, a "range of circumstances" can support a finding of state action.  We therefore consider the totality of the circumstances of the relationship between the private actor and the state to determine whether the action in question fairly is attributable to the state.

The Court found that CDS was a state actor because North Carolina delegated to the school operator the "state constitutional duty to provide free, universal elementary and secondary education."  *Id.* at 118.  In contrast, the Court found that RBA was not a state actor.  It reasoned, *id.* at 124:

> North Carolina has not chosen to delegate its constitutional duty to provide free, universal elementary and secondary education to for-profit management companies like RBA.  To the contrary, RBA has no direct relationship with the state and is not a party to the charter agreement between CDS and North Carolina.  Instead, RBA manages the daily functioning of the school under its management agreement with CDS.  In working for CDS, rather than for the state of North Carolina, RBA's actions are more attenuated from the state than those of CDS, the entity authorized by the state to operate one of its public schools.  We therefore conclude that RBA's actions implementing the skirts requirement are not "fairly attributable" to the state.

The Supreme Court has held that private action is fairly attributable to the state "when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]."  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  Here, the Second Amended Complaint expressly asserts that SMG was "forced" by the City to cancel the rally and that it acted pursuant to City orders.  *See* ECF 114,

¶ 25.  Thus, St. Michael's has sufficiently alleged that SMG's act of canceling the rally was "fairly attributable" to the City.  *Rendell-Baker v. Kohn*, 457 U.S. at 838.

Accordingly, I shall deny the Motion insofar as it seeks to dismiss the § 1983 claims against SMG.

### E.  Contract Claims

St. Michael's asserts three claims alleging violations of Maryland contract law: breach of contract, against SMG (Count V) (ECF 114, ¶¶ 153–72); promissory estoppel, against SMG (Count VI) (*id.* ¶¶ 173–80); and tortious interference with contractual relations, against the City Defendants (Count VII).  *Id.* ¶¶ 181–86.  The parties do not dispute that Maryland law applies to the contract claims.

### a.  Breach of Contract

The Second Amended Complaint asserts that St. Michael's entered into a valid contract with SMG for use of the Pavilion on November 16, 2021.  ECF 114, ¶ 154.  Further, plaintiff claims that SMG breached this contract when, on August 5, 2021, it "abruptly informed St. Michael's that it would not be allowed to hold its rally at the MECU Pavilion."  *Id.* ¶ 161.

Defendants seek to dismiss this claim.  They argue that "no contact [sic] existed between Plaintiff and SMG" at that time, because negotiations between the parties were ongoing at the time SMG informed plaintiff that the event was cancelled.  ECF 117-1 at 31.[26]

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1 (4th ed. 1990) ("Williston on Contracts");

---

[26] Defendants acknowledge that, on November 4, 2021, after issuance of the preliminary injunction, SMG and plaintiffs entered into a contract.  ECF 117-1 at 31.

*accord* RESTATEMENT (SECOND) CONTRACTS § 1 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421–22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006).

In Maryland, "a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing'" the existence of a contractual obligation as a threshold matter. *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012) (emphasis in original) (citation omitted).

"'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cnty. Comm'rs for Carroll Cnty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's Cnty. v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Thus, mutual assent is an integral component of every contract. *See, e.g.*, *Joseph Saveri L. Firm Inc. v. Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

In determining whether there is an enforceable contract, courts in Maryland begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc*., 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'") (citations omitted). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

The Maryland Court of Appeals[27] has enumerated "several factors that may be helpful in determining whether the parties have manifested an intention to be bound." *Id.* at 15, 919 A.2d at 708. These include the language of the preliminary agreement; the existence of open terms; whether partial performance has occurred; the context of the negotiations; the custom of such transactions, such as whether a standard form contract is widely used in similar transactions; whether the agreement has few or many details; whether the amount involved is large or small; and whether it is a common or unusual contract. *Id.* at 15–16, 919 A.2d at 708–09.

Defendants point to the lack of a signed contract to assert that no valid contract existed. ECF 117-1 at 32–33. However, parties may enter into a written contract, even without signatures, or enter into a contract that is not written, if they intend as much and the terms are adequately agreed upon. *Cochran*, 398 Md. at 14–21, 919 A.2d at 708–13; *Peoples Drug Stores v. Fenton Realty Corp.*, 191 Md. 489, 493, 62 A.2d 273, 275 (1948). But, of relevance here, "if the parties contemplate that an agreement between them shall be reduced to writing before it shall become binding and complete, there is no contract until the writing is signed.'" *Cochran*, 398 Md. at 18, 919 A.2d at 711 (quoting *Eastover Stores, Inc. v. Minnix*, 219 Md. 658, 665, 150 A.2d 884, 888 (1959)) (alteration added). In other words, "[i]f the parties do not intend to be bound until a final agreement is executed, there is no contract." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

---

[27] In Maryland's general election of November 2022, the voters of Maryland approved a constitutional amendment to change the name of the State's highest court, the Maryland Court of Appeals, to the Supreme Court of Maryland. And, the voters also approved changing the name of the Maryland Court of Special Appeals, the State's intermediate appellate court, to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland (Dec. 14, 2022), https://www.courts.state.md.us/media/news/2022/pr20221214#:~:text=Effective%20immediately %2C%20the%20Court%20of,the%20Appellate%20Court%20of%20Maryland. However, to avoid confusion, I will refer to the Maryland courts by the names that were in effect when the cited cases were decided.

As stated in *Peoples Drug Stores*, 191 Md. at 493, 62 A.2d at 275:

> [P]arties can make the completion of their contract depend upon the execution of a written instrument.  The question whether the parties negotiating a contract intended to be bound by their oral agreement but contemplated a written instrument merely as evidence of their agreement, or whether they did not intend to bind themselves until a contract was prepared and signed by them, must be decided from the facts and circumstances in each particular case.

But, the SAC is devoid of facts that, if proven, would support the conclusion that a contract existed between SMG and St. Michael's as of the time of cancellation.  ECF 114, ¶ 15.  The exhibits that are integral to the suit and incorporated by reference illuminate the parties' expectation for an executed, written agreement.[28]  The emails and the draft contract reflect that an agreement to rent the Pavilion was to be reduced to writing and signed by the parties before the agreement would become "binding and complete."  *Cochran*, 398 Md. at 18, 919 A.2d at 711.

On July 14, 2021, SMG emailed St. Michael's requesting that it "sign and return" an attached contract "for execution."  ECF 14-2 at 30.  Carmen Allard, a St. Michael's representative, responded the next day that she was "still reading the contract" and indicated that the name of the organization contained errors that needed amending.  *Id.* at 28–29.  Theresa Waters, a representative of SMG, responded that she would make the changes and return the amended contract, to which Allard replied: "I'll look forward to the corrected Contract."  *Id.* at 27.  And, on August 2, 2021, Waters resolved outstanding questions related to the contract, stating her intent to "try and finish the contract."  *Id.* at 17.  The next communication provided to the Court is the email of August 5, 2021, from Waters to Allard, informing Allard that SMG was no longer able to host the rally at the Pavilion, "per [SMG's] contract with the City."  *Id.* at 22.

---

[28] As discussed at length, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper."  *Goines*, 822 F. 3d at 167.

These communications, on which plaintiff relies, show that the agreement would not become binding and complete until the contract was presented, signed, executed, and delivered. That did not occur as of the time of cancellation on August 5, 2021. Therefore, St. Michael's has not sufficiently alleged the existence of a valid and enforceable contract. Accordingly, I need not analyze the issue of breach regarding the cancellation on August 5, 2021.

St. Michael's also alleges breach of an agreement it asserts was finalized on September 16, 2021. St. Michael's states that SMG sent to it a final version of the contract on this date, "which St. Michael's signed without any changes" and "sent a signed version back to SMG the same day." ECF 114, ¶ 163. But, again, the emails between Waters and Allard are relevant, and expand upon the allegations made in the SAC.

Upon sending Allard a revised contract, Waters stated that, after signing the contract, St. Michael's needed to return the contract to Waters "for final signature." ECF 19-2 at 5. And, Allard replied that she would "look forward to receiving the countersigned copy." *Id.* at 3. As noted, "if the parties contemplate that an agreement between them shall be reduced to writing before it shall become binding and complete, there is no contract until the writing is signed.'" *Cochran*, 398 Md. at 18, 919 A.2d at 711. St. Michael's does not allege that SMG countersigned the contract. Thus, the SAC does not allege the existence of a valid contract between SMG and St. Michael's as of September 16, 2021.

Again, St. Michael's has not sufficiently alleged the existence of a valid and enforceable contract as of September 16, 2021. Therefore, I need not analyze the issue of breach. And, for the same reason, St. Michael's has failed to state a claim for breach of contract.

Accordingly, I shall dismiss Count V of the Second Amended Complaint.

### b.  Promissory Estoppel

In the alternative, Count VI of the Second Amended Complaint lodges a claim of "promissory estoppel" against SMG.  ECF 114, ¶¶ 173–80.  Defendants contend that the claim is subject to dismissal because the emails between SMG and St. Michael's demonstrate that there was no clear and definite promise, but rather "only active negotiations between arms-length parties."  ECF 117-1 at 32.  In addition, defendants argue that plaintiff concedes that there was only one agreed upon term, the amount of liability insurance for the event, and that plaintiff has not identified "any forbearance related to the insurance assessment."  *Id.*

The elements of a promissory estoppel claim in Maryland were established in the touchstone case of *Pavel Enterprises, Inc. v. A.S. Johnson Co.*, 342 Md. 143, 166, 674 A.2d 521, 532 (1996): (1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise.  *Accord Citiroof Corp. v. Tech Contracting Co.*, 159 Md. App. 578, 589, 860 A.2d 425, 432 (2004); *Konover Prop. Trust, Inc. v. WHE Assocs.*, 142 Md. App. 476, 484, 790 A.2d 720, 724 (2002).

In Maryland, promissory estoppel is, in essence, "an alternative means of obtaining contractual relief."  *Md. Transp. Auth. Police Lodge No. 34 of Fraternal Order of Police v. Md. Transp. Auth.*, 195 Md. App. 124, 215, 5 A.3d 1174, 1227 (2010), *rev'd in part on other grounds*, 420 Md. 141, 21 A.3d 1098 (2011); *see also Pavel Enters.*, 342 Md. at 169, 674 A.2d at 534 ("[T]here are different ways to prove that a contractual relationship exists . . . .  Traditional bilateral contract theory is one.  Detrimental reliance [a.k.a. promissory estoppel] can be another."); *accord Suburban Hosp., Inc. v. Sampson*, 807 F. Supp. 31, 33 (D. Md. 1992) (applying Maryland law and

stating that "the nature of a lawsuit in which promissory estoppel is invoked remains that of an action to enforce a contract"). Thus, promissory estoppel is "a device for contractual recovery, when an element of a traditional bilateral contract is lacking." *Md. Transp. Auth. Police Lodge*, 195 Md. App. at 218, 5 A.3d at 1229. The detrimental reliance of the promisee serves as a substitute for the missing contractual element, such as acceptance or consideration. *See id.* at 213–15, 5 A.3d at 1226–27 (reviewing cases).

Promissory estoppel has been characterized as a "quasi-contract claim[ ]." *Ver Brycke v. Ver Brycke*, 379 Md. 669, 693 n.9, 843 A.2d 758, 772 n.9 (2004). The *Ver Brycke* Court further noted, *id.* (quoting *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 96, 747 A.2d 600, 607 (2000)): "'The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests.'"

The Second Amended Complaint states a claim for promissory estoppel.[29] It alleges that, based on SMG's acceptance of the deposit to reserve November 16, 2021 for the rally, in addition to plaintiff's prior experience hosting a rally at the Pavilion and the weeks it "spent communicating with SMG regarding the logistics of conducting the rally" (ECF 114, ¶¶ 13, 14), St. Michael's reasonably relied on a "clear and definite promise that [it] would be allowed to use the MECU Pavilion for the prayer rally on November 16, 2021." *Id.* ¶ 174. Further, the SAC asserts that SMG was aware that St. Michael's had begun "making arrangements with third-party vendors" for the rally. *Id.* ¶¶ 179–80. In addition, the SAC states that, based on the understanding that an

---

[29] The SAC states: "SMG made a clear and definite promise that St. Michael's would be allowed to use the MECU Pavilion for a prayer rally on November 16, 2021 on the terms agreed upon by the parties." ECF 114, ¶ 174. But, St. Michael's does not clarify the point in time to which it is referring. As discussed above, St. Michael's asserts that the parties reached an agreement at some point before August 5, 2021, and again on September 16, 2021.

agreement had been reached as to all material terms, and that a contract had been formed, St. Michael's "began publicly promoting the rally, resulting in thousands of reservations and the booking of over a dozen speakers" (*id.* ¶ 14), and that as a result of SMG's refusal to honor this agreement, St. Michael's "suffered considerable damages . . . including added expenses of trying to coordinate the logistics of the rally on very short notice, increased travel expenses, a reduction in the size of the event, and reputational harm." *Id.* ¶ 172.   Thus, the SAC alleges the facts necessary to support a claim for promissory estoppel.

Accordingly, I shall deny the Motion as to Count VI.

### c. Tortious Interference with Contractual Relations

In Count VII of the Second Amended Complaint, St. Michael's asserts a claim against the City Defendants for tortious interference with contractual relations.  ECF 114, ¶¶ 181–86.  The SAC states that "a contract existed between SMG and St. Michael's" as of "mid-July 2021" (*id.* ¶ 182), and that the City Defendants "engaged in intentional and improper conduct to induce SMG to breach its contract with St. Michael's or otherwise render it impossible for SMG to perform under the contract." *Id.* ¶ 184.

The tort "has five elements: (1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff." *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 466, 598 A.2d 794, 802 (1991).

I have determined that no contract existed between St. Michael's and SMG "as of mid-July." ECF 114, ¶ 182.  Therefore, St. Michael's fails to state a claim for tortious interference.

Accordingly, I shall dismiss Count VII.

### F.  Punitive Damages

In the Prayer for Relief, St. Michael's states that it seeks, *inter alia*, "[p]unitive damages in an amount to be determined at trial."  ECF 114 at Prayer for Relief, ¶ D.  Defendants urge the Court to reject the request, for two reasons: (1) municipalities and their officials are immune from actions for punitive damages under § 1983 in the absence of malice, which plaintiff has not alleged; and (2) Maryland law does not permit recovery of punitive damages for contract claims.  ECF 117-1 at 33–34.

In the Opposition, plaintiff clarifies that it is not seeking punitive damages as to the breach of contract or promissory estoppel claims.  ECF 133 at 37 n.20.  But, it states that the facts in the SAC demonstrate "callous indifference and evil intent" concerning plaintiff's First Amendment rights, and second that Maryland law permits punitive damages for tortious interference claims where there is "evil motive, intent to injure, and ill will."  *Id.* at 37–38.

Although the request in the SAC does not differentiate the claims for which St. Michael's seeks punitive damages, I shall construe the punitive damages request in accordance with the clarification in the Opposition.  However, because I shall dismiss the tortious interference claim, I need not analyze the propriety of the punitive damages request as to that claim.

It is well established that "a municipality is immune from liability for punitive damages under 42 U.S.C. § 1983."  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  And, because I have determined that the SAC does not allege that the City Officials personally violated plaintiff's First Amendment rights, I need not assess their liability for this claim.  Thus, SMG is the only party from whom punitive damages could be sought.

Punitive damages are available for claims under § 1983 "to punish defendants who act with a malicious intent to deprive plaintiffs of their rights or to do them injury . . . or with reckless or

callous indifference to the federally protected rights." *Piver v. Pender Cnty. Bd. of Educ.*, 835 F.2d 1076, 1082 (4th Cir. 1987) (first citing *Carey v. Piphus*, 435 U.S. 247, 257 n.11 (1978), then citing *Smith v. Wade*, 461 U.S. 30, 51 (1983)). But, the SAC contains no facts remotely suggesting that SMG acted with malicious intent or callous indifference. And, in the Opposition, St. Michael's makes no argument as to whether SMG acted maliciously or with reckless or callous indifference to its First Amendment rights. Indeed, the SAC is replete with allegations that SMG was "forced" by the City to cancel the rally. *See* ECF 114, ¶¶ 22, 25, 43, 50, 52, 54.

As the Supreme Court articulated in *Wade*, 461 U.S. at 54–55:

> Punitive damages are awarded . . . "to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future." Restatement (Second) of Torts § 908(1) (1977). The focus is on the character of the tortfeasor's conduct—whether it is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards. If it is of such a character, then it is appropriate to allow a jury to assess punitive damages . . . . To put it differently, society has an interest in deterring and punishing all intentional or reckless invasions of the rights of others, even though it sometimes chooses not to impose any liability for lesser degrees of fault.

Under Maryland law, regardless of the theory of recovery, "punitive damages cannot be recovered absent malice." *Saval v. BL Ltd.*, 710 F.2d 1027, 1033 (4th Cir. 1983). Moreover, punitive damages "cannot be awarded in a pure breach of contract case." *Sims v. Ryland Group, Inc.*, 37 Md. App. 470, 475, 378 A.2d 1, 4 (1977); *see also Biktasheva v. Red Square Sports, Inc*., 366 F. Supp. 2d 289, 295 (D. Md. 2005); *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 545, 515 A.2d 756, 765 (1986).

The term "actual malice" refers to "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill will or fraud . . . ." *Montgomery Ward v. Wilson*, 339 Md. 701, 729 n.5, 664 A.2d 916, 930 n.5 (1995); *see also Biktasheva*, 366 F. Supp. 2d at 296 ("Actual malice 'has been characterized as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being

to deliberately and willfully injure the plaintiff.'") (internal citation omitted); *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 264, 841 A.2d 828, 837 (2004) ("Maryland courts have defined 'actual malice' as 'conduct of the defendant characterized by evil motive, intent to injure, ill will, or fraud.'") (internal citation omitted).

"What is needed to support an award of punitive damages is conscious and deliberate wrongdoing." *Hoffman v. Stamper*, 385 Md. 1, 42, 867 A.2d 276, 301 (2005). Thus, "[n]egligence or misjudgment, 'however gross,' does not satisfy the knowledge element." *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188, 193 (1998); *see Al-Sabah v. Agbodjogbe*, SAG-17-730, 2020 WL 1307388, at *2 (D. Md. Mar. 19, 2020); *see also Darcars*, 378 Md. at 264, 841 A.2d at 837 (noting that "'negligence alone, no matter how gross, wanton, or outrageous, will not satisfy [the] standard [of actual malice]'") (internal citation omitted) (alteration in *Darcars*).

If a plaintiff fails to properly state a request for punitive damages, the court may strike the request. *See, e.g.*, *Mitchell v. Lydall, Inc.*, 1994 WL 38703, at *4 (4th Cir. Feb. 10, 1994) (per curiam); *Hanson v. Hanson*, GLR-19-2214, 2020 WL 4734313, at *3 (D. Md. Aug. 14, 2020). There are no factual allegations in the SAC that, if proven, would support a finding that SMG maliciously, callously, or recklessly invaded plaintiff's First Amendment rights. Moreover, because St. Michael's alleges that it was the City, rather than SMG, that made the decision to cancel the rally, the imposition of punitive damages on SMG would not serve the purpose of deterrence or punishment.

In sum, St. Michael's has not alleged facts to support an award of punitive damages. Accordingly, I shall grant the Motion as to plaintiff's request for punitive damages.

## IV.      Conclusion

Plaintiff's case may proceed as against the City and SMG, but may not proceed against Scott or Shea in their individual or official capacities.  In addition, the case may proceed as to plaintiff's First Amendment Free Speech and Free Assembly claims, brought pursuant to 42 U.S.C. § 1983.  However, St. Michael's has failed to state a claim for violations of the Free Exercise Clause and the Establishment Clause of the First Amendment.  Further, the Second Amended Complaint sufficiently alleges a claim for promissory estoppel against SMG, but fails to state a claim for breach of contract, tortious interference against the City Defendants, or for punitive damages.

For the foregoing reasons, I shall grant the Motion in part and deny the Motion in part.

An Order follows, consistent with this Memorandum Opinion.


Date: March 31, 2023                           _____/s/_____
                                               Ellen L. Hollander
                                               United States District Judge

-80-